# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

**WORLD TRADE CENTER PROPERTIES LLC; 1 WORLD TRADE CENTER LLC; 2 WORLD TRADE CENTER LLC; 4 WORLD TRADE CENTER LLC; 5 WORLD TRADE CENTER LLC; SILVERSTEIN WTC MGMT. CO. LLC; 7 WORLD TRADE COMPANY L.P.,**

**Plaintiffs,**

**vs.**

**AL BARAKA INVESTMENT AND DEVELOPMENT CORPORATION,** a/k/a AL BARAKA BANK, a/k/a DALLAH ALBARAKA GROUP, LLC (D1)

**NATIONAL COMMERCIAL BANK** (D2)

**FAISAL ISLAMIC BANK – SUDAN** (D3)

**AL RAJHI BANKING AND INVESTMENT,** a/k/a AL RAJHI BANK (D4)

**AL BARAKAAT EXCHANGE LLC,** a/k/a AL-BARAKAAT BANK (D5)

**AL SHAMAL ISLAMIC BANK,** a/k/a SHAMEL BANK, a/k/a BANK EL SHAMAR (D7)

**TADAMON ISLAMIC BANK** (D8)

**INTERNATIONAL ISLAMIC RELIEF ORGANIZATION,** a/k/a ISLAMIC RELIEF ORGANIZATION, a/k/a INTERNATIONAL RELIEF ORGANIZATION, a/k/a SUCCESS FOUNDATION (D9)

**SUCCESS FOUNDATION, INC.** (D10)

**MOHAMED S. OMEISH** (D11)

**ABDURAHMAN ALAMOUDI** (D12)

**SULAIMAN AL-ALI** (D14)

**TAREQ M. AL-SWAIDAN** (D16)

**CIVIL ACTION NUMBER:** 04-7280 (RCC)

**COMPLAINT**

**JURY TRIAL DEMANDED**

RECEIVED
04 SEP 10 PM 9:48
U.S. DISTRICT COURT SDNY

**M. YAQUB MIRZA** (D19)

**SANABEL AL KHEER, INC.,** a/k/a THE SANA-BELL, INC., a/k/a SANABEL AL KHAIR, a/k/a SANABIL AL-KHAIR (D20)

**MUSLIM WORLD LEAGUE,** a/k/a RABITA AL-ALAM AL-ISLAMI, a/k/a ISLAMIC WORLD LEAGUE (D21)

**MUSLIM WORLD LEAGUE OFFICES** (D22)

**ABDULLAH BIN SALEH AL-OBAID** (D23)

**HASSAN A.A. BAHAFZALLAH** (D24)

**YAQUB M. MIRZA** (D25)

**SAAR FOUNDATION,** a/k/a SAAR NETWORK (D26)

**ABU SULAYMAN** (D27)

**AHMED TOTONJI** (D28)

**HISHAM AL-TALIB** (D29)

**IQBAL YUNUS** (D30)

**M. OMAR ASHRAF** (D32)

**MOHAMMED JAGHLIT** (D33)

**MUHAMMAD ASHRAF** (D34)

**TAHA JABER AL-ALWANI** (D35)

**TARIK HAMDI** (D36)

**YAQUB MIRZA** (D37)

**SHERIF SEDKY** (D38)

**AFRICAN MUSLIM AGENCY** (D39)

**ARADI, INC.** (D40)

**GROVE CORPORATE, INC.** (D41)

**HERITAGE EDUCATION TRUST** (D42)

**INTERNATIONAL INSTITUTE OF ISLAMIC THOUGHT** (D43)

**MAR-JAC INVESTMENTS, INC.** (D44)

**MAR-JAC POULTRY, INC.** (D45)

**MENA CORPORATION** (D46)

**RESTON INVESTMENTS, INC.** (D47)

**SAAR INTERNATIONAL** (D48)

**SAFA TRUST** (D49)

**STERLING CHARITABLE GIFT FUND** (D50)

**STERLING MANAGEMENT GROUP, INC.** (D51)

**YORK FOUNDATION** (D52)

**RABITA TRUST** (D53)

**AL-HARAMAIN ISLAMIC FOUNDATION, INC.,** a/k/a AL-HARAMAIN ISLAMIC FOUNDATION, a/k/a ISLAMIC AL-HARAMAIN (D54)

**AL HARAMAIN FOUNDATION** (D55)

**AL HARAMAIN ISLAMIC FOUNDATION, INC.** (D56)

**AQEEL ABDUL-AZEEL AL-AQEEL** (D57)

**MANSOUR AL-KADI** (D58)

**SOLIMAN H.S. AL-BUTHE** (D59)

**PEROUZ SEDA GHATY** (D60)

**BENEVOLENCE INTERNATIONAL FOUNDATION,** a/k/a AL BIR AL DAWALIA, a/k/a AL BIR SOCIETY ORGANIZATION (D61)

**BENEVOLENCE INTERNATIONAL FOUNDATION – USA** (D62)

**BENEVOLENCE INTERNATIONAL FOUNDATION – CANADA** (D63)

**SYED SULEMAN AHMER** (D64)

**ENAAM MAHMOUD ARNAOUT,** a/k/a ABDEL SAMIA, a/k/a ABU MAHMOUD, a/k/a ABU MAHMOUD AL SURI, a/k/a ABU MAHMOUD AL HAMAWI (D65)

**MAZIN M.H. BAHARETH** (D66)

**SHAHIR ABDULRAOOF BATTERJEE** (D67)

**MUZAFFAR KHAN** (D69)

**JAMAL NYRABEH** (D71)

**WORLD ASSEMBLY OF MUSLIM YOUTH,** a/k/a WAMY INTERNATIONAL, INC., a/k/a WORLD ASSOCIATION FOR MUSLIM YOUTH (D72)

**THE GLOBAL RELIEF FOUNDATION,** a/k/a GRF, a/k/a FONDATION SECOURS MONDIAL, a/k/a AL-NAJDA (D76)

**ABDULLAH BIN LADEN** (D77)

**OSAMA BIN LADEN,** a/k/a ABU ABDALLAH (D78)

**TAREK M. BIN LADEN** (D79)

**SAUDI BIN LADEN GROUP,** a/k/a BIN LADEN CORPORATION (D80)

**KHALID BIN SALIM BIN MAHFOUZ** (D81)

**ABDULRAHMAN BIN KHALID BIN MAHFOUZ** (D82)

**SALEH ABDULLAH KAMEL** (D83)

**MOHAMMED AL FAISAL AL SAUD** (D84)

**TURKI AL FAISAL AL SAUD** (D85)

**SULTAN BIN ABDUL AZIZ AL SAUD** (D86)

**SULAIMAN BIN ABDUL AZIZ AL RAJHI** (D87)

**SALEH ABDUL AZIZ AL RAJHI** (D88)

**ABDULLAH SULAIMAN AL-RAJHI** (D89)

**KHALID SULAIMAN AL-RAJHI** (D90)

**YASSIN ABDULLAH AL KADI** (D91)

**MOHAMMAD JAMAL AL KHALIFA** a/k/a ABU BARAA (D92)

**ADEL ABDUL JALIL BATTERJEE,** a/k/a ABU SULAFA (D93)

**AQUEEL AL-AQUEEL** (D94)

**WA'EL HAMZA JALAIDAN,** a/k/a ABU AL-HASSEN AL-MADANI (D96)

**ABDULLAH OMAR NASEEF** (D97)

**THE REPUBLIC OF SUDAN** (D98)

**THE REPUBLIC OF SUDAN MINISTRY OF INTERIOR** (D99)

**THE REPUBLIC OF SUDAN MINISTRY OF DEFENSE** (D100)

**ARAB BANK, PLC** (D103)

**DUBAI ISLAMIC BANK** (D104)

**BANK AL-TAQWA LIMITED** (D105)

**AL TAQWA TRADE, PROPERTY AND INDUSTRY COMPANY LIMITED** (D106)

**AKIDA BANK PRIVATE LIMITED** (D107)

**AKIDA INVESTMENT CO. LTD.** (D108) )
**ASAT TRUST REG.** (D109) )
)
**BA TAQWA FOR COMMERCE AND** )
**REAL ESTATE COMPANY LIMITED** )
(D110) )
)
**GULF CENTER S.R.L.** (D111) )
)
**MIGA-MALAYSIAN SWISS** (D112) )
)
**GULD AND AFRICAN CHAMBER** )
(D113) )
)
**NADA INTERNATIONAL ANSTALT** )
(D114) )
)
**NADA MANAGEMENT** )
**ORGANIZATION SA** (D115) )
)
**NASCO BUSINESS RESIDENCE** )
**CENTER SAS DI NASREDDIN AHMED** )
**IDRIS EC** (D116) )
)
**NASCO NASREDDIN HOLDING A.S.** )
(D117) )
)
**NASCOSERVICE S.R.L.** (D118) )
)
**NASCOTEX S.A.** (D119) )
)
**NASREDDIN COMPANY NASCO SAS** )
**DI AHMED IDRIS NASREDDIN EC** )
(D120) )
)
**NASREDDIN FOUNDATION** (D121) )
)
**NASREDDIN GROUP** )
**INTERNATIONAL HOLDING** )
**LIMITED** (D122) )
)
**NASREDDIN INTERNATIONAL** )
**GROUP LIMITED HOLDING** (D123) )
)
**YOUSSEF M. NADA & CO.** (D124) )
)
**AHMED IDRIS NASREDDIN** (D125) )
)
**YOUSSEF M. NADA** (D126) )
)

**SAUDI AMERICAN BANK (SAMBA)** (D127)

**TAIBAH INTERNATIONAL AID ASSOCIATION** (D128)

**MERCY INTERNATIONAL RELIEF AGENCY (MIRA),** a/k/a MERCY INTERNATIONAL, a/k/a MERCY (D129)

**ARY GROUP** (D130)

**GLOBAL DIAMOND RESOURCES** (D131)

**ISLAMIC CULTURAL CENTER OF MILAN,** a/k/a CENTRO CULTURAL ISLAMICO DE MILANO, a/k/a ISLAMIC CULTURAL INSTITUTE OF MILAN, a/k/a ISTITUTO CULTURALE ISLAMICO DE MILANO (D132)

**ISLAMIC CULTURAL CENTER OF GENEVA** (D133)

**HANI RAMADAN** (D134)

**THE ADVICE AND REFORMATION COMMITTEE (ARC)** (D135)

**THE COMMITTEE FOR THE DEFENSE OF LEGITIMATE RIGHTS (CDLR)** (D136)

**GHASOUB AL ABRASH** (D147)

**KHALID SHEIK MOHAMMED** (D148)

**RAMZI BINALSHIBH** (D149)

**MUSTAF AHMED AL-HISAWI,** a/k/a SHEIK SAEED (D150)

**IMAD EDDIN BARAKAT YARKAS,** a/k/a ABU DAHDAH (D151)

**MUHAMMED GALEB KALAJE ZOUAYDI,** a/k/a ABU TALHA (D152)

**BASSAM DALATI SATUT** (D153)

**ABDALRAHMAN ALARNAOT ABU ALJER,** a/k/a ABU OBED (D154)

**MOHAMMAD KHAIR AL SAQQA,** a/k/a ABU AL DARDA (D155) )

**GHASOUB AL ABRASH GHALYOUN,** a/k/a ABU MUSAB (D156) )

**MOHAMMED ALI SAYED MUSHAYT** (D157) )

**ABDULLAH BIN ABDUL MUHSEN AL TURKI** (D158) )

**KHALID AL-FAWWAZ** (D159) )

**ABU QATADA AL-FILISTINI,** a/k/a ABU ISMAIL, a/k/a ABU UMAR, a/k/a ABU OMAR OMAR, a/k/a ABU UMR TAKFIRI, a/k/a ABU UMAR UMAR, a/k/a ALI-SAMMAN UTHMAN, a/k/a OMAR MAHMOUD UTHMAN, a/k/a UMAR UTHMAN (D161) )

**YASSIR AL-SIRRI,** a/k/a AMMAR (D162) )

**ABDULLAH AL FAISAL BIN ABDULAZIZ AL SAUD** (D163) )

**NAIF BIN ABDULAZIZ AL SAUD** (D164) )

**MOHAMMED AL MASSARI** (D165) )

**LUJAIN AL-IMAN** (D166) )

**ZIYAD KHALEEL** (D167) )

**IBRAHIM BAH** (D168) )

**ABU ZUBAYDAH** (D169) )

**AHMED ALI JUMALE** (D170) )

**MAMDOUH MAHMUD SALIM** a/k/a ABU HAJER AL IRAQI (D171) )

**OMAR AL BAYOUMI** (D172) )

**ZACARIAS MOUSSAOUI** (D173) )

**ISLAMIC INVESTMENT COMPANY OF THE GULF (BAHRAIN) EC** (D174) )

**SAUDI HIGH COMMISSION** a/k/a SAUDI )

HIGH RELIEF COMMISSION (D175) )
)
**SALMAN BIN ABDULAZIZ AL SAUD** (D176) )
)
**SHEIK ABDULLAH AZZAM,** a/k/a ABU MUHAMMED (D177) )
)
**ALBERT FRIEDRICH ARMAND HUBER,** a/k/a AHMED HUBER (D178) )
)
**ABDULLAH SALIM BAHAMDAN** (D179) )
)
**BAKR M BIN LADEN** (D180) )
**OMAR M BIN LADEN** (D181) )
)
**YESLAM M BIN LADEN** (D182) )
)
**ALFAISALIAH GROUP,** a/k/a AL FAISAL GROUP HOLDING CO. (D183) )
)
**HASSAN AL-TURABI** (D184) )
)
**ESSAM AL RIDI** (D185) )
)
**IBRAHIM BIN ABDULAZIZ AL IBRAHIM FOUNDATION** (D186) )
)
**WADI AL AQIQ** (D187) )
)
**SOCIETY OF ISLAMIC COOPERATION**, a/k/a JAM'YAH TA'AWUN AL-ISLAMIA (D188) )
)
**OMAR ABU OMAR,** a/k/a ABU KUTADA (D189) )
)
**ABU HAFS THE MAURITANIAN,** a/k/a MAHFOUZ OULD AL-WALID, a/k/a KHALID AL-SHANQITI, a/k/a MAFOUZ WALAD AL-WALID (D190) )
)
**MOHAMED ALBANNA** (D191) )
)
**QUEEN CITY CIGARETTES AND CANDY** (D192) )
)
**AGUS BUDIMAN** (D193) )
)
**AL-BARAKA BANCORP INC.** (D194) )
)
**AHMED RESSAM** (D195) )

**SAID BAHAJI** (D196) )

**ZAKARIYA ESSABAR** (D197) )

**MAMOUN DARKAZANLI** (D198) )

**MOHAMMED ALI HASAN AL MOAYAD** (D199) )

**AL FAROOQ MOSQUE** (D200) )

**YOUSEF JAMEEL** (D201) )

**IBRAHIM MUHAMMAD AFANDI** (D202) )

**MOHAMMED BIN ABDULLAH AL-JOMAITH** (D203) )

**ABDULRAHMAN HASSAN SHARBATLY** (D204) )

**AHMED ZAKI YAMANI** (D206) )

**AHMAD AL HARBI** (D207) )

**MOHAMMED AL-ISSAI** (D208) )

**HAMAD HUSSAINI** (D209) )

**ABU RIDA AL SURI,** a/k/a MOHAMED LOAY BAYAZID (D210) )

**SAUDI RED CRESCENT** (D211) )

**AHMED BRAHIM** (D212) )

**ABU MUSAB AL-ZARQAWI** (D213) )

**AYMAN AL-ZAWAHIR** (D214) )

**ABU IBRAHIM AL-MASRI** (D215) )

**SADDAM HUSSEIN** (D216) )

**DAR AL MAAL AL ISLAMI TRUST** (D217) )

**DMI ADMINISTRATIVE SERVICES S.A.** )

(D218)

**ISLAMIC ASSEMBLY OF NORTH AMERICA** (D219)

**SALMAN AL-OUDA** (D220)

**SAFAR AL-HAWALI** (D221)

**SALEH AL-HUSSAYEN** (D222)

**SAMI OMAR AL-HUSSAYEN** (D223)

**MUHAMMAD J. FAKIHI** (D224)

**YOUSSEF M. NADA & CO. GESELLSCHAFT M.B.H.** (D225)

**ABDULLAH BIN KHALID AL THANI** (D226)

**QATAR CHARITABLE SOCIETY** (D227)

**Defendants.**

# Introduction

1. On September 11, 2001, Plaintiffs in this action suffered massive damages to their properties as a result of their intentional damage inflicted upon them by the crashes of two hijacked aircraft into two buildings, the North and South Towers of the World Trade Center. The separate strikes of those two airplanes into those two buildings put in motion two, separate series of events that resulted in the destruction of the Twin Towers, as well as World Trade Center Buildings 4, 5 and 7 and related subgrade spaces. In response to these acts of barbarism and the destruction inflicted, Plaintiffs herein bring this civil action seeking to hold those individuals and entitities that were and are the perpetrators and enablers of the terrorist acts that caused the destruction of their properties. The financial resources and support network of these Defendants – charities, banks, front organizations and financiers – are what allowed the attacks of September 11, 2001 to occur. Terrorists like Osama bin Laden and his al Qaeda network do

not exist in a vacuum. They cannot plan, train and act on a massive scale without significant financial power, coordination and backing. Defendants herein, some of whom act in the shadows, are ultimately responsible for the damages caused by the actions of their terrorist agents and clients.

2. The war against terrorism is very important to the Plaintiffs herein. Plaintiffs herein fully support the overarching goals of cutting off al Qaeda's support network. As one United States Court of Appeals noted, “[t]he only way to imperil the flow of money and discourage the financing of terrorist acts is to impose liability on those who knowingly and intentionally supply the funds to the persons who commit the violent acts.” *Boim v. Quranic Literacy Institute, et al.*, 291 F.3d 1000 (7th Cir. 2002). That is an aim of this suit.

3. Claims herein are brought pursuant to the Foreign Sovereign Immunities Act 28 U.S.C. § 1605(a)(2); § 1605(a)(5); and § 1605 (a)(7) with Pub. L. 104-208, Div. A. Title I, § 1605 note (West Supp.)(Flatow Amendment); breaches of customary international law; the anti-terrorism provisions of 18 U.S.C. § 2331, 2333, *et. seq.*, the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, and related federal and state common law claims. Congress’ enactment of the terrorist-related statutes set forth herein evidences legislative intent for accountability and provides a forum for that accountability. In addition to accountability and compensation, these legal statutes can also be used to punish and deter future acts of terrorism.

4. The USA Patriot Act of 2001 was enacted to “deter and punish terrorist acts in the United States and around the world, to enhance law enforcement investigatory tools, and for other purposes.” USA Patriot Act of 2001, Title X, § 1001. Congress, by enacting the USA Patriot Act, reinforced this legislative intention to enable victims the ability to deter and punish

terrorist acts in the United States and around the world. The Patriot Act makes this message clear:

> All Americans are united in condemning, in the strongest possible terms, the terrorists who planned and carried out the attacks against the United States on September 11, 2001, and in pursuing all those responsible for those attacks and their sponsors until they are brought to justice.

USA Patriot Act of 2001, Title X, § 1002.

5. In the wake of September 11, 2001, the United Nations Security Council unanimously held that all Nations should act to prevent and suppress the financing or support of terrorism, as well as criminalize the willful provision or collection of funds for such acts. *U.N. Security Council Resolution 1373 (2001)*. The United Nations further resolved that the funds, financial assets and economic resources of those who commit, attempt to commit, participate in, or facilitate the commission of terrorist acts, including persons and entities that act on behalf of terrorists, should also be frozen without delay. *U.N. Security Council Resolution 1373 (2001)*. It is in the spirit of this international consensus of condemnation that Plaintiffs bring this action.

6. The logistical and monetary support system of al Qaeda must be cut off to stop the sponsorship and fostering of international terrorism.

7. Osama bin Laden, al Qaeda and its sponsors, promoters, financers, co-conspirators, aiders and abettors and criminal enterprise in the September 11, 2001 terrorist acts are fundamentally rooted in an illegitimate perversion of Islam. The charitable, financial, religious, and political networks that front al Qaeda – the Defendant banks, charities, individuals, financial and business institutions – are responsible for the damage inflicted on September 11, 2001. These Defendants, who formed an enterprise, aided, abetted, sponsored, conspired, financed or otherwise provided material support to Osama bin Laden, al Qaeda, and international terrorism must be held accountable.

8. Al Qaeda differs from traditional state-sponsored terrorist groups in critical ways. It is financially robust. As a 2002 independent commission on financing of international terrorism reported:

> Building al Qaeda's financial support network was Osama bin Laden's foremost accomplishment, and the primary source of his personal influence. Unlike other terrorist leaders, he was not a military hero, nor a religious authority, nor an obvious representative of the downtrodden and disillusioned. He was a rich financier, both a scion of one of Saudi Arabia's most influential families and a challenger to Saudi Arabia's existing system of governance, distinguished by his ability to organize an effective network.
>
> Al Qaeda's financial network continues to support the organization today, even after being driven from its Afghan base, and allows it to maintain its capacity to attack Americans at home and abroad. As long as al Qaeda retains access to a viable financial network, it remains a lethal threat to the United States.
>
> Organizationally, al Qaeda is notably and deliberately decentralized, compartmentalized, flexible and diverse in its methods and targets. The same description applies to its financial network. If al Qaeda were financed only by Osama bin Laden's personal inheritance, or only by a small number of state sponsors, and if it were only limited in scope to a small area of the globe, or weren't continuously replenishing its coffers, the problem would be much easier to solve.
>
> Instead, al Qaeda's financial network is characterized by layers and redundancies. It raises money from a variety of sources and moves money in a variety of manners.
>
> Al Qaeda has operated under a cloak of legitimacy – running legitimate businesses, such as the network of corporations Osama bin Laden created when he lived in Sudan, or the honey traders in Yemen that the U.S. government has now publicly identified as being a part of al Qaeda's financial network. Profits earned from these legitimate businesses are then channeled to terrorist ends. Al Qaeda also earns money from a wide range of criminal enterprises.
>
> However, the most important source of al Qaeda's money is its continuous fundraising efforts. Al Qaeda's financial backbone was built from the foundation of charities, nongovernmental organizations, mosques, web sites, fundraisers, intermediaries, facilitators and banks and other financial institutions that help finance the *mujahideen* throughout the 1980s.

In many communities, the *zakat* is often provided in cash to prominent, trusted community leaders or institutions, who then commingle and disperse donated moneys to persons and charities they determine to be worthy. These widely unregulated, seldom audited, and generally undocumented practices have allowed unscrupulous actors such as al Qaeda to access huge sums of money over the years.

Today al Qaeda continues to raise funds from both direct solicitations of wealthy supporters and through retail charities. Some, whose donations go to al Qaeda, know full well the terrorist purposes to which their money will be put.

Once raised in the manners described, al Qaeda's money is moved through a similarly diverse set of mechanisms. The first, and most simple, is the ubiquitous and highly efficient global financial system, including the interconnected network of banks and other financial institutions that undergird the global economy. For years, al Qaeda has been particularly attracted to operating in under-regulated jurisdictions, places with limited bank supervision, no anti-money laundering laws, ineffective law enforcement institutions, and a culture of no-questions-asked bank secrecy.

But al Qaeda did not limit itself to regional money centers; it also took advantage of the globalizing financial system to move its money through banks in virtually every corner of the world, including offshore jurisdictions long known for providing bank secrecy. For instance, in the case of al-Taqwa (a purported international financial services company now the subject of U.S. and international sanctions), al Qaeda moved its funds through accounts in such familiar havens as Liechtenstein and the Bahamas. And the United States has not been immune from al Qaeda money flows: We have all seen the video of Mohammed Atta withdrawing funds from an ATM in South Portland, Maine, on September 10, 2001: funds that were transferred from accounts run by a senior al Qaeda operative, Khalid Sheik Mohammed, in the United Arab Emirates.

Al Qaeda also abuses the Islamic banking system, an entirely legitimate form of investment and finance that abides by *sharia*, or Islamic law, which prohibits the earning or payment of interest. Many prominent Islamic banks operate under loose regulatory oversight, in part because they are based in jurisdictions without proper controls, but also because their religious nature often allows them a greater degree of autonomy owing to obvious domestic considerations. Islamic banks regularly commingle funds from depositors to place them within group investments by fund managers, creating ready opportunities for anonymous money transfers and settlement. Moreover, al Qaeda and other terrorist groups

> that use Islam to justify their activities are also more likely to find willing collaborators within the Islamic banking system.

Terrorism Financing, Report of an Independent Task Force Sponsored by the Council on Foreign Relations, 2002, ("The Report").

9. The Report concluded that individuals and charities in Saudia Arabia have been "the most important source" of funds for al Qaeda Saudi Arabian money has financed international terrorism while its citizens have promoted and executed it.

10. Cash infusions from Saudia Arabia to front groups across the world works to ensure that hatred, terror and perverse religious extremism take hold internationally and in the United States. According to a briefing presented July 10, 2002 to the Defense Policy Board, a group of prominent intellectuals and former senior officials that advises the Department of Defense on policy: "The Saudis are active at every level of the terror chain, from planners to financiers, from cadre to foot-soldier, from ideologist to cheerleader." *Rand Corporation, Defense Policy Board briefing, July 10, 2002*. The entities and individuals named herein promote a culture of violence through the material sponsorship of Osama bin Laden, al Qaeda and international terrorism. The Defendants' actions led to the terrorist acts that occurred on September 11, 2001, which proximately caused the Plaintiffs' damages.

11. The culture of violence is also promoted through religious influence. The Saudis are subjected to religious policing by the religious establishment which is dominated by descendants of Mohammed bin Abdul Wahhab. These religious police, the Committee for the Propagation of Virtue and the Prevention of Vice, exert strict and repressive control over the education system, and every aspect of social and personal behaviour. During the daily prayers, religious police order ships and businesses to close, while in the mosques clerics rail against non-Muslims, the schools teach hatred, and the Ministry of Islamic Affairs publishes books

describing Judaism and Christianity as deviant. The clerics dominate Saudi society, and anyone who talks of democracy, human rights or religious tolerance is put in jail or persecuted. These acts promote hatred, religious intolerance, violence, and terrorism. These act as prime enablers of al Qaeda, the growth of international terrorism, and the September 11, 2001 attacks.

12. A manifesto turned over by a captured al Qaeda member demonstrates the virulent anti-American tirades. The author's name is obviously a pseudonym: Salahuddin Ayyubi, known in the west as Saladin the Kurdish Sultan who reconquered Jerusalem from the crusaders in 1199. The pseudonym however is inaccurate, because Saladin was a soldier of honor embodying true Islamic beliefs and tolerance, unlike the cowardly, twisted and dishonorable murderers of innocents who penned this document. (In the back of the manifesto, there is a claim that it was authored by Osama bin Laden.)

13. The manifesto discusses the lawfulness of committing acts of terror against Americans and declares that it is legitimate to kill every person, including women and children, and to burn all that can be burned. This genocidal literature tries to legitimize biological and chemical warfare in the service of terrorism, including using nuclear weapons such as a dirty bomb. Terrorism is justified with pseudo-religious arguments, giving historical examples in abundance and richly, if inaccurately, citing to Islamic preachers and teachers of centuries past. Excerpts from the al Qaeda manifesto include:

> I say that all the nations of the world have to be looked at concerning their attitude towards Muslims. They are either countries of war, countries with which we are at war, or treaty partners. The basis on which an infidel state rests is that it is inimical and prepared to wage war against us which makes it lawful to fight it by all means necessary.
>
> The prophet also legitimized that a nation such as America is a state at war with us and not a treaty partner and killing of women and the old and children of the war states, when they could not easily be differentiated, is

> permissible, and it was not possible to get hold of the military personnel, except by killing them [the civilians].
>
> If an infidel is not a treaty partner and not someone to whom Muslim protection is due, then he is in reality a person of war, an enemy to be fought. And it is lawful to shed his blood . . .
>
> Once an infidel is a person of war, killing him is lawful. There is consensus among Muslims today that America has never been a land of Islam and will never be a treaty partner of Muslims. If we accept that she was a treaty partner, those treaties were bipartisan and today it no longer abides by those agreements.

(From The Truth About the New Crusade By the Vanquisher of the Crusaders)

14. This perversion of Islam purports to justify the evil acts of al Qaeda is outrageous and chilling to any civilized person:

> We have not reached parity with them yet. We have the right to kill four million Americans-two million of them children-and to exile twice as many and wound and cripple hundreds of thousands. Furthermore, it is our right to fight them with chemical and biological weapons. America is kept at bay by blood alone. . .

Al Qaeda spokesman Suleiman Abu Gheith, June 12, 2002.

15. In or around 1988, Osama bin Laden formed al Qaeda, which means “the Base” or “the Vanguard” in Arabic, into an international terrorist group with the aim of opposing non-Islamic governments with violence. Included in Osama bin Laden’s founding vision of al Qaeda was the overthrow of Islamic states that were considered to be too secular, or too beholden to the West. Another goal of al Qaeda was to drive the American armed forces out of the Saudi Arabian peninsula and Somalia. The al Qaeda organization brought together a large number of Arab fighters that had fought in Afghanistan against the Soviet Union. Up to five thousand Saudis, three thousand Yemenis, two thousand Algerians, two thousand Egyptians, four hundred

Tunisians, three hundred Iraqis, two hundred Libyans, and numerous Jordanians fought alongside the Afghans in attempting to oust the Soviets during the 1980s.

16. Osama bin Laden went to Afghanistan and became a prime financier, recruiter, and military leader of terrorist groups. He advertised all over the Arab world for young Muslims to come fight jihad in Afghanistan against the Soviets. He set up recruiting offices all over the world, including in the United States and Europe. These recruiting offices were often run under the auspices of charities which were taking donations from wealthy Saudi families and businessmen. These charities operated in the United States, Europe, Asia, Africa, the Middle East and elsewhere in furtherance of international al Qaeda terrorism. Charities became an essential part of the support system of al Qaeda and Osama bin Laden, providing the financial resources that enabled them to wage their "holy" war. Saudi charitable institutions raised funds that materially supported al Qaeda in part through a system of Islamic tithing known as zakat. The financial and logistical support given to al Qaeda by the Defendants funded al Qaeda growth in part by siphoning off charitable donations to sponsor terrorism.

17. Osama bin Laden paid for the transportation of the new recruits to Afghanistan with some of his personal fortune, and set up terror training camps there. Osama bin Laden brought in experts from all over the world on guerilla warfare, sabotage, and covert operations to train and lead the terrorist recruits. Within a little over a year, bin Laden had thousands of volunteers in training in his private military camps. After the withdrawal of the Soviets, these terrorists spread out over the world to their countries of origin. Steeped in a bloody perversion of of the legitimate concept of Jihad, these individuals were not inclined to let go of the militant life they had grown accustomed to during the Afghan war. Many took up the radical Islamic cause

in their home countries with the aim of destabilizing and overthrowing the more moderate Arab regimes, for not enforcing a "pure" form of Islam. Others searched for new places to fight.

18. For example, one thousand of Osama bin Laden's faithfuls returned to Algeria where they began a nine-year civil war. Those returning to Egypt joined the al-Gama'a al-Islamiyya and the Egyptian Jihad groups determined to overthrow the government of that country. As many as two hundred of Osama bin Laden's followers settled in New York and New Jersey within the United States; some of these were later implicated in terrorist plots such as the 1993 World Trade Center bombing. Al Qaeda operative Ramzi Yousef was convicted on murder and conspiracy charges for his role in the first World Trade Center bombing in 1993. When Pakistan cracked down on al Qaeda members, many of them fled to Asia and joined radical Islamic groups in the Philippines. Some returned to Central Asia to continue the fight against the Russians in Tajikistan, or to other areas such as Bosnia and Chechnya where Muslims were embroiled in extremist terror conflicts. By this time, Osama bin Laden's funding and support network was in place, and served as a template for the creation and growth of the al Qaeda network. Osama bin Laden tapped into the same network formed through his Afghan connections and incorporated those militant individuals and groups under the al Qaeda umbrella in expanding their base of international terrorism.

19. In 1991, Osama bin Laden sought refuge in Khartoum, the capital the Republic of Sudan. There he continued to recruit former fundamentalist warriors into the ranks of al Qaeda and offer them support. In addition to seasoned recruits, new volunteers to his radical cause were given military training and sponsorship in training camps set up there. Soon he had set up Sudanese factories, farms and projects established for the purpose of supplying jobs to those he had recruited. Osama bin Laden built roads and other infrastructure for the Sudanese

government with his construction company, al-Hijrah Construction and Development Ltd., and with the support of the Saudi Binladin Group. Osama bin Laden's and the Saudi Binladin Group's money built the airport at Port Sudan, as well as a major highway linking Khartoum to Port Sudan. These projects helped to establish and strengthen Osama bin Laden's relationship with the Sudanese regime. His import-export firm, Wadi al Aqiq, began doing brisk business. Osama bin Laden's Taba Investment Company Ltd. flourished while his agriculture company bought up huge plots of land. The Al Shamal Islamic Bank (or "Al Shamal Bank"), in which Osama bin Laden invested $50 million, helped finance these thriving companies, as well as overall support for the growing al Qaeda presence within the Republic of Sudan.

20. Over the next five years, terrorist training activities and recruitment fueled by these economic developments continued, while Osama bin Laden lived in Khartoum under the protection of the Sudanese regime. In 1996, the Sudanese government bowed to pressure from the United States and requested that Osama bin Laden leave the country. Osama bin Laden was allowed to move back to Afghanistan as an honored guest of the Taliban. For the next five years, with the funding, sponsorship, aiding and abetting of the Defendants herein, Osama bin Laden continued to expand the terrorist training camps that filled the ranks of al Qaeda, and served as bases from which to plan international terrorist attacks.

21. Al Qaeda members have engaged in a pattern of conduct in planning international terrorist attacks over the past fifteen years. The first such attackd were against the United Nations forces in Somalia on October 3 and 4 of 1993, in which eighteen American servicemen were killed and seventy-eight wounded. Osama bin Laden and al Qaeda members also plotted the terrorist bombing of the World Trade Center in 1993, and a plan in 1995 (Project Bojinka) to blow up twelve American airliners simultaneously. The backup plan for Project Bojinka was to

hijack planes and use them as missiles against prominent American landmarks such as the North and South Towers of the World Trade Center, the White House, and the CIA headquarters in Langley, Virginia.

22. Al Qaeda was also behind the Khobar Towers bombing in Riyadh, Saudi Arabia, in which nineteen American servicemen were killed in November of 1995. After the Khobar attack, inside Osama bin Laden's native Saudi Arabia, a group of prominent Saudis met in Paris where they conspired to pay off Osama bin Laden and his al Qaeda group to ensure that al Qaeda would never again attack within the borders of the Saudi Kingdom. This protection money served to safeguard Saudi Arabia, but also to enlarge the power of Osama bin Laden, al Qaeda, and international terrorism. Subsequent material support including payments to bin Laden and al Qaeda by Saudi nationals has been verified by a senior Taliban defector.

23. Emboldened in terrorist ambition, in 1998, Osama bin Laden and al Qaeda orchestrated attacks on the United States embassies in the East African countries of Kenya and Tanzania. These bombings resulted in two-hundred ninety-one deaths and over five thousand injuries. The attack on the U.S.S. Cole in Yemen in October of 2000 then followed, with the brutal attacks on September 11, 2001 thereafter. Osama bin Laden and al Qaeda have publicly and proudly proclaimed direct responsibility for these and other multiple atrocities in furtherance of international terrorism.

24. Direct attacks on Americans intensified in 1998 after Osama bin Laden issued this "fatwa," stating:

> We -- with God's help -- call on every Muslim who believes in God and wishes to be rewarded to comply with God's order to kill the Americans and plunder their money wherever and whenever they find it. We also call on Muslim ulema, leaders, youths, and soldiers to launch the raid on Satan's U.S. troops and the devil's supporters allying with them, and to displace those who are behind them so that they may learn a lesson.

These words provide an insight into how Osama bin Laden views the world. Osama bin Laden has not left the political intellectual era of the crusades; in this view the Middle East is the battle ground of the world's three major religions, Islam, Christianity, and Judaism. According to Islamic extremist views, a Judeo-Christian alliance has evolved which ultimately aims to conquer the holy places of Mecca, Medina, and Jerusalem. In this distorted reality, this purported alliance is responsible for all hardship and violence inflicted on Muslims throughout history. Following this world view, Osama bin Laden attempts to use terror to demonstrate to fellow Muslims that the "enemies" of Islam can be eliminated from "Muslim" lands such as his native Saudi Arabia. Toward this end, Osama bin Laden has proclaimed his intention to obtain and use biological, chemical, and nuclear weapons to wage war. He seeks these personal or political ends under the guise of religion.

25. Wahabbism is an Islamic sect founded by Mohammad Ibn Abdul-Wahhab in the 18th century. Abdul-Wahhab sought to rid Islam of the corruptions that he believed had crept into the religion from both within and without. His doctrine reverted to a strictly literal interpretation of the Koran and Wahhabism, in Abdul-Wahhab's view, became the sole source of legitimate Islamic thought and action. In direct contradiction to the civilized and moderate Arab world – the Wahabbists refused to move beyond outdated ideologies and codes of conduct. The Wahhabi rebellions of the nineteenth and twentieth centuries establishing the power of the sect in Arabia – were defined by their violence and brutality.

26. In recent decades, certain schools of Wahhabism have become even more virulent toward non-Islamic civilization, extolling the virtues of martyrdom for the sake of saving Islam. For example, inflammatory Khutbahs (sermons) given by the Khateeb (preacher) Salaah Al-

Budair in the Mosques of Mecca and Medina in August 2001 warned of the imminent threat the West posed to Islamic civilization:

> Fellow Muslims! We are nowadays confronted with a relentless war waged by the materialistic western civilization and culture that burns its producers and afflicts them with calamities, misery, immorality, disruption, suicide, and all kinds of evils . . . it is a civilization that races towards creating all means of trouble, disturbance, and destruction.

27. Al-Budair also emphasizes the greatness of offering to die as a martyr:

> Today we Muslims and indeed the entire world can witness the greatness of martyrdom being illustrated in the uprising in Palestine in general and the Al-Aqsaa in particular. This kind of stance, which revives the magnitude and virtues of martyrdom in the heart of the Muslim nation, is exactly what we need at this time. It is vital that the Muslims exert every effort to spread the love for achieving martyrdom just like the pious early generations of Muslims did. We must continue on the same road that they were on, which is that of our Prophet, and indeed all the prophets before him, in order to support our religion and defeat our enemies.
>
> Revive the importance of martyrdom and reawaken the spirit of seeking it! Instill the virtues of it in the hearts and minds by all methods possible. Our country [Saudi Arabia] has set an example in supporting this and donating generously in its cause from all different sections of the community. . .

28. Al-Budair finishes up these sermons by justifying suicide bombings:

> The Jews are described in the Book of Allah as those who distort words and facts and quote them out of context and this is what they and their supporters from the tyrant regimes all over the world are currently doing. They use false terminology to misguide, confuse, and deceive. What your brothers are committing in Al-Aqsaa are not acts of mindless violence, but rather it is a blessed uprising to resist and curtail the Jewish oppression and aggression: this is a legal right which all religions, ideologies and international laws recognize. Nobody could deny this fact except the ignorant, arrogant, or evildoers.

29. Such are the perverse Wahabbi sermons currently preached to inspire young men to join forces with Osama bin Laden and al Qaeda in a war against the West. As the former head of counter-terrorism for the FBI (and head of security for the World Trade Center on September 11, 2001) John O'Neill, succinctly stated: "All the answers, everything needed to dismantle

Osama bin Laden's organization can be found in Saudi Arabia." The hate-filled ideology of the Wahabbists and Al-Budair confirm John O'Neill's judgement that the ideological, political and financial essence of al Qaeda, the growth of which led to the September 11, 2001 terrorist attacks, stems from certain segments in Saudi Arabia.

30. This ideology of violence will continue to promote worldwide terrorism until its financial and support network is dismantled. Extremist Wahhabism is inherently dangerous given its propensity to promote non-tolerance and hatred, including the following:

> All non-believers, including non-Wahhabi Muslims, are guilty of shirk and apostasy;
>
> Only Wahhabi's are true Muslims, all others are non-believers;
>
> "Jihad" or holy war against all non-believers should be actively encouraged and participated in;
>
> The only acceptable system of government is an Islamic State based on Sharia—or Islamic law;
>
> In a strict and often misguided, misinterpreted and wholly unacceptable version—by almost the entire Muslim world—of Sharia law;
>
> In a purely Islamic world, with no geographic limitations or boundaries.

31. Put simply, Wahhabists believe they have the right to kill anyone who disagrees with their version of Islam. One Islamic scholar stated: "Wahhabisms evil and twisted interpretation of Islam in and of itself provides sufficient proof of the inherent dangers of Wahhabist ideology." Osama bin Laden and his al Qaeda organization are Wahhabists who have advocated for all of the above Wahhabist beliefs, including killing all non-believers. Wahhabists do not believe in national or governmental boundaries; they seek only one belief system and one world order—and one global Islamic State, based on their ill-founded interpretations of Islam.

32. In the aftermath of the September 11, 2001, attacks, fatwas were delivered in Saudi Arabia by Shaykhs Hamud al-Shu'aybi and Abdullah B. Jibrin which attempted to justify

the terror attacks. Moreover, certain members of the Saudi Royal family have knowingly and willfully exported Wahhabi ideology in order to convert others and to deflect attention away from Saudi Arabia. Wahhabism has been rejected by almost the entire Muslim world and has been called a threat to Islam itself. Professor Hamid Algar, one of the world's foremost Islamic scholars, stated:

> First, in the extremely lengthy and rich history of Islamic thought, Wahhabism does not occupy a particularly important place. Intellectually marginal, the Wahhabi movement had the good fortune to emerge in the Arabian Peninsula (albeit in Najd, a relatively remote part of the peninsula) and thus in proximity of the Haramayn, a major geographical focus of the Muslim world; and its Saudi patrons had the good fortune, in the twentieth century, to acquire massive oil wealth, a portion of which has been used in attempts to propagate Wahhabism in the Muslim world and beyond.

33. The majority of Islamic scholars denounce Wahhabist practices. Wahhabist movements, such as the Taliban militia in Afghanistan, have been almost universally criticized by the Muslim world. For example, President Musharraf of Pakistan said of the Taliban: "It is an ignorant, primitive interpretation of Islam that is condemned by the entire Islamic world." Extremist Wahhabism and the terror and use of violence it promotes, has been condemned by mainstream Muslim scholars and religious leaders as being violent, primitive and inconsistent with the principles of Islam.

34. These facts are widely known through the Arab world, as it was known that the Taliban was fostering and harboring these extremists. Those entities and individuals that provided material support to the Taliban knew or should have known that they were supporting the al Qaeda terrorist organization and Osama bin Laden. The Taliban openly armed, funded, trained, provided housing, transportation, communication, false documentation, identification, weapons, explosives, personnel, and currency to al Qaeda terrorists. The Taliban knowingly

financed terrorist manufacturing facilities, schools and training camps, and harbored known criminals.

35. The Defendants knowingly and intentionally provided financial and other material support and substantial asssistance to the al Qaeda Defendants. This financial and other material support and substantial assistance enabled the al Qaeda Defendants to plan, orchestrate, and carry out the September 11, 2001, savagery that murdered thousands of innocent people. Defendants clearly knew, or clearly should have known, they were providing material support, conspiring with, aiding and abetting and enabling the terrorists that destroyed the North and South Towers on September 11, 2001, and, with them, the lives of 2,749 innocents. By knowingly, purposely, recklessly and in many instances maliciously engaging in international terrorist activity, Defendants acts were a proximate cause of the events of September 11, 2001, for which they are jointly and severally liable. The Defendants' actions led to the terrorist acts that occurred on September 11, 2001, which proximately caused the Plaintiffs' damages. They must be held accountable. Those providing financial resources and weapons, *inter alia*, to known terrorists who openly pronounced their intention to continue to murder innocent people, specifically American citizens, were on notice of the violence such sponsorship would cause. The sponsorship of international terrorism was also reasonably anticipated to cause the senseless damage to property and business interruption/lost rental value that occurred on September 11, 2001.

36. This Complaint is brought pursuant to Rule 42 of the Federal Rules of Civil Procedure, which allows consolidation where actions involve common questions of law or fact. The Plaintiffs seek full, just, timely compensation, attorneys fees, treble damages, and punitive damages as appropriate and necessary to deter future acts of international terrorism.

37. While neither the government of Saudi Arabia nor the United States is a Party to this action, it is recognized that sensitive issues of United States foreign policy may nevertheless be raised, including the question of whether a suit of this nature interferes with or augments United States foreign policy interests. For this reason, it is important to note that it has been widely recognized, including by the United States government, that actions against foreign perpetrators or facilitators of terrorism is consonant with United States foreign policy objectives. This action comports with vigorously pursuing the war against terrorism, and is consistent with enabling legislation and the jurisprudence regarding the civil liability imposed on behalf of terrorism's victims. As one former national security advisor noted:

> The process of discovery in this lawsuit on behalf of 9-11 families can lead to a vital contribution to our national security, and for that reason alone the United States Government should welcome the filing.

(Statement by Richard Allen, former National Security Advisor to President Ronald Reagan.)

38. Richard Murphy, a former United States Ambassador to Saudi Arabia, recently admitted:

> I have never said that the Government of Saudi Arabia is our ally. I have said that we have common interests . . . but that does not include the protection of individual princes.

(Richard Murphy, former United States Ambassador to Saudi Arabia, to NPR Radio.)

39. As the United States Department of Justice itself argued before the Second Circuit Court of Appeals in a case involving international terrorism:

> Any foreign person, entity, or state responsible for the intentional destruction of a U.S. aircraft, particularly one flying to the United States with many U.S. national aboard, 'should reasonably anticipated being haled into court' in the United States. Any foreign state must surely know that the United States has a substantial interest in the protection of its flag carriers and nationals in international air travel from the terrorist activity, and can reasonably expect that any action that harmed this interest would

> subject it to a response in many forms, including possible civil actions in U.S. courts. It is certainly in the interest of fairness and justice to do so.

(Brief by the United States Department of Justice as intervening party in *Rein vs. Libyan Arab Jamahariyah, et al.*, United States Court of Appeals for the Southern District of New York, 1998.)

40. As President George W. Bush stated in a joint session of Congress on September 20, 2001:

> We must starve terrorists of funding, turn them against another, drive them from place to place until there is no refuge or no rest.

The evidence and substantive law in this case require that the sponsors of terrorism will be held accountable, and this is fully consistent with and done in support of United States law and foreign policy. As one United States government official noted "stopping the money flow is the best way to stop terrorism. Audit trails do not lie, they are the diaries of terror." Given the gravity of the existing threat and the overwhelming damage inflicted to date, Plaintiffs herein are committed to uncovering the truth and bringing to justice those who caused the September 11, 2001 attacks.

## **JURISDICTION AND VENUE**

41. Jurisdiction herein arises pursuant to 28 U.S.C. §§ 1330(a), 1331 and 1332(a)(2), and 18 U.S.C. § 2338. Jurisdiction also arises pursuant to 28 U.S.C. §§ 1605(a)(2), 1605(a)(5) and (a)(7) (the Foreign Sovereign Immunities Act), breaches of customary international law, 18 U.S.C. § 1962 (Racketeering Influenced and Corrupt Organizations Act) and 18 U.S.C. §§2334, 2338. This Court also has supplemental jurisdiction over claims herein pursuant to 28 U.S.C. § 1367. This Court has both personal and subject matter jurisdiction over the Defendants herein.

42. As herein alleged, actions for torts perpetrated by a Foreign State, such as The Republic of Sudan, through its agencies, instrumentalities, its officials, employees and/or agents,

fall within the exceptions to jurisdictional immunity under 28 U.S.C. §§ 1605(a)(5) and 1605(a)(7).

43. Venue is both proper and convenient in this District pursuant to 28 U.S.C. §§ 1391(d), 1391(f)(4), and 28 U.S.C. § 2334.

# PARTIES

## PLAINTIFFS

44. Plaintiffs herein are nationals of the United States of America, who lost property on September 11, 2001, and thereafter. The attacks at issue herein utilized commercial aircraft which crashed into the World Trade Center North and South Towers in New York City.

45. The Plaintiffs herein are World Trade Center Properties LLC, Silverstein WTC Mgmt. Co. LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, 5 World Trade Center LLC and 7 World Trade Center, L.P.

46. World Trade Center Properties LLC is a Delaware limited liability company with its principal place of business in New York.

47. 1 WTC Holdings LLC, 2 WTC Holdings LLC, 4 WTC Holdings LLC, and 5 WTC Holdings LLC are Delaware limited liability companies with their principal places of business in New York.

48. Silverstein WTC Mgmt. Co. LLC is a Delaware limited liability company with its principal place of business in New York.

49. 7 World Trade Center, L.P. is a Delaware limited partnership with its principal place of business in New York.

50. All of the members of the limited liability company Plaintiffs and all of the partners of the limited partnership Plaintiff are nationals of the United States of America.

51. On July 24, 2001, 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, and 5 World Trade Center LLC entered into leases with The Port Authority of New York and New Jersey granting them 99-year leaseholds with respect to four of the seven buildings in the World Trade Center complex. The leased buildings consisted of the two 110-story Twin Towers designated as 1 World Trade Center and 2 World Trade Center, two nine-story office buildings designated as 4 World Trade Center and 5 World Trade Center, and related subgrade spaces. The four buildings covered by the leases contained more than 10 million square feet of Class A office space. 7 World Trade Center, L.P. owns a long-term leasehold estate in 7 World Trade Center.

## FACTUAL ALLEGATIONS AGAINST DEFENDANTS

### BACKGROUND

52. Plaintiffs incorporate herein all previous paragraphs, including the introduction, and allege herein fully upon information and belief.

53. Osama bin Laden and al Qaeda are, by their own admission, responsible for the September 11, 2001 terrorist attacks.

54. On September 11, 2001, al Qaeda co-conspirators, Mohammed Atta, Abdul Alomari, Wail al-Shehri, Waleed al-Shehri, and Satam al-Suqami hijacked American Airlines Flight 11, bound from Boston to Los Angeles, and crashed it into the North Tower, or Tower One, of the World Trade Center in New York.

55. On September 11, 2001, al Qaeda co-conspirators, Marwan al-Shehhi, Fayez Ahmed (a/k/a Banihammad Fayez), Ahmed al-Ghamdi, Hamza al-Ghamdi, and Mohald al-Shehri hijacked United Airlines Flight 175, bound from Boston to Los Angeles, and crashed it into the South Tower, or Tower Two, of the World Trade Center in New York.

56. On September 11, 2001, al Qaeda co-conspirators, Khalid ad-Midhar, Nawaf al-Hazmi, Hani Hanjour, Salem al-Hamzi, and Majed Moqed hijacked American Airlines Flight 77, bound from Dulles Airport in Sterling, Virginia to Los Angeles, California, and crashed it into the Pentagon in Arlington, Virginia.

57. On September 11, 2001, al Qaeda co-conspirators, Ziad Jarrah, Ahmed al-Haznawi, Saaed al-Ghamdi, and Ahmed al-Nami hijacked United Airlines Flight 93, bound from Newark, New Jersey to San Francisco, California. In an act of defiant courage, the passengers of Flight 93 overtook the hijackers, resulting in its crash in Shanksville, Pennsylvania, prior to reaching its target in Washington, D.C.

58. All nineteen (19) hijackers were members of Osama bin Laden's al Qaeda terrorist group. Fifteen (15) of the nineteen suicide hijackers were Saudi Arabian nationals. All received sponsorship, training, support and funding through Osama bin Laden and his al Qaeda terrorist enterprise and material support network. Plaintiffs herein were damaged as a direct result of the acts of these criminals, the acts of their al Qaeda co-conspirators, sponsors and enterprise, and the acts of Defendants herein to sponsor, promote, and materially support these reasonably foreseeable acts of destruction. The Defendants' actions led to the terrorist acts that occurred on September 11, 2001, which proximately caused the Plaintiffs' damages.

59. Defendant and co-conspirator Zacarias Moussaoui (or "Moussaoui") was born in France of Moroccan descent on May 30, 1968. Before 2001, he was a resident of the United Kingdom. Moussaoui was schooled in the United Kingdom and traveled extensively, frequenting many Middle Eastern countries including Afghanistan. He was attending flight school in Minnesota when apprehended by the United States government in late 2001. In

December 2001, a grand jury in the Eastern District of Virginia criminally indicted Moussaoui for acts of international terrorism, specifically the attacks of September 11, 2001.

60. On August 28, 2002, German prosecutors brought charges against co-conspirator Mounir el-Motassadeq (or “el-Motassadeq”), a Moroccan man accused of supporting members of the Hamburg al Qaeda terrorist cell and helping to plan and carry out the September 11, 2001 terrorist attacks.

61. Mounir el-Motassadeq is an al Qaeda co-conspirator. His indictment was the first formal criminal charge brought by German authorities in connection with the September 11, 2001 attacks. El-Motassadeq was arrested in November of 2001 on evidence that he had access to the bank account of one of the suicide hijackers and arranged wire transfers to hijackers while they were learning to fly in the United States. He is charged with participation in the terrorist attacks of September 11, 2001, in the United States.

62. When arrested in 2001, prosecutors said el-Motassadeq was a close associate of Mohamed Atta, Defendant, co-conspirator, and 9/11 hijacker. In 1996, el-Motassadeq was one of the witnesses who signed Mr. Atta's will. El-Motassadeq managed the finances of another hijacker, Marwan al-Shehhi, and that the money was used to help al-Shehhi pay for his flight lessons in the United States and cover living expenses there. According to the criminal indictment, these funds were used to support members of the terrorist group al Qaeda.

63. El-Motassadeq admitted that he knew the September 11, 2001, hijackers, but he provided conflicting versions of the nature and intensity of those contacts. At times el-Motassadeq said he knew them only through the Al Quds mosque, which was attended by Atta and other hijackers. On other occasions, he said he had visited the apartment on Marienstrasse where Atta lived. El-Motassadeq and Atta were both students at TUHH University in Hamburg.

64. In July 2000, el-Motassadeq traveled to Karachi, Pakistan for a 'vacation.' The Pakistanis later confirmed that he had been in the country at this time and that there were indications that he had visited an al Qaeda camp in Afghanistan. In May 2001, el-Motassadeq visited the Stade nuclear plant near Hamburg, Germany.

65. In summer of 1999 or earlier, a group of Muslim students in Hamburg joined forces with the express goal of implementing in countries of Western culture, especially in the United States of America, the "Holy War" ("Jihad") to be propagated by them by means of international terror. The group's members included Mohammed El Amir Awad Elsayed Atta (or "Atta"), Marwan Yousef Mohamed Rashed al-Shehhi (or "al-Shehhi"), and Ziad Samir Jarrah (or "Jarrah"), (hijackers, all of whom died in the course of the attacks), co-conspirators, or Defendants Ramzi Mohammed Abdullah Binalshibh (a/k/a Ramzi Mohamed Abdallah Omar), Zakarlya Essabar, Said Bahaji, as well as Mounir el-Motassadeq.

66. As a result of the cell members' shared religious beliefs, origins and violence-prone Islamic-fundamentalist ideology as well as their close relationships among themselves, the organization was closed to the outside world and is best described and constituted as a conspiratorial enterprise, which served as one of the organizational units of an international network of violence-prone radical extremists under the control or guidance of the al Qaeda enterprise. The Hamburg cell, which attempted to present itself as a regular group of foreign students, underpinned its efforts to facilitate acts of terror by a strict mandate to subordinate individual opinions to the group's political goals.

67. Initially, the principal meeting point of the Hamburg cell was the apartment rented by Atta, Bahaji and Binalshibh in Hamburg-Marburg, which temporarily served as al-Shehhi's residence, too. El-Motassadeq, Essabar and Jarrah convened for meetings of the group

at this location. In September 1999, the apartment al-Shehhi rented nearby served as an alternative base of operations. In October of 1999, after al-Shehhi and Atta moved into the second apartment, it also became the primary address of el-Motassadeq.

68. In October of 1999 or earlier, the cell's members finalized their terrorist scheme, which called for the use of airplanes in "jihad" to kill as many "infidels" in the United States as possible. In order to coordinate details and logistical support with the responsible representatives of the international terrorism enterprise and material support network, they resolved to travel to Afghanistan in two groups.

69. In late November of 1999, the three hijackers (Atta, al-Shehhi and Jarrah) and Binalshibh traveled on almost identical dates to the common destinations of training camps run by al Qaeda. Aside from providing training in military operations, the camps served the purpose of heightening radical extremist ideology and fostering an inner resolve among recruits to sacrifice their own lives fighting the "godless enemies." A stint in these camps is regarded as an essential condition of joining the international jihad and belonging to a terrorist group. While al-Shehhi was back in Hamburg for a few days in early January 2000 (only to leave the country again until late March 2000), Jarrah did not return until late January. Atta stayed until late February and Binalshibh re-entered Germany in March 2000.

70. In spring of 2000, a second group traveled to Afghanistan. El-Motassadeq flew from Hamburg to Karachi on May 22, 2000, and returned on August 1, 2000. In the meantime, he underwent military training in a camp near Khandahar, Afghanistan.

71. In accordance with the plans for the attacks discussed in Afghanistan, the three terrorists began making arrangements for pilot training in the United States upon their return. Accordingly, in March 2000, Atta contacted 31 flight schools in the United States via email from

Hamburg, inquiring about the possibilities and conditions of flight training for two or three men from different Arab countries. On March 26, 2000, Jarrah signed an agreement to receive pilot training at the Florida Flight Training Center in Venice, Florida, and on March 30, 2000, transferred the amount of 349 German Marks to the account of the flight school's Munich representative.

72. On May 25, 2000, Jarrah applied for a United States entry visa, which he received without difficulties, as Atta had before him, on May 18, 2000. Al-Shehhi had received his United States entry visa from the United States consulate in Dubai, United Arab Emirates (UAE), on January 10, 2000. All three terrorists had previously obtained new passports.

73. Following their entry into the United States (al-Shehhi arrived on May 29, 2000, Atta on June 3, 2000), al-Shehhi and Atta opened a joint bank account on July 18, 2000, with Sun Trust Bank in Venice, Florida, through which they obtained financing and material support for their stay in the United States – from backers within the international terrorist enterprise and material support network. On July 7, 2000, they started taking flight lessons together at the flight school Hoffman Aviation in Venice, Florida. By December 21, 2000, they had successfully completed their training, receiving professional pilot licenses from the Federal Aviation Administration.

74. Atta and al-Shehhi then put their acquired skills to the test on a Boeing 727 flight simulator at the Simulations Center in Opa-Locks, Florida, in December 2000, and by taking several exercise flights at the Advanced Aviation Flight Training School in Lawrenceville, Georgia, and at the flight school in Decatur, Georgia, in January and February 2001, respectively.

75. Jarrah entered the United States on June 26, 2000, and, until January 13, 2001, underwent pilot training at the Florida Flight Training Center (F.F.T.C.) in Venice, Florida, where he obtained a private pilot license. Between December 15, 2000, and January 5, 2001, he took flight lessons at the Aeroservice Aviation Center in Virginia Gardens, Florida.

76. The plan of the organization to send Binalshibh to be trained as the fourth pilot alongside Jarrah at the F.F.T.C. in Venice, Florida, was frustrated as Binalshibh's applications for a non-immigrant visa for the United States were denied.

77. To take Binalshibh's place, Essabar was to be sent to the United States to undergo pilot training. Like Atta, al-Shehhi and Jarrah before him, Essabar attempted to obscure his visit to Pakistan by obtaining a new passport from the Moroccan embassy in Berlin on October 24, 2000. But because United States authorities denied Essabar's visa applications, too, this plan could not be realized, either. Instead, it was Zacarias Moussaoui, now detained and indicted in the United States for his involvement in the preparations for the attacks of September 11, 2001, who traveled to the United States following an eight-week visit to Pakistan, and enrolled in flight school. However, due to Moussaoui's arrest on August 17, 2001, he never completed his training.

78. El-Motassadeq and the other al Qaeda co-conspirators who remained in Hamburg, continued to be involved in the preparations for the attacks. In particular, they were responsible for ensuring that the terrorists and Zacarias Moussaoui had sufficient funds to finance their stay and training in the United States.

79. For the purpose of coordinating the preparations for the attacks between the group members who remained in Hamburg and those who had traveled to the United States, several meetings were held for group members in Germany and Spain. Accordingly, Binalshibh and

Jarrah met on January 4, 2001, in Bochum or Dusseldorf. Later, Binalshibh traveled to Berlin to meet Atta, who had arrived there no later than January 6, 2001, after spending time in Spain and returning to the United States on January 10. 2001. Another meeting between Atta and Binalshibh on July 17 or July 18, 2001, in Tarragona, Spain, served the purpose of coordinating the exact times of the attacks.

80. El-Motassadeq, together with Bahaji, acted as the resident administrator of the terror organization in Hamburg. El-Motassadeq's chief responsibility consisted of securing funding for the group's terrorist activities. He made use of al-Shehhi's account, which provided as a source of financing. El-Motassadeq made sure that the account continued to receive sizeable support payments from sources in the United Arabian Emirates and elsewhere by transferring semester fees to maintain the status of al-Shehhi as a student, thus securing the latter's right to remain in Germany and meeting the condition of future payments. Shortly before al-Shehhi left for Afghanistan, in late November 1999, el-Motassadeq had also received control over the former's account along with al-Shehhi's bank card, which he used not only to transact financial and other personal business on behalf of al-Shehhi to cover up the latter's absence, but also to distribute the funds needed. He transferred funds from al-Shehhi's to Binalshibh's account which the latter passed on to al-Shehhi in the United States, who used it to finance his flight training. During the absence of al-Shehhi, several cash withdrawals were made to provide funding for the intended flight training of Binalshibh and Essabar and to benefit other cell members and promote acts of international terrorism.

81. Defendant Khalid Sheik Mohammed is a Kuwaiti of Pakistan descent who has participated in violent acts of international terrorism against Americans since at least 1993. Khalid Sheik Mohammed holds himself out as head of the military committee of al Qaeda.

Khalid Sheik Mohammed has publicly taken "credit" for the atrocities of September 11, 2001, as well as the 1993 World Trade Center bombing and the 1995 plot to use airliners as weapons. Khalid Sheik Mohammed aided, abetted, materially supported and conspired with al Qaeda operatives in planning the September 11, 2001 attacks, including Mohammed Atta, Ramzi Binalshibh, and others.

82. Umar Faruq (or "Faruq") is a high level al Qaeda operative and terrorist co-conspirator. Co-conspirator Faruq was born May 24, 1971, and is a member of the al Qaeda terrorist organization who was arrested in or about May 2002. According to the confession of Abu Zubaydah, top al Qaeda leader detained by the United States authorities, Umar Faruq was senior al Qaeda representative in Southern Asia. An interrogation of Umar Faruq was conducted by United States authorities at the United States air force base in Baghram, Afghanistan, on May 23, 2002.

83. During a custodial interview on Sept 9, 2002, Umar Faruq confirmed that he was al-Qaeda's senior representative to Southeast Asia and was initially sent to the region by Abu Zubaydah and Ibn Sheik Al-Libi to plan large-scale attacks against United States interests in Indonesia, Malaysia, Philippines, Singapore, Thailand, Taiwan, Vietnam and Cambodia. In particular, Faruq prepared a plan to conduct simultaneous car/truck bomb attacks against United States embassies in the region to take place on or about September 11, 2002.

84. Abdelghani Mzoudi is a co-conspirator who provided logistical support to Mohammed Atta and other suicide hijackers. Abdelghani Mzoudi is also alleged to have attended terrorist training camps in Afghanistan in the summer of 2000. He is currently jailed in Germany. Abdelghani Mzoudi provided material logistical support to Ramzi bin al Shibh and al Qaeda.

85. Haji Jamshed is an al Qaeda co-conspirator and a principal financier in the creation and management of al Qaeda training camps.

86. Al Qaeda leader Abd al-Rahim al-Nashiri, one of the network's chief of operations in the Persian Gulf, was recently captured by United States officials. Abd al-Rahim al-Nashiri (a/k/a Umar Mohammed al-Harazi, a/k/a Abu Bilal al-Makki) is a known al Qaeda operative who engaged in acts of international terrorism.

87. All of these al Qaeda operatives were members of and participants in the al Qaeda enterprise, and they received material support from the other Defendants herein. The Defendants' actions led to the terrorist acts that occurred on September 11, 2001, which proximately caused the Plaintiffs' damages.

## The Banking Defendants

### The Islamic Banking System and its Role in International Terrorism

88. Beginning in the late 1970s, upon the receipt of large amounts of wealth, Saudi Arabia and other Gulf countries refined a banking system aimed at promoting and propagating Islam around the world. The main financial vehicle to fund Islam was set up under the Islamic principle of Zakat, a legal almsgiving required as one of the five pillars of Islam at the standard rate of 2.5% on current assets and other items of income.

89. According to the Koran, only the poor and needy deserve Zakat. But some, for example, Omar Abu Omar (a/k/a Abu Kutada) an al-Qaeda principal in the United Kingdom, have acted to influence a trend to support those fighting the cause of Allah through Zakat funds.

90. As a result, the Zakat legal and religious duty has been usurped and abused by terrorists. John B. Taylor, Undersecretary of Treasury for International Affairs, stated in April

2002, that preventing terrorists from abusing financial institutions was a main goal in the war against terrorism.

91. Most of the Gulf State countries lack effective regulations to impose rules of accounting and auditing. The al Qaeda network extensively relied on funds diverted from the Zakat and other direct donations from sponsors through Islamic banks. Since 1998, Osama bin Laden made regular calls for Muslims to donate through the zakat system to his organization. In December 1998, during an interview with ABC News, he stated that:

> Muslims and Muslim merchants, in particular, should give their zakat and their money in support of this state [Taliban regime] which is reminiscent of the state of Medina (Al- Munawwarah), where the followers of Islam embraced the Prophet of God.

92. In September 2001, in a interview with Pakistani newspaper Ummat, he declared that:

> Al-Qaida was set up to wage a jihad against infidelity, particularly to counter the onslaught of the infidel countries against the Islamic states. Jihad is the sixth undeclared pillar of Islam. [The first five being the basic holy words of Islam ("There is no god but God and Muhammad is the messenger of God"), prayers, fasting (in Ramadan), pilgrimage to Mecca and giving alms (zakat).].

93. Osama bin Laden himself, in partnership with several Saudi and Gulf Islamic banks, founded a banking institution in Sudan that provided funding for terrorist operations. Several banks helped transferring funds to al Qaeda through the Zakat system, by direct donations, or by knowingly providing means to raise or transfer funds to the terrorist organization. Some banks controlled the Zakat fund beneficiaries, including charities, that have provided financial and logistical support to al Qaeda.

94. Islamic banking facilities, instruments and tools have provided essential support to the al Qaeda organization and operations. The banking Defendants in the lawsuit have acted

as instruments of terror, in raising, facilitating and transferring money to terrorist organizations. In doing so, the banking Defendants herein utlize, are part of, and/or are engaged in the international banking system and are subject to its rules, standards and practices.

## Al Baraka Investment and Development Corporation

95. Al Baraka Investment & Development Corporation (or "al Baraka"), a wholly owned subsidiary of Dallah Albaraka Group LLC (or "Dallah Albaraka"), is based in Jeddah, Saudi Arabia. Its investments include 43 subsidiaries, mainly banks in Arab and Islamic countries. Most of them are known as or registered as "al Baraka Bank." United States assets include al Baraka Bancorp Inc. in Chicago, Illinois, and al Baraka Bancorp Inc. in Houston, Texas.

96. A memo from the Russia Federation's Security Service details the al Baraka Bank's role in funding Defendant al-Haramain:

> On existing knowledge, part of the obtained financing comes from the charitable collections (Zakat) and goes to the personal foreign accounts of field commanders, including Khattab and Basayef.

97. Al Baraka provided Osama bin Laden with financial infrastructures in Sudan beginning in 1983. For example, the use of al Baraka Bank by al-Haramain was confirmed by a statement from al-Haramain chairman, Aqueel al-Aqueel, who declared that the charity maintained accounts at al Baraka Bank in Saudi Arabia.

98. Al Baraka Investment & Development is mostly present in the Sudanese banking sector, through assets held in Algharb Islamic Bank, Al Shamal Islamic Bank, Faisal Islamic Bank, Sudanese Islamic Bank and Tadamon Islamic Bank. Al Baraka is also affiliated with the National Development Bank in Sudan.

99. Defendant Saleh Abdullah Kamel was born in Makkah, Saudi Arabia, in 1941. After being the adviser to the Saudi Minister of Finance, in 1969 he founded Dallah Albaraka

Group LLC, quickly establishing himself as one of the leading promoters of an Islamic financial and banking system capable of rivaling large Western institutions.

100. Dallah Albaraka Group LLC, a diversified conglomerate based in Jeddah, Saudi Arabia, is involved in various industries, services and financial activities. The group includes twenty-three banks in Arab and Islamic countries, in addition to several investment and financial companies.

101. Dallah Albaraka Group LLC's portfolio includes a wholly owned subsidiary specializing in aviation-services, Dallah Avco Trans-Arabia Co Ltd. The company was formed in 1975 and is based in Jeddah, Saudi Arabia.

102. Two of the hijackers on September 11, 2001, of American Airlines Flight 77, Nawaf al Hazmi and Khalid al Mihdhar, received funding from Omar al Bayoumi (a/k/a Abu Imard), a Saudi national who paid their house rent in San Diego. Omar al Bayoumi is listed as a suspect wanted by the FBI in connection with the September 11, 2001 attacks.

103. Omar al Bayoumi was Assistant to the Director of Finance for an al Baraka company, Dallah Avco, a position he gave as a reference in an application for admission to Case Western Reserve University in Cleveland, Ohio in 1998.

104. On May 5, 1998, Omar Al Bayoumi registered a fictitious company name called Masjed al Madinah al Munawarah (a/k/a Masjid al Madinah al Munawarah) based in San Diego, California. In March 25, 1999 a mosque was registered in the State of Pennsylvania under the name of Masjid al Madinah al Munawwarah, Inc.

105. Dallah Albaraka Group LLC's financial arm is al Baraka Investment & Development (or "ABID"), a wholly owned subsidiary based in Jeddah, Saudi Arabia.

106. Saleh Abdullah Kamel, Chairman of Dallah al Baraka and al Baraka Bank, was one of the three founding members of Al Shamal Islamic Bank. Saleh Abdullah Kamel founded the bank in 1983, along with a Sudanese company, Al Shamal Investment and Development, and the Government of Northern State, then controlled by Governor Mutasin Abdel-Rahim, representative of Hassan al-Turabi.

107. The practice and policy of Dallah Albaraka Group LLC and al Baraka Bank is to provide financial support and material assistance to international terrorist organizations including al Qaeda.

108. In 1998, al Aqsa Islamic Bank was established with $20 million in capital. The main shareholders were Dallah al Baraka Group LLC and the Jordan Islamic Bank. Jordan Islamic Bank, a Dallah al-Baraka LLC subsidiary, owns 14 percent of al-Aqsa Islamic Bank. Saleh Abdullah Kamel acknowledged that Dallah al-Baraka Group LLC owns another twelve percent directly.

109. Al Baraka provided support to the "charity" al-Haramain operations and helped transfer funds for Osama bin Laden operations, as reported by the Bosnian Intelligence Agency (Agency for Investigation and Documentation – AID) in a memorandum titled "Some illegal activities of humanitarian organizations investigated by the relevant investigative bodies of the Federation of Bosnia Herzegovina (FbiH)":

> Records available for 1998 show a flow of money into the so-called "operating" account of the HO [Humanitarian Organization] at the Deposit Bank, Sarajevo, from the "main" account, sent from Saudi Arabia via the Deutsche Bank and the Albaraka Bank in Turkey. The amount is 1,059,687 DEM [$2.13 million].

110. Al Baraka Turkish Finance House, an al Baraka branch in Turkey, is a subsidiary of Dallah al Baraka Group LLC.

111. A Bosnian Intelligence memo regarding the activities of al-Haramain states the following:

> Given all the above security factors, we believe that the clear lack of any concrete humanitarian projects indicates that the existence of this HO [Humanitarian Organization] was a fictitious cover . . .

112. The report establishes al-Haramain's role in financing and assisting Osama bin Laden's operations.

> [t]he Saudi HO [Humanitarian Organization] al-Haramain, . . . has acted as a channel for financing the activites of terrorist organizations. . . . According to available intelligence, the Sarajevo office assisted the terrorist organization Gama al Islamija, while members of bin Laden's el Itihad al Islamija (AIAI) terrorist groups were employed at the Somalia offices, which also financed their operations.

113. Additional allegations regarding the charity Defendant al-Haramain are detailed below.

## **Al Shamal Islamic Bank**

114. Al Shamal Islamic Bank was formed in the Republic of Sudan (or "Defendant Sudan" or "Sudan") on April 1983, and started operations on January 2, 1990, with a paid capital of $3.9 million. Shares were issued between 1997 and 2000. In or about the same year of the bank's formation, Osama bin Laden moved several of his Saudi businesses and assets, or extended the reach of these businesses and assets, into the Republic of Sudan (or "Sudan").

115. A United States' State Department fact sheet on Osama bin Laden, dated August 14, 1996, notes Osama bin Laden's operations in Sudan since 1983: "In a 1994 interview, Bin Ladin claimed to have surveyed business and agricultural investment opportunities in Sudan as early as 1983."

116. In 1989, Hassan al Turabi installed a radical extremist Islamic government in Sudan through a *coup*. In 1991, Osama bin Laden settled in Sudan, by invitation of Hassan al

Turabi and the Sudanese government. A 1996 State Department fact sheet on Osama bin Laden described his operations in the country beginning in 1991:

> Bin Ladin relocated to Sudan in 1991, where he was welcomed by National Islamic Front (NIF) leader Hasan al-Turabi. (…) [bin Laden] embarked on several business ventures in Sudan in 1990, which began to thrive following his move to Khartoum. Bin Ladin also formed symbiotic business relationships with wealthy NIF members by undertaking civil infrastructure development projects on the regime's behalf.

117. Osama bin Laden's close relationship with the new extremist Sudanese regime became symbiotic and he conducted several business projects with or on behalf of the NIF. One of these investments was the Al Shamal Islamic Bank, as reported by the State Department:

> Bin Ladin and wealthy NIF members capitalized al-Shamal Islamic Bank in Khartoum. Bin Ladin invested $50 million in the bank.

118. Osama bin Laden's involvement in business transactions in Sudan including the Al Shamal Islamic Bank was confirmed by a 2002 Congressional Research Service Report:

> In 1991, bin Laden relocated to Sudan with the approval of Sudan National Islamic Front (NIF) leader Hasan al-Turabi. There, in concert with NIF leaders, [bin Laden] built a network of businesses, including an Islamic Bank (al Shamal), an import-export firm, and firms that exported agricultural products. An engineer by training, bin Laden also used his family connections in the construction business to help Sudan build roads and airport facilities. The business in Sudan (…) enabled him to offer safe haven and employment in Sudan to al Qaeda members, promoting their involvement in radical Islamic movements in their countries of origin (especially Egypt) as well as anti-U.S. terrorism.

119. Al Shamal Islamic Bank was founded in 1983 by three individuals or entities: (1) Al Shamal for Investment and Development, a Sudanese company; (2) Defendant Saleh Abdullah Kamel, Chairman of the Saudi Dallah al Baraka Group LLC; and (3) the Sudanese Government of Northern State, then controlled by Governor Mutasim Abdul-Rahim, Secretary General of the National Congress Party in Khartoum, and representative of extremist Hassan al-Turabi.

120. In April 1984, the Al Shamal Bank issued shares to its main founders. They included the Government of Northern State, the Defendant Faisal Islamic Bank – Sudan, Defendant Saleh Abdullah Kamel, his brother Omar Abdullah Kamel, and Defendant al Baraka Investment and Development (ABID), a wholly owned subsidiary of Dallah al Baraka Group LLC and Defendant Saleh Abdullah Kamel.

121. Among the shareholders of the Al Shamal Bank was Defendant Faisal Islamic Bank – Sudan, a subsidiary of Islamic Investment Company of the Gulf (Bahrain) EC, whose parent company is Defendant Dar-al-Maal al Islami (DMI), based in Switzerland. The three entities are chaired by Defendant Mohammed al Faisal al Saud, and controlled by Saudi investors.

122. Al Shamal Islamic Bank Chairman and shareholder, Defendant Adel Abdul Jalil Batterjee, is the Chairman of al-Bir Saudi Organization, whose United States branch, Benevolence International Foundation (or "BIF"), is also a front for al Qaeda sponsorship.

123. Defendant Adel Abdul Jalil Batterjee is both Chairman of the Al Shamal Islamic Bank and was also Chairman of the World Assembly of Muslim Youth. Batterjee is the subject of an FBI investigation for terrorist activities and is implicated in the criminal indictment of Enaam Mahmoud Arnaout of BIF.

124. Al Shamal Islamic Bank General Manager, Mohammad S. Mohammad, acknowledged in a September 2001 press release that Osama bin Laden had two accounts in the bank, opened on March 30, 1992 in the name of al-Hijrah Construction and Development Ltd. This company, according to the United States Department of State, worked directly with Sudanese military officials to transport and provide provisions to terrorists training in Osama bin Laden's terrorist training camps in northern Sudan.

125. A third Al Shamal Bank account was opened in 1993 in the name of Osama bin Laden’s company, Wadi al Aqiq, a company registered in Saudi Arabia. The import-export firm, in conjunction with Osama bin Laden’s Taba Investment Company Ltd., secured a near monopoly over Sudan's major agricultural exports of gum, corn, sunflower, and sesame products in cooperation with prominent NIF members.

126. Al Shamal Bank has repeatedly been used to fund criminal and terrorist activities. A former associate of Osama bin Laden, Jamal Ahmed al-Fadl, testified during the United States trial on the 1998 embassy bombings in Africa, that Osama bin Laden and at least six al Qaeda operatives held bank accounts in Al Shamal Islamic Bank under their real names.

> Q. While you were in the Sudan, did you handle money for Osama bin Laden?
> A. Could you repeat the question.
> Q. Did you work on the finances for al Qaeda while you were in the Sudan?
> A. Yes.
> Q. Did you know where the bank accounts of Osama bin Laden and al Qaeda were?
> A. Yes.
> Q. Do you know whose names they were in?
> A. The bank account under Osama bin Laden in Bank Shaml [al Shamal Islamic Bank], Khartoum.
> Q. That was under Osama bin Laden's true name?
> A. Yes.
> Q. Were there accounts in other names?
> A. Yes. Afad Makkee got account also.
> Q. Afad Makkee, the account that he had under his name, do you know what name that is?
> A. I remember Madani Sidi al Tayyib.
> Q. Do you know of any other persons who had al Qaeda money in their accounts?
> A. Abu Rida al Suri.
> Q. Do you know his true name?
> A. Nidal.
> Q. Anyone else that you knew had al Qaeda money in bank accounts in their name?
> A. Abu Hajer al Iraqi.
> Q. Do you know his true name?

A. Mamdouh Salim.
Q. Did you have any accounts in your name?
A. Shared with Abu Fadhl.
Q. So you had accounts in your name that were shared with Abu Fadhl?
A. Yes.
Q. Do you recall anyone else that had bank accounts in their name for al Qaeda?
A. Abdouh al Mukhlafi.

127. Jamal Ahmed al-Fadl also testified that al Qaeda operatives received monthly checks of several hundred dollars from Al Shamal Islamic Bank accounts:

Q. When you worked for Osama bin Laden, in the Sudan, how much were you paid?
A. $1,200 . . . per month.
Q. For how long did you work for him?
A. Almost two years.
Q. What banks did he keep his money at?
A. Bank el Shamar [Al Shamal Islamic Bank].
Q. Any other banks?
A. I think he had accounts in different banks, but I only recall Bank Shamar [al Shamal Islamic Bank].

128. Jamal Ahmed al-Fadl also testified that he transferred $100,000.00 from Al Shamal Islamic Bank to an al Qaeda representative in Jordan:

Q. How did you carry the $100,000?
A. In my bag with my clothes.
Q. Do you recall what kind of bills the $100,000 was in?
A. I remember they all hundred bill.
Q. Sorry?
A. They all hundred bill.
Q. They were all hundred dollar bills?
A. Yes.
Q. Who gave you the money?
A. Abu Fadhl, he bring it from Shamal Bank [al Shamal Islamic Bank] and he bring it to me.
Q. Abu Fadhl brought it from the Shamal Bank [al Shamal Islamic Bank]?
A. Yes.

129. During the course of the same trial, another associate of Defendant Osama bin Laden, Essam al Ridi, testified that the Al Shamal Bank was used for al Qaeda operational

purposes, stating that "$250,000 was wired from Al Shamal Islamic Bank" in 1993 via Bank of New York to a Bank of America account held in Dallas, Texas -- where he used it to "buy a plane delivered to bin Laden . . . intended to transport Stinger missiles. . . ." in 1993.

130. Following September 11, 2001, the Chairman of the Senate Armed Services Committee and Chairman of the Permanent Subcommittee on Investigation of the Governmental Affairs Committee testified that Defendant Al Shamal Islamic Bank operations continue to finance and materially support international terrorism and that there are indications that Osama bin Laden remains the leading shareholder of that bank.

## Al-Rajhi Banking and Investment Corporation

131. Officially founded in 1987, Defendant al-Rajhi Banking & Investment Corporation, (or "al-Rajhi Bank") has a network of nearly 400 branch offices throughout Saudi Arabia and manages seventeen subsidiaries across the world. Defendant Sulaiman Abdulaziz al-Rajhi is the Managing Director of al-Rajhi Banking & Investment Corporation and Defendant Saleh Abdulaziz al-Rajhi is the Chairman.

132. The al-Rajhi Banking & Investment Corporation is the primary bank for a number of charities that serve as al Qaeda front groups. Al-Haramain Islamic Foundation, the Muslim World League, and the International Islamic Relief Organization all funnel terrorism financing and support through the al-Rajhi Banking & Investment Corporation financial system. One of the hijackers in the September 11, 2001 attacks, Abdulaziz al-Omari, who was aboard American Airlines Flight 11, held an account with al-Rajhi Banking & Investment Corporation.

133. Defendant Sulaiman Abdul Aziz al-Rajhi has a history of financially supporting al Qaeda terrorists. Sulaiman Abdul Aziz al-Rajhi managed the National Commercial Bank budget of the Saudi Joint Relief Committee. The al-Rajhi family is also the primary financier of the

SAAR Foundation Network and, as such, is implicated by the SAAR Network's sponsorship of terrorism and Osama bin Laden. Saleh Abdulaziz al-Rajhi has been closely linked to Osama bin Laden's personal secretary and convicted terrorist, Wadih el-Hage. When the Kenyan house of Osama bin Laden's personal secretary, Wadih el-Hage, was raided in 1997, information regarding Saleh Abdulaziz al-Rajhi was discovered. Wadih el-Hage is a known al Qaeda member who was convicted for the 1998 United States Embassy bombings in Kenya and Tanzania.

134. Co-conspirators, agents, aiders and abettors of the al-Rajhi banking scheme and enterprise to fund or otherwise materially support terrorism include: Sulaiman Abdul Aziz al-Rajhi, Saleh al-Rajhi, Abdullah Sulaiman al-Rajhi, and Khalid Sulaiman al-Rajhi. All of these Defendants do business in and have a significant business presence in the United States, including but not limited to, through al-Watania Poultry, one of the World's largest poultry businesses, and through Defendants Mar-Jac Poultry, Inc., Mar-Jac Investments, Inc. and Piedmont Poultry. They are also material sponsors of international terrorism.

135. Al Qaeda, and other international terrorist organizations, raise money from a variety of sources and move money in a variety of manners. Once the system is in place to raise the money, a set of mechanisms is necessary to move the money. "The first, and most simple, is the ubiquitous and highly efficient global financial system, including the interconnected network of banks and other financial institutions that undergird the global economy. For years, al Qaeda has been particularly attracted to operating in under-regulated jurisdictions, places with limited bank supervision, no anti-money laundering laws, ineffective law enforcement institutions, and a culture of no-questions-asked bank secrecy." "*Terrorist Financing, Report of an Independent*

*Task Force Sponsored by the Council on Foreign Relations*" ("*Terrorist Financing Report*"), pg. 14, Maurice R. Greenberg, Chair, 2002.

136. Al Qaeda has infiltrated and abused the Islamic banking system, a typically legitimate form of investment and finance that abides by Shariah, or Islamic law, which prohibits the earning or payment of interest. "Many prominent Islamic banks operate under loose regulatory oversight, in part because they are based in jurisdictions without proper controls, but also because their religious nature often allows them a greater degree of autonomy owing to obvious domestic considerations. Islamic banks regularly commingle funds from depositors to place them within group investments by fund managers, creating ready opportunities for anonymous money transfers and settlement. Moreover, al Qaeda and other terrorist groups that use Islam to justify their activities are also more likely to find willing collaborators within the Islamic banking system." *Terrorism Financing Report*, pg.15. Al Rajhi Banking & Investment Corporation ("Al Rajhi") is one such willing al Qaeda collaborator, aider and abettor.

137. Al Qaeda and other terrorist groups, in partnership with banks, financial entities and charities, have successfully implemented a global financing system to collect and distribute money to terrorist individuals, cells and networks in every corner of the world by perverting and taking advantage of every Muslim's religious duty - - payment of Zakat.

138. One of the so-called "five pillars" of Islam is Zakat or almsgiving. The Quran requires every Muslim, individuals and corporations, to give Zakat for specific charitable purposes identified in the Quran. The standard rate for Zakat is 2.5% of current assets and other items of income. In Saudi Arabia, Muslims are legally required to fulfill their Zakat obligation. The Kingdom of Saudi Arabia's Department of Zakat and Income Tax (DZIT), under the

auspices of the Kingdom's Ministry of Finance, organizes, audits, and collects Zakat from all individuals and companies holding Saudi citizenship.

139. Each year, every able Muslim Saudi citizen and Saudi company is obligated to donate 2.5% of his or its assets, in money or kind, to the poor and indigent as specified in the Quran. This legal and religious duty is generally satisfied by yearly donations to charities that operate both within the Kingdom of Saudi Arabia and elsewhere. Many of these charities have financed and continue to finance international terrorism under the cover of supporting Islamic schools, mosques, or orphanages.

140. It is estimated that hundreds of Saudi-based charitable organizations distribute as much as $4 billion dollars each year. Under Islamic law, there are no taxes, and the Zakat money serves as a social support system. Zakat funds are often provided in cash to prominent, trusted community leaders, or to institutions such as banks, which then commingle and disperse donated monies to persons or charities that they deem worthy. These practices have allowed unscrupulous front groups or charities to fund violent, extremist Islamic groups, including al Qaeda. Al Qaeda and its mentors, sponsors, and facilitators are responsible for the horrific acts of terror on September 11, 2001. The charities that Al Rajhi has sponsored include, but are not limited to, Muwafaq Foundation, Al Haramain, Benevolence International Foundation, International Islamic Relief Organization ("IIRO"), Muslim World League, and World Assembly of Moslem Youth ("WAMY").

141. Islamic banks are major donors to Islamic charities as a result both of their own corporate Zakat obligations as well as their guidance and involvement in the distribution of the Zakat payments of their individual depositors. Most Islamic banks maintain a Zakat Department. This department selects the recipients for the bank's own Zakat donations and is charged with

ensuring that the Zakat is in fact distributed to worthy and appropriate recipients so that the donation satisfies the bank's religious obligation as set forth in the Quran and under Shariah law. As a result, Islamic religious charities have tremendous influence and power in the Middle East, in Saudi Arabia, and throughout the world.

142. Islamic banks, through their Zakat Departments, also typically provide services to individual depositors to assist them in selecting recipients for their Zakat funds and also to facilitate the actual donations. Depositors make use of these services and do so in reliance on the banks to ensure that the donation is made to worthy recipients so that the donation complies with Shariah law and satisfies the depositor's Zakat obligation. Al Rajhi engages in the provision of banking and Zakat services as described above.

143. Islamic banks that adhere to Shariah principles must also calculate the percentage of unlawful or unacceptable income that is collected but is considered unacceptable according to Shariah principles. This income is referred to as "Hararm," or forbidden. Examples of Hararm income include, among other things, any interest that is earned as a result of an account holder's credit balance and any income derived by a corporation from impure activities such as gambling or the sale of liquor. Hararm income that must be given away cannot count as a virtuous or charitable act. As such, it cannot fulfill a Muslim's Zakat obligation. Donations of Hararm income, then, are made in addition to donations made to satisfy the Zakat requirement.

144. In addition to the actual monetary donations to charities, Islamic banks like Al Rajhi also provide a broad range of facilities, material support, and banking services to charities. These activities include assistance in the actual distribution of both individual and corporate Hararm and Zakat obligations, the maintenance of numerous bank accounts for various charities and individuals associated with the charities, accounts specifically set up for the collection of

donations; inclusion in a charities' advertisements meant to raise donations and/or website of a bank's name and account information where donations can be sent directly; and the facilitation of wire transfers to and from various entities and charities.

145. Islamic law prohibits the collection of interest. As a result, investors must invest funds either in private businesses or partnerships rather than in traditional interest-bearing accounts. Under this system, Islamic banks serve as an active business partner and agent with their customers in a partnership or collaboration to manage and invest the customer's capital in a mutually beneficial way. According to the Al Rajhi Banking & Investment Corp. website:

> Unlike their counterparts elsewhere, Islamic bankers do not expect to advance money and receive a predetermined sum on a fixed date in the future. Under the Shariah, the bedrock of the Islamic faith, they are instead responsible for ensuring that money is invested in viable projects, with reliable borrowers. If the project succeeds the banker shares in the profit. If it fails he suffers the losses.

(*See* Al Rajhi website profile; www.alrajhibank.com.)

146. As partners, the bank and its partners, co-conspirators or agents have a close and collaborative relationship that requires that the bank be aware of the project or business involved in the transactions, the source of its funding and its goals, successes and failures. In other words, the Islamic bank's relationship to its investment "customer" is akin to the relationship between Western business partners, and completely unlike the more arms-length Western banking relationship between customers and banks.

147. Charities that directly (or through indirect channels) sponsor, fund, materially support, conspired to cause, aid and/or abet international terrorism rely extensively on funds from both Zakat and Hararm donations made by and/or passed through Islamic banks on behalf of themselves and/or their depositors, and they rely on banks, including Al Rajhi, to facilitate the illicit transfer of funds.

148. Since at least 1998, Osama bin Laden made open and public calls for Muslims to donate through the Zakat system to his terrorist organization. In December 1998, during an interview with ABC News, Osama bin Laden said “Muslims and Muslim merchants, in particular, should give their Zakat and their money in support of this state [the Taliban Regime] which is reminiscent of the state of Medina (Al-Munawwarah), where the followers of Islam embraced the Prophet of God.”

149. On August 21, 1998, the President of the United States signed an Executive Order blocking the assets of Osama bin Laden and his terrorist cells, including al Qaeda, as international terrorists. Osama bin Laden, his sponsors and followers, were known to openly promoting hatred and violence against innocents long before this time. On September 23, 2001, in direct response to the terrorist acts on September 11, the President signed Executive Order 13224, which ordered the blocking of property of and prohibition of transactions with persons who commit, threaten to commit, or provide financial or other support to support terrorism. The list of these “specially designated global terrorists” or terrorist organizations (“SDGT”) included Osama bin Laden and al Qaeda.

150. Early in the formation of al Qaeda, at a time when its objective was global Jihad, warfare and bloodshed envisaging terrorist attacks against "Western" targets, Osama bin Laden received financial support from a group of wealthy donors from the Gulf areas known as the Golden Chain. The list of donors includes Defendants Ibrahim Afandi, Saleh Kamel, Bin Mahfouz, and Al-Rajhi. Defendant Adel Batterjee is also listed on the Golden Chain of financiers for al Qaeda, alongside Osama bin Laden.

151. In full recognition of Islamic banking principles, Osama bin Laden and his al Qaeda organization, in partnership with several Saudi and Gulf Islamic banks, founded banking

institutes in The Republic of Sudan that provided material funding and support for international terrorist operations and organizations and constituted an enterprise. Al Rajhi was a particpant in this enterprise and material support network.

152. Al Rajhi is a Saudi Joint Stock Company. It was formed and licensed as a commercial bank pursuant to Saudi Royal Decree on June 30, 1987. Its headquarters are in Riyadh, Saudi Arabia.

153. Al Rajhi is one of the leading financial institutions in the Kingdom of Saudi Arabia and one of the largest companies in the Middle East. It provides a range of corporate and personal banking services in Saudi Arabia and has the largest retail branch network in the Kingdom. By the end of 2002, Al Rajhi had 377 branches within the Kingdom and the largest number of ATM machines of any bank in the Kingdom. Al Rajhi also continues to expand its international network. In addition, Al Rajhi manages and operates seventeen subsidiaries across the world, and maintains a global presence.

154. Al Rajhi operates under Islamic principles, paying no interest on deposits, and performing financial transactions in line with Shariah, a set of rules and laws that guide economic, social, political, and cultural aspects of the daily lives of Muslims. Shariah originates from both the rules dictated by the Quran, its teachings and sayings (also called "hadith") of the Prophet Muhammed.

155. As explained on its website, Al Rajhi established a Shariah Board; "to substantiate and materialize the Islamic role of the Corporation and to implement Shariah rules and principles. The Board reviews all our investment and lending schemes and advises us on their validity in the light of the Shariah." (Website profile of Al Rajhi, www.alrajhibank.com.sa/shariahboard.htm).

156. Al Rajhi sought and seeks depositors from the general public in Saudi Arabia and throughout the world. It also sought and seeks capital from its shareholders. Al Rajhi makes its money from investing its depositor's money and from investing its own and others' capital. Al Rajhi, as other Islamic banks, pays no interest to its depositors, but makes its money through active partnership with them.

157. As one of the largest Muslim banks in the Middle East, and as an Islamic bank particularly known for its adherence to Shariah, Al Rajhi was and is a bank of choice for many major charities in Saudi Arabia. Al Rajhi consistently touts its widespread involvement in cultural and social charity activities organized by Academic, Scientific and Health Authorities in the Kingdom of Saudi Arabia. According to its website, Al Rajhi "is present in all cultural and social occasions starting from donations to charity and Holy Quran recitation societies, sponsorship to cultural, scientific and health activities and allocation of scholarships on Islamic banking studies." (See Al Rajhi website, www.alrajhibank.com.sa/finPortal/published/aboutus/content/culture.htm).

158. Consistent with Al Rajhi's public statements that all of its activities are in compliance with Shariah rules, questions and inquiries concerning Islamic law are submitted by Al Rajhi to its own Shariah Board and/or Authority for guidance and oversight. The Al Rajhi Shariah Board issues religious and legal recommendations in connection with Al Rajhi's banking and investment activities and services. In addition, Al Rajhi's Shariah Monitoring Department follows up on implementation of these decisions with field inspections.

159. Members of the Al Rajhi Shariah Board as of February 2003 include:

Sheikh Abdullah bin Aqull, Chairman
Sheikh Abdullah bin Minea', Deputy Chairman
Sheikh Abdullah bin Bassam

Sheikh Abdullah Al-Zayid
Sheikh Saleh bin Humaid
Sheikh Ahmad Al-Mubaraki
Sheikh Abdul-Rahman Al-Atram

160. As a Saudi Arabian entity, Al Rajhi has its own Zakat obligation. Each year, it is obligated to donate 2.5% of its current assets and other items to recipients who fall within one of the categories for almsgiving set forth in the Quran. Rather than provide charity directly to the poor or needy, Al Rajhi satisfied, and continues to satisfy, its Zakat obligation by donating to charities of its own choosing for disbursement. The charities are then to disburse the money. The charities to which Al Rajhi has contributed or otherwise supported in this fashion include, among others, Al Haramain, IIRO, Muslim World League, WAMY, and the Saudi Joint Relief Committee. These charities and the individuals they sponsor cannot function or operate without the support of banks, including Al Rajhi.

161. Accounting with respect to Zakat is based on Zakat rules and regulations in the Kingdom of Saudi Arabia. As of January 1, 2001, Al Rajhi considers Zakat a liability of its shareholders to be deducted by Al Rajhi from dividend distributions.

162. Al Rajhi has made its Zakat payments to the extent it believes is required for the years up to and including December 31, 2000.

163. Al Rajhi has made its Zakat payments to the extent it believes is required for the years up to and including December 31, 2000.

164. Islamic banks identify and calculate Hararm income for their depositors and investors. Islamic banks typically maintain a Department to oversee and distribute Hararm income for themselves as well as for their individual depositors and to ensure that both the donation amount and its subsequent distribution comply with Shariah law. As a result of those

obligations and services, Islamic banks were and are directly involved in the selection of beneficiaries and the donation of billions of their own and their depositors' dollars to charities that sponsor terrorism.

165. In addition, Al Rajhi has its own Hararm obligation that must be calculated and subsequently donated to charity. Rather than provide charity directly to the needy, Al Rajhi satisfied, and continues to satisfy, its Hararm obligation by donating to charities of its own choosing. The charities, in theory, are to disburse the money to the needy. The charities to which Al Rajhi has contributed in order to satisfy its Hararm obligation include, among others, Al Haramain, IIRO, Muslim World League, WAMY, and Saudi Joint Relief Committee. These charities cannot function without the support of banks, including Al Rajhi.

166. Through its Zakat department, Al Rajhi assists individual depositors and account holders who, like Al Rajhi, wish to satisfy their Zakat and Hararm obligations by donating to charitable organizations, rather than by direct contribution to the needy. Al Rajhi selects, or participates in the selection of, the charities that will receive and distribute the Zakat and Hararm payments of both Al Rajhi itself and the Al Rajhi depositors and account holders who make use of this service.

167. Through its Zakat Department, Al Rajhi was and is directly involved in the selection of beneficiaries and the donation of billions of its own and its investors' and depositors' money. The charities selected by Al Rajhi's Zakat department to receive these donations include, among others, Al Haramain, IIRO, Muslim World League, WAMY, and Saudi Joint Relief Committee. Al Rajhi knew or had to know that the funds that it collected for and distributed to Al Haramain, IIRO, Muslim World League, WAMY, Saudi Joint Relief

Committee and other charities materially supported, aided and abetted al Qaeda, international terrorists and their activities.

168. In order to ensure that it's Zakat and Hararm contributions, and those of its depositors and accountholders will, in fact, satisfy their religious obligations under Islam, Al Rajhi is required to determine that the ultimate recipients of these contributions fall within one of the categories prescribed in the Quran for recipients of Zakat. As a result, Al Rajhi knew or had to know the intent and purpose of these charities, the individuals who control them, including board members and trustees, the sources of their funding, the beneficiaries and uses of the donations collected and their respective amounts. In making these determinations, Al Rajhi is assisted by the fact that many of the charities maintain accounts with Al Rajhi. Al Rajhi had ready access to records of checks and wire transfers made by the charities that it can examine to ensure that the money dispersed or spent by the charities has actually been used for the purpose of charity.

169. Al Rajhi acts as a partner or collaborator with the charities with respect to the management and accounting of the donations (that flow both to and from the charity), the collection of Zakat and Hararm, the selection of beneficiaries, and the investment of capital for the charities and their board members, directors and officers. As stated above, Al Rajhi knew or had to know the intent, purpose or goals of these charities, the individuals who control the charities, including board members and trustees, the sources of their funding, the beneficiaries of the funds collected and their respective amounts.

170. Al Rajhi knew or had to know that al Qaeda was an international terrorist organization that was widely and publicly known to openly promote indiscriminate violence against America and that its target was and remains the United States. Al Rajhi also knew or had

to know that al Qaeda was and is the manager and recipient of millions of dollars from charities, including Al Haramain, IIRO, Muslim World League, WAMY, Saudi Joint Relief Committee and others. As such, Al Rajhi aided, abetted, acted in concert with and/or materially supported al Qaeda terrorists, international terrorist activities, and the al Qaeda enterprise.

171. As a result of its obligation to inquire and its ready access to information about the charities in question, Al Rajhi knew or had to know that certain charities, including Al Haramain, IIRO, Muslim World League, WAMY, and Saudi Joint Relief Committee, were using funds collected to support and sponsor al Qaeda terrorists and international terrorist activities. As such, Al Rajhi aided, abetted and materially supported the al Qaead terrorists, international terrorist activities, and the al Qaeda enterprise.

172. As a result of its obligation to inquire and its ready access to information about the charities in question Al Rajhi knew or had to know that the funds that it collected on behalf of certain charities, including Al Haramain, IIRO, Muslim World League, WAMY, and Saudi Joint Relief Committee, were likely to be used for terrorist activities against the United States, its citizens, and for other illegal terrorist-related purposes. As such, Al Rajhi aided, abetted, conspired with and materially supported al Qaeda terrorists, terrorist activities, and the al Qaeda enterprise.

173. As a result of its obligation to inquire and its ready access to information about the charities in question, Al Rajhi knew or had to know that the funds that it managed, on its own behalf and on behalf of its depositors and accountholders, of certain charities, including Al Haramain, IIRO, Muslim World League, WAMY, and Saudi Joint Relief Committee, were reasonably foreseeable and/or likely to be used for terrorist activities and terrorist-related

purposes against the United States. As such, Al Rajhi aided, abetted and materially supported such terrorists, terrorist activities, and the al Qaeda enterprise.

174. Despite the actual and/or implied knowledge that money contributed to these charities was being used to support terrorist activities, Al Rajhi continued to send funds to these charities in the form of Zakat and Hararm contributions on its own behalf and on behalf of its depositors and accountholders. Through these contributions, Al Rajhi aided, abetted, conspired with and/or materially supported al Qaeda terrorists and international terrorist activities. Al Rajhi provided additional material support in the form of wire transfers of money from charities to terrorists and in the form of links from certain websites that permitted donors to send their contributions directly to Al Rajhi accounts maintained by these charities.

175. Al Rajhi knew or had to know knowledge that certain of its depositors, and in particular, the Defendant charities herein, were material supporters of terrorism and terrorist activities. Despite this knowledge, Al Rajhi continued its partnership and collaboration with these charities and as a result, Al Rajhi itself aided, abetted, conspired with and/or materially supported international terrorism, terrorist activities, and the al Qaeda enterprise.

176. As a result of its obligation to inquire and its ready access to information about the charities in question, Al Rajhi knew or had to know that certain charities, including Al Haramain, IIRO, Muslim World League, WAMY, and Saudi Joint Relief Committee, were using a portion of the funds they collected to support and sponsor terrorists and terrorist activities. As such, Al Rajhi aided, abetted and materially supported terrorists, terrorist activities, and the al Qaeda enterprise.

177. As a result of its obligation to inquire and its ready access to information about the charities in question, Al Rajhi knew or had to know that the funds that it collected on behalf

of certain charities, including Al Haramain, IIRO, Muslim World League, WAMY, and Saudi Joint Relief Committee, were reasonably foreseeable and/or likely to be used for international terrorist activities and terrorist-related purposes. As such, Al Rajhi aided, abetted and materially supported international terrorists, terrorist activities, and the al Qaeda enterprise.

178. As a result of its obligation to inquire, and its ready access to information about the charities in question, Al Rajhi knew or had to know that the funds that it managed or contributed, on its own behalf and on behalf of its depositors and accountholders, to certain charities, including Al Haramain, IIRO, Muslim World League, WAMY, and Saudi Joint Relief Committee, were reasonably foreseeable and/or likely to be used for international terrorist activities and terrorist-related purposes.

179. One of the hijackers in the September 11, 2001 attacks, Abdulaziz al-Omari, who was aboard American Airlines Flight 11, maintained an account with Al Rajhi numbered 162608010366080 and was issued a Visa debit card number 4909-8016-2002-5457. Mohammed Atta, the lead hijacker on flight 11 and leader of the September 11 operation, made a transfer to this Al Rajhi account held by Al Omari. As such, Al Rajhi facilitated, aided, abetted and materially supported terrorists, terrorist activities, and the al Qaeda enterprise.

180. At all relevant times, Al Rajhi maintained and provided services for a large number of bank accounts for Al Haramain Islamic Foundation. Al Rajhi continues the maintenance of Al Haramain’s accounts despite the fact that Al Haramain was banned from Kenya in September 1998 as a result of national security concerns following the 1998 terrorist attacks on the United States embassies in Tanzania and Kenya. Al Rajhi continues to maintain Al Haramain’s accounts despite Al Haramain’s designation on March 11, 2002 as terrorist organizations by both the United States and Saudi Arabian authorities for its diversion of

"charitable funds" to al Qaeda and international terrorism prior to September 11, through its Somalia and Bosnia-Herzegovina branches.

181. Al Rajhi knew or had to know that certain of its depositors, and in particular, Al Haramain, were material supporters of terrorism and terrorist activities. Despite the open and public nature of this information, Al Rajhi continued its partnership and collaboration with Al Haramain and as a result, Al Rajhi itself aided, abetted, conspired with and/or materially supported terrorism and terrorist activities.

182. The relationship between Al Rajhi and Al Haramain is, among other things, a collaboration that maximizes donations for Al Haramain and profits for Al Rajhi. This benefit to Al Rajhi is a result of Al Haramain's involvement in and material support of terrorist activities and the al Qaeda enterprise.

183. At all relevant times, Al Rajhi maintained and provided services for WAMY including at least two bank accounts; 111/6 (branch of Shahar Quarter, 335) and 66-1 (Al Mazra'a branch (2), Riyahd, 446).

184. Al Rajhi knew or had to know that certain of its depositors, and in particular, WAMY, were material supporters of terrorism and terrorist activities. Despite this knowledge, Al Rajhi continued its partnership and collaboration with WAMY and as a result, Al Rajhi itself aided, abetted and materially supported the resulting acts of international terrorism and terrorist activities.

185. The relationship between Al Rajhi and WAMY is, among other things, a collaboration that maximizes donations for WAMY and profits for Al Rajhi. This benefit to Al Rajhi is a result of WAMY's involvement in and support of terrorist activities.

186. At all relevant times, Al Rajhi maintained and provided services to Muslim World League, including the maintenance of accounts numbered 3206080100870-40 and 8885.

187. Al Rajhi knew or had to know that certain of its depositors, and in particular, Muslim World League, were material supporters of terrorism and terrorist activities. Despite this knowledge, Al Rajhi continued its partnership and collaboration with Muslim World League and as a result, Al Rajhi itself aided, abetted and materially supported terrorism and terrorist activities.

188. The relationship between Al Rajhi and Muslim World League is, among other things, a collaboration that maximizes donations for Muslim World League and profits for Al Rajhi. This benefit to Al Rajhi is a result of Muslim World League's involvement in and support of terrorist activities.

189. At all relevant times, Al Rajhi maintained accounts and provided services to IIRO, including account number 77700. In addition, the Saudi Embassy website in 2000 reported in a press release that IIRO was launching a campaign to assist Palestinians. Specifically, IIRO called for the payment of $1,000 for the family of each "martyr." The press release also reported that an account was set up at Al Rajhi to accept funds. (http://www.saudiembassy.net/press_release/00_spa/10-12-mideast.html)

190. Al Rajhi oversees and facilitates the donations to IIRO by providing account services for that express purpose and by allowing IIRO to advertise both the existence of the account and its banking relationship with Al Rajhi.

191. Al Rajhi knew or had to know that certain of its depositors, and in particular, IIRO, were material supporters of terrorism and terrorist activities. Despite this knowledge, Al

Rajhi continued its partnership and collaboration with IIRO and as a result, Al Rajhi itself aided, abetted and materially supported international terrorism and terrorist activities.

192. The relationship between Al Rajhi and IIRO is, among other things, a collaboration that maximizes donations for IIRO and profits for Al Rajhi. This benefit to Al Rajhi is a result of IIRO's involvement in and support of terrorist activities.

193. From at least 1999, Al Rajhi oversees and facilitates the donations to the Saudi Joint Relief Committee ("SJRC") by providing account services for that express purpose and by allowing SJRC to advertise both the existence of the account and its banking relationship with Al Rajhi. SJRC was directed by a founder of al Qaeda, Defendant and co-conspirator Wa'el Julaidan.

194. Al Rajhi oversees and facilitates the donations to SJRC by providing account services for that express purpose and by allowing SJRC to advertise both the existence of the account and its banking relationship with Al Rajhi.

195. Al Rajhi knew or had to know that certain of its depositors, and in particular, SJRC, were material supporters of terrorism and terrorist activities. Despite this knowledge, Al Rajhi continued its partnership and collaboration with SJRC and as a result, Al Rajhi itself aided, abetted and materially supported terrorism and terrorist activities.

196. The relationship between Al Rajhi and SJRC is, among other things, a collaboration that maximizes donations for SJRC and profits for Al Rajhi. This benefit to Al Rajhi is a result of SJRC's involvement in and support of terrorist activities.

197. Al Rajhi has engaged in a common course of conduct as it relates to knowing sponsorship of international terrorism. HAMAS is a radical Islamic organization formed in 1987. It origins were the Muslim Brotherhood, an international Islamic extremist movement

which sought the creation of one Arab nation governed by Shariah law. HAMAS perpetrates suicide attacks against civilians and military targets.

198. HAMAS has been on the U. S. State Department's List of Designated Foreign Terrorist Organizations since December 1995.

199. In the 1970's, members of the Muslim Brotherhood began creating an international banking network that would operate out of the reach of Middle Eastern governments which opposed the Muslim Brotherhood and provide material support to HAMAS, and later to al Qaeda. The network was headed by Defendant Youseff Nada. His terrorist-related activities led to his recognition as a sponsor of international terrorism, and his ultimate designation by the United States as a Specially Designated Global Terrorist ("SDGT") on November 7, 2001 for support of al Qaeda.

200. Another organization that provided funding to HAMAS is a Texas organization, Infocom. One of its founders was Chairman of the Board of Holy Land Foundation for Relief and Development. As a result of its ties to HAMAS, and dealings with HAMAS leader and designated terrorist Mousa Marzouk and his personal secretary, Nasser Al Khatib, Infocom was raided by the FBI, and United States Customs Immigration and Naturalization on September 6, 2001 and its assets blocked by the United States Treasury.

201. Al Rajhi chose Infocom to host its website notwithstanding that it knew that Infocom company was owned and operated by HAMAS leader and SDGT Mousa Marzook (designated in 1995) and his relations. Payments of $706,566 were made to Marzook from an Al Rajhi account between January 1989 and December 1991. Marzook and one of his agents made a total of 11 wire transfers totaling $2,003,659 into an Al Rajhi bank account from January 1989 through September 1992. In 1992 five transfers totaling $1,295,093 were made from an

account with Al Rajhi to Al Khatib. Between 1991 and 1997, 48 wire transfers totaling $1,542,804 were made from an account with Al Rajhi to Infocom which cannot be attributed to fees for website handling.

202. Al Rajhi acts as a partner or collaborator with investors and depositors such as Marzook. At all relevant times, Al Rajhi knew or had to know that Marzook was engaged in acts of terrorism. As such, Al Rajhi has historically engaged in a pattern and conduct and aided, abetted and materially supported international terrorists.

203. Abdul Aziz Al-Khereiji, an executive on the Board of Al Rajhi between April 3, 1999 and autumn 2000, was, at the same time, one of four shareholders of Isle of Man company, Muwaffaq Limited (a/k/a/ Blessed Relief Foundation), an organization collecting and distributing funds for al Qaeda. One of the two directors and a fellow shareholder of Muwaffaq Limited was Yasin al Qadi. On November 22, 1999, when al Qadi resigned as director, Al-Khereiji took his place on the board. The use of Muwaffaq Limited as an al Qaeda front to receive funding from Saudi businessmen resulted in the freezing of al Qadi's assets by the United States Treasury and his designation as a SDGT in October 2001. In addition, al Qadi and Yaqub Mirza were business partners in a company based in Boston, Massachusetts, called Ptech, Inc.

204. At all relevant times, Al Rajhi knew or had to know that its Director Al-Khereiji was also a Director of a terrorist front, Muwaffaq Limited. As such, Al Rajhi aided, abetted and materially supported terrorists and terrorist activities.

205. Directors and advisory members of Al Rajhi and its Shariah Boards share directorships and advisory positions with charities that are Defendants in this case. The

knowledge of these bank directors, officers, and board members, of the terrorist activities of the individuals and charities, will be directly imputed to Al Rajhi.

206. On or about December 1999, Al Rajhi directly funded Tulkarm Charity Committee, a known front for HAMAS, in checks drawn from the correspondent New York bank account of Al Rajhi Banking & Investment Corporation. Al Rajhi knew or had to know that these payments were likely to be used for terrorist activities and terrorist-related purposes.

207. Most of the countries in the Middles East, including Saudi Arabia, have ineffective and/or rudimentary bank supervisory, anti-money laundering laws and anti-terrorist financing in place. In the countries that do have such laws, implementation is weak or non-existent. To address this problem, strategic initiatives were undertaken by the United States Congress and Administration, and the international community to help change the environment that facilitates and advances terrorist financial and support networks. These efforts have included multilateral initiatives through the United Nations Counter-Terrorism Committee (CTC), the International Monetary Fund (IMF), the World Bank, and the Financial Action Task Force (FATF) - - a twenty-nine member intergovernmental organization established by the G-7 in 1989 to set international anti-money laundering standards. In 1995, international efforts resulted in the formation of the Egmont Group, which is intended to knit together like-minded nations focused on preventing financial crimes through the work of the Financial Intelligence Unit (FIU) in each member nation.

208. The Kingdom of Saudi Arabia is neither a member of FATF nor Egmont Group. Its banks, including Al Rajhi Investment and Banking Corporation, likewise do not comply with FATF and/or Egmont Group regulations. Al Rajhi is obliged to follow the Accounting Standards for Commercial Banks issued by the Saudi Arabian Monetary Agency ("SAMA"), the Central

Bank of Saudi Arabia, and the International Accounting Standards ("IAS"). Al Rajhi is regulated and supervised by SAMA. Since 1999, it has been required to cooperate with SAMA concerning investigations into terrorist financing.

209. Although FATF requirements have not been adopted by SAMA or any other regulatory body within Saudi Arabia, they are nevertheless recognized throughout the world as the minimum banking standards by which all such institutions should practice. The purpose of these regulations is to both insure that criminals and terrorists do not manipulate banks to fund their terrorist schemes and to prevent banks from assisting terrorists and terrorist acts.

210. In 1999, William Weschler of the National Security Council and Richard Newcomb of the Office of Foreign Assets Control (OFAC) traveled to Saudi Arabia to specifically warn SAMA and Al Rajhi that their financial systems were being manipulated or utilized to fund terrorist organizations such as al Qaeda. In addition, FATF, the U.S. Treasury Department and a number of other international financial bodies specifically warned SAMA and other officials within the government of Saudi Arabia that they must adopt "know your customer" and anti-money laundering and anti-terrorist financing regulations and to comply with FATF's other provisions.

211. In spite of all these warnings, Al Rajhi failed to adopt even the most minimal standards which are utilized by even the smallest banks throughout the world. This is true even though Al Rajhi and all other Islamic banks have in their possession and are required to keep meticulous records of the full details of their own and their customers Zakat and Hararm donations and investment collaborations.

212. Al Rajhi's disregard of the warnings and total failure to implement even minimal industry standards with respect to anti-terrorist and money laundering safeguards, and "know

your customer" regulations, resulted in the use of Al Rajhi as an instrument of terror and a material supporter, aider and abettor of al Qaeda terrorists, international terrorists activities, and member of the al Qaeda criminal enterprise.

213. In the wake of September 11, and as a result of a worldwide awareness that Saudi Arabia and Al Rajhi have repeatedly refused and failed to implement anti-terrorist and money laundering safeguards and "know your customer" regulations, Saudi Arabia has recently admitted that the implementation of such regulations by its banks is and was feasible and desirable. As such, any delay on the part of Al Rajhi in the implementation of the regulations was intentional, reckless, and negligent.

214. Al Rajhi is majority owned and controlled by the al-Rajhi Family ("al-Rajhi Family") who derive from it much of their immense wealth. Family members also make up the majority of its board of directors and executive committee. The Chairman, Managing Director and largest stake holder is Sulaiman Abdul Aziz al-Rajhi and one of his brothers, Saleh Abdul Aziz al-Rajhi, has the second largest holding and is also a director. In addition, he has been closely linked to Osama bin Laden's personal secretary, Wadih el-Hage. When the Kenyan house of Osama bin Laden's personal secretary was raided in 1997, evidence regarding Saleh al-Rajhi was discovered. Wadih el-Hage was convicted for the 1998 United States Embassies bombings in Kenya and Tanzania by al Qaeda. Other members of the executive committee include Abdullah Sulaiman al-Rajhi, Salah Ali Aba Al-Khalil, Naser Mohammed Al-Subai'y and Mohammed Abdul Aziz Al Rajhi.

215. The al-Rajhi Family is the biggest donor to the SAAR Foundation. SAAR is an acronym for Sulaiman Abdul Aziz al-Rajhi. The SAAR organization was incorporated in Herndon, Virginia as a non-profit organization on July 29, 1983 and voluntarily dissolved on

December 28, 2000. It was incorporated at 555 Grove Street, Herndon, Virginia. It was operated by Yacub Mirza (President and Registered Agent, CEO and Trustee), Mohammed Jaghlit (Treasurer and Director), Cherif Sedky (Secretary, Trustee and Director), Hisham Al-Talib (Registered Agent), Jamal Barzinji (Chairman) and Ahned Toronji (CFO and previously employed by Al Rajhi as an executive at its Majlis-al-Shura branch bank). Another associate of the al-Rajhi Family is Abdullah al Obaid, employed as Deputy General Manager of Al Watania Poultry, a substantial Saudi company owned by the al-Rajhi Family from 1994 to the present. All of these Defendants do business in and have significant business presence in the United States through al-Watania Poultry, one of the World's largest poultry businesses, and through Defendant Mar-Jac Poultry, Inc., Mar-Jac Investments, Inc. and Piedmont Poultry in the United States.

216. Virginia Secretary of State corporate records indicate that a network of more than 100 intricately-linked and mutually-supporting organizations were based with the SAAR Foundation at 555 Grove Street. The organizations at 555 Grove Street had intertwining and constantly changing directorships, with the same individuals serving as executives on the boards of a number of companies. These organizations are known or reasonably suspected terrorist organizations. The SAAR Foundation was at the center of this network with its operators performing multiple roles within the network.

217. The stated purpose of the SAAR Foundation was to fund anti-hunger, educational and technological projects in developing Islamic countries. It has or had substantial funds, and made substantial payments and donations, but appears to have undertaken very little, if any, fund raising activities. Contrary to its lawyer's representation to the Internal Revenue Service that "its source of funds will be general public rather than a very small group of donors and contributors

[and] the general public will be regularly approached," there is little evidence of this. In the year 1998, SAAR reported donations of over $1.7 billion, the highest yearly total for a charitable organization in United States history.

218. On December 14, 2001 both the United States Customs and the IRS received information that the SAAR Foundation and related organizations and individuals were involved in the funding of terrorist activity. Acting on such information, United States authorities carried out investigations into the network of organizations centered around 555 Grove Street. As a result, on March 21st and 22nd, 2002, 555 Grove Street was raided by Special Agents supporting Operation Green Quest along with other addresses linked to the network and its officers. Search warrants were applied for and issued by the District Court of the Eastern District of Virginia on the basis of evidence presented to it by Operation Green Quest.

219. The al-Rajhi Family is the principal financier of the SAAR Foundation network, and as such, is implicated by, among other things, the SAAR network raids in March 2002 for its ties to international terrorism, al Qaeda and Osama bin Laden.

220. The al-Rajhi Family is closely associated with other members of the Golden Chain, the wealthy donors to Osama bin Laden's cause at a time when it was known by them that he advocated war against the United States and its citizens. In 1998, Sulaiman Abdul Aziz Al Rajhi was on the executive council of IIRO with Ibrahim Afandi. In 1989, Sulaiman Saleh Al Rajhi was on the Board of Trustees of Sanabel Inc. (a company registered in the District of Columbia) with Ibrahim Afandi and Saleh Kamel and the same three persons that incorporated Sanabel al-Kheer, the investment arm of IIRO based at 555 Grove Street, Herndon, Virginia. Yacub Mirza, an officer of the SAAR Foundation, was another Trustee on the board of Sanabel,

Inc. and in 2002, together with an al-Rajhi Family employee, Abdullah Al Obaid, was an executive of Sanabel al-Kheer.

221. Al Rajhi Banking and Investment, by and through the al-Rajhi Family which owns and controls it, has extensive dealings and connections with individuals and organizations linked, or reasonably believed to have links to international terrorism. Given the nature and extent of these links, it is alleged that Al Rajhi has knowingly or materially provided or channeled funds for terrorist-related activity and/or has intentionally, recklessly or negligently allowed itself to be used to facilitate the funding of such activities.

222. At all times relevant, the al-Rajhi Family members have been in control of Al Rajhi bank. The knowledge of these family members with respect to the terrorist activities of the charities and individuals holding Al Rajhi accounts, and receiving Al Rajhi Zakat and Hararm donations are maintained in collaboration, and with Al Rajhi will be directly imputed to Al Rajhi and vice versa.

223. At all relevant times, Al Rajhi and its officers, directors and/or Board of Directors, through their failure to prevent the al-Rajhi Family from engaging in the material support of terrorism through their use and manipulation of Al Rajhi, actively aided, abetted, conspired with and/or materially supported al Qaeda terrorists and international terrorist activities.

224. At all relevant times, Al Rajhi and its Board of Directors, by facilitating the al-Rajhi Family's ties to terrorists, terrorist activities and terrorist organizations, actively aided, abetted, conspired with and/or materially supported international terrorism and al Qaeda and was an active participant in the al Qaeda criminal enterprise.

## National Commercial Bank

225. The National Commercial Bank (or "NCB") was founded in 1950 by Salim bin Mahfouz. Defendant Khalid bin Salim bin Mahfouz was born in Hadramaut, Yemen, on September 12, 1928. Khalid bin Salim bin Mahfouz is the son of Salim bin Mahfouz, who emigrated to Saudi Arabia in or about 1930. The National Commercial Bank was the first commercial bank of Saudi Arabia, based in Jeddah. After Salim bin Mahfouz's death in 1986, his son Khalid bin Mahfouz became President and CEO of the National Commercial Bank and remained in that position until 1999, becoming its principal shareholder with control over more than 50% of the bank's capital. The NCB has several wholly-owned subsidiaries, including SNCB Corporate Finance Ltd. in London, SNCB Securities Ltd. in London, and SNCB Securities Ltd. in New York City through which it operates an international banking enterprise.

226. The National Commercial Bank was implicated between 1986 and 1990 in the fraudulent schemes and practices of the Bank of Credit and Commerce International (or "BCCI"). NCB Chairman Khalid bin Salim bin Mahfouz became Chief Operating Officer and major shareholder of BCCI. A 1992 United States Senate Report on the BCCI scheme detailed the role of National Commercial Bank in hiding assets, money laundering, the cover-up and obstruction of a Senate investigation, and sponsoring international terrorism. The National Commercial Bank was used by Osama bin Laden and al Qaeda as a financial arm, operating as a financial conduit for Osama bin Laden's operations. As a former CIA counter-terrorism expert explained in October 2001:

> How does the al Qaeda organization fund its worldwide network of cells and affiliated groups? Several businessmen in Saudi Arabia and in the Gulf contribute monies. Much of the money is paid as 'protection' to avoid having the enterprises run by these men attacked. There is little

> doubt that a financial conduit to Bin Laden was handled through the National Commercial Bank, until the Saudi government finally arrested a number of persons and closed down the channel. It was evident that several wealthy Saudis were funneling contributions to Bin Laden through this mechanism. Now, it appears, that these wealthy individuals are siphoning off funds from their worldwide enterprises in creative and imaginative ways.

227. The bin Mahfouz family businesses are organized through a series of "holding" companies, including a conglomerate, Saudi Economic and Development Company LLC (Sedco), founded in 1976 and based in Jeddah, and the petroleum company, Nimir Petroleum, which is chaired by Khalid bin Mahfouz's son.

228. Between 1986 and 1990, Khalid bin Salim bin Mahfouz was Chief Operating Officer of the Bank of Credit and Commerce International (BCCI). After several fraudulent practices were discovered, Khalid bin Salim bin Mahfouz was indicted on July 1, 1992, on charges of participation in a Scheme to Defraud in the First Degree in violation of New York Penal Law § 190.65, in connection with certain of Defendant's acts and omissions relative to BCCI Holdings and certain related entities. The indictment alleges a series of misrepresentations, sham loans, and fraudulent conduct in failing to disclose the status of Defendant's interest in BCCI.

229. Under Khalid bin Salim bin Mahfouz, the BCCI was also implicated in supporting international terrorism, as reported by the United States Senate.

> In the course of targeting BCCI for laundering drug money, the CIA learned of BCCI's involvement in manipulating certain financial markets, in arms trafficking, and in supporting international terrorism, including handling the finances of Sabri al-Bannah or Abu Nidal, and his terrorist organization.

230. The 1992 Senate investigative Report detailed the initial involvement of the BCCI in terrorism financial supporting terrorism:

> BCCI's support of terrorism and arms trafficking developed out of several factors. First, as a principal financial institution for a number of Gulf sheikhdoms, with branches all over the world, it was a logical choice for terrorist organizations, who received payment at BCCI-London and other branches directly from Gulf-state patrons, and then transferred those funds wherever they wished without apparent scrutiny. Secondly, BCCI's flexibility regarding the falsification of documentation was helpful for such activities. Finally, to the extent that pragmatic considerations were not sufficient of themselves to recommend BCCI, the bank's pan-third world and pro-Islam ideology would have recommended it to Arab terrorist groups.

231. A bank audit of the National Commercial Bank conducted in 1998 revealed that over a 10 year period $74 million dollars was funneled by its Zakat Committee to the International Islamic Relief Organization, headed by Osama bin Laden's brother-in-law.

232. The NCB audit report also stressed various irregularities due to "unreported expenses and loans." It states that "without knowledge of the Zakat Committee, NCB Directors established over the years credit and loans facilities for several charitable organizations, along with banking facilities that were not reviewed by the Committee." Direct donations were received through NCB facilities to the Red Crescent Saudi Committee, the International Islamic Relief Organization and the Muwaffaq Foundation. National Commercial Bank, its agents and employees knew or should have known they were materially sponsoring, aiding and abetting al Qaeda, Osama bin Laden, and international terrorism.

233. The NCB audit report points out a $3 million dollar transfer to Blessed Relief Foundation, an organization that provided material support of Osama bin Laden and founded by Khalid bin Salim bin Mahfouz. Khalid bin Salim bin Mahfouz was dismissed from the NCB in 1999 soon after the release of the bank's audit report and placed under arrest in Taif. Former CIA Director James Woolsey testified before the Senate Judiciary Committee that along with the financial ties to and support of Osama bin Laden, Khalid bin Salim bin Mahfouz was Osama bin

Laden's brother-in-law by virtue of bin Laden's marriage to bin Mahfouz's sister Kaleda. Khalid bin Mahfouz set up various charity organizations around the world since 1991. Every one of these foundations were linked to al Qaeda and involved in the financing and material sponsorship of Osama bin Laden's international terrorist operations.

## Dar al Maal al Islami

234. Dar al Maal al Islami (or "House of Islamic Money" or "DMI") is the registered name for DMI Administrative Services SA. The company is headquartered in Cointrin, Switzerland. DMI Administrative Services SA replaced Dar al Maal al Islami on February 5, 2002, and is its successor in interest. DMI activities started July 29, 1981. Until 1983, DMI was operated under M. Ibrahim Kamel's chairmanship. On October 17, 1983, Prince Mohamed al Faisal al Saud became CEO. Under Mohammed al Faisal al Saud's chairmanship, DMI developed banking, investment and insurance activities in approximately twenty offices around the world. DMI operates broadly in Islamic countries, and investments are conducted strictly under Islamic rules and with an understanding of the terrorist threat. His actions and breach of duty have aided, abetted and provided material sponsorship of the spread of international terrorism and al Qaeda:

> The $3.5 billion DMI Trust, whose slogan is "Allah is the purveyor of success," was founded 20 years ago to foster the spread of Islamic banking across the Muslim world. Its 12-member board of directors includes Haydar Mohamed bin Laden, a half-brother of Osama bin Laden.

235. DMI is currently chaired by Abdulkarim Khaled Uusuf Abdulla who replaced Prince Mohamed al-Faisal al-Saud in early 2002. DMI has involved itself in al Qaeda financing through several of its subsidiaries, including but not limited to, Islamic Investment Bank of the Gulf, Faisal Islamic Bank, Tadamon Islamic Bank, and Al Shamal Islamic Bank.

236. DMI owns 100% of Islamic Investment Company of the Gulf. Mohamed al-Faisal al-Saud chairs Islamic Investment Company of the Gulf. Osama bin Laden's brother, Haydar Mohamed bin Laden, was a director of the company. Islamic Investment Company of the Gulf (Bahrain) EC is the main shareholder of Faisal Islamic Bank of Sudan, chaired by Mohamed al-Faisal al-Saud.

## Faisal Islamic Bank – Sudan

237. Faisal Islamic Bank – Sudan, subsidiary of Islamic Investment Company of the Gulf (Bahrain) EC and DMI, was one of the five main founders of Al Shamal Islamic Bank in April 1984 and became member of the board in July 1988. Mohammed al Faisal al Saud is heavily involved in the sponsorship of terror through Faisal Islamic Bank – Sudan.

238. Defendant Faisal Islamic Bank – Sudan was implicated as an al Qaeda sponsor during the 2001 United States trial on the 1998 embassy bombings in Africa as managing bank accounts for al Qaeda operatives. A former finance manager for al Qaeda in Khartoum, Jamal Ahmed al-Fadl, testified:

> Q. Where were the accounts [of al Qaeda] held? In what countries?
> A. . . . we got account in Bank Faisl Islami [Faisal Islamic Bank].
> Q. Is that also in Khartoum?
> A. Yes."

239. Defendant Faisal Islamic Bank's subsidiary in Turkey is currently under investigation by the Istanbul Prosecutor's Office on charges of tax irregularities concerning seven executives. Prosecutors are demanding three years imprisonment for the executives including Defendant Mohammed al-Faisal al-Saud.

## Al Barakaat Exchange LLC

240. Al Barakaat Exchange LLC (or "al Barakaat") is an international banking enterprise based in Dubai, United Arab Emirates, with several branches located around the

world. The United States government designated al Barakaat and its branches as terrorist entities on November 7, 2001, and froze the organization's assets. Two of the United States branches—in Boston, MA, and Alexandria, VA—were accused of racketeering and conspiracy to avoid reporting financial transactions, respectively. The members of the Alexandria branch have pled guilty.

241. Under Secretary for International Affairs John B. Taylor has described al Barakaat as a premier financial transfer system for al Qaeda:

> Al Barakaat is a financial conglomerate headquartered in Dubai that operates in 40 countries including the United States. The founder of the organization, Shaykh Ahmed Nur Jimale, has close links with Usama bin Laden and has used al Barakaat to facilitate the financing and operations of Al Qaida and other terrorist organizations.

242. Treasury Secretary O'Neill corroborated al Barkaat's funding of al Qaeda:

> The al Barakaat companies are the money movers, the quartermasters of terror. At core, it is a hawala conglomerate operating in 40 countries around the world with business ventures in telecommunications, construction, and currency exchange. They are a principal source of funding, intelligence and money transfers for bin Laden.

243. Al Barakaat has or had branches in Minnesota, Massachusetts, Ohio and Washington State. All of the al Barakaat Group of companies are co-conspirators, aiders and abettors, material sponsors of al Qaeda, Osama bin Laden and international terrorism.

## Tadamon Islamic Bank

244. Defendant Tadamon Islamic Bank was formed in Khartoum, Sudan on November 28, 1981 and started operations on March 24, 1983, less than one month before Al Shamal Islamic Bank obtained banking authorization for its own activities. The Tadamon Islamic Bank is active across Sudanese territory, through twenty-one different establishments and has several subsidiaries in Sudan.

245. Shareholders of the Tadamon Islamic Bank include Al Baraka Investment and Development Corporation (and/or subsidiaries of the Saudi Dallah al Baraka Group) Saleh Abdullah Kamel, National Company for Development and Trade, and Dubai Islamic Bank. Defendant Faisal Islamic Bank Sudan, a subsidiary of the Islamic Investment Company of the Gulf (Bahrain) EC, whose parent is Dar Al Mal Al Islami, was the main shareholder of Tadamon Islamic Bank as of 1995.

246. Tadamon Islamic Bank facilitated, materially sponsored, aided and abetted, and/or conspired with al Qaeda and its international terrorists and financial operations. According to a testimony of former al Qaeda financier in Khartoum, Jamal Ahmed Mohamed al-Fadl, during the 2001 trial regarding the 1998 Embassy bombings in Africa, Tadamon Islamic Bank managed accounts of al Qaeda operatives:

> Q. "Do you recall anyone else that had bank accounts in their name for al Qaeda?
> A. Abdouh al Mukhlafi.
> Q. Who was this person named Abdouh al Mukhlafi?
> A. He is from Yemen.
> Q. What role did he play for Bin Laden?
> A. He goes with Bin Laden when Bin Laden travel outside or inside Sudan.
> Q. What role did he play for Bin Laden when Bin Laden traveled?
> A. He is like bodyguard for him, and also if Bin Laden, he needs bank something, he use account for that.
> Q. Did he handle money during the travel?
> A. Yes.
> Q. Where were the accounts held? In what countries?
> A. In Sudan and is in Bank Tadamon Islami [Tadamon Islamic Bank]."

247. Tadamon Islamic Bank is also a shareholder of Defendant Al Shamal Islamic Bank, a bank formed in Sudan and extensively used for al Qaeda operations. Tadamon Islamic Bank joined the provisional Board of Directors of Al Shamal Bank on July 1988 and has been a major shareholder of Al Shamal Islamic Bank since March 26, 1986.

## Dubai Islamic Bank

248. Dubai Islamic Bank is headquartered in the United Arab Emirates (or "UAE") and was created in 1975. The Dubai Islamic Bank is chaired by Mohamed Khalfan bin Kharbash, the current UAE Minister of Finance. The Dubai Islamic Bank is a shareholder of Baraka Islamic Bank EC, an affiliate of Defendant Al Baraka Bank. Dubai Islamic Bank is also a shareholder of Defendant Tadamon Islamic Bank in Sudan, which is a shareholder of the Defendant Al Shamal Islamic Bank.

249. Dubai Islamic Bank has a history of illicit money laundering. Dubai Islamic Bank was one of the BCCI's main shareholders, investing $80 million. Dubai Islamic Bank was also involved in a number of other illicit financial scandals, including the $242 million money-laundering operation through gold trading involving Foutanga (Babani) Sissoko, a billionaire from Mali.

250. In 1999, the United States announced that Dubai Islamic Bank had laundered money for Osama bin Laden. On July 8, 1999, a spokesman for the United States State Department stated that the government of the United Arab Emirates reported that they have taken steps to clean up the Dubai Islamic Bank and to restore its reputation. Asked whether his comment implied that wrongdoing had been occurring at the Dubai Islamic Bank, the State Department spokesman admitted this fact. The Dubai Islamic Bank has engaged in a pattern of conduct that demonstrates aiding, abetting and material sponsorship of international terrorism.

251. The United States State Department also confirmed that a United States delegation traveled to the United Arab Emirates with evidence that Osama bin Laden was channeling funds through the Dubai Islamic Bank. The Central Intelligence Agency had

obtained evidence that Osama bin Laden has been allowed to funnel money through the Dubai Islamic Bank.

252. Dubai Islamic Bank is involved in providing financial facilities and support to the terrorists for various anti-American terrorist operations, including the September 11, 2001 attacks. The Dubai Islamic Bank's involvement, support and role in the September 11, 2001 attacks was noted in a draft general report on the economic consequences of September 11, 2001, and the economic dimensions of anti-terrorism, by NATO on April 22, 2002:

> It is now apparent that institutions located in United Arab Emirates, the region's most developed and lightly regulated financial center, played a key role in moving resources to those who planned and carried out the 11 September attacks. There has subsequently been much discussion about a traditional trust based means of transferring value; the al Hawala transaction system, which allows clients to move funds internationally without leaving any traces of the operation. The Al Barakaat Hawala operating out of Somalia and the UAE apparently helped to move funds to the terrorists who carried out the New York and Washington Attacks. al Qaeda had previously used the Dubai Islamic Bank and local Hawala transfer companies to fund the bombings of the American embassies in Kenya and Tanzania.

253. Mustafa Ahmed al-Hisawi (a/k/a Sheikh Saeed), a Saudi national, was Osama bin Laden's chief financial officer during his time in Sudan from 1991 to 1996, before bin Laden went to Afghanistan. In June of 2001, Mustafa al-Hisawi arrived in the United Arab Emirates from Qatar. He left the UAE for Karachi, Pakistan, on September 11, 2001.

254. United States' authorities have identified at least $500,000 that flowed from overseas sources into United States accounts controlled by some of the hijackers, including transfers from Mustafa Ahmed al-Hisawi to Germany, the United States, and to the banks in the State of Florida in particular.

255. Mustafa Ahmed al-Hisawi held accounts at the Dubai Islamic Bank (and its affiliate and correspondent, Standard Chartered Bank) where money transfers originated to hijackers Marwan al-Shehhi and Mohammed Atta since at least June 2000.

256. For example, on June 29, 2000, $4,790 was wired from the United Arab Emirates to Marwan al-Shehhi. With it, Marwan al-Shehhi opened up a joint account in his and Mohammed Atta's name at the Florida SunTrust bank. Atta and al-Shehhi also had set up accounts in Dubai, Atta and al-Shehhi, al-Shehhi at a branch office of the Hong Kong Shanghai Bank (HSBC Holdings); Atta at the branch office of Citibank. Money was deposited into these accounts by cash, check or wire from various sources and then transferred to their Florida account by wire.

257. In July 2001, $109,440 arrived in al-Shehhi and Atta's joint Florida bank account. $9,985 was sent on July 19th. $9,485 came on August 7, 2000. $19,985 came on August 30, 2000. $69,985 came on September 18, 2000. During this period, Atta and al-Shehhi used the money to pay for their training at two airports on small aircraft, and other expenses related to the September 11, 2001 attacks.

258. Two days before the terrorist attacks on September 11, 2001, Mustafa Ahmed al-Hisawi received transfers back of "surplus" funds of $ 15,000 from three of the hijackers, Mohammed Atta, Walid al-Shehri and Marwan al-Shehhi.

259. On September 27, 2001, on United States demand, the Central Bank of the United Arab Emirates announced that it had ordered the freezing of accounts and investments of twenty-six persons or organizations suspected of having contacts with the al Qaeda organization and Osama bin Laden, including the Dubai Islamic Bank.

260. Additionally, on Sept 25, 2001, Luxembourg's commission for supervising financial institutions (Commission de Surveillance du Secteur Financier), issued a regulatory alert naming Dubai Islamic Bank as having links with Osama bin Laden and terrorism.

## Bank al-Taqwa Limited

261. Bank al-Taqwa Limited (or "Bank al-Taqwa") was established in the spring of 1988 in Nassau, Bahamas. Shrouded in secrecy, the actual number and locations of its satellite offices is unclear. Bank al-Taqwa has a registered office in Nassau, Bahamas and Lugano, Switzerland, but is reported to have a presence in more than thirty countries. Apparently, Bank al-Taqwa does not maintain offices in the Middle East and does its international banking business through other banking institutions to maintain a presence in the Middle East.

262. Prominent members of the Muslim Brotherhood created Bank al-Taqwa. The bank's President, Youssef Nada, has been a member of the Egyptian Muslim Brotherhood for fifty years. Vice President, Ali Ghalib Himmat, is a long standing member of the Syrian Muslim Brotherhood as well.

263. As an Islamic bank, Bank al-Taqwa is overseen by a Shari'ah board, or religious council. The members of this board include Youssef al-Qardawi, a leading member of the Muslim Brotherhood and Abdel Fattah Abu Ghadda, of the Syrian Muslim Brotherhood.

264. Albert Friedrich Armand Huber (or "Ahmed Huber"), a director of the bank, stated in a 1995 interview that Saudis with money from oil are very active investors in Bank al-Taqwa. An inspection of a list of the shareholders of the Bahamas branch verifies this statement. There are hundreds of shareholders of Bank al-Taqwa, most of whom are from the Gulf State region. Youssef Nada has stated that at the peak of its fourteen year life Bank al-Taqwa controlled $220 million dollars.

265. On November 7, 2001, Bank al-Taqwa, its affiliated businesses, and its key executives were designated as financial supporters of al Qaeda by President George W. Bush. Along with the designation was a call for the freezing of Bank al-Taqwa's assets. The company's headquarters, two of its satellite offices and a few of the executives' residences were raided as part of the international investigation into the bank's relationship with and sponsorship of Osama bin Laden, al Qaeda, and international terrorism.

266. When President George W. Bush announced the designation of Bank al-Taqwa as part of the al Qaeda financial network, he described Bank al-Taqwa as follows:

> Al Taqwa is an association of offshore banks and financial management firms that have helped al Qaeda shift money around the world. Al Taqwa… raise[s] funds for al Qaeda. They manage, invest and distribute those funds. They provide terrorist supporters with Internet service, secure telephone communications and other ways of sending messages and sharing information. They even arrange for the shipment of weapons.

267. President George W. Bush also explained how Bank al-Taqwa works as a front-organization that covertly aids and abets al Qaeda:

> They present themselves as legitimate businesses, but they skim money from every transaction for the benefit of terrorist organizations. They enable the proceeds of crime in one country to be transferred to pay for terrorist acts in another.

268. Bank al-Taqwa was designated as a terrorist entity because it serves, supports and fosters al Qaeda. By curtailing Bank al-Taqwa's operations, President George W. Bush believes that al Qaeda's operations will be curbed as well:

> By shutting these networks [al Taqwa] down, we disrupt the murderer's work. Today's action interrupts al Qaeda's communications. It blocks an important source of funds.
> …
> Today, we've taken another important action to expose the enemy to the light and to disrupt its ability to threaten America and innocent life.

269. Ahmed Idris Nasreddin (or "Nasreddin"), an officer at Bank al-Taqwa, was designated as a terrorist on April 19, 2002, for his role in financially supporting al Qaeda.

270. On August 29, 2002, fourteen additional organizations affiliated with Bank al-Taqwa were designated by President George W. Bush and had their assets frozen for financially aiding and supporting al Qaeda. These organizations were either owned or run by one of the Bank al-Taqwa executives, Youssef M. Nada or Ahmed Idris Nasreddin, who were already designated: Akida Bank Private Limited; Akida Investment Co. Ltd.; Nasreddin Group International Holding Limited; Nasco Nasreddin Holding A.S.; Nascotex S.A.; Nasredding Foundation; Ba Taqwa for Commerce and Real Estate Company Limited; Miga-Malaysian Swiss, Gulf and African Chamber; Gulf Center S.R.L.; Nascoservice S.R.L.; NASCO Business Residence Center SAS Di Nasreddin Ahmed Idris EC; Nasreddin Company Nasco SAS Di Ahmed Idris Nasreddin EC; Nada International Anstalt; and Nasreddin International Group Limited Holding.

271. In the early 1990s, Ahmed Nasreddin, one of the designated Bank al-Taqwa executives, aided the establishment of a mosque highly utilized by the al Qaeda terror network. The mosque, the Islamic Cultural Institute of Milan, Italy, is just across the border from Lugano, Switzerland. It has acted as a recruiting and coordination center for al Qaeda cells in Europe. The United States Treasury Department issued a press release that describes the Islamic Cultural Institute of Milan as "the main al Qaeda station house in Europe. It is used to facilitate the movement of weapons, men and money across the world."

272. Nasreddin's lawyer, P. F. Barchi, admitted that in the mid-1990s Egyptian Secret Service agents warned Nasreddin about potential terrorist problems with the mosque. Barchi

also confirms that Nasreddin financially supported the center through charitable donations that were used for rent, utilities and expenses.

273. Youssef M. Nada, one of the terrorist designated Bank al-Taqwa executives, employed the al Qaeda financier and Defendant, Sulaiman Abdul Aziz al-Rajhi. Sulaiman Abdul Aziz al-Rajhi worked for Youssef M. Nada at the Akida Bank in the Bahamas, which has also been designated for providing financial support to al Qaeda. Outside of his role with Akida Bank, Sulaiman al-Rajhi has provided material support and sponsorship to al Qaeda and international terrorism through the al-Rajhi Banking & Investment Corporation and the SAAR Foundation "charities."

274. Al Taqwa Trade, Property and Industry Company Limited, Akida Bank Private Limited, Akida Investment Co. Ltd., Asat Trust Reg., Ba Taqwa for Commerce and Real Estate Company Limited, Bank Al-Taqwa Limited, Gulf Center S.R.L., Miga-Malaysian Swiss, Guld and African Chamber, Nada International Anstalt, Nada Management Organization SA, Nasco Business Residence Center Sas di Nasreddin Ahmed Idris EC, Nasco Nasreddin Holding A.S., Nascoservice S.R.L., Nascotex S.A., Nasreddin Company Nasco Sas di Ahmed Idris Nasreddin EC, Nasreddin Foundation, Nasreddin Group International Holding Limited, Nasreddin International Group Limited Holding, and Youssef M. Nada & Co. are aiders, abettors, material sponsors and/or co-conspirators of Bank al-Taqwa Limited and are designated as sponsors of al Qaeda and international terrorism by the United States government.

## <u>**Arab Bank, PLC**</u>

275. Arab Bank, PLC operates an international banking system that is used regularly by al Qaeda's Spanish cell for transfers of cash to members of al Qaeda operating in Germany, Pakistan, Afghanistan, Lebanon, Yemen, Bosnia, and elsewhere. Several of the recipients of

cash transfers through Arab Bank PLC have been incarcerated or are being sought as key members of the al Qaeda organization with direct tires to the hijackers and terrorists who perpetrated the September 11, 2001 attacks. Arab Bank PLC has materially supported, aided, abetted and financed al Qaeda.

276. In mid-1996, Osama Darra and Mohamed Needl Acaid [presently incarcerated in Spain] managed a commercial establishment named Decomisos Mardini in Madrid. They made fraudulent use of credit cards, defrauding amounts totaling 1,947,8974 Spanish Pesetas and 7,419,490 Spanish Pesetas, with the aim of applying the amounts obtain to financing and supporting al Qaeda. Throughout the latter half of 1996, Mohamed Needl Acaid remited through Arab Bank, PLC numerous cash transfers to Islamic extremists associated with Chej Salah (chief recruiter for terrorists recruited from Spain in Peshawai, Pakistan). Arab Bank has branch offices in United States, including in New York, New York, and across the world.

## Saudi American Bank

277. Saudi American Bank is based in Riyadh, Saudi Arabia, and was formed in 1980 pursuant to a royal decree to take over the then existing branches of Citibank in Riyadh and Jeddah, Saudi Arabia. Citibank had opened its Jeddah branch in 1955 and its Riyadh branch in 1966. Saudi American Bank was formed in accordance with a program adopted by the Kingdom of Saudi Arabia in the mid-1970's under which all foreign banks were required to sell majority equity interests to Saudi nationals.

278. Saudi American Bank started operations on July 12, 1980, based in Riyadh. The Saudi American Bank is chaired by Abdulaziz Bin Hamad Al Gosaibi. Khalil A. Kordi and Rashid M. Al. Romaizan are among the directors of the bank. The Saudi American Bank is the second largest bank in Saudi Arabia.

279. The Saudi American Bank has offices in the United States based in New York. The Chairman of the bank is Abdulaziz Bin Hamad Al Gosaibi who was born in 1923 is also Chairman of the Saudi Cement Company in Damman, Saudi Arabia. The Saudi Cement Company shareholders include Defendant Omar Sulaiman Al-Rajhi. The Saudi American Bank is also the main banker of Arab Cement Company. The company is owned by Al Rajhi Group and Saudi Binladin Group. Arab Cement Company is managed by several other Defendants including Khalid bin Salim bin Mahfouz and Mohammed Bin Laden.

280. The Saudi American Bank is the official correspondent of the al Baraka Bank Lebanon, based in Beirut and chaired by Defendant Saleh Abdullah Kamel. The Saudi American Bank has maintained a partnership with al Baraka financial system since its beginning.

281. The Saudi American Bank serves as the bank for the Dallah al Baraka Group, named as Defendant herein and chaired by Defendant Saleh Abdullah Kamel. The Saudi American Bank is close to the Saudi Bin Laden family, and appears on its financial transactions. Binladin for Contracting and Trading is owned by members of the Bin Ladin family including Bakr Bin Laden and Mohammed Bin Laden.

282. Regarding the construction of infrastructure in Sudan while Osama bin Laden was training and developing al Qaeda terrorists, the Saudi Binladin Group offered material support. The Public Buildings and Airports Division of Saudi Binladin Group participated in the construction of the Port Sudan Airport, and Mohamed BinLadin Organization (or "Binladin Organization") provided a technical assistance to major road construction. The Saudi Binladin Group confirmed publicly these two collaborations with Sudan during al Qaeda's and Osama bin Laden's tenure there.

283. Saudi American Bank financed these Sudanese works directly providing material support and assistance to Osama bin Ladin. Indeed, Saudi American Bank was the main banker of the Saudi Binladin Group and Binladin Organization with respect to Sudanese operations. Saudi American Bank is also the Riyadh correspondent of al Faisal Islamic Bank, which is managed by Defendant Mohamed al Faisal al Saud. Al Faisal Islamic Bank has facilitated al Qaeda terrorist operations as detailed herein. The Saudi American Bank is also the main correspondent in Riyadh for a branch of Al Shamal Bank, a branch of DMI Trust based in Nassau, involved in the financing of al Qaeda.

284. In year 2000, the Saudi American Bank participated in the fund raising campaign in Saudi Arabia for collecting donations to the "heroes of the Al Quds uprising" (Intifada) by providing a bank account and facilities to receive donations for a committee of charity organizations including Defendants World Assembly of Muslim Youth, International Islamic Relief Organization and al Haramain Foundation.

285. Defendnat al Barakaat was able to penetrate the United States banking system with the help of Ahmed Ali Jumale (or "Jumale"). Employed by Barakaat Boston, Ahmed Ali Jumale, is a Somali financier who founded Barakaat and was a close associate of Osama bin Laden. From 1979 to 1986, Jumale worked in Jeddah, Saudi Arabia as a senior employee of the Saudi American Bank.

286. Ali Ghaleb Himmat, Ahmed Huber, Mohamed Mansour, Zeinab Mansour-Fattouh, Ahmed Ali Jumale, Ahmad I. Nasreddin and Youssef M. Nada (a/k/a Youssef Mustafa Nada) are aiders, abettors, material sponsors and/or co-conspirators of international terrorism.

# THE CHARITY DEFENDANTS

## The Charity Fronts of Terror

287. Shortly after September 11, the United States Treasury Department designated a number of charities as terrorist entities and froze their assets. These included the Rabita Trust, al-Haramain, al-Rashid Trust, Wafa Humanitarian Organization, and others. Furthermore, the Treasury Department froze the assets of the Benevolence International Foundation and the Global Relief Foundation. Many of these charities are Saudi funded. Then, in a series of raids over two days in March 2002, federal and local officials stormed the offices of several locations in Virginia and Georgia. These locations housed numerous charities that funnel money to and from al Qaeda. Certain of these entities are under criminal investigation or indictment.

288. Islamic extremists have usurped charities as a means to raise funds and travel the world easily and efficiently. Numerous charities around the world have been pinpointed as used for terrorist purposes. Some have been shut down, while others have continued to thrive, raising new funding for international terrorist activities.

289. As an organization, al Qaeda began with Mekhtab al Khidemat (Arabic for the "Office of Services"), which was a purported charitable organization with offices all over the world. In the United States indictment of al Qaeda and Osama bin Laden for the 1998 United States Embassy bombings in East Africa, the government noted that:

> [Al Qaeda] grew out of the "mekhtab al khidemat" organization which had maintained offices in various parts of the world, including Afghanistan, Pakistan (particularly in Peshawar) and the United States, particularly at the Alkifah Refugee Center in Brooklyn, New York.

290. The charity Defendants in this action are used as terrorist fronts, to mask money transfers and provide cover for terrorist operatives.

## **Al-Haramain Islamic Foundation, Inc.**

291. The Saudi Arabian-based al-Haramain Islamic Foundation Inc. (or "al-Haramain") is a private charitable organization that is supposed to provide a variety of humanitarian services for Muslims worldwide. Established in Riyadh in 1992, al-Haramain quickly developed a vast network of offices and representatives that now spans over fifty countries, including the United States. Al-Haramain raises most of its funds from Saudi Arabia where it oversees the distribution of its resources across the world.

292. Although al-Haramain incorporates in many of the countries in which it operates these branches are still controlled primarily from al-Haramain's headquarters in Riyadh, Saudi Arabia. The President and Vice-President of the United States branch, Aqeel al-Aqeel and Mansour al-Kadi, both reside in Riyadh, Saudi Arabia where they run all of al-Haramain worldwide. Defendant al-Haramain Islamic Foundation, Inc., is a Saudi charity front that has exploited its non-profit status for the benefit of Osama bin Laden and his terrorist network al Qaeda, in the furtherance of international terrorism. In doing so, al-Haramain has developed an extensive worldwide network. Many of al-Haramain's foreign branches have been exposed for providing direct and material support to al Qaeda. The United States State Department has designated two of al-Haramain's branches located in Bosnia and Somalia, as terrorist entities and frozen the assets of both. The leaders of al-Haramain have direct links to al Qaeda.

293. In December of 1999, al-Haramain conducted a joint fundraising event with a known al Qaeda front, the Defendant International Islamic Relief Organization (IIRO) and suspected front, the World Assembly of Muslim Youth (WAMY) in Riyadh, Saudi Arabia. Al-Haramain and its co-conspirators also solicit and operate widely in the United States.

294. Co-conspirators, aiders and abettors of the al-Haramain Islamic Foundation doing business or registered to do business in the United States include Defendants: Al Haramain Foundation; Al Haramain Islamic Foundation, Inc.; Aqeel Abdul-Azeel al-Aqeel; Mansour al-Kadi, Soliman H.S. al-Buthe; and Perouz Seda Ghaty.

295. Al-Haramain's self-titled "Most Important Aims" include relief work in areas of the world where Muslims are deprived. An unwritten, though no less important, aim of al-Haramain is providing assistance to Osama bin Laden's al Qaeda.

296. Intelligence officials throughout the world have acknowledged that al-Haramain exploited its non-profit status in secreting its aid to terrorist groups. In referring to al-Haramain in a speech given on March 11, 2002, United States Treasury Secretary Paul O'Neill, stated:

> Few deceits are more reprehensible than the act of collecting charity from well-intentioned donors, and then diverting those funds to support hatred and cruelty. As I said during my visit to the Gulf, misusing charity funds to support terrorism harms the people who gave the donation, harms the people who should have received it and is dangerous to us all. Organizations that pervert the name of charity are an affront to us all, and we will find them, expose them, and shut them down.

297. After the June 2, 2002, raids of al-Haramain offices in Bosnia, the Commander of the NATO-led forces in Bosnia, Lieutenant General John Sylvester stated:

> We detected a pattern here . . . for terrorist cells and those who aid and harbor them to operate behind the shield of legitimate humanitarian . . . organizations…. They were preaching good, and sometimes doing good, while plotting evil.

298. On March 11, 2002, the United States froze the funds of the Bosnia-Herzegovina and Somalia branches of the al-Haramain Islamic Foundation. These branches of al-Haramain were "diverting charitable funds to terrorism." The United States Treasury Department issued a Press Release about the designations that stated:

> The branch offices of al Haramain in Somalia and Bosnia are clearly linked to terrorist financing.

299. Although al-Haramain in Saudi Arabia was not included in this designation, the Bosnian and Somalian branches receive their funding and guidance from the al-Haramain headquarters in Riyadh, Saudi Arabia.

300. Al-Haramain's Bosnia and Somalian offices and the rest of al-Haramain are closely intertwined. Al-Haramain's headquarters provides the funding, management, and direction of the Somalian and Bosnian branches. The headquarters also maintains one website that covers al-Haramain worldwide and, on occasion, devotes certain pages of its website to certain individual branches.

301. A United States Treasury Department Press Release stated that al-Haramain worked with the al Qaeda linked Somali-based terrorist group al-Itihaad al-Islamiya and the al Qaeda financial vehicle al-Barakaat Bank. The press release states:

> The Somalia office of al-Haramain is linked to Osama bin Laden's al Qaeda network and al-Itihaad al-Islamiya (AIAI), a Somali terrorist group. al-Haramain Somalia employed AIAI members and provided them with salaries through al-Barakaat Bank, which was designated on November 7, 2001 under E.O. 13224 because of its activities as a principal source of funding, intelligence and money transfers for Osama bin Laden.

302. The cooperation between al Qaeda and al-Itihaad al-Islamiya has not ceased. The 2002 United States Department of State's Patterns on Global Terrorism report states that al-Itihaad al-Islamiya is a terrorist group that maintains ties to al Qaeda. The Treasury Department Press Release about the designation also states that al-Haramain's support of al-Itihaad al-Islamiya has been concealed under its humanitarian cover:

> Over the past few years, al-Haramain Somalia has funneled money to AIAI by disguising funds as if they were intended for orphanage projects or Islamic school and mosque construction. The organization has also

> employed AIAI members and provided them with salaries through Barakaat Banks and Remittances, a subsidiary of al-Barakaat Bank.

303. This concert of action, aiding and abetting of terror and material sponsorship of international terrorism is precisely the hallmark of the offensive upon the United States that culminated on September 11, 2001.

304. The al-Haramain Islamic Foundation was banned from Kenya for national security concerns following the 1998 embassy bombings. Osama bin Laden and al Qaeda were convicted by the United States in 2001 for plotting and executing these dual attacks in Nairobi, Kenya, and Dar Es Salaam, Tanzania, which killed 224 people, including 12 Americans, and injured more than 4,000. These indictments and convictions demonstrate the United States government's belief that both Osama bin Laden and al Qaeda have commited acts within and outside the United States which trigger the United States District Courts' jurisdiction over such entities.

305. The United States Treasury Department Press Release following the March 11, 2002, designation of al-Haramain's Bosnian and Somalian offices, stated the following about its connection to the terrorist group al-Gama'a al-Islamiyya:

> The Bosnia office of al-Haramain is linked to al-Gama'a al-Islamiyya, an Egyptian terrorist group. Al-Gama'a al-Islamiyya was designated on November 2, 2001 and it is a signatory to Osama bin Laden's Fatwah dated February 23, 1998, targeting Americans and their allies.

306. In March 2002, Bosnian officials raided al-Haramain's Sarajevo office and discovered more proof of al-Haramain using its humanitarian image as a cover for terrorism. A Bosnian intelligence report explains how investigators discovered that al-Haramain's financial records from 1994 through 1998 had been destroyed and that $1.59 Million dollars had been inexplicably withdrawn from the charity between 1999 and 2001. The Bosnian intelligence

report about the March 2002 raids also stated: "We believe that the clear lack of any concrete humanitarian projects indicates that the existence of this organization was a fictitious cover for probable links with terrorism." In 2001, the Saudi-based al-Haramain aided al Qaeda terrorists groups in Chechnya and elsewhere by providing them with recruits, weapons, and money.

307. Al-Haramain's website used to have a direct link to the al Qaeda site about the Chechnyian operations (qoqaz.com). The website is part of the al Qaeda propaganda organization, Azzam Publications group of websites, including qoqaz.com, qoqaz.net, and azzam.com (among others). The government of the United States has been tracking the domains of azzam.com and qoqaz.com in an ongoing effort to shut-down the sites for their role as an al Qaeda sponsor, promoter and mouthpiece. FBI Special Agent Robert Walker described qoqaz.net, the English-language equivalent of qoqaz.com, in his April 29, 2002, Affidavit in Support of Complaint Against Benevolence International Foundation, Inc. and Enaam M. Arnout. In his Affidavit, Walker stated that qoqaz.net leverages its relationship with charities:

> In or about early 2000, a website (www.qoqaz.net) dedicated to the cause of Chechen mujahideen identified the leaders of the military fight in Chechnya as including Ibn al Khattab and included pictures of mujahideen training as well as killed mujahideen. CW-1 has identified Ibn al Khattab as a well-known mujahideen leader with links to Osama bin Laden. . . .
>
> The website condemned America . . .

308. Shortly after the merger of Egyptian Islamic Jihad with Osama bin Laden's al Qaeda (*See* Sudan allegations, *infra*), Ahmed Ibrahim al-Najjar, initially a member of the Egyptian Islamic Jihad, was sent on a new mission to Albania to work for al-Haramain. After al-Najjar was deported from Albania to Egypt in 1999, he was sentenced to death for acts of terrorism. In his testimony, al-Najjar admitted to being a full-fledged al Qaeda member who entered Albania with a false passport and who, like many other al Qaeda operatives, was

engaged in purported humanitarian activities while waiting for new orders to act. The case of al-Najjar is but one example of a senior al Qaeda operative who not only found refuge from authorities with al-Haramain, but a platform from which to wage war and promote the use of terror.

309. Al-Haramain took part in a committee of charitable organizations that formed the Saudi Joint Relief Committee (or "SJRC"). Along with al-Haramain, the SJRC is comprised of the IIRO, WAMY, the Saudi Red Crescent, and the Muslim World League, among others. The SJRC has been connected to Osama bin Laden and two of his top operatives, Wa'el Hamza Jalaidan and Adel Muhammad Sadiq bin Kazem. The United States Treasury Department has branded Jalaidan a Specially Designated Global Terrorist Entity [SDGT], stating that Jalaidan is "an associate of Usama bin Laden and a support of al-Qa'ida terror." Al-Haramain has been able to continue its cooperation with al Qaeda for years in large part due to its ostensible appearance as a humanitarian organization.

310. In the United States, al-Haramain has three business entities in Ashland, Oregon: al-Haramain Foundation, al-Haramain Islamic Foundation, and al-Haramain Islamic Foundation, Inc. All three of these separately filed businesses are at the same address and under the same management. These three businesses are one and the same as al-Haramain's headquarters in Riyadh, Saudi Arabia. The President and Vice-President of the United States branch, Aqeel al-Aqeel and Mansour al-Kadi, are the Secretary General and Deputy General, respectively, of the Riyadh office. The al-Haramain branch in Ashland, Oregon, is specifically linked to al Qaeda operations.

311. Al-Haramain Ashland states in its year 2000 Form 990 that it operates an Islamic center in Springfield, Missouri. Corporate records reveal that al-Haramain owns property in Springfield, Missouri.

312. Al-Haramain has been implicated as providing funds for the bombing of a night club in Bali in 2002. Al-Haramain continues in its illicit pattern of conduct in sponsoring acts of international terrorism.

313. During an interrogation conducted by United States authorities at the United States air force base in Baghram, Afghanistan, on May 23, 2002, Umar Faruq, senior al Qaeda representative in Southern Asia, confessed that al-Haramain was the main financial mechanism for funding terrorists operations in the region, through its Indonesian office director in Jakarta, Ahmed al-Moudi. The al-Haramain organization is said to have planned terrorist attacks in Indonesia.

> Al Haramayn was the funding mechanism of all operations in Indonesia. Money was laundered through the foundation by donors from the Middle East. Money was given to [*him*] to al Harmayn's branch in Jakarta, which he said is connected to Kompak [*Crisis Center Committee or Committee for Crisis Handling of the Dewan Dakwah Islamiyah organization, Islamic Propagation Council in Indonesia*]. The two groups plan terrorist activity in Indonesia. The foundation had an office in Makassar where Faruq was introduced to the foundation's head by Agus Dwikarna [*Director of Kompak*]. Faruq was given orders by Rashid [*al-Qaida senior officer*] to get money transferred to the foundation's office in Jakarta through Ahmed al-Moudi [*head of al Haramayn's office in Jakarta*].

314. Umar Faruq further stated that al-Haramain received money from a Saudi Sheikh (Sheikh Bandar), who heads the al-Haramain Islamic Foundation in Saudi Arabia according to Faruq.

> [*Sheikh Bandar*] gave $99,000 to Faruq to give to Al Moudi. Faruq said Sheikh Bandar was the head of Al Haramayn in Saudi Arabia.

315. Furthermore, during a custodial interview on September 9, 2002, Umar Faruq stated that terrorist operations of Jemaah Islamiya (founded by Abu Bakar Bashir), an Islamic extremist group closely associated with al Qaeda were funded by donations channeled through al Haramain Islamic Foundation:

> Al Qaeda encourages Basyir's [*Abu Bakar Bashir*] goal to spark a religious civil war in Indonesia in order to achieve his vision of a pure Islamic state under Islamic law. Basyir's plan of training jihadists and massing weapons and ammunition has been coordinated with Rashid, a senior lieutenant of Usama bin Ladin. Rashid also acts as a representative of a committee of Gulf-state sheiks who are Al Qa'ida financiers and who have committed ample funds, weapons, ammunition and computers to support this war. Funds are channeled through the Al-Haramayn NGO.

316. Al-Haramain is engaged in unlawful aiding, abetting, conspiring with and offering material support to al Qaeda which constitutes an unlawful pattern of conduct, illicit scheme and enterprise.

## **Benevolence International Foundation Inc.**

317. The Benevolence International Foundation (a/k/a Al Bir al DaWalia) (or "BIF"), headquartered in Palos Hills, Illinois, purports to be an international charity organization involved in fundraising for charitable causes. BIF was incorporated in the State of Illinois as a non-profit organization on or around March 30, 1992. One of the directors listed on the incorporation documents is Defendant Adel Abdul Jalil Batterjee (a/k/a Adil Abdul Galil Batargy) (or "Baterjee"). BIF has offices in Pakistan, Bosnia, Azerbaijan, Tajikistan, Yemen, Bangladesh, Turkey, Dagestan, Georgia, China and Ingueshetia.

318. The organization is also known as "al Bir al Dawalia," which translated from Arabic means "Benevolence International." It was originally founded in the 1980's by a wealthy Saudi Arabian national named Adel Abdul Jalil Batterjee, who was an associate of Osama bin Laden. Defendant Adel Abdul Jalil Batterjee later transferred control of the organization to the

current Chief Executive Officer Enaam M. Arnaout (or "Arnaout"). Defendant Enaam Arnaout has been affiliated with BIF since at least 1992, and was criminally indicted for his role in sponsoring al Qaeda through diversion of charitable funds to sponsor al Qaeda.

319. Adel Abdul Jalil Batterjee is a wealthy Saudi Arabian businessman. He has investments across a number of different industries including commercial, property, medical, industrial, and contracting. This business is done primarily through the family's business, the Batterjee Group, but also through other investments and businesses. Recent attempts to locate Batterjee in Saudi Arabia have failed and it is currently believed that he may be in the Sudan.

320. Batterjee originally met Arnaout in 1987 when Arnaout was teenager studying Islam in Pakistan. Batterjee appointed Arnaout as the head of the Bosnian branch in the early 1990s. According to Benevolence International Foundation's 1992 articles of incorporation, Adel Batterjee is one of the three founders of BIF in the United States. In 1993, the Saudi Government closed Batterjee's charity al-Birr at the same time it was closing other organizations for ties to terrorism. Following this closing, Batterjee moved the BIF headquarters to Chicago, Illinois and brought Arnaout in from Bosnia to run the organization. Batterjee officially transferred control of the organization to Enaam Arnaout on September 15, 1997, when Arnaout assumed the Executive Director position.

321. Adel Batterjee's name does not readily appear in any Benevolence International Foundation corporate records after 1994, yet he continued funding the foundation. On February 12, 2002, the United States Government recorded a telephone conversation that the now jailed CEO of BIF, Enaam Arnaout, had with his brother Hisham in Saudi Arabia. During this conversation, Arnaout discusses "Abu Sulafa" with his brother. The United States government has identified the name "Abu Sulafa" as an alias for Adel Batterjee. Using Batterjee's alias,

Arnaout states the Batterjee has been sending money to Benevolence International Foundation's branches:

> EA: And the man [Abu Sulafa], may God reward him with goodwill, he loves goodwill, so he does not want to boycott the offices, (UI) the offices, he is sending them wire transfers. So, if, if I receive a wire transfer from him, to any office of the offices, my home is destroyed.
> H: Yes, meaning, should I tell him not to send a thing.
> EA: Tell him, oh brother, now, they want, now scrutinizing on what is our relation to Saudi Arabia.
> …
> EA: So I want you to talk to Abu Sulafa, tell him "Enaam is telling you, that oh beloved brothers, the scrutiny now is on a Saudi connection."
> (EA: Enaam Arnaout, H = Hisham, Arnaout's brother)

322. One Justice Department al Qaeda expert suggested that this telephone conversation may further elucidate Batterjee's role as the source of the "mysterious set of wire transfers" that contributed $30,000 to $40,000 to BIF each month. Investigators have tracked the wire transfers to a Swiss Bank account registered to a Cayman Islands corporation.

323. Evidence introduced in the criminal trial of United States v. Usama Bin Laden, et al., Case Number S98 Cr. 1023, United States District Court, Southern District of New York, and gathered in the related investigation, demonstrated that al Qaeda sought and received a substantial amount of financial support from numerous international sources for the procurement of equipment (including weapons and communication equipment), recruitment, training, transportation, and lodging, among other support and expenses. In addition, al Qaeda terrorists received training in how to avoid law enforcement and intelligence scrutiny and to travel surreptitiously. They are also taught to avoid putting matters in writing. Al Qaeda members have held positions with BIF and this charity is one of the organizations utilized by al Qaeda.

324. Once money was withdrawn from the bank accounts of relief organizations, its use by al Qaeda can be virtually untraceable. According to an affidavit of Special Agent Robert Walker of the FBI, an al Qaeda witness explained that the money would almost always be withdrawn in cash, and the relief organizations from whose account the money was taken would generate paperwork which indicated that all the money was being used for charitable purposes such as building mosques or schools, or providing clothing for the poor. According to this affidavit, only a portion of the money withdrawn was actually used for the purposes stated by the relief organizations. The remaining funds were provided to al Qaeda for whatever use al Qaeda deemed necessary. This is consistent with evidence adduced at the 1995 trial in the Southern District of New York of persons convicted of seditious conspiracy involving the 1993 plot to attack various buildings in New York and with the overall evidence. Al Qaeda operatives and supporters have also smuggled money into the United States.

325. On or about March 19, 2002, law enforcement authorities in Bosnia-Herzegovina searched eight locations affiliated with BIF, including BIF's offices in that country. The documents recovered included documents establishing direct communication between Enaam Arnaout and Osama bin Laden and others in the late 1980's and early 1990's. The documents included a disk found at BIF's office in Bosnia which included scanned images of these documents.

326. On December 16, 1994, Defendant Mohamad Jamal Khalifa, while traveling with the aforementioned Bayazid, was detained in San Francisco by American officials. At the time, Mohamad Jamal Khalifa had been living for a substantial period of time in Manila, the Philippines, and was affiliated with a number of entities, including a non-government organization known as Benevolence International Corporation (or "BIC") and the International

Islamic Relief Organization (or "IIRO"). At the time of his travel, Mohamad Jamal Khalifa had been convicted in absentia in Jordan for his alleged involvement in 1993 and 1994 in a series of bombings of public places in Jordan. Two of the principal participants in the bombing were Jordanians who had spent time with Mohamad Jamal Khalifa in the Philippines but who had then returned to Jordan to conduct these bombings and contemplated assassinations. Mohamad Jamal Khalifa was then retried – and acquitted – after his extradition from San Francisco to Jordan following the December 1994 stop. At his Jordanian trial, Mohamad Jamal Khalifa admitted to the Jordanian authorities that he had known the bombers and had sent them money.

327. Mohamad Jamal Khalifa, alias "Abu Baraa," is referenced on a document recovered in the searches of BIF locations in Bosnia in March 2002. On or about November 19, 1998, telephone toll records indicate that BIF's Illinois office was in telephonic contact with a telephone number in Saudi Arabia used by Khalifa.

328. Financial records obtained from Citibank indicate that in the four month period from January 4, 2000, to April 11, 2000, BIF sent nineteen (19) wire transfers from its checking account, number 980110435, in the amount of $685,560.

329. A folder recovered in another BIF search in December 2001, indicated handwritten notations in Arabic which included the statements:

> Contribute with your mujahideen brothers to repel the Crusader-Zionist attack on Muslim lands.
>
> Steeds of war projects.

330. The reference to "steeds of war projects" is an apparent reference to a verse in the Koran which reads: "Against them [the enemies] make ready your strength to the utmost of your power, including steeds of war, to strike terror into the hearts of the enemies . . . ."

331. On April 21, 1999, evidence recovered by the FBI from BIF's office in Palos Hills, Illinois, included, among other things, a copy of a February 1999 article in the Seattle Times concerning small pox as a biological terrorism weapon. The sections of the text indicating that federal, state and local authorities are poorly prepared for a biological attack involving smallpox were highlighted. In none of BIF's advertisements of its humanitarian causes has it ever indicated that it was dealing with the issue of small pox in any country.

332. BIF claims to be a charitable organization but in fact is engaged in the support of various persons and groups involved in military and international terrorist activity.

333. Enaam Arnaout has a relationship with Osama bin Laden and many of his key associates dating back more than a decade, as evidenced by cooperating witnesses and seized documents. BIF is an organization that al Qaeda has used for logistical support, including the movement of money to fund international terrorist operations. Various persons involved in terrorist activities, specifically including persons trying to obtain chemical and nuclear weapons on behalf of al Qaeda have had contacts with Benevolence International Foundation offices and personnel.

334. Benevolence International Foundation has had direct dealings with representatives of the Chechen insurgents as well as Hezb e Islami, a military group operating at various times in Afghanistan and Azerbaijan. Benevolence International Foundation made efforts to provide the Chechen mujahideen with money, an X-ray machine, and anti-mine boots, among other material support.

335. On December 14, 2001, searches were conducted of the offices of Benevolence International Foundation in Palos Hills, Illinois, and in Newark, New Jersey, along with the home of its chief executive officer, Enaam M. Arnaout, removing materials from each place.

According to a government witness, Enaam M. Arnaout was planning in March 2002, to leave for Jeddah, Saudi Arabia.

336. Also on December 14, 2001, the Treasury Department's Office of Foreign Asset Control (or "OFAC") issued an order blocking Benevolence International Foundation's assets and records, pending further investigation into BIF's ties to terrorists. Enaam M. Arnaout, Chairman of Benevolence International Foundation, has a relationship with Osama bin Laden and key associates dating back more than a decade. The Benevolence International Foundation is used by al Qaeda for logistical support: terrorists attempting to obtain chemical and nuclear weapons on behalf of al Qaeda have contacts with the Benevolence International Foundation and its office personnel; and, Benevolence International Foundation has had direct dealings with al Qaeda operatives, providing them with military and financial support. Defendant Arnaout has been criminally indicted for his role in the September 11, 2001 attacks due to his sponsorship of al Qaeda.

337. In the latter part of the 1980's, an al Qaeda organization known as "mekhtab al khidemat" (the "services office") maintained offices and facilities in various parts of the world, including Afghanistan, Pakistan and the United States. The organization was operated principally by Sheik Abdullah Azzam and Osama Bin Laden for purposes including the providing of logistical support to the mujahideen (fighters) in Afghanistan.

338. In the mid to late 1980s, Defendant Enaam Arnaout, using various aliases including "Abu Mahmoud," "Abu Mahmoud al Suri," "Abu Mahmoud al Hamawi," and "Abdel Samia," worked with and for mekhtab al khidemat and LBI to provide assistance to various mujahideen including those under the command of Osama Bin Laden.

339. Within that same time frame, Defendant Arnaout served as director of communications in the "al Masada" mujahideen camp in Jaji, Afghanistan, under the direction of Osama Bin Laden. Defendant Arnaout distributed resources, including weapons, at the direction of Osama Bin Laden and others.

340. Defendant Arnaout and his co-conspirators fraudulently solicited and obtained funds from charitable donors and prospective donors to the BIF Enterprise by falsely representing that the BIF Enterprise would use donated funds solely for humanitarian purposes, with a small amount being used for administrative expenses, while concealing the material fact that a portion of the money raised by the BIF Enterprise was being used to support groups engaged in armed confrontations and violence overseas.

341. Defendant BIF and Arnaout and co-conspirators used BIF's status as a charity and a tax-exempt organization to lessen scrutiny by various governments concerning the financial and other activities of the BIF Enterprise's employees and agents, the BIF Enterprise's overseas offices, and the travel of the BIF Enterprise employees, agents, and associates.

342. Defendant Arnaout and BIF co-conspirators kept secret from governments and the general public, including a significant number of donors, material facts about Defendant Arnaout's relationship with organizations engaging in violence, including al Qaeda and Osama Bin Laden.

343. Defendant BIF and Arnaout and his co-conspirators agreed to conduct financial transactions, affecting interstate and foreign commerce, by wire transferring funds from BIF's checking accounts in Illinois to bank accounts in various locations, including New Jersey and accounts outside the United States, knowing that the property involved in the transactions represented the proceeds of specified unlawful activities, namely, mail and wire fraud in

violation of Title 18, United States Code, Sections 1341 and 1343, with the intent to promote the carrying on of unlawful activities and material support to organizations engaged in violent activities, in violation of Title 18, United States Code, Section 2339A; and knowing that the transactions were designed, in whole or in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of unlawful activities. Defendant BIF and Arnaout and co-conspirators agreed to transport, transmit, and transfer monetary instruments and funds from a place in the United States to or through a place outside the United States with the intent to promote the carrying on of a specified unlawful activity, namely, the material support to organizations involved in violent terrorist activities.

344. Defendant BIF and Arnaout and co-conspirators agreed to provide and attempt to provide material support and resources to persons, groups and organizations engaged in violent terrorist activities, including al Qaeda, and to conceal and disguise the nature, location, source and ownership of material support and resources, knowing and intending that they were to be used in preparation for and in carrying out acts of international terrorism violation of Title 18, United States Code, Section 2339A.

345. Defendant BIF and Arnaout and co-conspirators corruptly endeavored to influence, obstruct and impede the due administration of justice by submitting to the United States District Court false and misleading declarations.

346. BIF and Arnaout engaged in a conspiracy, the method and means of the conspiracy included the following, among other illegal activities.

347. In or about 1992, Defendant Arnaout assisted in delivering, assembling and operating a satellite telephone for use in Afghanistan by Gulbuddin Hekmatyar and Hezb-e-Islami.

348. Sometime in 1993 or thereafter, members of the international terrorist conspiracy caused the production of videotapes depicting fighters in Bosnia-Herzegovina and eulogizing dead fighters, including al Qaeda members and soliciting donations to support international terrorism.

349. On or about June 10, 1995, BIF caused the delivery of an X-ray machine and currency from the BIF Enterprise to a representative of the Chechen mujahideen in Baku, Azerbaijan.

350. In or about November 1995, Defendant Arnaout and other members of the BIF conspiracy caused the shipment of anti-mine boots to Baku, Azerbaijan, ultimately destined for the Chechen mujahideen. Defendant Arnaout and BIF members solicited donations from the public to purchase additional anti-mine boots for the mujahideen, falsely claiming that the project was for the benefit of civilians.

351. In or about May 1998, BIF and Arnaout facilitated the travel of an influential founding member of the al Qaeda network, Mamdouh Mahmud Salim (a/k/a Abu Hajer al Iraqi), to Bosnia-Herzegovina by indicating that Salim was a director of BIF.

352. In the latter part of the 1990’s, with Defendant Arnaout’s knowledge, Saif al Islam el Masry (a/k/a Abu Islam el Masry), a member of al Qaeda’s majlis al shura (consultation council), as well as a top military expert and instructor, served as an officer of the BIF.

353. Between June 2000 and September 2001, BIF caused the transfer of approximately $1,414,406.00 via wire from an account at Union Bank of Switzerland to BIF’s checking account in the United States. Those funds were commingled in BIF’s checking account with donations the BIF Enterprise received from other sources and disbursed in large part to the BIF Enterprise offices overseas.

354. In or about October 2001, Defendant Arnaout relayed to the BIF founder Adel Batterjee in Saudi Arabia via telephone Arnaout's concern that Arnaout was under scrutiny of the United States government and in particular the fact that Defendant Arnaout had been searched at the airport upon his return to the United States.

355. In January 2002, following the blocking of BIF's bank accounts by the United States Department of the Treasury, Defendant Arnaout spoke via telephone to Adel Batterjee in Saudi Arabia, and Batterjee requested Defendant Arnaout to relocate with his family to Saudi Arabia.

356. Beginning at a time unknown through in or about March 2002, Defendant Arnaout, and employees of the BIF Enterprise, possessed, and attempted to erase in part, in Bosnia-Herzegovina, among other items, an archive of documents and photographs concerning Osama Bin Laden and al Qaeda, including:

i. a chart of an organization involved in military activity headed by Osama Bin Laden;

ii. notes summarizing several meetings during which al Qaeda was formed in Afghanistan in August 1988 (indicating that Osama Bin Laden, Abu Ubaidah al Banshiri and Mamdouh Salim, a/k/a "Abu Hajer al Iraqi," among others, were in attendance), and specifying the text of the original bayat (oath of allegiance) made by prospective al Qaeda members to al Qaeda;

iii. notes reflecting the commencement of al Qaeda's "work" on or about September 10, 1988;

iv. personnel files of the mujahideen trained in the al Masada camp in Jaji, Afghanistan, in or about 1988, which contained the true names and aliases and military experience of the trainees;

v. a list of wealthy sponsors from Saudi Arabia including references to Osama Bin Laden and Adel Batterjee, the founder of the BIF Enterprise;

vi. various documents reflecting Defendant Arnaout's involvement in the acquisition and distribution of hundreds of rockets, hundreds of mortars, offensive and defensive bombs, and dynamite, as well as disguised explosive devices in connection with the al Masada camp;

vii. various documents in a separate folder reflecting Defendant Arnaout's participation in obtaining missiles, bombs and mortars in 1989 and 1990 in connection with Hezb e Islami;

viii. various newspaper articles including a 1988 article with a photograph depicting Osama Bin Laden, Defendant Arnaout, and one of the founders of the BIF Enterprise; as well as 1998 articles concerning Osama Bin Laden's threats against the United States and the State Department's 1997 list of designated terrorist organizations;

ix. a handwritten organizational chart placing Defendant Arnaout at the top of a jihad organization involved with weapons; and

x. In or about late 2001 and early 2002, while the BIF Enterprise continued to solicit and receive donations from the public while fraudulently holding itself out as a humanitarian organization that had never supported or financed violence, Defendant Arnaout falsely and publicly stated that he did not know Osama Bin Laden personally, that Defendant Arnaout never fought against the Soviet Union, that Defendant Arnaout was never at the al Masada camp.

357. On March 26, 2002, in an effort to obtain a court order requiring, among other things, the release of BIF funds frozen by the United States Department of the Treasury, BIF and Defendant Arnaout submitted a declaration knowingly and falsely stating: "BIF has never provided aid or support to people or organizations known to be engaged in violence, terrorist activities, or military operations of any nature. BIF abhors terrorism and all forms of violence against human beings."

358. On or about April 15, 2002, Arnaout spoke to the BIF director in Pakistan and advised him to avoid government scrutiny in Pakistan by fleeing to Afghanistan with the BIF's money and to evade detection by refraining from the use of banks, telephones or electronic mail.

359. Enaam M. Arnaout conspired with others to provide material support and resources to persons, groups and organizations engaged in violent terrorist activities, including al Qaeda, and persons engaged in violent confrontations and to conceal and disguise the nature, location, source and ownership of material support and resources, knowing and intending that they be used in preparation for and in carrying out acts of international terrorism in violation of Title 18, United States Code, Sections 2339A and 2 and other criminal statutes.

360. Defendant Arnaout and other members of the BIF conspiracy agreed to transfer by wire funds from BIF's checking accounts to bank accounts in various locations, including New Jersey and accounts outside the United States, which involved the proceeds of specified unlawful activities.

361. Enaam M. Arnaout conducted and attempted to conduct a financial transaction, affecting interstate and foreign commerce, namely, transferring by wire approximately $4,000 from BIF's checking account at Citibank FSB to Fleet Bank in Newark, New Jersey, knowing that the property involved in the transaction represented the proceeds of a specified unlawful activity, namely mail fraud in violation of Title 18, United States Code, Section 1341, with the intent to promote the carrying on of the mail fraud and wire fraud; in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 2.

362. Enaam M. Arnaout for the purpose of executing a scheme to defraud knowingly caused an envelope containing a donation check in the amount of $1,620 to be delivered by the United States Postal Service according to directions thereon, from a corporation to:

Benevolence International Foundation
9838 S. Roberts Rd. #1W
Palos Hills, IL 60465

363. Enaam M. Arnaout for the purpose of executing a scheme to defraud, knowingly caused an envelope, containing a donation check in the amount of $1,000 to be delivered by the United States Postal Service according to directions thereon, from a corporation to:

Benevolence International Foundation
9838 S. Roberts Rd. #1W
Palos Hills, IL 60465

364. Enaam M. Arnaout for the purpose of executing the scheme to defraud, knowingly caused to be transmitted by means of wire communication, certain signs, signals and sounds, in interstate commerce, namely an electronic transmission of funds in the amount of approximately $10,000 from BIF's checking account at LaSalle National Bank to Fleet Bank in Newark, New Jersey; in violation of Title 18, United States Code, Sections 1343 and 2.

365. Co-conspirators, aiders, abettors, and participants in the illicit scheme and enterprise of the Benevolence International Foundation (a/k/a al-Birr al-Dawalia), include Defendants: Benevolence International Foundation – U.S.A. (Main Office), Benevolence International Foundation – U.S.A. (East Coast Office), Benevolence International Foundation – Canada, Syed Suleman Ahmer, Enaam Mahmoud Arnaout (a/k/a Abdel del Samia, a/k/a Abu Mahmoud), Mazin M.H. Bahareth, Shahir Abdulraoof Batterjee, Adel Baterjee, Zahir H. Kazmi, Muzaffar Khan, Soliman J. Khudeira, and Jamal Nyrabeh, all located, doing business or registered to do business in the United States.

## **World Assembly of Muslim Youth**

366. The World Assembly of Muslim Youth (or "WAMY") and the Benevolence International Foundation (BIF) are tightly connected organizations that share the same leadership and work together on a number of joint projects. Adel Abdul Jalil Batterjee was the Secretary General of WAMY at the time he founded the al Qaeda front organization BIF in the United

States. Outside of Batterjee's role, the two organizations WAMY and BIF have also cooperated in joint-publishing of literature and film that bears both of their logos.

367. Batterjee commissioned the writing of a biography specifically about Osama bin Laden and the origins of the al Qaeda network in Arabic. This biography, *The Arab Volunteers in Afghanistan*, was jointly published in 1991 by the Benevolence International Foundation and the World Assembly of Muslim Youth. The book details Osama bin Laden's life, including the creation of bin Laden's terrorist network, al Qaeda. On the back cover is a written statement that expresses the ideology of the book, "This is the jihad in Afghanistan. What we see now, it is a blessed river. The Arab people are the people that feed the jihad river." *Arab volunteers in Afghanistan.*

368. The conspirators of the first World Trade Center bombing in February 1993 had in their possession several terrorist training manuals when they were caught. Ahmad Ajaj had in his possession an al Qaeda manual that detailed how to be an effective terrorist, teaching proper ways to make bombs and remain covert. It was found in an envelope that had both the WAMY and Lajnat al-Birr logos on it. Ajaj has been convicted for participating in the first World Trade Center attack.

369. Khalid al-Fawwaz, a senior al Qaeda leader currently imprisoned in The United Kingdom, had the same manual as Ajaj except for updates that included more recent al Qaeda knowledge. Al-Fawwaz ran Osama bin Laden's public relations organization the Advice and Reformation Committee in London and masterminded the 1998 United States Embassy bombings, for which he was indicted by the United States government. That someone of al-Fawwaz' stature in al Qaeda possessed manuals that were distributed by WAMY is indicative of the shared ideology and cooperation between WAMY and al Qaeda.

370. Another manual found in Ahmed Ajaj's possession was hate literature against Americans, Christians, and Jews. This encyclopedia, which glorified the hijacking of busses and the killing of innocent civilians in Israel, was published by WAMY.

## **International Islamic Relief Organization**

371. The International Islamic Relief Organization (or "IIRO") has materially supported terror around the globe, including Osama Bin Laden and al Qaeda. IIRO's office in the Philippines is headed by Osama bin Laden's brother-in-law, Defendant Mohammed Jamal Khalifa and has acted as a center of terrorist financing and training activity – across the globe. IIRO then evolved into a vast independent terrorist machine – funding, recruiting and aiding and abetting al Qaeda members around the globe. IIRO was involved with the 1993 World Trade Center bombing, the plot to destroy the Lincoln Tunnel and the Brooklyn Bridge, the plot to assassinate former President William Jefferson Clinton and Pope John Paul II, the plot to blow up twelve American airplanes simultaneously, and the 1998 Embassy bombings in East Africa.

372. The IIRO sister company, International Relief Organization (or "IRO"), sends money back and forth with IIRO. IRO sends money to other organizations that sponsor terror. Another IIRO sister company, the Success Foundation, sends money back and forth with the IIRO and IRO. The Success Foundation also sends money to other organizations who sponsor terror.

373. Several employees of the Muslim World League, IIRO's parent organization, have explicitly worked with al Qaeda. Osama bin Laden's associates from Afghanistan infiltrated and propagated Muslim World League Offices around the world. The Rabita Trust, another branch of the Muslim World League, had its assets frozen as a Specially Designated Global Terrorist Entity (or "SDGT") of the United States Treasury. Wa'el Jalaidan, as Secretary

General of the Rabita Trust and Muslim World League Office in Peshawar, Pakistan has repeatedly aided and abetted terrorists. Jalaidan has been branded a SDGT by the United States Treasury Department and his assets have been frozen. The Treasury Department described Jalaidan as follows at his designation as a terrorist entity:

> Usama bin Laden and a top al-Qa'ida lieutenant, Abu Zubaida, have acknowledged Wa'el Julaidan as a known associate of their operations. Julaidan has been the head of various non-governmental organizations providing financial and logistical support to the al-Qa'ida network.

374. Abdurahman Alamoudi, the Secretary of the Success Foundation, has openly stated his support for HAMAS and Hizbollah, both designated terrorist organizations. Alamoudi is the President of the American Muslim Foundation (or "AMF"), which receives thousands of dollars from the Success Foundation, as stated on the income tax Form 990s for the Success Foundation. Mohammed Omeish, President of the United States branches of IIRO and IRO, as well as their sister organization the United States-based Success Foundation, is also Vice-President of the American Muslim Foundation.

375. Adnan Basha, IIRO's Secretary-General, wrote "The major finance is coming from the generous people of Saudi Arabia, King Fahd, and the royal family." Arafat El-Ashi, head of IIRO's Canada branch, testified in the trial of Mahmoud Jaballah that IIRO and MWL were intimately connected to and funded by certain Saudi Arabian interests. Arafat el-Ashi stated in his testimony in the Jaballah trial that as a IIRO and MWL employee, he considered himself an employee of the Saudi government.

376. According to the account of Mohammed Bayazid, al Qaeda member and associate of Osama bin Laden, the Muslim World League opened an office in Pakistan for the use of the founders of al Qaeda. The Muslim World League initially was funded by Osama bin Laden, then the government of Saudi Arabia took over the funding. According to the Arabic periodical

publication *Rose Al-Yusuf*, the IIRO is firmly entrenched with Osama bin Laden's al Qaeda organization. As one example, the IIRO supported an al Qaeda guest house in Egypt.

377. The perpetrators of the attack on the World Trade Center in 1993 were given al Qaeda funding and support through Defendants Mohamad Khalifa and IIRO. Mohamad Khalifa, as the head of IIRO, used the organization to collect and launder money for al Qaeda operations. IIRO funded the terrorist al Qaeda groups Moro Islamic Liberation Front (or "MILF") and the Abu Sayef Group (or "ASG"). A former Abu Sayyaf member stated: "Less than 30% of the IIRO funds went to legitimate public works, the rest going toward the purchase of weapons." Mohamad Khalifa's branch of the IIRO served as a base to plan and finance al Qaeda and international terrorism.

378. IIRO built its office in Khartoum, Sudan in the same residential neighborhood as Osama bin Laden's personal office, according to the testimony of a former al Qaeda member, Jamal Ahmed Mohammed Al-Fadl. IIRO also built its Khartoum office near the office of Benevolence International Foundation, another al Qaeda front, and in the same residential neighborhood where Osama bin Laden had his personal office.

379. The IIRO was implicated in the bombing of the United States Embassies in Kenya and Tanzania in 1998. Kenya deregistered the IIRO after the bombing. IIRO Tanzania was reportedly working with al Qaeda immediately before the United States Embassy bombing. IIRO went on to plot to destroy United States Consulates in India in 1999.

380. According to Canadian intelligence documents, IIRO funded al-Jihad. Mohmous Jaballah, an Islamic al-Jihad member tried in Canada, was an IIRO employee. Egyptian al-Jihad, led by al Qaeda's second-in-command, Ayman al-Zawhiri, is a branch of al Qaeda. As an

employee of IIRO Canada, Mohammed Khatib founded the Canadian branch of Benevolence International Foundation.

381. IIRO works with numerous other al Qaeda affiliated charities. IIRO shares the same address in The United Kingdom as the International Development Foundation (or "IDF"), a charity affiliated with Defendant Khalid bin Mafouz, a senior al Qaeda financier. The Success Foundation, IIRO's namesake, is also funded by Khalid bin Mafouz. IIRO aids and abets the Saudi Joint Relief Committee, an al Qaeda charity in Bosnia and elsewhere. IIRO, through Khalifa, sponsors, aids and abets Benevolence International Foundation, the al Qaeda charity front. IIRO provides funding for other alleged humanitarian organizations that have materially sponsored, aided and abetted and conspired with al Qaeda: Global Relief Foundation (or "GRF"), Taibah International, Islamic African Relief Agency, World Assembly of Muslim Youth, (or "WAMY").

382. Mohammed Omeish is Vice President of American Muslim Foundation which according to its tax Form 990, filed in 1999, gave money to Tarik Hamdi. Tarik Hamdi helped Osama bin Laden get a satellite phone and other electronic equipment which was used to coordinate acts of international terrorism.

383. After September 11, 2001, IIRO's offices in Virginia were raided by the FBI as a result of al Qaeda sponsorship. One of the September 11, 2001, hijackers claimed to be going to work for IIRO's Fazeh Ahed. IIRO also extensively funded the Taliban regime. As stated by Dr. Adan Basha, Secretary-General of IIRO, the IIRO donated more than Sixty Million ($60,000,000) dollars to the Taliban Regime. The Taliban Regime was a known material sponsor, aider and abettor of al Qaeda terrorists. After September 11, 2001, Pakistan deported

89 Arab aid workers from the IIRO and other organizations because they were aiding, abetting, funding, otherwise conspiring with, sponsoring and/or supporting al Qaeda.

384. Sanabil al-Khair was created to manage the International Islamic Relief Organization's financial assets. IIRO's website states, "It [IIRO] has established an endowment fund (Sanabil Al-Khair) which will be used to generate a stable income to finance its various activities." The Sanabil al-Khair has incorporated in the United States under two different names: The Sana-Bell, Inc. and Sanabel al-Kheer, Inc. Their corporate records indicate the same address as IIRO in Herndon, Virginia.

385. Additional co-conspirators, material sponsors and/or aiders and abettors and members of the terrorist enterprise of the International Islamic Relief Organization include Defendants: Success Foundation, Inc., Mohamed S. Omeish, Abdurahman Alamoudi, Khaled Nouri, Sulaiman al-Ali, Abdullah M. al-Mahdi, Tareq M. al-Swaidan, Abdul al-Moslah, Salah Badahdh, Abdullah bin Saleh al Obaid, Hassan A.A. Bahfzallah, and M. Yaqub Mirza, all located, doing business or registered to do business in the United States.

386. Memo on IIRO/MWL letterhead detailing a meeting between Abu Abdullah (Osama bin Laden), Dr. Abdullah Naseef, Sheik Abdel Majeed Zindani, and Dhiaul Haq in which it is stated that "the attacks will be launched from them (these offices)…" The memo also states that:

> "You must pursue finding an umbrella which you can stay under…and I prefer the name of the League (most likely, Muslim World League) because Dr. Naseef is one of the brothers…"

387. The 1992 IRS Form 990 for the Islamic Relief Organization based in Falls Church, VA, lists a donation of $273,000 for "Bosnia & Somolia Relief Funds" sent to a P.O. Box in Jeddah, Saudi Arabia – that of the IIROSA.

388. A 1996 CIA memo on NGOs and terrorist links states the following:

> "The IIRO is affiliated with the Muslim World League, a major international organization largely financed by the government of Saudi Arabia"
>
> "[t]he former head of the IIRO office in the Philippines, Mohammed Jamal Khalifa (brother-in-law to UBL), has been linked to Manila-based plots to target the Pope and US airlines (Bojinka)."
>
> "The IIRO helps fund six militant training camps in Afghanistan, according to a clandestine source."

389. As stated above, during Mahmoud Jaballah's Canadian Immigration trial, Dr. Arafat El-Asashi, Director of IIRO's Canadian office, was called to testify about the functions and activities of MWL/IIRO. Specifically, he stated:

> A. The Muslim World League, which is the mother of IIRO, is a fully government funded organization. In other words, I work for the Government of Saudi Arabia. I am an employee of that government. Second, the IIRO is the relief branch of that organization which means that we are controlled in all our activities and plans by the Government of Saudi Arabia.
>
> ****
>
> Q. Is the Muslim World League the type of organization that would actually have physical offices in countries throughout the world?
> A. Of course. I said in the beginning that we have over 30 offices all over the world. One is here; one is in Washington, D.C. They are spread all over, in Europe, in Asia.
> Q. When you speak of an office that is an IIRO office, that counts as a Muslim World League office as well?
> A. What happens is that sometimes the IIRO and Muslim World League office is one, but sometimes they have two different offices, although the umbrella organization is the same, which is the Muslim World League.
>
> ****
>
> Q. Do I understand correctly from the questions that you responded to from Mr. Rodrigues that the IIRO is really only active in those places where there is need for relief?
> A. Yes.

Q. In other words, in Canada, in terms of your dual role with your dual office here, you would be doing more activity in relationship to the Muslim World League than you would with regard to the IIRO?
A. Exactly, although we do have certain activities from the IIRO required to be done in Canada. For instance, in the month of fasting we have some money coming from there to spend to make parties for those who fast. The poor people here in a number of mosques would get together and eat as guests of the IIRO.
Q. When they break their fast?
A. Exactly. This is an example. There are other things.
Q. You said "money from there".
A. From Saudi Arabia.

390. In July 1992, Sanabel Al-Kheer and IIRO sponsored a fundraising drive in Jeddah for the Muslims of Bosnia. The conference was inaugurated by Prince Saud ibn Abdul Mohsen, acting governor of Makkah, and acting chairman of Sanabel al-Kheer. Over SR19 million was collected in one day. The largest single donors reportedly included Prince Saud ibn Abdul Mohsen and Bakr Bin Laden. Several months later, Sanabel Al-Kheer reported that it had transferred SR12 million collected on July 5 directly to IIRO to underwrite its "charitable operations" in the Balkans.

391. In December 1993, IIRO held another yearly fundraising drive to help support embattled Bosnian Muslims. IIRO collected an additional SR15 million, which put the organization on a base capital level of nearly SR82 million. Prince Saud ibn Abdul Mohsen spoke again as an honorary trustee and noted "the continuous support and encouragement of the Custodian of the Two Holy Mosques King Fahd" in promoting IIRO operations.

392. In February 1994, IIRO organized another annual Sanabel Al-Kheer fundraising convention in Riyadh. During the traditional opening speech, Prince Salman Bin Abdul Aziz, Governor of Riyadh, told of how he had personally solicited "donations from a number of benevolent Saudi people" for Sanabel and IIRO totalling SR6,979,462. *("Saudis back fund-raising for Bosnian Muslims." The Saudi Gazette. February 26, 1994.)* Over SR3.7 million

was raised in the Saudi Cultural Festival Palace for IIRO/Sanabel. The royal function was attended by Shaykh Abdulaziz bin Baz (General Mufti of Saudi Arabia). A few months later, IIRO officials stated that in the year 1994, the charity had raised more than SR90 million from wealthy benefactors in Saudi Arabia.

393. On February 23, 1995, IIRO held its eighth annual charity festival in Riyadh in conjunction with Sanabel al-Kheer. Donations totaling SR8 million ($2.13 million) included: SR1 million from Prince Salman bin Abdel Aziz; SR2 million from the Al-Jomaih Co.; SR1 million from Prince Al-Waleed bin Talal bin Abdel Aziz; and, at least SR500,000 from Abdulrahman Al-Jeraisy on behalf of his company.

394. On February 5, 1996, the IIRO and Sanabel Al-Kheer annual fundraising drive raised more than SR6 million at the Cultural Palace in Riyadh. Large donations included: SR1 million from Prince Salman Bin Abdul Aziz; SR1 million from Prince Sattam Bin Abdul Aziz (deputy governor of Riyadh); SR1 million from Abdulaziz Al-Jomaih; and, SR10,000 from Shaykh Abdulaziz Bin Baz. Awkasho, Rashad.

395. In January 1997, Dr. Farid Qurashi organized the tenth annual fundraising drive of IIRO – Sanabel. IIRO collected over SR17 million. Qurashi was quoted as saying that IIRO had successfully raised a grand total of SR2.3 billion (about $615 million) between 1986 and 1995. In addition to that, according to Qurashi, Sanabel Al-Kheer's global investments had returned SR425 million in profits by the start of 1997.

396. In December 1998, at the 12th annual Sanabel al-Kheer/IIRO charity drive, IIRO netted over SR6 million, including: SR5 million from Prince Sultan bin Abdelaziz bin Saud (Second Deputy Premier and Saudi Defense Minister); SR1 million from Riyadh Governor Prince Salman; and, SR10,000 from Shaykh Abdulaziz bin Baz.

397. As alleged in the complaint and noted on IIRO's website, IIRO established an endowment fund named "Sanabil Al-Khair" to "generate a stable income to finance its various activities." Sanabil Al-Khair (Saudi Arabia) is incorporated in the U.S. as The Sana-Bell, Inc. and Sanabel al-Kheer, Inc. In a civil suit filed by The Sana-Bell, Inc. in the District Court for the District of Maryland, Sana-Bell describes itself as an American non-profit corporation deserving tax-exempt status and headquartered in Jeddah, Saudi Arabia.

398. On July 22, 1991, the U.S. branch of IIRO ("The International Relief Organization, IRO") was first officially established at 360 S. Washington St. in Falls Church, Virginia by Dr. Sulaiman bin Ali Al-Ali, wealthy businessman, member of IIRO's Executive Committee, and a member of the Shura (Consultative) Council of the Kingdom of Saudi Arabia. IIRO in America was established to fund "institutions, groups, and individuals whose projects, programs and situations fall in one of [IIRO's] service program areas… Institutions, groups and individuals submit proposals for assistance or cooperation. Proposals are reviewed to determine eligibility and validity. Once approved, [IIRO's] administration decides on the size and amount of help."

399. Inside the U.S., IIRO received significant funding from official Saudi sources: on January 18, 1996, Sulaiman bin Al-Ali reported to Arab journalists that Prince Bandar ibn Sultan, Saudi Ambassador in Washington, had donated SR500,000 worth of computer equipment directly to the IIRO office in Washington D.C.

400. According to the deposition of Dr. Al-Ali's former U.S. business partner Soliman Beheiri, Al-Ali came to the United States in the summer of 1991 to establish IIRO. Beheiri stated the Al-Ali came to the United States from Saudi Arabia with $10 million dollars to invest through IIRO and Sana-Bell, with the goal of generating a sufficient return on investment to

support IIRO's mission in the United States. Beheiri further testified how, in November 1991, Sulaiman Al-Ali introduced Biheiri to Dr. Abdulrahim Saati, a university professor of economics in Jeddah. Al-Ali introduced Saati as a "welcoming from Saudi Arabia from the office of the International Islamic Relief Organization to visit his office here to find out how he's progressing in establishing the organization here, and also assisting them in buying the building they have bought in Falls Church."

401. Sana-Bell, Inc. (the U.S. branch of Sanabel Al-Kheer) was organized as a District of Columbia non-profit company on July 28, 1989. In a civil lawsuit filed with the USDC for the District of Maryland, Sana-Bell described itself as an American non-profit corporation deserving of tax-exempt status and headquartered in Jeddah, Saudi Arabia. Dr. Abdullah al-Obaid and Hassan Bahafzallah, listed as officers of Sana-Bell on their Articles of Incorporation filed in Washington D.C., have both served for many years as senior IIRO/MWL Executives in Saudi Arabia.

402. Dr. Sulaiman Al-Ali was himself later named as a member of Sana-Bell's Investment Committee and claimed to be the sole corporate executive responsible for executing and managing Sana-Bell investments. In April of 1998, the President of the "SanaBel Committee," [sic] writing on the letterhead of the Office of the Secretary General of the Muslim World League wrote to Mirza to confirm that Alali "rejoin[ed]" the Sana-Bell Al Kheir Committee and that Al-Ali would be "responsible for Sanabel in U.S.A." In July 1998, Dr. Abdullah Al-Obaid, Secretary General of the Muslim World League and Chairman of IIRO, wrote to Mirza and indicated that Al-Ali was a "member of the Executive Committee" of Sanabell S.A. of IIRO, and that he assisted in the review of its investments. Al-Obaid noted that part of the proceeds of these investments were used to establish Sana-Bell, Inc in the U.S.

According to the deposition of Soliman Biheiri, "money transferred from Sana-Bell account to [Sulaiman Al-Ali's] office here was big, and I have a record of that. That can come close to over $1 million."

403. During a U.S. Treasury interrogation of Soliman S. Biheiri, the agents write:

> "he found it very strange that Al-Ali opened up the office of the International Islamic Relief Organization (IIRO) in the United States as "International Relief Organization". Biheiri told the agents that Al-Ali's IRO was one and the same organization as the IIRO in Saudi Arabia. He related that he suspected that the IIRO's U.S. office had been deliberately named the IRO, so that one could not make the connection between the two organizations."

404. Through IIRO and Sana-Bell, Dr. Sulaiman Al-Ali also invested vast sums into other parallel fraudulent investment schemes tied to suspected terrorist financing. One of these was known as the Global Chemical Corporation (a.k.a. Amana Industrial and Trading), a defunct Illinois for-profit entity in Chicago, Illinois. According to FBI Special Agent Valerie Donahue, since November 1993, IIRO disbursed approximately $1,225,975 to Global Chemical and Amana. IIRO 990 records from 1995 quoted Al-Ali's total investment in Amana/Global Chemical at closer to $2,189,434. According to one Global Chemical administrator, Al-Ali was able to marshal these funds because "he's originally from Saudi Arabia, and he knew a lot of businessmen overseas in the Gulf area, and he… was the potential person to generate that money from different businessmen. And we looked… up to him to really generate that funding for this big project… and he stepped up to the plate and he said, yeah, I know a lot of people that I can generate that money."

405. In a ten-count federal grand jury indictment returned in October 1996, Global Chemical President Mohammed Mabrook was charged with fraudulently obtaining at least $1,000,000 from various investors. As part of this scheme, Mabrook allegedly "created fictitious

documents purporting to reflect customer orders for hundreds of thousands of dollars' worth of Global Chemical products… then solicited investors to provide funds to pay for the manufacture of products needed to fill these non-existent purchase orders." FBI Special Agent Valerie Donahue agreed that "the pattern of Global's receipt and disbursement of funds is consistent with the operation of an investment fraud scheme,..." Mabrook drew up fraudulent purchase orders with non-existent clients as documentation for supposed investments.

406. On January 9, 1997, Global Chemical's Chicago headquarters was raided by FBI Agents as part of a money laundering and fraud investigation. The organizations named in the Search Warrant included NAMA Inc., the corporate entity founded by Al-Ali's brother and business partner Bachir Kabbara at 360 S. Washington St. in Falls Church. Days later, IIRO's Northern Virginia offices run by Sulaiman Al-Ali were raided by FBI Agents as part of the same terrorism, money laundering and fraud investigation. The individuals and organizations named in the Search Warrant included Global Chemical Corp, Nama Inc., Taibah International Aid Association, Sulaiman Al-Ali, and Bachir Kabarra. In an Online Chat session posted on March 22, 2002, Mohammed Omeish wrote:

> "I used to work with International Islamic Relief Organization [in the U.S.]. This organization ended its work about three years ago. The reason was …a decision of the administrative council at that time…The investigation to which IIRO was subject was for its being an investor in a commercial organization in Chicago which was raided by the authorities for a background of supporting terrorism, and IIRO was a chief investor. What touched the company touched the organization."

407. Ads issued jointly by the Muslim World League/IIRO call Muslims to "deal with Allah in the project of Sanabil Alkhair – Spikes of Good" The account accepting donations is with Defendant Al Rajhi Banking Company. *(This also verifies the link between MWL, IIRO, and Sanabil Al-Khair.)*

408. On IIRO – North America letterhead, Dr. Sulaiman A. Al-Ali requests all Muslims to "support IRO to provide the [Bosnian] refugees with immediate help," and to "donate generously". The appeal was sent out in English and in Arabic text.

409. Al-Mubeen is an Islamic Magazine published by:

The North American Committee
International Islamic Relief Org.
Muslim World League

410. The magazine states that all correspondence should be sent to a P.O. Box in Jeddah, Saudi Arabia.

411. On the Muslim World League's Canadian website, a list of international branches of the Muslim World League include the following addresses:

134 West 26th Street
New York, NY 10001
&
360 S. Washington Street
Suite 300
Fall [sic] Church, VA 22046

412. The latter address is identical to that of the IIRO as it is incorporated in the U.S.

413. The Muslim World League's main website (based in Saudi Arabia) also lists these addresses as international branch offices.

414. Hijacker Mohammed Atta received money from Mustafa Ahmed [al-Hawsawi] whose name and activities were revealed in documents found in the IIRO office in Ireland. [Hawsawi] was the assistant of Osama's brother-in-law, Sa'ad al Sharif, number 4 of Al Qaida.

415. IIRO was associated with other alleged terrorist-financing charities. On October 26, 1996, senior representatives of Benevolence International Foundation, Global Relief Foundation, HolyLand Foundation, International Relief Association, Islamic African Relief Agency, Mercy International – USA, and IIRO met to study the idea of establishing a council for

American Muslim Charities. The first three of these charities are on the U.S. Government's SDGT list and have had their assets frozen.

416. Mohammed Abdullah Al-Jomaih was listed on the Golden Chain document as one of the wealthy Saudi financiers of al Qaeda. He is also a member of the Board of the IIRO and frequent donor to that organization. His company, Al Jomaih Company, gave SR 2 million to the IIRO in 1995.

417. Sulaiman Bin Abdulaziz al-Rajhi was on the executive committee of the IIRO in 1998, along with Abdullah Saleh al-Obaid, Secretary General of the MWL, President of MWL-USA, President of Sana-Bell, Inc., and President of Sanabel al-Kheer. The al-Rajhi name was one of those listed on the Golden Chain document as providing funds for al Qaeda.

418. A Russian memo states:

> "[IIRO] heads were related to the Saudi Arabia secret services."
>
> "Among those who get Saudi assistance through the Muslim World League are…. The Islamic Salvation Front (Algeria) … Muslim Brethren organizations in Egypt, Syria, Jordan, Sudan…"

419. A chart on IIRO letterhead details IIRO allocations to Hamas Front Groups.

420. In testimony before the U.S. Senate Subcommittee on Terrorism, Technology and Homeland Security, Alex Alexiev, Senior Fellow at the Center for Security Policy, stated that despite Saudi claims to the contrary, charities such as Al Haramain, the World Muslim League (a.k.a. Muslim World League), World Assembly of Muslim Youth, and International Islamic Relief Organization are tightly controlled by the Saudi government; and more often than not, run by government officials.

421. Philippine authorities detained Mahmoud Abdel-Jalil, the Jordanian regional director of the International Islamic Relief Organization who had lived in the Philippines

between 1984 and 1994. He was arrested on July 8, 1994 on charges of financially supporting the Abu Sayyaf organization, an Islamic extremist group linked to al Qaeda.

422. As alleged in the TAC, the IIRO was implicated in the 1998 U.S. Embassy bombings in Africa. A business card holder belonging to one of the convicted terrorists, Wadih el-Hage, was seized and used during the trial. Contained within that business card holder were three business cards from IIRO offices: One stating the name of Hussain Ali Al-Ghanam, African Consultant from IIRO in Saudi Arabia; another from IIRO-SA stating the name Abdulnassir S. Osman, Executive Manager – Kenya; and finally one from the office of the Muslim World League/IIRO in Africa stating the name Abdullah Mohammed Al Sagheer.

## The Muslim World League

423. The Muslim World League was founded in 1962 in Saudi Arabia, to "disseminate Islamic Dawah and expound the teachings of Islam." The Muslim World League (or "MWL") is the parent organization of the charity IIRO. MWL uses the IIRO as an operational arm to perform many of its charitable activities.

424. The Muslim World League is an organization funded, supported, and financed by persons or entities of Saudi Arabia. According to the testimony of Arafat al-Asahi, a MWL representative in Canada:

> Q. During those eight years that you have been with the IIRO here in Canada, have you ever heard anything to the effect that the Canadian government has any concern whatsoever with respect to your office?
>
> A. Let me tell you one thing. The Muslim World League, which is the mother of IIRO, is a fully government funded organization. In other words, I work for the Government of Saudi Arabia. I am an employee of that government. Second, the IIRO is the relief branch of that organization which means that we are controlled in all our activities and plans by the Government of Saudi Arabia. Keep that in mind, please.
>
> Q. I will. Thank you. When you say you work for the Government of Saudi Arabia, are you also paid by that government?

A. I am paid by my organization which is funded by the government. Let me tell you one little thing. Whenever the Saudi Embassy in Ottawa required anything, to ask about any Muslim project all over Canada, they come to us. They ask us about the people who are doing this project. Do you get this point?
Q. Yes.
A. Whatever we say is acceptable, fully acceptable, by the Saudi Embassy and by the government of Saudi Arabia.
Q. Is the Muslim World League the type or organization that would actually have physical offices in countries throughout the world?
A. Of course. I said in the beginning that we have over 30 offices all over the world? One is here; one is in Washington, D.C. They are spread all over, in Europe, in Asia.
Q. When you speak of an office that is an IIRO office, that counts as a Muslim World League office as well?
A. What happens is that sometimes the IIRO and the Muslim World League office is one, but sometimes they have two different offices, although the umbrella organization is the same, which is the Muslim World League.

425. The Muslim World League has at least two offices in the United States. The New York City office is currently active, while its main office in Herndon, Virginia, was the target of federal raids in early March 2002. Its officers at the Virginia office are President Abdullah bin Saleh al-Obaid, Vice President Hassan A. A. Bahafzallah, and Secretary/Treasurer Yaqub M. Mirza.

426. Abdullah al-Obaid, President of the United States branch of MWL, and former Secretary-General of the organization, also runs one of the al-Rajhi family's largest corporations, al-Watania. The al-Rajhi family is the primary funder of the entire SAAR Foundation Network. Adullah al-Obaid also served as Secretary-General of the Rabita Trust.

427. Yaqub Mirza, the secretary and treasurer of the MWL in the United States, is the financial mastermind of the SAAR Network. Yaqub Mirza's house was raided in March, 2002 by federal authorities investigating his alleged connections to al Qaeda and September 11, 2001.

428. The Muslim World League has numerous connections with al Qaeda operatives. Mohammed Bayazid, an al Qaeda operative who fought alongside Osama bin Laden and the other mujahideen in Afghanistan (and has been implicated in a plot to get nuclear materials for al Qaeda), described how Defendant Mohammed Jamal Khalifa, Osama bin Laden's brother-in-law, opened a Muslim World League office in Pakistan for the use of the founders of al Qaeda:

> Brother Jamal Khalifa (Abu-l-Bara) was the one who started the educational project, both in the interior of Afghanistan and abroad. Thanks to Dr. Abdullah Azzam's efforts he succeeded in getting the approval of the Muslim World League to open an office for the League in Peshawar as an umbrella under which the brothers could work and move in Pakistan freely.

429. Wa'el Jalaidan, whom the United States Treasury Department named as "one of the founders of al Qaeda," headed the Muslim World League in Peshawar, Pakistan and also served as the Secretary-General of the Rabita Trust. Jalaidan has been branded a Specially Designated Global Terrorist Entity (or "SDGT") by the United States Treasury Department and his assets have been frozen. The Treasury Department also characterized Jalaidan as having "directed organizations that have provided financial and logistical support to al-Qa'ida." Wa'el Jalaidan operated Muslim World League offices around the world. These offices served in the early days of al Qaeda to attract and train holy warriors for the war in Afghanistan.

430. Wadih el-Hage, convicted for his role in the 1998 United States Embassy bombings in Africa, stated at his trial that he worked at the Muslim World League in Peshawar, Pakistan in the 1980s. It was while working at the Muslim World Leage that el-Hage met Abdullah Azzam, the mentor of Osama bin Laden, and a co-founder of al Qaeda.

431. Ihab Ali, another al Qaeda operative in prison in the United States on perjury charges, also went to work for the Muslim World League in 1987. Ihab Ali played a large role in the embassy bombings, facilitating communication between Osama bin Laden and other al

Qaeda members and also piloting Osama bin Laden's personal jet. In 1993, Ihab Ali took flight lessons at the Airman Flight School in Norman, Oklahoma—the same school Zacarias Moussaoui attended and which Mohammed Atta scouted as a possibility for his flight training.

432. According to the grand jury, Ihab Ali did not disclose the extent to which his pilot training and international travels concerned efforts to assist in al Qaeda's terrorist activities.

433. In conjunction with the attempted assassination of Egyptian President Hasni Mubarak in 1995, one of the would-be assassins admitted: "The Muslim World League bought our travel tickets and gave us spending money before we arrived at the [Osama bin Laden's] farm in Suba region in southern Sudan."

434. Co-conspirators, aiders, abettors, and participants in the illicit scheme and enterprise of the Muslim World League (a/k/a Rabita al-Alam al-Islami, a/k/a Islamic World League), include Defendants: Muslim World League, Abdullah bin Saleh al-Obaid, Hassan A.A. Bahafzallah, and Yaqub M. Mirza, all located, doing business or registered to do business in the United States.

## The SAAR Foundation

435. The SAAR Foundation was named after Sulaiman Abdul Aziz al-Rajhi, head of the Saudi Arabian al-Rajhi family, and was formed in the 1970s by a group of Muslim scholars and scientists from the Middle East and Asia. SAAR was incorporated in Herndon, Virginia as a 501c(3) non-profit organization on July 29, 1983, and dissolved as of December 28, 2000. The Saudi Arabian al-Rajhi family is the foundation's biggest donor. The SAAR Network financially supports terrorism and its main contributors, the al-Rajhi Family, has a long history of same.

436. Virginia Secretary of State Corporate Records indicate that there are more than one hundred affiliated organizations registered or doing business at just one of SAAR's

addresses in Herndon, Virginia. Most of these organizations do not maintain a physical presence at that address, or elsewhere. The SAAR Foundation and network is a sophisticated arrangement of non-profit and for-profit organizations that serve as front-groups for extremist Islamic terrorist organizations.

437. On March 20th and 21st, 2002, the offices of many SAAR Network organizations, along with the residences of their top executives, were raided by the joint terrorism task-force, Operation Greenquest. Operation Greenquest was created after September 11, 2001, by the United States Treasury Department as a new multi-agency financial enforcement initiative bringing the full scope of the government's financial expertise to bear against sources of terrorist funding. According to the search warrants issued at nearly twenty locations, the SAAR Network was raided for "potential money laundering and tax evasion activities and their ties to terrorist groups such as . . . al Qaeda as well as individual terrorists . . . (including) Osama bin Laden."

438. The SAAR Foundation reported revenues of over $1.7 billion for the year 1998, which represents more than any other United States charity has ever generated. The SAAR Foundation and its affiliated charities keep a low profile in that they do not conduct fundraising events or publicly reach out to potential donors like most charities.

439. On November 7, 2001, Bank al-Taqwa was first designated by President George W. Bush's Executive Order as a Specially Designated Global Terrorist Entity and the United States Department of Treasury and its assets were frozen. Two SAAR Network executives, Samir Salah and Ibrahim Hassabella, were both former executives at Bank al-Taqwa. Two other executives in the SAAR Network, Jamal Barzinji and Hisham al-Talib, worked for Youssef M. Nada, the head of Bank al-Taqwa who also had his assets frozen. The SAAR Network links with Youssef Nada include that Sulaiman al-Rajhi was on the Board of Directors at Youssef Nada's

Akida Bank in the Bahamas. People associated with the SAAR Foundation and its network were also implicated in the United States Embassy terrorist bombings in Kenya and Tanzania.

440. The SAAR Network and the more than one-hundred businesses and individuals that comprise it are fronts for the sponsor of al Qaeda and international terror. These organizations are closely inter-twined with Defendants IIRO, Muslim World League and their related "charities." The connections between the al-Rajhi family, the SAAR Network, and the terrorist front-groups extends past the financial network to a repetitious pattern of overlapping officers. The United States branches of the Muslim World League and its subsidiaries are a part of the SAAR Network. The Muslim World League and SAAR share officers and addresses. They are analogous to the SAAR Network in that they play an intermediary role between wealthy Saudi financiers and terrorist groups.

441. Co-conspirators, material sponsors, aiders, abettors, and participants in the illicit scheme and enterprise of the SAAR Network include Defendants: Abu Sulayman, Ahmed Totonji, Hisham al-Talib, Iqbal Yunus, Jamal Barzinji, M. Omar Ashraf, Mohammed Jaghlit, Muhammad Ashraf, Taha Jaber al-Alwani, Tarik Hamdi, Yaqub Mirza, Sherif Sedky, African Muslim Agency, Aradi, Inc., Grove Corporate, Inc., Heritage Education Trust, International Institute of Islamic Thought, Mar-Jac Investments, Inc., Mar-Jac Poultry, Inc., Mena Corporation, Reston Investments, Inc., SAAR International, Safa Trust, Sterling Charitable Gift Fund, Sterling Management Group, Inc., and York Foundation, all located doing business or registered to do business in the United States.

## **Rabita Trust**

442. Rabita Trust is a charitable organization which was created to organize the repatriation and rehabilitation of stranded Pakistanis (Biharis) from Bangladesh. Founded in

1988, the trust fund was started jointly by the government of Pakistan and the Saudi-based charity, the Muslim World League (Rabita al-Alam-e-Islami). Rabita Trust received the majority of its funding from the Muslim World League, a world-wide Islamic organization heavily funded by the Saudis, but which has also been involved with terrorism.

443. Rabita Trust was initially granted 250 million Riyals from the Pakistani government as well as 50 million Riyals from the Muslim World League to help relocate some 250,000 displaced Pakistani refugees in Bangladesh. In its 15 years of existence, the Rabita Trust has only managed to relocate a few hundred Biharis.

444. Rabita Trust is an al Qaeda front, and the Head of Rabita Trust is a known al Qaeda member. A Treasury Department press release issued when Rabita Trust's assets were frozen indicated that:

> Rabita Trust is headed by Wa'el Hamza Jalaidan, one of the founders of al-Qaida with bin Laden. He is the logistics chief of bin Laden's organization and fought on bin Laden's side in Afghanistan.

445. According to an authoritative biography of bin Laden and the original members of al Qaeda, the head of Rabita Trust, Wa'el Jalaidan, fought alongside Osama bin Laden and championed his cause. Detailing how al Qaeda's key founders fought against the Soviets in Afghanistan during the Soviet-Afghan war of the 1980s, this account is noted for its accuracy and clarity. The biography, written by a fellow compatriot of bin Laden, noted:

> One of the men who led the Arab Afghan Jihad forces came from one of the wealthiest Saudi families; he was influenced by the Afghan struggle, who would live together with them and sacrifice everything for the Afghani jihad. This man was Osama bin Laden, a young, tall man who followed Dr. Abdullah Azzam to fight in Afghanistan. Another Saudi joined together with them; his name was Wa'el Jalaidan, a US student who was studying agriculture and left to fight jihad in Afghanistan.
>
> These three: Osama bin Laden (a.k.a. 'Abu Abdallah'), Dr. Abdullah Azzam (a.k.a. Abu Muhammed), and Wa'el Jalaidan (a.k.a. Abu Al-

> Hassen al-Madani), gathered together in December 1979 to create the new Islamic revolution in Afghanistan.

446. Accordingly, Jalaidan was branded a Specially Designated Global Terrorist Entity by the United States Treasury Department and his assets have been frozen.

447. Rabita Trust is the sister organization of the International Islamic Relief Organization as they are both subsidiaries of the Muslim World League.

448. Rabita Trust, a subsidiary of the Muslim World League, is connected to the SAAR Network, through two officers, Dr. Abdullah Omar Naseef and Abdullah al-Obaid. The SAAR Network was the focus of March 2002 raids led by United States authorities for the network's ties to al Qaeda.

449. On October 12, 2001, President George W. Bush's Executive Order designated Defendant Rabita Trust as a Specially Designated Global Terrorist Entity and the Treasury Department froze its assets. Defendant Abdullah Omar Naseef founded the Defendant Rabita Trust in July 1988 and is currently its chairman.

450. Abdullah Omar Naseef ( or "Naseef") also served as Secretary-General of the Muslim World League during the time he created Defendant Rabita Trust and has attempted to spread Muslim World League offices around the world. Part of his global efforts are found in his involvement in a SAAR Network charity. Naseef is an officer of Makkah al-Mukarramah, Inc., registered in Virginia as a non-profit organization. A second shared executive is the Vice-Chairman of the Board of Trustees of Rabita Trust, Abdullah al-Obaid, who is also an officer at two of the SAAR Network businesses that were raided, the Muslim World League and Sanabel al-Kheer. Defendant Abdullah Omar al-Obaid is unique in that, not only is he an officer at the Muslim World League and the SAAR Network, but he is also the Deputy General Manager at

one of the al-Rajhi's largest businesses, al-Watania Poultry in Saudi Arabia. Al-Watania Poultry has branches worldwide and in the United States.

## The Global Relief Foundation

451. The Global Relief Foundation (or "GRF") was incorporated in January 1992 in Illinois. According to its website, GRF "is a non-profit humanitarian organization working to provide care, support and relief to people in need throughout the world."

452. GRF is active all over the world, providing relief for several countries, including the United States, Afghanistan, Kosovo, Lebanon, Bosnia, Kashmir, Turkey, and Chechnya, among others. GRF has branches of its organization, aside from Bridgeview, Illinois, located in Belgium, Yugoslavia, and Serbia.

453. In 2000, GRF's name appeared on a list being circulated by the government of charities allegedly funding terrorism. On December 14, 2001, federal authorities raided the offices of the Global Relief Foundation as well as the residences of several of its directors. Simultaneously, the United States Treasury froze GRF's assets. A spokesman for the Treasury Department noted that GRF is aiding terrorism:

> There was coordinated action to block the assets, because this group is suspected of funding terrorist activities.

454. The Treasury spokesman added that the public's safety was at risk if GRF were allowed to continue to operate:

> This extraordinary action was taken because it's relevant to the health and safety of the American public.

455. On the same day as the raids in the United States, the NATO-led taskforce named the Kosovo Force (KFOR) stormed two GRF offices in Yugoslavia and Serbia. A statement from KFOR explaining the raids detailed why:

> This afternoon KFOR soldiers, working in close cooperation with UNMIK-Police, carried out a coordinated search operation on the offices of the Global Relief Foundation in Pristine / Pristina and Dakovice / Dakovica, after receiving credible intelligence information that individuals working for this organization may have been directly involved in supporting worldwide international terrorist activities.

456. This action was an orchestrated element of a worldwide operation coordinated with governments and law enforcement agencies against the offices of the Global Relief Foundation and other organizations suspected of supporting international terrorists.

457. GRF by and through its agents has engaged in the planning of attacks against the United States:

> The Global Relief Foundation is a worldwide, US based Non-Governmental Organization (NGO), which has headquarters in Chicago, Illinois, USA and a European Headquarters in Brussels, Belgium. It is suspected of supporting worldwide terrorist activities and is allegedly involved in planning attacks against targets in the USA and Europe.

458. The head of the Global Relief Foundation branch in Belgium received over $200,000 from Muhammed Galeb Kalaje Zouaydi (a/k/a Abu Talha) (or "Zouaydi"), a high level al Qaeda financier. Zouaydi, who was arrested by Spanish authorities on April 23, 2002, is a brother-in-law of Osama bin Laden. A top financier for al Qaeda, he also served as one of the original terrorists who fought with Osama bin Laden and the other original founders of al Qaeda.

459. On October 12, 2001, the United States Treasury froze the assets of Jam'yah Ta'awun Al-Islamia (Society of Islamic Cooperation) and branded it a Specially Designated Terrorist Entity. According to the Treasury, the Society of Islamic Cooperation is headed by Zouyadi, who is also an explosives expert. Based in Qandahar City, United States Treasury department officials allege that the organization was founded by Osama bin Laden in early 2001.

460. Zouyadi was in close connection with the al Qaeda cell in Germany that participated in the September 11, 2001 attacks. Zouyadi also sent money to Mamoun

Darkazanli, who had his assets frozen and was designated a terrorist entity by the United States government shortly after September 11, 2001, and is suspected of being a key al Qaeda pointman in Europe, as is described in more detail *infra*.

461. GRF's offices have also been raided in the Yugoslavia and Serbia as part of international investigations into GRF's support of terrorism. On at least one occasion, Zouaydi transferred 231,664 euros to the head of GRF's Belgium arm, Nabil Sayadi, who is also linked to Osama bin Laden.

462. Documents provided by the United States government in defense of its freezing of GRF's assets indicate that known al Qaeds terrorist Wadih el-Hage was in direct contact with GRF officials while he was planning international terrorism attacks. Specifically, the government noted in its supporting documents that the FBI reported that evidence introduced at el-Hage's trial demonstrated that, in the late 1990s, GRF maintained communications with Wadih el-Hage.

463. Furthermore, the government indicated:

> At the time, el Hage was in contact with GRF, he resided in Kenya, and played an "active role" in an al Qaeda terrorist cell operating there...

464. During this same period, 1996 and 1997, el-Hage was also in contact with GRF offices in Belgium and Bridgeview, Illinois. In particular, documents recovered in a search in Kenya showed that el-Hage was in contact with GRF in Bridgeview, Illinois after returning from a visit with al Qaeda leadership in Afghanistan in February 1997.

465. Evidence provided by the government in freezing GRF's assets corroborates GRF's promotion of martyrdom to kill the "enemies of Islam." The government assessed:

> Newsletters distributed by GRF and published in 1995 by the Central Information News Agency Network (CINAN), which, like GRF, is operated via a Bridgeview post office box, encourage "martyrdom through

> JIHAD." The newsletters, written in Arabic and translated by the FBI, include an article soliciting funds for the Bosnian relief effort to assist those suffering from the prolonged agony due to atrocities imposed by the "enemies of Islam." The article refers to the Jihad (struggle) that should be carried out by Muslims and states: "It seems that the Prophet (Mohammad) had linked religion with JIHAD. So when do we awake? When can we take revenge for God and his religion? When can we rise to defend our rights and self respect?" The article continued, "God had equated martyrdom through JIHAD with supplying funds for the JIHAD effort," and concluded, "All contributions should be mailed to: GRF." (emphasis added)

466. GRF newsletters implored individuals to donate money to their organization for the purposes of buying weapons. The government explained:

> Other GRF newsletters and publications encourage readers to give their Zakat, or charitable tithe, to GRF to assist in the purchase of, *inter alia*, weaponry. "[F]or God's cause (the Jihad, they [the Zakat Funds] are disbursed for equipping the readers for the purchase of ammunition and food, and for their [the Mujahideen's] transportation so that they can raise God the Almighty's word and protect the gaps…." The article concluded by exhorting Muslims "to make the Global Relief Foundation your messenger of goodness, and we will, God willing, disburse it as specified in Bosnia, Kashmir, Afghanistan, Tajikistan, and Lebanon."

467. Since GRF's assets were blocked, information gathered about GRF, according to the government, has only reaffirmed that GRF works closely with and in support of terrorist organizations:

> In addition to this unclassified evidence, the classified material gathered since the date of the blocking has greatly amplified OFAC's [Office of Foreign Asset Control] belief that GRF may have acted in concert with, and in support of, terrorists and terrorist entities.

468. Several photographs obtained at GRF's offices in Chicago indicate that GRF used its humanitarian cover as means to send expensive communications equipment abroad. The government described what exactly was found during the raids on GRF's offices:

> A set of photographs and negatives discovered at GRF's Chicago offices indicate types of "humanitarian" supplies that GRF has sent abroad. The photographs display large shipping boxes arrayed under a GRF banner.

> Other photographs reveal that the boxes contain sophisticated communications equipment: approximately 200 handheld radio transceivers, long range radio antennas, and portable power packs, with an estimated total value of $120,000. Arrayed near the communications equipment are a tool kit, a box of Bushnell binoculars, saddles, and ropes.

469. Other photographs found in the raids indicate that GRF had an specific interest in munitions:

> Other photographs in this same set depict fighters armed with automatic rifles, a sand-bagged bunker with a radio mounted outside, and mutilated corpses with the name "KPI" (Kashmiri Press International) printed alongside. Finally, one photograph displays two dead men with the caption "HIZBUL MUJAHIDEEN," a known terrorist organization operating in the Kashmir region between India and Pakistan. On the reverse side of the photograph was handwritten in Arabic, "two martyrs killed by the Indian government."

470. Mohammed Chehade, Rabih Haddad, Hazem Ragab, and Mohammed Alchurbaji are aiders, abettors, agents, sponsors, co-conspirators, and participants in the illicit scheme and enterprise of the Global Relief Foundation.

## <u>Taibah International Aid Association</u>

471. Taibah International Aid Association (or "Taibah") is a charitable organization headquartered in Falls Church, Virginia. Established in 1991, Taibah's IRS Form 1023, which serves as an application to the United States Government for tax exempt status, lists Abdullah A. bin Laden, Osama bin Laden's half-brother, as a founding officer. The same form also lists Taibah's stated goals as a humanitarian organization:

> The Taibah International Aid Association's first and most important activity is to act as a missionary in the United States to promote the Muslim faith and provide a better understanding of the Muslim faith.
>
> The second most important activity is to give monetary aid and contribute goods and services to people of the Muslim faith, and other people in need throughout the world.

> The third most important activity is to raise money and contribute money to other charitable organizations which qualify as exempt organizations which will provide for the education, enhancement and betterment of all Muslim believers' lives.

472. From its headquarters in the United States, Taibah has a presence around the world through offices, mosques, and educational centers in the following countries: Albania, Bosnia-Herzegovina (BiH), Bulgaria, Gargizia, Kazakhistan, Kosovo, Ozpakistan, Russia, Shofishia, Tajikistan and Tataristan, among others.

473. Despite a well developed website, Taibah does not solicit funding through this channel. According to its IRS Form 1023, Taibah relies on fundraising trips to the Middle East and mailings sent to Muslims in the United States for its revenue. As a result, roughly half of the United States arm of Taibah International's revenue comes from Saudi Arabia. On its year 2000 IRS Form 990, Taibah lists a four year aggregate contribution of nearly $150,000 dollars in fund raising from Saudi Arabia. Also, Taibah's Bosnian branch relies on Saudi Arabia for funding. The Saudi Arabian Saudi High Commission has been identified by Bosnian intelligence as a source of Taibah's funds.

474. Although it purports to be a humanitarian organization, the Taibah International Aid Association furthers the aims and materially supports Osama bin Laden and al Qaeda. Through the actions of its agents, officers and employees, Taibah has provided financial and material support to al Qaeda. The strong affiliation that Taibah maintains with many other al Qaeda front-groups demonstrates its place as a highly connected component of Osama bin Laden's financial and logistical support network.

475. Tiabah's support of international terrorism and al Qaeda is ongoing. On October 21, 2001, five Algerians were arrested in Bosnia-Herzegovnia on criminal charges of international terrorism following a threat to the United States Embassy in Bosnia. The incident

resulted in the five day closure of the United States and British Embassies for what both embassies called a credible security threat. The plot was discovered when United States intelligence intercepted a telephone conversation between two of the accomplices about the mission. During this telephone conversation, one of the terrorists said, "American interests would be jeopardized within 48 hours." One of the individuals involved was Mustafa al-Kadir, who was granted Bosnian citizenship based on his employment with Taibah International. Al-Kadir was still working with Taibah at the time of this foiled terrorist attack and ensuing arrests.

476. The NATO Secretary-General, George Robertson, stated that at least one of the five arrested Algerians had direct links with al Qaeda and Osama bin Laden. The leader of the group, Bensayah Belkacem, has been identified as a top al Qaeda lieutenant. In October 2001, Belkacem was arrested at his apartment in Zenica, Bosnia where authorities found phony passports and a mobile telephone listing for Abu Zubeida, al Qaeda's third-in-command. According to phone transcripts, Belkacem was also in phone contact with al Qaeda military commander Abu al-Maid.

477. On December 13, 2001, Bosnian police searched the offices of Taibah International. Following the raid, an audit and investigation of Taibah's financial records was conducted on January 25, 2002. This audit reveals that Taibah's financial records were managed in a way that that obscured its true financial status. The financial records contained flagrant abuses in Taibah's allocation of donations and in the manner its expense accounts were maintained. A March, 2002, Bosnian Intelligence Memo from the Agency for Investigation & Documentation (AID) that summarizes the audit described the illegal management of Taibah's funds by its executives:

> It is also noteworthy that large cash sums were withdrawn by management individuals at the organization which were never accounted for by any

> record of expenditure, and which indicates a wise scope for possible illegal spending of money. It is clear that each of these items is for more than 10 thousand marks.

478. Other discrepancies noted in the audit were the misuse of automobiles, supplying of fictitious declarations of affiliation and employment, as well as suspicious requests for visas.

479. Funding for the Bosnian office of Taibah originates from bank accounts at the al-Rajhi Islamic Bank. The flow of money begins with the al-Rajhi Islamic Bank in Saudi Arabia, then to Taibah via wire transfers through Hypobank in Germany and Commerce Bank in Bosnia. The al-Rajhi Islamic Bank, its agents, officers, directors, and so-called charities, members of the al-Rajhi family are significant financial supporters of terrorism as is discussed *supra*.

480. In Bosnia, Taibah International works closely with another al Qaeda front-group, the charitable organization and Defendant Global Relief Foundation (or "GRF"). According to the 2002 Bosnian Intelligence Memo, when GRF was initially registered, it operated in Bosnia under the auspices of Taibah International. Taibah's close working relationship with GRF is in accord with both charities' role as al Qaeda sponsors and front groups.

481. The 2002 Bosnian Intelligence Report on non-profit organizations affirms that Taibah's Bosnian office received its revenues from another Saudi Arabian charity, the Saudi Relief Commission (a/k/a Saudi High Relief Commission) (or "SRC"). Taibah has been implicated in the 1998 United States embassy bombings along with the SRC.

482. Two officers from Taibah International's United States branch, Samir Salah and Abdulrahman al-Amoudi (or "al-Amoudi"), play a large role with United States organizations that have come under scrutiny for their ties to al Qaeda. Both of them are officers of a number of organizations in the SAAR Network. Abdulrahman al-Amoudi, Taibah's Vice-President, is a past employee of the SAAR Foundation, the hub of the SAAR Network, and currently heads a

few SAAR Network charities. Al-Amoudi also runs the United States operations of the Saudi-based International Islamic Relief Organization. Samir Salah, Taibah's Secretary, serves as a director at many SAAR Network organizations, including CFO at Piedmont Poultry. Samir Salah also managed the Caribbean branch of the Bank al-Taqwa.

483. Taibah International Aid Associations directors, officers, including Abdullah A. bin Laden, Anwar Hajjaj, Abdulrahman al-Amoudi, Samir Salah, Saleh O. Badahdah, Sulaiman al-Alsheikh, and Abelmagne Ali Eldeen are aiders, abettors, material sponsors, co-conspirators, and participants in the illicit scheme and enterprise of Taibah International Aid Association, al Qaeda, and international terrorism.

## Islamic Assembly of North America

484. The Islamic Assembly of North America ("IANA") was first incorporated on December 8, 1993 in Aurora, Colorado. According to the IANA website, the founders established the group in order to "reviv[e] the Islamic nation to its proper state and condition" by "engag[ing] in a complete and comprehensive form of Islamic work… based on the principles of [Sunni Islam]… aim[ed] at bringing together the efforts of many dawah [missionary] activities and coordinating the activities of different Islamic centers and groups." As stated on the IANA web site, one of the central efforts in that regard is to "[o]bserve and analyze the current events in the Muslim world" and to "[a]ssist the oppressed and tyrannized scholars, Islamic workers, and Muslim masses in any locality."

485. IANA describes itself as being "founded by a number of individuals and organizations in North America." IANA and its intricate operational network have since expanded to a number of other U.S. states, including Michigan, Idaho, Oregon, Pennsylvania, and Wisconsin. In fact, over the past decade, IANA has served as part of a well-funded,

networked system of radical Islamic entities operating across the western United States including the Dar Makkah Foundation in Denver, Colorado; the Dar Makkah Association in Portland, Oregon; Al-Mutaqla Al-Islami in Washington and Idaho; Attawheed Foundation in Pittsburgh, Pennsylvania; *Assirat Al-Mustaqeem* ("The Straight Path"), a magazine published in Pittsburgh in 1999-2000; and, *Al-Jumuah*, a magazine published in Madison, Wisconsin. The entities are linked by shared officers and employees and by financial relationships.

486. IANA, in its present form, has its roots in the Denver-based Dar Makkah Foundation. According to Shaykh Muhammad al-Jibaaly of the Quran wa`as-Sunnah Society (QSS):

> Daar Makkah: An organization… established in Denver Colorado in the 80's. It was very well known for its bookstore containing many Salafi… books and cassettes. When IANA was formed in 1992 (or shortly before that), Daar Makkah's general secretary was Muhammad al-Ahmari, and its office director was Bassem Khafagi. Soon thereafter, these two, as well as others, moved into IANA, and Daar Makkah became much weaker than it used to be, its position and direction being assumed by IANA.

487. Dar Makkah, a Colorado non-profit organization first founded in 1988, was established (according to its own flyers) "to act as another pulpit for Islam in North America. There is a high demand for Da`wa [missionary conversion] to Islam while a new supply dictates that they all should work together and coordinate their work to fill the gaps and compliment the efforts." Another Dar Makkah flyer likewise described the group as "an independent Islamic society concerned with the Islami[c] current issues." According to Dar Makkah's IRS 1023 filing in 1992:

> The Organization in the past had started with a narrow objective: to make available Islamic books and literature to the public. The Organization then went into another phase of making Isamic information (books, tapes, lectures, etc.) available. The Organization then had acquired (leased) an office and started raising funds by contacting business people and the public as well as sale of books and tapes. The Organization also organized

> lectures, speeches, and got together to provide the right Islamic information and teachings.

488. Also according to Dar Makkah's IRS 1023 filing, the principle basis of the group's "fund-raising program" was "[p]ersonal contacts with selected individuals and businesses in The United States and other countries (mainly Saudi Arabia)."

489. Until its closure in 1994, the Al-Kifah Refugee Center (with offices in Brooklyn, Boston, and Tucson) served as the U.S. branch of *Makhtab-e-Khademat al-Mujahideen* (the "Mujahideen Services Office"), the direct predecessor of Al-Qaida.

490. Phone records from the Brooklyn, NY-office of Al-Kifah indicate that someone at (303)691-2201 in Colorado called the Al-Kifah Center at least once in late 1992, shortly prior to the February 1993 World Trade Center bombing. This 303 telephone number corresponds to the mailing address of the Dar Makkah Foundation at 2040 S. Oneida St. #2A in Denver.

491. In 1989, among other items, Dar Makkah offered its supporters in Colorado reprinted copies of articles from *Al-Jihad* magazine. *Al-Jihad*, at that time, served as the official propaganda arm of *Makhtab-e-Khademat al-Mujahideen*. The coversheet for the reprints carried the Dar Makkah logo and the slogan, "The one who is not concerned about the matters of the Muslims is not part of them."

492. Also in 1989, the Dar Makkah Foundation sponsored approximately $3,500 worth of travel expenses for Dr. Safar Al-Hawali as he traveled from Jeddah, to New York, Detroit, Denver, Los Angeles, Portland, and back in a tour of lectures and seminars. Dr. Safar Al-Hawali is one of the most radical dissident clerics in Saudi Arabia, and is repeatedly cited as a key inspiration by Usama Bin Laden himself.

493. Al-Hawali is personally listed on the incorporation documents for Mercy International Relief Agency-Dublin, a charitable-front group that is suspected of providing funds

for Al-Qaida terrorist operations. Mercy's head office in Dublin, Ireland has been linked in published reports to Zacarias Moussaoui and other conspirators in the September 11 suicide hijackings.

494. On July 10, 2002, the Qatari television channel Al-Jazeera interviewed Al-Hawali by telephone. He referred to America as a "tyrannous and evil nation that Allah is manipulating, unbeknownst to it, until it reaches the end to which it is sentenced." He added, should the U.S. and its allies attempt to interfere with "the land of the two holy places" [Saudi Arabia]:

> … it will have no protection from the cruelty of God and the vengeance of the soldiers of Allah, the mujahideen. It will have no protection, even if it digs a hole in the earth or seeks refuge in space. Holes in the ground in which to hide every time a plane deviates from its course will not help those who put forth this kind of proposal… they will find no one who loves martyrdom more than we [do], and no one more willing to die—as this is the hope of every man in this land. While the American young people, including Clinton, evade military service, our young people meticulously do this service.

495. On March 9, 1991, Dar Makkah sponsored a 5th Annual Cultural Day at the Islamic Center of Denver, headlined by "Dr. Mohammed Al-Ahmary." One of the other two speakers was "Dr. Abdallah Makkawi." Upon information and belief, Dr. Abdallah Makkawi is also known as Abdallah M. Mekkaoui.

496. In June 1987, in a foreword to a work on the subject of Ibn Taimiyya, Mekkaoui thanked a number of individuals for their assistance and support, including: Shaykh Muhammad Al-Jibaaly (QSS); Saffet Catovic (Benevolence International Foundation [BIF]); and Mohammed Hozien (brother-in-law of Al-Qaida supporter Tarik Hamdi).

497. In Accurint credit reports, Mekkaoui is referenced to the following registered address:

> "P.O. Box 1561
> Newark, NJ 07102"

498. English-language booklets bearing this Newark P.O. Box address were also distributed to Muslims on the West Coast during this approximate period. The booklets proclaimed, "Al-Jihaad continues in Afghanistan! Remember your Mujaahideen brethren; and strive to fulfill your obligation in this struggle." It continued by requesting Muslims "who intend to assist Al-Jihaad in Afghaanistaan" to send letters and money donations to the same Newark P.O. Box linked to Abdallah M. Mekkaoui.

499. In 1993, Dar Makkah published a work entitled "The Importance of the Mosque in Islam" by Dr. Mustafa as-Siba`i. As-Siba`i explained:

> The history of the mosques in Islam has proved that from them come the great armies of Islam which rush to fill the earth with Allah's guidance. From the mosques the beams of the light of guidance emanate for the Muslims and others… We [i.e. the author and his generation] witnessed, when we were still children, how the mosques were the centers of the nationalist movement against the French occupation. From the mosques also came the leaders of the Jihad against colonialism in general and against Zionism (Israel) in specific… The mosque will return to its role in raising real men, graduating heroes, reforming corruption, fighting evil and building society upon the foundation of fearing and pleasing Allah alone. We hope for this to take place, Allah willing, when the vanguard of our purified, believing youths… occupy the pulpits and the rooms of the mosques.

500. IANA was born out of a meeting of a number of individuals who are concerned and active in the field of dawah (proselytizing) in the United States and Canada. These individuals were representatives of a number of Islamic Centers and organizations, in hopes that the reality of the dawah in America and elsewhere will achieve the important step of working as a group. IANA is one of the organizations of Ahl al-Sunnah wa al-Jama'ah. Its goal- by the will and support of Allah- is to gather together all of their energies and potential resources, dawah-wise, human and financial, to revive and meet the needs of Muslims. IANA has laid down specific goals and priorities it is achieving to attain, by the will and aid of Allah. These are:

- Unify and coordinate the efforts of the different dawah oriented organizations in North America and guide or direct the Muslims of this land to adhere to the proper Islamic methodology.
- Spread the correct knowledge of Islam, built upon the Book of Allah and the authentic sunnah and assist its dissemination among Muslim Americans and immigrants.
- Widen the horizons and understanding, both dawah wise and educational, among Muslims concerning different Islamic contemporary issues.
- Observe and analyze the current events in the Muslim world. Tie the Muslims of America into what is happening in the Muslim world and assist them in understanding the events and the implications of the current events.
- Assist the oppressed and tyrannized scholars, Islamic workers and Muslim masses in any locality.
- Produce a serious and effective media institute to serve the Islamic presence in North America.
- Create a dawah program that will keep in mind the youth and their needs and concerns in this Western society. Organize the dawah among them in order to create a new generation that will protect the Islamic presence in North America.
- Create programs and institutions that will serve the English-speaking Muslims of North America.

501. IANA Board Chairman Mohammed Al-Ahmari described the meaning of the organization's mission the following way:

> As long as Muslims are without fatal, far-reaching, striking power, we will stay under the protection of the super powers because we surrendered ourselves to them… We beg for their defense and mercy, and voluntarily giving them; rather giving themselves, unlimited access to what ever pleases them… We threw away 'And make ready against them all you can of power' behind our backs, we ousted 'Verily! Shooting is the Power', and 'He who learned shooting and forgot it, is not one of us.' The physical power and weapons became great prohibitions in the world of the super powers' reservations! And it will continue to be so until the Ummah wakes up and removes the veil of shame from its face… We at IANA are guarding one of the Islamic fronts that we believe to be important in the revival of the anesthetized Islamic body.

502. In order to achieve its goal of promoting the spread of fundamentalist Islam, IANA and its officers have spent large sums of money on sponsoring extremist political conferences held inside the United States, publishing websites, books, and magazines written by

radical anti-American (predominantly Saudi and Kuwaiti) clerics, and by obtaining controlling stakes in a number of prominent American mosques. As a result, IANA was the only American Muslim organization to be individually promoted on the website of Azzam Publications, widely considered to be the premier English-language mouthpiece of Al-Qaida.

503. In December 1993, a featured speaker at IANA's third annual convention was senior Al-Qaida recruiter Abdelrahman Al-Dosari (a.k.a. Shaykh Abu Abdel Aziz "Barbaros"). The title of Al-Dosari's speech was "Jihad & Revival." He lectured to the audience in English:

> Fight for the sake of Allah—not fighting by shouting, not fighting by burning tires by the road… no, this is not the Muslim way… [It is] the fight… killing the enemy, and to be killed. And this [duty] is not new for Muslims, not new for Islam… It is required from every Prophet to perform Jihad… If you are not going to go for jihad, if you are not going to leave your business, not going to leave your family, not leaving this earth, and fighting in the sake of Allah, Allah(SWT) is going to punish you… Go alone, without any arms, without any weapons, without anything, you go. It is your duty. And Allah is responsible about your food and about your weapons and about everything… we will give you direction.

504. Al-Qaida member Abdelrahman Al-Dosari also spoke in Arabic-language sessions at the 1993 IANA national conference. In these sessions, he lectured:

> Allah is going to help certain people to control the world and this control will come according to certain Quranic verses and as we know Allah said be prepared for the enemy by all means. Also, Allah said he is going to give us Tamkeen [control over the world]… it is a promise from Allah that those that believe in Allah and wage Jihad will go to Paradise. So to wage Jihad is one of the most important characteristics of the Believer… Whenever there is a pure Islam, there will be blessing or we will always be fighting with the enemy. Even the Prophet (SWS) participated in 27 battles and now we say that we are believers. Tell me Brothers, how many times you participated in Jihad or even thought about it? …this western tool, democracy, is not our way to have the Tamkeen. We have to follow the path of Allah and listen to his word, 'Make ready against [the enemies of Allah] with the utmost of your power.'

505. Al-Dosari also spoke at IANA's third annual convention was senior Al-Qaida recruiter Abdelrahman Al-Dosari. The convention was held on December 21, 1995 to December 25, 1995 in Dearborn, Michigan.

506. In 1996, featured speakers at IANA's fourth annual convention included Shaykh Muhammad Al-Jibaly, (Chairman of al-Qur'an was-Sunnah Society). In an official reply to a letter from Bassem Khafagi and IANA, Al-Jibaly wrote:

> If we check the list of Arabic lectures from your previous conferences, we find the following examples, 'Yemen, Past and Present,' 'Peace or New War'… 'Bleeding Wounds,' 'Peace with the Jews,' 'So that We are not Attacked from Within,' 'The Salaf and Judging the Rulers,' 'Political Oppression and the Progress of the Ummah', etc, etc. It is interesting to note that many of these political lectures were delivered by al-Ahmari, who is IANA's chairman.

507. General Abdelrahman Sewar El-Dahab is a former military dictator of the Sudan, and is the current honorary President of the Sudanese Islamic Call Organization (ICO), a.k.a. *Al-Munzamaat Al-Dawa Al-Islamiyya* (MDI). During his term of martial law, Al-Dhahab upheld relative strict Islamic shari`a law in the Sudan. In 1985, his government initiated a deliberate policy "of arming Arab tribal groups" in order to offset the influence of the Sudanese People's Liberation Army (SPLA). Those Islamic militia groups have been subsequently accused of gross human rights violations, including the standardized practice of slave-trading. MDI/ICO's main Sudanese bank account for donations is hosted by the Al-Shamal Islamic Bank in Khartoum. Al-Shamal is reputed to have been created as a joint project between the Sudanese National Islamic Front (NIF) and Usama bin Laden, who allegedly invested $50 million of his own personal funds in the bank.

508. Shaykh Salah Al-Sawi is rumored in Salafi Muslim circles to have been "warned about being of the Ikhwaanee Muslimeen [Muslim Brotherhood]." In response to a fatwah

permitting American Muslims to fight in the war against the Taliban and Al-Qaida alliance in Afghanistan, Al-Sawi declared:

> [N]either America nor anyone else possess irrefutable evidence supporting such formation of alliances and 'coalitions' … In this manner, the fatwa raced side by side with the Jewish media in blaming the Taliban as well as Osama bin Laden… the Al-Qaeda Network—as is well known amongst the observers of the affairs of the Islamic world, from East and West—is a Jihad movement, that originated to support the Afghani Jihad during the war with the Soviet Union. They were afflicted during this time with a goodly trial. This was according to the observation of the entire world. The first people to be aware of this were the decision-makers of the United States. These governments portrayed the returning fighters from Afghanistan as time bombs, bound to detonate at any moment at the foundations of the buildings of Arab organizations! This went to the extent that merely returning from Afghanistan was considered a great crime from every aspect, deserving nothing less than execution or lifetime imprisonment in some countries… They realized that their primary enemy was one that hides behind the scenes; one that manipulates many of the local leadership, as puppets in a puppet show are manipulated; one that stresses the enmity toward the Islamic Jihad in every location… This enemy [to them] is indeed represented by a strong, mighty, and global power, being led by the United States. He [Usama bin Laden] opened up his eyes and saw the 'children of the rock' being killed in Palestine with American weapons and American support… So is it wrong for a person to ask: Can there be any blame on the Al-Qaeda Network or other organizations for demanding on its list of demands, and prioritizing on its list of priorities the opposition to this overwhelming injustice?!

509. In March 1997, IANA convened a three-day long "Islamic Creed" camp in Manhattan, Kansas with the cooperation of the local Islamic Center of Manhattan. One of the lecturers at the symposium was former IANA president Bassem Khafagi, who discussed "The Future of Da`wah [Islamic missionary work] in America." Khafagi, an Egyptian national, was recently arrested in New York and is charged in Michigan with two counts of bank fraud.

510. IANA was characterized in a press release by the Saudi Arabian Embassy in Washington, DC as following the same beliefs of the Muslim Brotherhood, an Egyptian terrorist organization which was responsible for the assassination of Egyptian President Anwar Sadat.

511. IANA has relied on Sami al-Hussayen for funding and internet development services. Mr. Al-Hussayen is a University of Idaho PhD student currently standing criminal trial in Idaho for materially supporting terrorism. Beginning in 1998, he served as a courier transferring at least $100,000 to IANA from his uncle, Saleh al-Hussayen, and other Wahhabist sources in Saudi Arabia. From March 1995 until February 2002, IANA received $3,000,000 in financial support from Sami al-Hussayen sources. One deposit was a $300,000 wire transfer from an unknown Swiss bank account on May 14, 1998. Sami al-Hussayen served on the IANA Board of Trustees, whose constitution vests that group with authority over all of the Assembly's activities.

512. Since May 11, 2001, al-Hussayen has been IANA's official registered agent in Idaho. From November 16, 1999 to February 13, 2003, Sami Hussayen functioned as an employee and official of IANA. His official duties included website creation, registration, management, administration and maintenance.

513. According to the Affidavit for the Search Warrant, al-Hussayen is also a "business associate of the IANA in its purpose of 'Da'wa' (proselytizing), which includes the website dissemination of radical Islamic ideology, the purpose of which was indoctrination, recruitment of members, and the instigation of acts of violence and terrorism."

514. Three unique IANA accounts were found on Sami al-Hussayen's hard drive by FBI investigators (Nos. 628800505, 0530025980, 530053115).

515. On June 19, 2001, IANA's website www.islamway.com published an article by Salman al-Awda that was republished on his website, www.islamtoday.net, on November 4, 2001. According to the Affidavit for the Search Warrant, this article:

> justified and advocated suicide bombings if certain conditions were met, namely: (1) that the purpose is to assist Allah's religion; (2) that 'the

> attacker is almost certain that his act will have some benefit, either by inflicting the enemy with casualties or injuries, by encouraging the Muslims to fight the enemy, or by weakening the enemy's resolve by showing them what a single man is capable of…[;] (3) that the act is against 'unbelievers who have declared war against the Muslims…[;] (4) that 'the act is in their countries or in countries under their rule, where Muslims need to resists them and expel them…[;] and (5) 'to be approved by the parents of the attacker…'

516. On August 16, 2001, IANA's website www.islamway.com published a propaganda statement that encouraged individuals to join arms in jihad against the West. Appropriately entitled "An Invitation to Jihad," the publication stated that "[t]he mujahid brothers will accept you with open arms and within a period of two weeks you will be given commando training and will be sent to the frontline."

517. Just two days before the September 11, 2001 attacks, on September 9, 2001, an individual posted a statement on IANA's website www.islamway.com that he was leaving Afghanistan "on duty" and that "Jihad is the only means to eradicate all evil on a personal and general level[;]" that "[t]he only answer is to ignite and trigger an all out war, a worldwide Jihad; and that "[w]e will do our best to ignite this war, may Allah protect us."

518. From at least October 2, 1998 until his imprisonment on February 26, 2003, al-Hussayen provided expert computer services, advice, assistance and support to IANA in the form of website registration, management, administration and maintenance. Al-Hussayen was either the registered agent or administrative contact for IANA's most prominent websites, including www.iananet.org, www.ianaradionet.com, www.islamway.com, and www.alasr.ws.

519. From August 17, 1994, until his arrest in February 2003, al-Hussayen maintained six U.S. bank accounts which served as a conduit for international money destined for IANA. From at least January 23, 1997, until February 2003, al-Hussayen received and disbursed $300,000 in excess of his study-related funds, such as his monthly stipend from the Saudi

Arabian Government. A portion of these excess funds were provided by Al-Hussayen's uncle, Saleh Abdel Rahman al-Hussayen, who sent him $49,992 on September 10, 1998, and $49,985 on September 25, 1998. These additional funds were held by al-Hussayen and not transferred to IANA until IANA's existing funds were nearly depleted.

520. From November 16, 1999, to February 2003, al-Hussayen transferred money to IANA's officers, including the IANA president, Mohammed Al-Ahmari. These funds paid IANA's operating expenses, including employee salaries. Al-Hussayen also maintained a checking account in a Michigan bank in his name, but with al-Ahmari's home address and, according to the FBI, al-Ahmari's "apparently exclusive use of the account." The strength of Al-Hussayen and al-Ahmari's relationship is illustrated in the hundreds of phone calls they made to each other.

521. Financial investigations have shown that a check from an IANA bank account was sent back to Mr. Hussayen with notation on the memo line stating repayment of a loan. The back of the check was endorsed by Mr. Hussayen.

522. From December 1994 to July 2002, al-Hussayen traveled, and funded the travel of other individuals, related to IANA.

523. IANA and Sami al-Hussayen created and managed numerous websites that exhibited a fundamentalist Islamic trait and incited violence against the West in a manner consistent with al-Qaeda's ideology and rhetoric. By establishing these websites, al-Hussayen and IANA created a forum from which notorious al-Qaeda Sheikhs (spiritual leaders) could incite thousands of followers to engage in terrorist attacks. Indeed, IANA web sites (iananet.org; ianaradionet.com; islamway.com; alasr.ws; almanar.net) made "over 20,000 impressions a day" on its followers who visited the sites.

524. FBI intercepts of phone calls and emails depict a relationship between IANA trustee al-Hussayen and both Sheikh Salman al-Awda and Sheikh Safar al-Hawali. FBI Special Agent Michael Gneckow testified that the intercepts, "… revealed one thing, that the Defendant has an extreme amount of respect for Sheikh al-Ouda. He [al-Hussayen] has operated in the capacity of assisting with setting up web sites that Sheikh al-Ouda can use as a vehicle to preach his message to – as I've stated before, to the widest audience possible." Agent Gneckow also stated that, in one intercept, Sheikh al-Ouda "deferred to the Defendant as being the … manager of the web site and he deferred decisions with regard to the web site to him."

525. Agent Gneckow also testified that the intercepts reveal a similar relationship between al-Hussayen and Sheikh Safar al-Hawali, "Again, the interceptions show a very close link between the Defendant and Sheikh al-Hawali, the setting up of web sites, the providing of vehicles for extended communication, telephonic contact with intermediaries of Sheikh al-Hawali.

526. Further evidence of al-Hussayen's relationship with Sheikh al-Awda and Sheikh al-Hawali was discovered in materials seized during the search and arrest of al-Hussayen. In his possession was a phone book that had both Sheikhs' telephone numbers written in Arabic.

527. The website www.alasr.ws was owned by IANA and run by Sami al-Hussayen, who registered the site on September 11, 2000. www.alasr.ws is an Arabic language internet magazine. On May 15, 2001, www.alasr.ws published statements by three radical Sheikhs, one of which was the al-Qaeda spiritual leader Salman al-Awda. According to the FBI, these publications "extolled the virtue of and advocated suicide operations and martyrdom as necessary and permitted aspects of world jihad."

528. Among the other earlier fatwas sanctioned by IANA included a call to crash an airplane into an enemy target. The fatwa at issue, which IANA published on its Al-Asr website, was issued by extremist spiritual leader Sheikh Hamid Al-Ali of Kuwait, who as of 1999 was under investigation Kuwait's state prosecutor. Sheikh Al-Ali's fatwa discussed different kinds of justifiable suicide operations such as "storming enemy lines without hope of survival" or dying "to destroy a vital enemy command post." Al-Ali's fatwa concluded that, "The modern version of that is to use bombing methods or to crash one's plane on a crucial target to cause great casualties."

529. On June 19, 2001, IANA's website www.islamway.com published an article by Salman al-Awda that was republished on his website, www.islamtoday.net, on November 4, 2001. According to the Affidavit for the Search Warrant, this article:

> …justified and advocated suicide bombings if certain conditions were met, namely: (1) that the purpose is to assist Allah's religion; (2) that 'the attacker is almost certain that his act will have some benefit, either by inflicting the enemy with casualties or injuries, by encouraging the Muslims to fight the enemy, or by weakening the enemy's resolve by showing them what a single man is capable of…[;] (3) that the act is against 'unbelievers who have declared war against the Muslims…[;] (4) that 'the act is in their countries or in countries under their rule, where Muslims need to resists them and expel them…[;] and (5) 'to be approved by the parents of the attacker…'

530. On September 4, 2002, Salman al-Awda's website www.islamtoday.net published an article by the radical Sheikh Safar al-Hawali entitled "An Appeal to Help Our Palestinian Brothers." As stated in the Affidavit for the Search Warrant:

> The publication advocated jihad; solicited financial support for the fighters; and advocated open violence, namely, [d]eveloping the methods and means of Jihad-such as targeting settlements, surprise attacks on military bases, manufacturing and improving weapons, and similar careful and wise choices and deep penetration in martyrdom operations…."

531. By publishing al-Awda's and other al-Qaeda Sheikhs' statements online, IANA is supporting al-Qaeda's efforts to indoctrinate and incite followers worldwide. On August 16, 2001, IANA's website www.islamway.com published a propaganda statement that encouraged individuals to join arms in jihad against the West. Appropriately entitled "An Invitation to Jihad," the publication stated that "[t]he mujahid brothers will accept you with open arms and within a period of two weeks you will be given commando training and will be sent to the frontline."

532. On September 9, 2001, just two days before the attacks, an individual posted a statement on IANA's website www.islamway.com that he was leaving Afghanistan "on duty" and that "Jihad is the only means to eradicate all evil on a personal and general level[;]" that "[t]he only answer is to ignite and trigger an all out war, a worldwide Jihad; and that "[w]e will do our best to ignite this war, may Allah protect us."

533. Among other items featured for download on www.islamway.com were Arabic-language copies of the following Al-Qaida propaganda videos: 'The Martyrs of Bosnia' (a.k.a. Shuhadaa Al-Busna)**.** The video depicts in graphic detail the 1992-93 civil war in the Balkans, as seen through the eyes of the Arab-Afghan mujahideen under the command of Al-Qaida member Abdelrahman Al-Dosari (a.k.a. Shaykh Abu Abdel Aziz "Barbaros") and Al-Gama`at Al-Islamiyya commander Anwar Shaaban. During the video, a number of other past and present Al-Qaida members are featured subjects of discussion, including Abu Zubair Al-Madani (a cousin of Usama Bin Laden) and Abu el-Ma`ali (a.k.a. Abdelkader Mokhtari), a notorious Algerian GIA terrorist based in Bosnia.

534. Operation Badr (a.k.a. Badr Al-Busna)**.** This video, produced by the Arab-Afghan *Kateebat Al-Mujahideen* ("Mujahideen Battalion") in Bosnia led by Abu el-Ma`ali, depicts

mujahideen involvement in the final battles of the Bosnian civil war. The video also eulogizes the fallen Al-Gama`at terrorist leader Anwar Shaaban. A number of suspected Al-Qaida members are additionally featured in this video.

535. On December 4, 2002, al-Hussayen received an email from the al-Qaeda political office "extolling the virtues and successes of a Jihadist and suicide operations targeting the west." The communiqué specifically references al-Qaeda's 1998 U.S. Embassy bombings, USS Cole attack, and September 11 attacks.

536. Beginning in early 2000 visitors to www.islamway.com and other Arabic language websites sponsored by IANA and maintained by Mr. Hussayen, could join an internet e-mail group to see news regarding jihad. The invitation to join was titled "Cry and Call to Muslims". It encouraged people to fight the idolater with your money, your selves, your tongues and your prayers. This e-mail group grew to 2,400 members and served as a communications platform for individuals who wished to engage in violent jihad. Mr. Hussayen's status as a moderator of the internet e-mail group gave hi various privileges with respect to the acceptance, retention and deletion of messages posted to the group.

537. On February 25, 2003, an urgent appeal to Muslims was posted urging individuals to provide information about valuable targets for attacks, particularly in the Middle East. The long list of requested targets included American military bases, the logistical support for bases, the residences of civilian workers, facilities of American oil companies and routes followed by oil tankers.

538. The internet e-mail group also served as a platform for IANA and Mr. Hussayen's direct fundraising appeals. In 02/2000, Mr. Hussayen posted a message to all group members urging them to donate money to support those who were participating in violent jihad in order to

provide them w/ weapons and physical strength to carry on with the war against those who kill them. It was sent each month thereafter as a monthly reminder to support violent jihad.

539. Beginning in February 2000, immediately after the creation of Yahoo!QoqazGroup by Al-Hussayen, Sami al-Hussayen sent to all the members of the Yahoo!QoqazGroup a "monthly reminder." Al-Hussayen urged its recipients to donate money to support those participating in jihad. Al-Hussayen's mailing said: "providing them with weapons and physical strength to carry on with the war against those who kill them."

540. Imam Moataz Al-Hallak was a featured guest on IANA Radio Net on June 4, 1999, broadcasting from Austin, Texas. Al-Hallak lectured:

> If you support Allah (SWT), Allah will support you and make your stance firm… And this is the second condition for us to be victorious. It is the total obedience and submission to Allah (SWT). Surrendering our whole being to Allah (SWT), without questioning his orders or his commandments, or the commandments of his Messenger (SAW)… Remember when you prayed unto your lord and he thus responded, 'I shall aid you with a thousand agents following one upon the other.' These are the soldiers of Allah that support the believers. Now, let us say that the whole world is on one side, and Allah (SWT) on the other side, supporting us with his agents. Who is there that can defeat us? All the world, including whatever they have of arsenal, all nuclear power, and just one agent sent by Allah (SWT)… Nobody can defeat us if we are with Allah (SWT).

541. IANA also sponsored the www.al-multaqa.com web site which served as an international jihadist recruitment tool for fighters going to Chechnya. "Several articles extolling the Chechen warriors and glorifying martyrdom were found on the server for IANA's www.al-multaqa.com website," which included the online publication of "Al-Multaqa", an Arabic language magazine. Sami al Hussayen maintained and controlled the site. Mr. Hussayen was on the Board of Editors which was created in 04/05/1999 and registered to "Al-Multaqa" at a Moscow, Idaho address used by Mr. Hussayen and others.

542. Assirat Al-Mustaqeem, during its short existence, gained a reputation as one of the most radical Arab magazines in print. According to its founders, Assirat is "a monthly Islamic magazine that is concerned with Islamic Revival issues… [and] covers the most important da`wah, intellectual, and political issues of Islamic Revival."

543. The October 1998 issue of *Assirat* called the United States a "strategic target," while the magazine's last issue in July 2000 advocated jihad against the West.

544. Khalid Ayed, a writer for *Assirat* in Pittsburgh shared a Portland, Oregon address with Wadih El-Hage. Another Assirat writer, Mulhim El-Tayeb, also shared the same Portland, Oregon address with Wadih El-Hage.

545. The January 2000 edition of *Assirat* carried the following editorial titled, "In The Land of Ice Cream," by "Abdallah Abd`al Aziz":

> Behind a wall of tears, he looks into the wide horizon, and finds nothing but despair. Again and again, he looks, but sees nothing worth seeing. The place is a big prison of high-rises, rows upon rows of them. They call it civilization. Poor fellow, Abu al-Mawt ["Father of Death"]. He imagines he was back in Afghanistan… Poor fellow, Abu al-Mawt. This is the land of the infidels… He puts his hand in his pocket to get out the money and he finds a book. He looks at it, it is the Qur`an. Poor fellow, Abu al-Mawt, he is suffering from amnesia. He opens the Qur`an and reads: 'A Gift from Abu Jihad to Abu al-Mawt.' Tears stream down his cheeks—Abu Jihad was his best friend. They were comrades in their love for Allah, but Allah has favored Abu Jihad with death. Poor fellow, Abu al-Mawt. His sorrow swells and he sobs. He sees the traces of blood on the Qur`an. Abu Jihad was killed with the Qur`an in his hand… Poor fellow, Abu al-Mawt is lonely, in exile. His home is lost. He sits and remembers and his heart is bursting, he is shaking like a feather. The [guesthouse] is a beehive of action… A group is going tomorrow to the al-Farooq training camp… The village of Pabi, the gate of al-Tal, the river of Jalalabad, the mountains of Jaji, the desert of Kandahar, the snow of Jerdiz, a mortar shell, the dust of battle, the frontline, the 'Green Brigade.'… 'Would it be that after the Prophet has abandoned their land, you would accept to prosper among the infidels? Haven't you found the path of the Prophet, haven't you heard the songs of the caravan [of martyrs]?

546. In fact, *Assirat,* produced in Pittsburgh, Pennsylvania starting in 1991, was the creation of a group of North American Muslims, many of whom are senior members and officials of IANA. *Assirat* regularly published articles about IANA, and IANA's officers contributed articles to the magazine or sat on its advisory board.

547. *Assirat* was produced by "Dar Assirat for Dawa and Media," a "non-profit Islamic media organization that is concerned with using and developing the printed and audiovisual media materials to be a means of calling to Islam." The Advisory Committee of Dar Assirat included: Bassem Khafagi, Shaykh Abdurrahman Al-Mahmoud (Saudi Arabia), Ali Al-Timimi, Shaykh Mohammed Al-`Abdah (Britain), and Shaykh Mohammed Al-Mahdi (Yemen).

548. The relationship between IANA and *Assirat* did not end when the magazine folded in July 2000. Two Algerians who wrote for the magazine are now on IANA's staff. They are among a number of former Assirat staff and other men who have moved between Pittsburgh and other U.S. cities, associating with organizations or individuals with known or suspected ties to Islamist movements.

549. *Assirat's f*ormer managing editor, Khaled Guerdjouma, now writes for the IANA's web publication known as *Al Asr* ("The Era"). IANA published a booklet by Guerdjouma—under the pen name Khalid Hassan—on Islamic movements in his native Algeria. Guerdjouma has since returned to Algeria.

550. Redouane Mohammed Azizi, a fellow Algerian and friend of Guerdjouma, wrote for *Assirat* in Pittsburgh as well. He moved recently to Ann Arbor to become a writer for *Al Asr.* Interviewed by journalists from *The Pittsburgh Tribune* in IANA's office, Azizi acknowledging knowing other Muslims connected to *Assirat* and other IANA-related organizations in Pittsburgh and described them as "close-knit."

551. Tawfiq Tabib (a.k.a. Tawfig Tabib, Tawfiq Tobib) was a well-known correspondent for *Assirat al-Mustaqeem.* On December 13, 1991, Tabib was arrested by U.S. Customs as he attempted to enter the United States through JFK Airport in New York. Two months later, he was subsequently indicted on Class B felony charges that he had kidnapped his own children from their recognized legal guardian (his estranged wife Hanan Ali), and deliberately brought them overseas for three months to keep them out of her reach.

552. In August 1994, Tabib interviewed senior Al-Qaida recruiter Abdelrahman Al-Dosari (a.k.a. Shaykh Abu Abdel Aziz Barbaros). During his interview with Tabib, Al-Dosari commented that he had first arrived in Afghanistan in 1984, and had then begun his "journey with Jihad." Moreover, as he explained, "I am still following this same path."

553. In 1991, Tabib filed articles of incorporation for a Eugene, Oregon-based mosque known as "Masjid Al-Sunnah, Inc." These papers indicated that Tabib was the registered agent and President of Masjid Al-Sunnah. Below his name and address, Tabib noted that upon any possible dissolution or liquidation of this corporate entity, "the assets shall go to DAR MAKKH[sic] In Denver, Colorado."

554. IANA maintained a toll-free fatwa phone service. Among the religious leaders whose declarations are included in the service is Sheik Jamal Zarabozo, whose books were also sold in IANA's Ypsilanti office. Zarbozo's fatwas were frequently printed in the "Friday Report" produced by IANA's predecessor, Dar Makkah. Zarabozo has accused Muslim modernists of breaking Islamic principles by opposing the stoning of adulterers and the killing of "apostates." In another fatwa, he warned against visiting a Christian church to "watch people commit the greatest sin…You have no way of knowing what evil Satan may put into your heart by attending the gatherings wherein shirk (idolatry) is being committed."

555. In June of 2001, the IANA site www.alasr.ws published an article entitled "Provision of Suicide Operations" by the Saudi Sheikh Hamid al-Ali. An excerpt of the article reads:

> The second part is the rule that the Mujahid (warrior) must kill himself if he knows that this will lead to killing a great number of the enemies, and that he will not be able to kill them without killing himself first, or demolishing a center vital to the enemy or its military force, and so on. This is not possible except by involving the human element in the operation. In this new era, this can be accomplished with the modern means of bombing or bringing down an airplane on an important location that will cause the enemy great losses.

556. The article is significant in that it provides a religious justification for the September 11, 2001 attacks. The relevance of the article's author, content, and timing in relation to the attacks is too strong to be dismissed as mere coincidence.

557. The 19 hijackers had a clear ideological motive for their actions. As part of their fundamentalist interpretation of Islam, they required an affirmation that their acts were sanctioned by the faith and worthy of reward in the afterlife. This type of affirmation is customary in Islamic terrorists planning suicide attacks and can only come from a respected religious leader. Sheikh Hamid al-Ali is a known fundamentalist Sheikh and one of the few with the authority to issue such a religious justification. The article's publication in June is also an appropriate time-frame in regards to the attacks on September 11, 2001. Also, the terminology used in the article, such as "bombing or bringing down an airplane on an important location that will cause the enemy great losses" is unusual in its specificity of the tactics used in the attacks.

558. From the Fatwa collection 538/28:

> The clerics have agreed that if the infidels used Muslims as shields causing Muslims fear and there was fear about Muslims not fighting, it is permitted to throw at them, aiming at the infidels. If we are not fearful for Muslims, it is also permitted, to aim at those Muslims according to one of the scholars. Whoever is killed for the sake of jihad, which has been

> ordered by Allah and his Messenger, prayers and peace of Allah upon him, is a martyr. His killing is not worse than killing whoever kills the Mujahideen believers. Since Jihad is an obligation even if Muslims are killed, then there is nothing greater than getting killed for the sake of jihad.

559. Immediately following the September 11, 2001 terror attacks, Mohammed Al-Ahmari's name and Michigan address appeared on a U.S. federal watch list of suspected terrorists and terrorist supporters with possible links to 9/11.

560. On December 23, 1999, Al-Ahmari wrote and published an article on the Daru-Salam mailing list, entitled "Step Closer to New World Order." Al-Ahmari charged:

> Is it then merely a coincident that UN 1284 was drafted by the British, Dutch, and the U.S.?... The U.S. is doing all this, because of the [K]abalist-run White House, Congress, the mass media, and other sectors of the economy (the [K]abalist forces of Zionists, Freemasons, and other secret societies). No nation is bold enough to oppose the U.S… Russia is basically bankrupt, running on U.S., IMF, and World Bank loans, and run by 9 or so billionaire Jews who hold Israeli citizenships. France is run by the Grand Orient Lodge of Freemasonry. This is what is meant by the New World Order… That is how the [K]abalists will achieve their world control. They use the UN as the cover, NATO as the military wing, and the U.S. firepower as the enforcers. When they achieve their final aim they will spread their Luciferian ideology… and subjugate the world's population."

561. On August 16, 2000, Al-Ahmari authored another article on Daru-Salam entitled "What is the New World Order and Who Wants it?" Similar to his previous missive, Al-Ahmari again alleged:

> New World Order groups operate in secrecy, because their true beliefs would frighten the ordinary person… The secret religion of these secret societies is the worship of Satan… These secret groups who worship Satan do not like to use the title of Satan because it was a defamatory title given to him by God… The Luciferians worship Satan secretly within their lodges and temples but advocate Humanism to the common man in order to destroy the belief in the One God, the Almighty Creator… One of the most holy of their books is the Hebrew book, the [K]abala. The [K]abala is an ancient text written using obscure wording and hidden symbols. The essence of the [K]abala, behind its esoteric mysticism, is the religion of

> Satanism and Demonology… Some scholars call these Luciferian groups as collectively the 'Illuminati' meaning the 'illuminated' after Lucifer's name. Others call them Masons and Masonic-like. I prefer to call them the [K]abalists after their holy book… Their ultimate aim is to establish a Luciferian dictatorship over the world and enslave all outside their lodges and temples. They have also established political organizations as fronts to achieve their aim of world conquest. Some of these organizations include the Bilderberger Group, the Council on Foreign Relations, Trilateral Commission, and many others.

562. On December 19, 2001, Al-Ahmari authored a new article on Daru-Salam in which he alleged a high "level of… influence on the George Walker Bush (Bush Jr) Administration" from "Israeli Jewish advisors… in the White House or other Executive Branch Positions." Number one on Al-Ahmari's list was U.S. Secretary of State Colin Powell, who (according to Al-Ahmari), "has one Jewish ancestor on his father's side… grew up in a heavily Jewish-populated neighborhood in New York, and speaks Yiddish."

563. Dr. Homam Albaroudi is listed on the Articles of Incorporation for IANA in Aurora, Colorado. He lists his address as 2040 S. Oneida #2A Denver, Colorado 80224. This is the same address as Dar Makkah and the registered office of the Horn of Africa Relief Agency (HARA). Dr. Albaroudi served as President of IANA. Dr. Albaroudi is the spokesman for the Committee to Free Rabih Haddad, Dr. Alaroudi is a board member of the Council on American Islamic Relations (CAIR), Michigan. This is the same organization that Basam Khafagi was working for in Washington, DC at the time of his arrest. Khafagi served as CAIR's Director of Communications.

564. An officer of IANA's Canada branch ran a mosque that harbored an al-Qaeda operative. Bahaa Elbatal is a director of the Islamic Assembly of North America in Canada. Elbatal is also the Secretary at the mosque in Montreal where Ould Slahi found refuge and led prayers. Slahi is a senior al-Qaeda operative that provided assistance to both the 1998 Embassy

Bombing attacks and the failed Millennium plot. IANA has a network of organizations in Canada. These include: The Bader Islamic Association, Al-Quan Wa-Sunnah Society of North America, and the Somali Bader Organization.

565. Azzam Publications, an official al-Qaeda propaganda site named after Abdullah Azzam, was a forum for al-Qaeda publications and communications that called for jihad against the West. The websites that Azzam linked to espoused like-minded Jihadist ideology. One of the websites that Azzam linked to was www.iananet.org, IANA's official website.

566. A webpage on IANA's www.islamway.com was devoted to jihad in Palestine from October 2000 to September 2002 called upon its viewers to contribute to Hamas, a US government designated terrorist group. IANA engaged in terrorist support activity fully knowing that it was engaged in unlawful activity. As an example, an email that IANA officer Sami Al-Hussayen received soliciting a donation for Hamas on April 15, 2002 explicitly stated that it is from "the battalion of the martyr Ezeldeen Al-Qassam" of "the military wing for the Islamic Resistance Movement" and money was needed to arm fighters against the "Zionist occupiers." The IANA website www.islamway.com requested donations be sent to IANA, which funded the creation and maintenance of these websites. To generate support for the Chechen jihad, www.islamway.com page carred a description of the "duty" of Muslims. In the page accessible from at least April 2000 to August 2001, it stated that the viewers should engage in "jihad of the self" or should send money to support those who fight in jihad.

567. During an IANA sponsored fundraising visit to the U.S. in the weeks leading up to September 11, 2001, Sami al-Hussayen's uncle, Saleh Abdel Rahman al-Hussayen, a senior Saudi cleric and current director of the Two Holy Mosques, met with IANA officials in Michigan. The night before September 11, 2001, Saleh al-Hussayen stayed in the same Marriott

Residence Inn in Herndon, Virginia as three of the hijackers on Flight #77 that crashed into the Pentagon. Following the attacks, the FBI attempted to interview the uncle in his hotel room. According to the FBI, the "interview came to an abrupt end when the uncle feigned a seizure, prompting the agents to take him to a hospital where the attending physicians found nothing wrong with him." The FBI was successful in interviewing the uncle's wife and the couple left the country shortly thereafter. Saleh al-Hussayen, spent five years as a member of the Shariah Board at the Defendant al-Rajhi Banking & Investment Company. The al-Rajhi Bank is a key al-Qaeda financial institution.

568. Mohammed al-Ahmari, IANA President and Chairman, said in an interview to the *New York Times* in 2001 that half of IANA's money comes from the Saudi government and the other half primarily from Saudi donors.

569. As part of its mission to spread Islam, IANA sponsors annual conventions. Specially Designated Global Terrorist Global Relief Foundation (GRF) participated in and sponsored a number these conferences. The organization sent money to IANA to offset the conferences' costs.

570. Defendant SDGT Benevolence International Foundation (BIF) provided financial support to IANA. During al-Hussayen's detention hearing on March 11, 2003, FBI Special Agent Michael Gneckow testified that BIF sent money to IANA that went to "assist sponsoring conferences and the like."

571. As part of its mission to spread Islam, IANA sponsors annual conventions. Defendant SDGT Global Relief Foundation (GRF) participated at these conferences and sent money to IANA to offset the conferences' costs.

572. IANA officer and website developer Al-Hussayen provided financial support to Global Relief Foundation. According to FBI Special Agent Michael Gneckow, the FBI investigation revealed "that there have been checks – personal checks by the Defendant to Global Relief and on the memo line of checks, there is I believe again in Arabic a notation that money is to go to Chechnya." Gneckow testified that he believes al-Hussayen intended to fund Mujahideen in Chechnya:

> Investigations around the country that come across information such as this, personal checks with notations on memo line, seem to indicate that the people that are sending the money have a specific purpose for that check. In this case, it's our belief that those checks were written specifically to go to the Mujahideen in Chechnya.

573. The Egyptian Islamic Jihad (EIJ), which merged with al-Qaeda, is a designated as a Foreign Terrorist Organization (FTO) by the U.S. As such, it is illegal for an individual to send money or have significant contact financially or otherwise with the EIJ or any of its members.

574. A former EIJ member, Amal Saltan, is the writer and has some controlling interest in the internet magazine al-Manar. In the late 1990s and early 2000s, IANA officer al-Hussayen sent $15,200 directly to Amal Saltan. Al-Hussayen has also provided support to Saltan's al-Manar internet magazine in his role as the administrative contact for www.almanar.net.

575. IANA's Waqf Foundation, located at the same 3588 Plymouth Road address as IANA lists the following wire transfer information:

> Waqf Foundation
> National City Bank, Ann Arbor, MI 48104
> Routing No. 072000915
> Account No. 6230158260

576. The stated purpose of the foundation according to the IANA website is to "financially support IANA's different Dawah projects and programs." In a WAQF Foundation

pamphlet published by IANA, the Prophet's Sunna of WAQF (endowments) which includes equipping fighters, is discussed to be the idea behind the WAQF Foundation.

577. To follow is a listing of Al Rajhi Banking and Investment Corporation contributions to IANA:

| **Clear Date** | **Amount** | **Name/Source** | **Bank Account** |
|---|---|---|---|
| April 15, 2002 | $100 | Al Rajhi Trading Est. | HSBC Republic 606019841 |
| July 16, 1996 | $7660 | Al Rajhi Banking & Investment Corp. Traveler's Checks | |
| July 5, 2000 | $13,333 | Abdul Rahman Al Rajhi | Al Rajhi Banking & Investment |
| May 19, 2000 | $25,0000 | Abdulrahman Abdullah Al Rajhi | Al Rajhi Banking & Investment |
| April 30, 2001 | $29,981 | Suliman Abdul Aziz Al Rajhi | Al Rajhi Banking & Investment (Wire Transfer) |

578. To follow is a history of contributions from SDGT Benevolence International Foundation and IANA:

| **Clear Date** | **Amount** | **Name/Source** | **Bank Account** |
|---|---|---|---|
| December 16, 1996 | **$320** | **BIF** | **NA** |
| November 18, 1998 | **$285** | **BIF** | **NA** |
| May 4, 2000 | **$415** | **BIF** | **NA** |
| May 2, 2001 | **$3,000** | **BIF** | **NA** |

579. To follow is a history of contributions from SDGT Global Relief Foundation to IANA:

| **Clear Date** | **Amount** | **Name/Source** | **Bank Account** |
|---|---|---|---|
| January 8, 1995 | $250 | GRF | NA |
| November 22, 1996 | $175 | GRF | NA |
| December 9, 1996 | $360 | GRF | NA |
| December 23, 1997 | $357 | GRF | NA |
| March 27, 1998 | $7000 | GRF | NA |
| November 25, 1998 | $115 | GRF | NA |
| November 25, 1998 | $170 | GRF | NA |
| April 14, 2000 | $415 | GRF | NA |
| May 16, 2000 | $1450 | GRF | NA |

| | | | |
|---|---|---|---|
| December 14, 2000 | $400 | GRF | NA |
| January 29, 2001 | $159.54 | GRF | NA |
| April 11, 2001 | $6000 | GRF | NA |
| October 9, 2001 | $4,500 | GRF | NA |

580. The SAFA Trust, Inc. a Virginia-based network of Islamic charities under investigation by the FBI for financing Hamas and al Qaeda contributed $75.00 (Check #1568) to IANA on 8/14/95.

581. SDGT Al-Haramain Islamic Foundation was intimately involved with the financing and promotion of IANA activities in America and abroad.

582. September 15, 1999 Fax - Al-Haramain Foundation (Head office - Riyadh) signed contract between IANA, represented by Sami Omar Al-Hussayen and Albuthi of Al Haramain to sell and distribute 50,000 copies of "Meanings of the Holy Koran" - "The two parties are to share on a (50%) basis the profits..." IANA was responsible for selling and distributing books for $7 a copy. IANA also must open bank acct. under name of project and will provide Al-Haramain monthly reports on sales and distribution activities. (2) Memorandum of Agreement between Al-Haramain and IANA to sell and distribute the Family Library/Ibn Kathir's Interpretations/Islamic Electronic Calendar. The organizations agreed to share 50% of profits, etc. The agreement was signed by Albuthi for Al-Haramain and Al-Hussayen for IANA (2/12/1422 h.)

583. A letter was sent from Al-Haramain to the brothers at the Board of Directors of the Ihsan School, Syracuse, New York State, USA. The letter states that "Based on the agreement between you and brother Suleiman Bin Hamad Albathi concerning the supervision of Ihsan School..." The letter continues that they will supervise school administration if the land ownership of the school is transferred to the foundation, with Al-Haramain handling school operational expenses. The letter also states that if Al-Haramain ceased to supervise that school,

it will return land ownership to IANA. The agreement is signed by Al-Haramain General Manager, Aqil Bin Abulaziz Al-Aqil.

584. Document dated November 10, 2001 listing c/o Sami Al-Hussayen Al-Haramain Foundation and IANA as distributors. The document includes a contract between World Library for the Islamic book and Al-Haramain Charitable Foundation (represented by Albuthi) for printing of 50,000 copies of the "Holy Koran definitions" into English for $250,000 w/ proof of delivery to "our Foundation representative brother Sami Al-Hussayen."

585. Contract between the World Library for the Islamic Book represented by Mohamad Bin Abdulmohsen Altuwaijri and Alharamain Charitable Foundation represented by Suleiman Bin Hamad Albuthi. World Library "is to print 50,000 copies of the translation into English of the "Holy Koran definitions"...according to the sample presented to the foundation representative in the US brother Sami Al-Hussayen". Cost total is $250,000. "Place of delivery: Inside the United States, as determined by our Foundation representative brother Sami Al-Hussayen whose address is the following: C/O Sami Al-Hussayen, Sweet Ave. #6311 Moscow, ID 83834, USA, Phone: 208-885-8980." The contract requires that Al-Haramain Foundation’s name be written on books w/ Ashland, Oregon and Springfield, Mo addresses. The distributor is identified as IANA, and the contract is signed by Altuwaijri and Albuthi.

586. A Letter to Al-Haramain from IANA saying that the organization was contacted by Ahmad Othman from "Amana" company regarding problems with a shipment of Korans the company received. The books did not have an Al-Haramain or IANA logo imprinted in the volumes. Amana offered to trade them for good quality hardbacks without the logo. The letter, signed by Al-Murabit, asks Al-Haramain to make a decision.

587. Between June 8, 2002-June 12, 2002, multiple e-mails were exchanged between Almurabit, Alahmari and Al-Hussayen regarding the Al-Haramain website banner, but also about transferring a radio station server to Amanah. Almurabit agrees to the transfer but since "…there are other sites on the server and I do not want to take any steps without your technical knowledge and expertise in the field." Al-Hussayen responds "What is the Al-Haramain banner we have on that page?" Almurabit responds to the banner inquiry by saying that they are awaiting his answer regarding the radio server.

588. Other emails are included from Almurabit to Al-Hussayen attaching pictures of websites with banners, asking if this exchange was per agreements with Albuthi. Al-Hussayen responds to Almurabit saying that he sees Almurabit has placed the banner on the site. Almurabit says that he reviewed what is written between him (Al-Hussayen) and Al-Haramain and he "does not understand their objections, we even added the advertisement that is located on the top also." Al-Hussayen also invites Almurabit to view the new Reciter program "which contains four lectures and four interpretations in seven languages." Almurabit tells Al-Hussayen "we ask Allah to reward you and those who worked on it." Also, Al-Hussayen asks whether "Omar" is following up and collecting donations for Dawah project (library) that Al-Hussayen transferred to Omar.

589. An e-mail from Almurabit (IANA) to Alahmari. The cc: Al-Hussayen forwarding messages Islamway site report for the month of May. The email indicates that the report is being sent to Ibrahim Al-Sheikh of Al-Haramain for "follow-up." Almurabit tells Al-Hussayen that he doesn't "…want to take any step without your approval…" when he discusses moving other sites to the Amanah server.

590. E-mails exchanged from June 12-June 13, 2002 between Islam Almurabit, Suleiman Albuthi, Al-Hussayen, and Imamuddin Shaikh regarding a site report for the month of May for the Islamway Radio site. The site report was sent to Albuthi. Albuthi responds to Almurabit by saying that so far he (Almurabit) has not placed the banner on the site linking directly to Al-Haramain according to the agreement. Almurabit tells him they placed it on the site last week. Albuthi says it still is not there and cc's Al-Hussayen with his message. Almurabit then asks for Al-Hussayen's help with the banner issue.

591. Sami Al-Hussayen called Alahmari in Qatar. Al-Hussayen asks if he received the deposit for the trust? Alahmari acknowledges receipt of the money and says it was "…about 7,000…we were planning for the salaries of the youths, then suddenly they gave us the news..." They discuss a book distribution agreement. Al-Hussayen says "We are not losing anything in the deal...as the cost of it, 1/4 million, has been paid by 'Al-Haramain'." They continue the discussion regarding the sale of the books. Al-Hussayen says "We are not losing the printing...they supported and are supporting us. If you want me to write you a check for one year of the warehouse, I will have not problem to do so...I'll write it, but it is not worth it to lose 1/4 million dollars. It is not worth it to lose Al-Haramain support. If we lost Al-Haramain today, lost Al-Jumah tomorrow and Al-Rajhi after that, who will support us?" They discuss printing additional copies of a magazine in Saudi Arabia. Alahmari and Al-Hussayen discuss money with Abu Assem (Aqil Bin Abdulaziz Al-Aqil (Al-Haramain))

592. Another telephone call was placed by Al-Hussayen to IANA (Omar Bunu). Al-Hussayen asks Bunu to request that Islam Al-Murabit send a letter to Al-Haramain about their support of Islamway. Al-Hussayen says he spoke to Al-Haramain about renewing their agreement for another 6 months and was told that they (Al-Haramain) are pleased with IANA's

cooperation but asked that IANA send a letter thanking them for their support. Al-Hussayen asked for a copy of the letter and told them that he will follow up with them from there. Instructions were given to send the letter to Ibrahim Al-Sheikh. Al-Hussayen also discussed CD's for sale with Bunu...reciters (sheikhs) on each.

593. Another telephone call between Al-Hussayen and an unknown male about the NOURSA campaign. Al-Hussayen was asked about "the brothers at *Al-Multaqa*." Al-Hussayen was told that a "site" had been set up for the conference. The unknown male told Al-Hussayen that Sheikh Salman and Sheikh Safar would be included by video conferencing. Al-Hussayen asks him to check with the people at Al-Haramain to see if they are going to renew their contract with Islamway. Al-Hussayen also discusses "the idea of opening the door for getting donations to Islamtoday via the internet, using credit cards." They discuss how this cannot be done in KSA but rather has to be done in the U.S. Al-Hussayen asks the unknown male to look into it because, "As for me, I am a student, I cannot do anything."

594. E-mail from Al-Hussayen to Almurabit (IANA), cc: Alahmari (response to Almurabit's e-mail same date) re: sending Ibrahim Al-Sheikh (Al-Haramain rep. tied to Internet Committee) an amount for hosting the server (to be given to Brother Bandar thru Suliman (Albuthi?)). The message discusses "NUSRA" campaign and associated international conference to be held in Britain at the beginning of November with Al-Timimi, Sheikh Gaafar (Idrees), Jamal Zarabozo...Sheikh Salman and Safar will participate by phone - Al-Hussayen suggests advertising/lectures/books etc. by the "assembly" to support the campaign in America and Canada.

595. An IANA Fax coversheet from IANA to Mr. Ibrahim Al Al-Sheikh - Al-Haramain Charitable Foundation. Subject: Agreement renewal for Islamway funding.

596. IANA Letter to Mr. Ibrahim Al Al-Sheikh confirming the Al-Haramain Foundation's support agreement for the IANA website for another year. It was signed by Islam Almurabit, IANA Executive Officer.

597. E-mail from Almurabit (IANA) to Al-Hussayen forwarding an e-mail from Abu Abdallah (likely Waleed Buraih). The message is a request from Al-Haramain Charitable Organization asking Al-Hussayen to send the organization a report about "your site Islamway" as soon as possible.

598. A telephone call between Al-Hussayen and Abu Moaz (likely Sheikh Salman Al-Ouda). Abu Moaz refers to Al-Hussayen as "Sheikh." They discuss how to identify the number of people who visit the site…as many as 40,000 per day. Al-Hussayen tells Abu Moaz "Not only does the broadcasting attract people but the presence of the archives too." Al-Hussayen confirms that he wrote a new program for the Live Islam site which tracks the number of visitors to each page. The site received 300,000 visits per week. Al-Hussayen talks about the advantages to having lots of links from your website. "For example, those who listen to the radio of Al-Haramain will end up going through us." Al-Hussayen says "I designed all the pages to revolve around Live Islam...Why Live Islam?, What is Live Islam?, Live Islam's services and solutions, with our prices." Abu Moaz tells Al-Hussayen that he transferred the amount he requested to the account information he forwarded to him.

599. Al-Hussayen received a telephone call from an unknown male regarding an agreement between IANA and IBHAR to develop the "Journey to Discover Islam" project. Al-Hussayen is worried that the agreement doesn't have a provision to keep IBHAR from creating the project with IANA, and then taking the same project and marketing it jointly with another DAWA organization such as CAIR or Al-Haramain. The unknown male talks about his first

agreement with IANA that was superceded by the agreement with IBHAR (first contract in the name of Al-Sath or Al-Souah). Al-Hussayen asks him about the web design cost for ‘Help the Needy’ because he wants to do something similar for Live Islam. The unknown caller asks if "‘Live Islam’ is for the Assembly or undeclared ownership?" Al-Hussayen responds, “for the Assembly. It is now registered as an independent corporation in Saudi Arabia for spreading Islam, but the Assembly's, I mean the diffusion, is not declared." Al-Hussayen concludes, "We will plug in and fill a ready application in Fusion Code. Okay?"

600. According to Help the Needy’s website:

> HELP THE NEEDY was established in 1414 Hijri/ 1993 Gregorian, and is registered officially in the United States of America, for helping and assisting the needy among Iraqi Muslims. The people in charge of HELP THE NEEDY are volunteers that do not receive salaries, and all money collected by HELP THE NEEDY is given to the needy.

601. Corporate records, however, indicate that the above is misleading, as Help the Needy operated for many years as an unincorporated entity. Help the Needy became an assumed name for the Islamic Assembly of North America (IANA) on May 12, 2000. The charity operated out of Syracuse, New York, under the aegis of IANA until just after September 11, when it was officially incorporated in New York in November 2001 as Help the Needy Endowment, Inc.

602. For several years, Help the Needy was operating under the guise of a non-profit organization, but never even applied to the Internal Revenue Service for non-profit status until July 2002. The indictment of Help the Needy makes clear that the application for tax-exemption “included a false and misleading representation that HTN [Help the Needy] was an organization that recently concentrated on aiding the needy in the United States.”

603. On February 26, 2003, federal authorities charged Dr. Rafil Dhafir, Maher Zagha, Ayman Jarwan, and Osameh al-Wahaidy with conspiring to funnel illegally at least 4 million dollars to Iraq. All but Maher Zagha, who remains in Jordan, were arrested and are in custody. In addition, the corporate entities Help the Needy and Help the Needy Endowment, Inc., were also charged.

604. Utilizing sham business identification and false social security numbers and birthdates, the conspirators established a small financial network whereby money was funneled from bank accounts established in New York to the Jordan Islamic Bank in Amman, and from there to individuals in Iraq.

605. Jarwan pled "guilty to a criminal conspiracy count and one count of tax fraud for misleading donors about the charity's lack of tax-exempt status." Al-Wahaidy pled guilty for violating U.S. sanctions against Iraq. Rafil Dhafir has pled not guilty, and Zagha remains free in Jordan.

606. While operating as a sham non-profit, Help the Needy provided money to organizations now designated as terrorist entities, Defendant SDGT Global Relief Foundation and Defendant SDGT Benevolence International Foundation.

607. Help the Needy contributed funds at least twice to the SDGT Global Relief Foundation (GRF), which in December 2001 had its operations shut down and in October 2002 was designated a terrorist entity for supporting al-Qaeda. In 1999, Help the Needy donated $9,500 to GRF and in 2000 donated $7750. According to an affidavit by IRS Agent Thomas Sweeney, "between April 1999 and December 13, 2001, Help the Needy also sent four checks totaling $36,570 to the Global Relief Foundation for 'Chechnya relief' and 'Kosovo.'" Global Relief Foundation also sent $18,000 to Help the Needy in August 1998.

608. Also, according to documents filed in the case, Help the Needy sent a $4,978 check to the SDGT Benevolence International Foundation (BIF) in June 1996. BIF had its assets frozen in December 2001 and was designated a terrorist entity in November 2002 for funding al-Qaeda.

609. Safar al-Hawali and Salman al-Awda, whose extremist writings were prominently featured on IANA's web site and publications, are two of Saudi Arabia's most radical Sheikhs. In 1993, the two Sheikhs were banned from speaking in public as part of the Saudi Arabian government's crack-down on Islamic extremists. The following year, in 1994, they were imprisoned despite much protest from their followers. They spent five years in jail until their release in 1999 due to pressure from radical groups. Though the two Sheikhs relented on their attacks on the Saudi kingdom and royal family, they continued to advocate suicide bombings and destroying the West and non-Muslims, religiously justifying al-Qaeda's terrorist attacks.

610. To Osama bin Laden, al-Hawali and al-Awda served as mentors. Indeed, the testimony of al-Qaeda turncoat Jamal Ahmed Al-Fadl during the Embassy bombings trial indicated that bin Laden was in direct contact with the two men:

> Q. Wasn't Mr. Bin Laden in contact with religious scholars in Saudi Arabia?
> A. Yes, he got two scholars.
> Q. Didn't he talk about the scholars who were imprisoned in Saudi Arabia?
> A. Yes, Salman al Auda and Safar al Hawali.

611. During their imprisonment, al-Qaeda and its affiliate groups vigorously defended the Sheikhs and when terrorist attacks occurred, al-Qaeda often stipulated that in order for the attacks to stop, Saudi Arabia must release al-Hawali and al-Awda. In the Bond Hearing of Sami Al-Hussayen, FBI Special Agent Mike Gneckow recounted how al-Qaeda's 1998 attacks on the

U.S. Embassies in East Africa was accompanied by letters taking credit for the attacks and demanding the clerics' release:

> Immediately prior to the embassy bombings in 1998, there were three letters that were faxed to three different' media outlets in Europe claiming responsibility for the bombings. In two of the letters, there were specific conditions that were laid out as to how the violence would stop. One of the conditions -- and it was -- essentially the same condition in each of these two letters called for the release of Sheikh Al-Hawali, Sheikh Al-Awda and the (inaudible) sheikh in the United States for the 1993 World Trade Center.

612. This type of attack followed by the demand to free the Sheikhs occurred previously in 1995, according to Special Agent Gneckow:

> In 1995, there was a bombing of a National Guard armory - or a National Guard facility in Saudi Arabia. There was a fax to CNN claiming responsibility for that particular attack and in that attack, it claimed that this act was in retaliation for the imprisonment of Al-Hawali and Al-Awda.

613. Found among a former al-Qaeda safe house in Afghanistan after September 11, 2001, were some tapes of al-Awda preaching for jihad. Special Agent Gneckow explained at al-Hussayen's bond hearing:

> Q. Another event that I would like you to address regarding house or a facility associated with Al Qaeda, a search of and things found that related to the Sheikh Al-Awda.
> A. Post 9/11 during a search of a former Bin Laden house in Afghanistan, there were tapes of Sheikh Al-Awda that were in the house.
> Q. And the tapes dealt with what, generally speaking?
> A. They were generally motivational speeches, talking about Jihad, talking about -- basically motivational sort of speeches. Lectures.

614. Safar al-Hawali was one of the original incorporators of the Mercy International Relief Agency (MIRA) in Dublin. MIRA, working as a front for al-Qaeda, was deeply involved in the planning and funding of the 1998 U.S. Embassy bombings in Kenya and Tanzania.

615. Mounir Motassadeq, convicted in Germany as an accessory to over 3,000 counts of murder for his involvement in the September 11, 2001 attacks, had the numbers of both Salman al-Awda and Safar al-Hawali in his phonebook, indicating that Motassadeq was in contact with them in the time leading up to the September 11, 2001 attacks.

616. Salman al-Awda's website www.islamtoday.com, administered by Sami Al-Hussayen, contains several fatwas (religious recommendations) by al-Awda and al-Awda's counterpart, Safar al-Hawali. One such fatwa by al-Hawali demonstrates how the sheiks legitimize al-Qaeda's activities and exhort people to jihad:

617. A new Fatwa about Jihad by Shaikh Safar bin Abder-rahman al-Hawali:

> The battle between us and the people of the book [Jews and Christians] and the enemies of this religion continues. It is not abating and not interrupted. There may be other priorities in one place or another, but the battle continues till the last hour, day of judgment, so do not make the matter of obligation dependent on whether the enemy starts a new aggression or attacks on yet another Muslim country or Islamic capital, as we had been thinking.
>
> The issue is larger, and cannot be confined to two borders, or two options, such as absolutely obligatory jihad, the jihad called fard `ain which does not allow a single Muslim to stay behind, not the adults and not the little ones, not the males and not the females. It is not as if there were a choice of not bothering and not to do anything about it, not even to look up. Things are not always that clear and polarized. The battle comprises all spheres. It is a battle in the social sphere and the economic one. It would be a grave mistake to limit the battle to just one sphere, or to limit our duty to just wielding weapons and to proceed to a given country while otherwise not doing anything, as if we had done nothing, whereas we know how ferocious the enemy is, and the battle so vast and comprehensive. Therefore, we have to keep all the levels in view. Let us look at just one example from the life of the blessed Prophet. The Lord tells him in the Qu'ran, "Oh prophet, fight the infidels and the hypocrites and be severe on them." Battling the infidels is something obvious and not limited to a number of days per year. Indeed, he was fighting them at all times and not restricting the use of the sword to one or two days per annum. Conditions in Iraq must necessarily bring to light matters and unexpected events. Everyone of us will have to be prepared to help his brothers on to victory to the best of his capacity. Our obligation towards

> our brothers. We have to communicate to the Westerners and to client regimes the clear message that we oppose this aggression.

618. The conduct and acts described herein constitute an illicit scheme and enterprise to materially support al Qaeda.

## Saudi Binladin Group

619. The Saudi Binladin Group (or "SBG"), also known as the Binladin Corporation, is an expansive global conglomerate and member of the RICO enterprise that provided material support to al Qaeda.

620. The Saudi Binladin Group's website details its history in the following manner:

621. The history of Binladin began in 1931 when Mohammed Binladin founded the company. From its humble beginnings as a general contractor, the company has grown and prospered in parallel with the growth and prosperity of the Kingdom of Saudi Arabia. Over the years the company has been entrusted with many major construction projects, projects that helped the Kingdom to develop its resources and expand its infrastructure.

622. The Saudi Binladin Group (a/k/a Saudi Binladen Group, a/k/a Binladin Corporation) (or "SBG") is based in Jeddah, Saudi Arabia. The group founded in 1931 is a privately held company wholly owned by the descendants of Mohammed Awad Bin Laden, father of Osama Bin Laden. The international conglomerate is active in the areas of construction, engineering, real estate, distribution, telecommunications and publishing. Construction accounts for more than half of SBG's gross revenue.

623. SBG or its predecessor in interest was the first private contractor in Saudi Arabia. SBG's status as an organization makes it exempt from publishing its financial records. For several years, it was the official and exclusive contractor of the holy sites of Mecca and Medina.

624. Saudi Binladin Group is run by Bakr M bin Laden, son of Mohammed bin Laden. Family member Salem bin Laden ran the group until his accidental death in 1998. SBG's board of directors include Saleh Gazaz, Mohammed Bahareth, Abdullah bin Said, Mohammed Nur Rahimi, Tarek M. bin Laden, and Omar M. bin Laden. Until recently, the Saudi Binladin Group had an address in Rockville, Maryland.

625. Osama Bin Laden received extensive financing and material support from the SBG. He declared during an interview in 1997 that:

> We transported heavy equipment from the country of the Two Holy Places (Arabia) estimated at hundreds of tons altogether that included bulldozers, loaders, dump trucks and equipment for digging trenches. When we saw the brutality of the Russians bombing Mujahidins positions, by the grace of God, we dug a good number of huge tunnels and built in them some storage places and in some others we built a hospital. We also dug some roads, by the grace of God, Praise and glory be to Him, one of which you came by to us tonight.

626. Osama Bin Laden used SBG support and assistance to build necessary infrastructure in Afghanistan as he did in Sudan. In the introduction of his Declaration of War against the Americans in 1996, Osama Bin Laden admitted this family support:

> Then in 1979, just after he graduated from King Abdul Aziz University in Jeddah with a degree in Civil Engineering, the Soviet Union invaded Afghanistan, and the Mujahideen put out an international plea for help. Usama bin Ladin responded by packing himself and several of his family's bulldozers off to Afghanistan.

627. The Saudi Binladin Group provided material support and financing to Osama Bin Laden in Afghanistan, as reported by the United States State Department:

> Under Al-Qaida auspices, Bin Laden imported Bulldozers and other heavy equipment to cut roads, tunnels, hospitals, and storage depots Afghanistan's mountainous terrain to move and shelter fighters and supplies.

628. His [Osama Bin Laden] father backed the Afghan struggle and helped fund it, so when Bin Laden decided to join up, his family responded enthusiastically.

629. After the Soviets withdrew from Afghanistan in 1989, Osama Bin Laden returned to work in the Saudi Binladin Group's Jeddah-based construction business. He continued to support militant Islamic Groups until his departure to Sudan 1991. After his relocation to Sudan the same year, Osama Bin Laden maintained close relationships with the Saudi Binladen Group and they remained his sponsor.

630. The relationships between Osama Bin Laden and his family continued, despite claims to the contrary. Dr. Saad Al Fagih, Saudi dissident living in London, and former Afghan combatant, who kept close relationship with Osama bin Laden for many years, stated in 1994: There's a very interesting thing in Islamic structure of the family: you are obliged to support your family members. Even if they are distant members. If it's a cousin or a niece or a nephew, especially a brother, you have to support them if you are a capable person. And the people feel sinful if they don't let this money go to its real owner, in this case, Osama bin Laden.

631. The notion that Osama bin Laden had been somehow "disowned" by the bin Laden's is not supported by the facts or by the realities of Islamic culture. In a 1997 interview, Osama bin Laden revealed that on nine different occasions, his mother, uncle and brothers had visited him in Khartoum in Sudan. The Saudi Binladen Group provided Osama bin Ladin financial assistance and engineering support in Sudanese construction projects. Various sources confirmed that the Sudanese construction company set up by Osama Bin Laden, Al-Hijra for Construction and Development, was a subsidiary of the Saudi Binladen Group. This information is confirmed by an Intelligence Newsletter:

> These are Wadi al Aqiq, an agricultural company with an investment arm; Al Timar Al Mubarikah, a sugar concern; Al Hijra a building and public

> works Company . . . an affiliate of the powerful Saudi group headed Bin Laden's father.

632. In Sudan, Osama bin Laden participated in the construction of the Tahaddi road and the Port Sudan Airport. The Saudi Binladin Group provided support and contribution to these public works through two subsidiaries. The Public Buildings and Airports Division of the Saudi Binladin Group participated in the construction of the Port Sudan Airport, and the Mohamed BinLadin Organization (of SBG) was providing technical assistance on the road construction with Sudan and Osama bin Ladin. The Saudi Binladin Group confirmed publicly these two collaborations:

> Over the years the Division has undertaken various challenging projects, large and medium scale, including complete airports and roads. . . . The projects executed include . . . Port Sudan Airport.
>
> SBG's skills . . . has been recognised and utilized in the United Arab Emirates, Jordan, Yemen and Sudan.

633. The agreement for the construction of an airport in Port Sudan was between the Sudanese Government and the Saudi Binladin International Company. In 1993, Osama bin Laden stated that he was involved in the construction of the road linking Khartoum to Port Sudan:

> I am a construction engineer and an agriculturalist. If I had training camps here in Sudan, I couldn't possibly do this job (the Challenge road) […] Yes, I helped some of my comrades to come here to Sudan after the war.

634. Relationships between the three entities: Osama bin Laden, the Republic of Sudan, and the Saudi Binladin Group were stressed during the inauguration ceremony of the Port Sudan airport:

> Meanwhile, Osama Bin Laden, was the first guest invited to attend the inauguration of the new Port Sudan Airport. He sat in the front row and was the guest of honor in this ceremony. It was a group of Bin Ladin's

> companies that carried out the project of the new and modern airport that cost huge amounts of money.

635. Moreover, while Osama bin Laden was constructing the Tahaddi Road with Saudi Binladen Group's technical assistance, his own company, Al-Hijra, was headed by Muslim activists. Thus, the testimony of Jamal Ahmed al-Fahd during the 2001 trial of the 1998 African Embassy Bombings revealed nature of Al-Hijra executives in Sudan:

> Q. Do you know who ran the Al-Hijra Company while it was in the Sudan?
> A. At the time, few people. The first one Dr. Sharif al Din Ali Mukhtar.
> Q. Who else?
> A. Abu Hassan al Sudani, and Abu Hamman Al Saudi, Abu Rida Suri and Abu Hajer.

636. Other Al-Hijra agents, officers, or executives were directly involved in al Qaeda and terrorist operations. Mandouh Mahmud Salim, an al Qaeda co-conspirator, was on the Al-Hijra board of directors and is considered a founding member of al Qaeda.

637. The Saudi Binladin Group sheltered and directly supported operatives of the al Qaeda terrorist organization. Mohammad Jamal Khalifa is known to be a key figure in the network of Osama bin Laden and has been implicated as a central al Qaeda figure in several international terrorist plots. Yet Khalifa was taken in by a branch of Saudi Binladin Group, the Mohammed Binladin Organization, headed by Osama bin Laden's brothers. The address listed on Khalifa's visa application was the Mohammed Binladin Organization in Jeddah.

638. The Mohammed Binladin Organization is a wholly-owned subsidiary of the Saudi Binladin Group. The board members include Saleh Gazaz, Mohamed Bahareth, Abdullah Bin Said, Mohamed Nur Rahimi, Bakr M. bin Laden, Tarek M. bin Laden, Omar M. bin Laden, and Yeslam M. bin Laden.

639. In the early 1990s, Tarek bin Laden served as the general supervisor of the International Islamic Relief Organization (IIRO), a charity that has aided and abetted and materially supported al Qaeda and international terrorism. During this time, IIRO was rapidly becoming al Qaeda's foremost charity used as a means to transfer funds, personnel, and other means of material support.

640. According to an Arabic publication, Tarek bin Laden had a prominent role in 1990 at the IIRO:

> Tarek bin Laden has been a member of the IIRO in MWL for ten years. He has been working quietly for the orphans and the immigrants in the Islamic world. In the past two years the operation of IIRO has grown thanks to the support of the Saudi Royal family. Tarek says that the IIRO relies on donations of the Saudi people and some donations from the Islamic world.

641. Yassin Abdullah al-Kadi is a United States designated terrorist and Director of Global Diamond Resources, based in Nevada. Along with Yassin al-Kadi, serving on the board of directors are representatives of the bin Laden family who invested in Global Diamond Resources. Yassin al-Kadi was introduced to Global Diamond Resource's Chairman by an executive at the Saudi bin Laden Group. In regards to the company's decision to let al-Kadi join as an investor, the Chairman said, "I relied on the representations of the bin Laden family. They vouched for him."

642. Osama bin Laden's name is still listed in the Saudi BinLaden Group's corporate records. Saad Al-Fagih, a London-based surgeon and Saudi dissident who heads a group called Movement for Islamic Reform in Arabia, and Abdel Bari Atwan, editor of Al-Quds al-Arabi who interviewed Osama Bin Laden in 1996, claim that Bin Laden's mother has met with him twice since he moved to Afghanistan in 1996. The first trip occurred in the spring of 1998. The second trip occurred in the spring of 2001.

643. In January of 2001, Al Jazeera network aired footage of Osama bin Laden attending the wedding of his son, Muhammad, along with other members of the Bin Laden family.

644. In observance of Muslim customs and beliefs, it is a family member's duty to not "spoil" their income with money that is not theirs; rather, it is their duty to ensure the rightful owner has custody of his/her money. Osama Bin Laden's large family has not completely cut him off:

> "The only way they guarantee [this custom] is by letting bin Laden's share reach him. Some of the brothers and sisters believed it was their religious duty to support this distinguished brother from their own money. While many are very careful not to irritate the royal family, many more do not care and insist on letting the money reach Osama."

645. The Bin Laden family "reportedly own extensive residential properties in Boston and the Saudi Binladin Group ("SBG") made two $1 million gifts to Harvard University to fund endowments for the study of Islamic law and Islamic art and architecture."

646. The principal bank of SBG (and the bin Laden family) is Defendant National Commercial Bank. Other banks used by the bin Ladens include Al Bank AlSaudi AlFransi, Gulf Investment Bank, and Defendant Saudi American Bank.

647. As noted in "Plaintiffs' Memorandum of Law in Opposition to Motion of Defendants Saudi Binladin Group, Bakr Binladin, Omar Binladin and Tariq Binladin to Dismiss the Complaint or, in the Alternative, For a More Definite Statement," Ambassador Charles W. Freeman, Jr., an "expert" on Saudi Arabia, stated:

> If there were ever any company closely connected to the U.S. and its presence in Saudi Arabia, it's the Saudi Binladin Group."

648. Freeman is also President of the Middle East Policy Council, "a Washington nonprofit concern that receives tens of thousands of dollars a year from the bin Laden family."

649. The Middle East Policy Council Board ("MEPC") of Directors includes, among Freeman and others, Dr. Fuad A. Rihani, Director of Research and Development, Saudi Binladin Group. According to MEPC's 2001 Form 990 filed with the IRS, Fuad Rihani remains a board member of MEPC and lists his address as 4320 4th Street Cir., NW, Hickory, NC 28601. *Interesting side note: MEPC banks with Riggs – Acct # 01 08 466 593 receives contributions to the organization.*

650. As alleged in the Complaint, SBG had, at one time, maintained an address in Maryland. Specifically, SBG's listing of International Offices as posted on its website in 2001 includes:

> United States of America
> 51 Monroe Street
> Suite 1700
> Rockville, Maryland 20850
> Tel: (301) 738-8836
> Fax: (301) 738-8802
> Contact – Philip J. Griffin

651. Listed under the heading "Exports" on SBG's website in 2001:

> "The products of SBG manufacturing companies located in Europe and the Middle and Far East are exported through the group's trading and distribution network to eighteen countries."

652. "USA" is one of the eighteen countries listed.

653. According to SBG's 2001 website, its international division, Binladin Group International, "operates in the global market place and is responsible for all matters relating to international tenders, organizing (sic) the participation of the various SBG Operating Divisions in projects either as sole contractors, in joint venture or consortiums." During the 1980s and 1990s, several corporations purportedly linked to SBG and the bin Ladin family were established in the United States; among those are:

Binladen Brothers for Construction – incorporated on December 31, 1980, dissolution on December 3, 1987

Binladen Aviation, Inc. – incorporated on December 27, 1983, dissolution on December 18, 1997

Binladin U.S.A. – incorporated on March 1, 1988 and currently inactive

654. The Saudi Binladin Group is a member of the U.S.-Saudi Arabian Business Council ("USSABC"), along with Defendants Al Rajhi Banking & Investment Company, The National Commercial Bank, Saudi American Bank (through Samba Financial Group), Al Baraka Investment & Development Corporation (through Dallah Albaraka Holding Co.), Ibrahim Mohammed Afandi (through Al-Afandi Establishment for Trade, Industry & Contracting), and Mohammed Bin Abdullah Al Jomaih (through Aljomaih holding Company). The USSABC is an "organization of business leaders in both countries working together to increase trade and investment by promoting broader understanding among U.S. and Saudi Arabian companies, as well as specific business opportunities." This group maintains offices in Washington, D.C. and Riyadh, Kingdom of Saudi Arabia.

655. The USSABC publishes a quarterly newsletter depicting current topics of the organization. In the 1999 issue (vol. IV, No. 3), it is noted that Defendant Saudi American Bank ("SAMBA") had conducted a series of "Saudi Arabian Economic Opportunity Roadshows" from 1997 to 1999. As a follow-up to this series, SAMBA organized a Saudi-American Companies Conference on June 25-27, 1999, in Washington, D.C. Among those that attended the conference were Dr. Fuad Rihani, Chairman's Advisor for R&D, Saudi Binladin Group and Philip J. Griffin, Vice president, Business Development and Pubic Relations, SBG-USA, Inc.

656. According to a May 7, 2001 press release, the U.S. Commerce Department led a Saudi delegation to the International Franchise Expo in Washington, D.C. from May 18-20.

Among those that attended this conference was Dr. Fuad A. Rihani, Chairman's Advisor for R&D, Saudi Binladin Group.

657. The Executive Board members of Binladin Group International include Bakr M. Binladin, Yahia (or Yehya) M. Binladin, Omar M. Binladin, Hasan M. Binladin, and Ahmed M. Binladin. Yehia M. Binladin is also Managing Director of the Saudi Binladin Group. Yeslam Binladin is the head of SBG's European investment arm, Saudi Investment Company ("SICO"). Of these individuals, the following maintain residences in the United States:

| | |
|---|---|
| Mohammed M. Binladen &<br>Ahmed M. Binladen | 197 8th Street<br>Charlestown, MA 02129<br>(current as of 1/26/04) |
| Yeheya (sic.) Binladen | 1864 Thomas Avenue<br>Coos Bay, OR 97420<br>(current as of 7/13/01) |
| Yeslam Binladen | 634 Stone Canyon Road<br>Los Angeles, CA 90077<br>(current as of 1/25/02) |

658. A U.S. Department of Justice memorandum from Ellen Warlow, Director of the Office of International Affairs at the DOJ, to the Central Authority of Switzerland dated September 20, 2001; Subject: Urgent Request for assistance in the investigation of the terrorist attacks on the World Trade Center North and South Towers and the Pentagon:

> Investigators believe hat UBL has received funding from two accounts at --------- in the names of Cambridge Engineering and the Saudi Bin Laden Group…. The investigation thus far reflects that UBL was a shareholder in the Saudi Bin Laden Group and received a buyout payment….

659. Another Swiss memorandum indicates that $300 million have transited through these accounts.

660. As described above, InfoCom, a computer and information technology exporting company was incorporated in Richardson, Texas in 1992. InfoCom was indicted in 2002 on charges that the company and its officers were supporting terrorism, specifically HAMAS. One

of InfoCom's officers, Ghassan Elashi, was also the registered agent and owner of the HolyLand Foundation for Relief and Development, a charity recently designated as a terrorist entity by the U.S. Government. The Saudi Binladin Group lists Bayan Elashi (founder of InfoCom) and InfoCom's name and address as the Administrative/Technical contacts for their website. InfoCom also hosts websites for many other terrorist related organizations such as the World Assembly of Muslim Youth, Benevolence International Foundation, and the Global Relief Foundation.

661. Spanish authorities investigating al Qaeda connections to certain individuals in Spain seized documents belonging to Bassam Dalati Satut, an individual accused of being a member of the Spanish al Qaeda cell. On one of the seized documents, Farid Quraishi is listed as the General Director of the International Islamic Relief Organization, a known al Qaeda financing front. The address listed below Quraishi's name is P.0. Box 4843, Jeddah, Kingdom of Saudi Arabia. The same address listed on SBG's website in 2001 as that of Project Management & Development Co. Real Estate Limited, the real estate division of the Saudi Binladin Group.

662. In the mid-to-late 1990s, officials from the U.S. government began focusing on al Qaeda's financing network. After reviewing available intelligence, "[o]ne thing was clear: a lot of money being raised was coming from people in Saudi Arabia." Based on this fact, the officials planned to visit Saudi Arabia in an effort to obtain cooperation and additional information on terrorist financing. William Wechsler paid the Saudis a visit in 1995, followed by Richard Newcomb in 1998:

> "Despite Saudi promises to provide additional information and support, little was forthcoming in the months after the visit[s]. The Saudis protested [the] focus on continuing contacts between Usama and his wealthy, influential family, who were supposed to have broken all ties with him years before. 'How can we tell a mother not to call her son?' [the Saudis] asked."

663. At the wedding of his son, Mohammad, Osama bin Laden read a poem describing the destruction of the USS Cole as the wedding audience cheered. Among those that attended the wedding were "bin Laden's mother, two brothers, and a sister who flew to Kandahar from Saudi Arabia."

664. The Saudi binladin Group and members of the bin Laden family named herein materially supported al Qaeda and its illicit enterprise.

## Yassin Abdullah al-Kadi and Muwaffaq

665. One month after the September 11, 2001 attacks, on October 12, 2001, with Executive Order 13224, President George W. Bush designated Saudi businessman Yassin al-Kadi as a terrorist entity and sponsor for financially supporting al Qaeda. As stated in a United States Department of Treasury Press Release on October 12, 2001:

> Yasin al-Qadi (heads) the Saudi-based Muwafaq (or "Blessed Relief") Foundation, an al Qaeda front that transfers millions of dollars from wealthy Saudi businessmen to bin Laden.

666. Defendant Muwaffaq (or "Blessed Relief") was registered in the Channel Islands in 1992 but run from Jeddah, Saudi Arabia. The Blessed Relief charity had an international presence with offices in Europe, Ethiopia, Pakistan, Sudan, Somalia and a post office box in the United States. Blessed Relief purported to conduct traditional relief work such as the distribution of food, clothing and medical equipment to victims of war or famine. Blessed Relief was endowed by Defendant Khalid bin Mahfouz, the al Qaeda financier, and run by Yassin al-Kadi. Khalid bin Mahfouz's son, Abdulrahman bin Mahfouz, is also a director of the Blessed Relief charity.

667. Yassin al-Kadi ran Blessed Relief from 1992 until approximately 1997 with $15 to $20 million of his own money, along with contributions from other wealthy associates. Millions of dollars have been transferred to Osama bin Laden and al Qaeda through Blessed

Relief. An audit of the Defendant National Commercial Bank of Saudi Arabia in the mid-1990s, which was then run by Khalid bin Salim bin Mahfouz, reveals the transfer of $3 million for Osama bin Laden that was moved from the accounts of wealthy Saudi businessmen to Blessed Relief.

668. In a 1995 interview, Osama bin Laden identified Blessed Relief's place in his support network, "The bin-Laden Establishment's aid covers 13 countries . . . this aid comes in particular from the Human Concern International Society." Osama bin Laden went on to list a number of the Human Concern International's branches, including the Blessed Relief Society.

669. Yassin al-Kadi incorporated the United States branch of Blessed Relief in Delaware in 1992, along with Talal M. M. Badkook and Dr. Mohaman Ali Elgari. Blessed Relief was an al Qaeda front used by wealthy Saudis and others to funnel money to Osama bin Laden's terrorist network.

670. Yassin al-Kadi is a Director of Global Diamond Resources, based in Nevada. He sits on the board as a representative of New Diamond Holdings, a firm that has a controlling interest in Global Diamond. Along with al-Kadi on the board of directors are representatives of the bin Laden family who invested in Global Diamond Resources a year before al-Kadi. Global Diamond Resources is a diamond company that manages three mines in South Africa. Although al-Kadi invested $3 million into Global Diamond Resources through the company New Diamond Corp., his investment had diminished to about $750,000 as of October, 2001.

671. Three of the al Qaeda members on the FBI's most wanted terrorist list have been discovered to have dealings in the diamond field. Following September 11, 2001, and the increased difficulty al Qaeda is facing moving its money through its traditional financial

channels, al Qaeda has been converting more of its assets into diamonds. As one European investigator put it:

> I now believe that to cut off al Qaeda funds and laundering activities you have to cut off the diamond pipeline. We are talking about millions and maybe tens of millions of dollars in profits and laundering.

672. Yassin Abdullah al-Kadi is the Vice President of the Saudi Arabian company M.M. Badkook Co. for Catering & Trading, owned by his partner in Blessed Relief, Talal Mohammed Badkook. Talal Badkook is also a member of the Al-Mustaqbal group along with Saleh Mohamed bin Laden, son of Mohammed bin Laden, and Abdullah Saleh Kamel, son of Saleh Kamel and the Chairman of the Dallah al-Baraka.

673. Yassin al-Kadi is the Chairman of the National Management Consultancy Center (or "NMCC") in Jeddah, Saudi Arabia. The NMCC lists an address in Jeddah, Saudi Arabia, which is the same address listed on Blessed Relief's Delaware corporate records.

674. Yassin al-Kadi and Muwaffaq materially supported al Qaeda and its illicit enterprise.

## Certain Members of the Saudi Royal Family, and Related Persons

675. The close relationship between Osama bin Laden and certain of the highest members of the Saudi Royal family stretches back for a long period and continues to this day.

676. On August 2, 1990, the Republic of Iraq invaded Kuwait. Osama bin Laden then met with Defendant Sultan Bin Abdulaziz al Saud (or "Prince Sultan"). Prince Sultan is the Second Deputy Prime Minister, Minister of Defense and Aviation, Inspector General, and Chairman of the Board of Saudi Arabian Airlines, which does business in the United States and internationally. In the meeting, Osama bin Laden offered the engineering equipment available

from his family's construction company and suggested bolstering Saudi forces with Saudi militants who he was willing to recruit.

677. This offer was also made to Defendant Turki al Faisal al Saud (or "Prince Turki"), the then Chief of Saudi Intelligence, or Istakhbarat. Prince Turki had an ongoing relationship with Osama bin Laden from the time that they first met in Islamabad, Pakistan at the Saudi embassy, during the Soviet Union's occupation of Afghanistan.

678. Defendant Mohammed al Faisal al Saud (or "Prince Mohammed" or Prince Mohammed al Faisal") is involved in the financing, aiding and abetting and material support of Osama bin Laden, al Qaeda, and international terrorism in part through Faisal Islamic Bank and Al Shamal Islamic Bank. Prince Abdullah al Faisal bin Abdulaziz al Saud (or "Prince Abdullah" or "Prince Abdullah al Faisal") and Prince Naif bin Abdulaziz al Saud (or "Prince Naif") are also engaged in the aiding and abetting or material sponsorship of Osama bind Laden, al Qaeda, and international terrorism as described herein. Salman bin Abdul Aziz al Saud (or "Prince Salman") has also provided material support to Osama bin Laden, and al Qaeda. Additional members of the Saudi Royal family may be implicated and added to this action as investigations continue under the theories and facts articulated herein.

679. Prince Turki was head of Saudi Arabia's Department of General Intelligence (Istakhbarat) from 1977 until 2001. As such, he was in a position to know the threat posed by bin Laden, al Qaeda, the Taliban, and the extremist and violent perversion of jihad and hatred that the Saudi religious schools were fomenting in young people. Prince Turki abruptly left his position in or around August 30, 2001, when he was dismissed as chief of Saudi Intelligence just prior to the September 11, 2001 attacks.

680. Prince Turki was the head of the Saudi Royal families' intelligence service for twenty-five years. Prince Turki met personally with Osama bin Laden at least five times while in Pakistan and Afghanistan during the mid-eighties to mid-nineties. Prince Turki also had meetings with the Taliban in 1998 and 1999. On or about 1995, while the Saudi Istakhbarat was headed by Prince Turki and decided to give massive financial and material support to the Taliban. Also in 1995, al Qaeda bombed the Khobar Towers in Saudi Arabia.

681. Al Qaeda financier Zouaydi had close financial ties with Defendants Turki al Faisal al Saud and Mohammed al Faisal al Saud as is detailed *infra*.

682. Mullah Kakshar is a senior Taliban official who defected and provided a sworn statement regarding the transfer of funds from wealthy Saudis directly to al Qaeda and Osama bin Laden in Afghanistan. Mullah Kakshar's sworn statement implicates Prince Turki as the facilitator of these money transfers in support of the Taliban, al Qaeda, and international terrorism.

683. In 1996, according to various intelligence sources, a group of Saudi princes and prominent Saudi business leaders met in Paris and agreed to continue contributing, sponsoring, aiding and abetting Osama bin Laden's terrorist network.

684. In July of 1998, a meeting occurred in Kandahar, Afghanistan that led to an agreement between certain Saudis and the Taliban. The participants were Prince Turki, the Taliban leaders, as well as senior Pakistani intelligence officers of the ISI and representatives of Osama bin Laden. The agreement reached stipulated that Osama bin Laden and his followers would not use the infrastructure in Afghanistan to subvert the royal families' control of Saudi government and in return, the Saudis would make sure that no demands for the extradition of terrorist individuals, such as Osama bin Laden, and/or for the closure of terrorist facilities and

camps. Prince Turki also promised to provide oil and generous financial assistance to both the Taliban in Afghanistan and Pakistan. After the meeting, 400 new pick-up trucks arrived in Kandahar for the Taliban, still bearing Dubai license plates.

685. Prince Turki was instrumental in arranging a meeting in Kandahar between Iraqi senior intelligence operative, the Ambassador to Turkey Faruq al-Hijazi, and Osama bin Laden, in December of 1998.

686. Prince Turki headed Istakhbarat until August 2001. Istakhbarat served as a facilitator of Osama bin Laden's network of charities, foundations, and other funding sources. Prince Turki is under consideration to be named as an ambassador from Saudi Arabia to the United Kingdom.

687. Born in Riyadh, Saudi Arabia in 1924, Prince Sultan is the son of Abdulaziz bin Abdul Rahman al Saud, founder of the modern Kingdom of Saudi Arabia and Hussa bin Ahmad Sudairi. He is one of the six full brothers of King Fahd bin Abdulaziz al Saud. These seven brothers are referred to as the Sudairi seven. Prince Sultan was appointed Governor of Riyadh in 1947.

688. Prince Sultan has been the Second Deputy Prime Minister, Minister of Defense and Aviation since 1962 and Inspector-General of the Kingdom of Saudi Arabia. In addition, Prince Sultan is Chairman of the Supreme Council for Islamic Affairs which has oversight and control over charities in Saudi Arabia. Defendant and Saudi Defense Minister Sultan bin Abdulaziz al Saud is believed to be a shareholder of Nimir Petroleum.

689. Beginning with the Gulf War, Prince Sultan took radical stands against western countries and publicly supported and funded several Islamic charities that were sponsoring

Osama bin Laden and al Qaeda operations, including the International Islamic Relief Organization, Muslim World League, World Assembly of Muslim Youth and al-Haramain.

690. Prince Sultan has been involved in the sponsorship of international terrorism through the IIRO and other Saudi-funded charities. Defendant International Islamic Relief Organization is a direct arm of the Saudi Royal family, according to Arafat el-Asahi, the Director of the Canadian branch of the International Islamic Relief Organization. The United States Department of State has also identified IIRO as an organization which sponsors terrorism. Dr. Adnan al Basha, the Secretary General of the International Islamic Relief Organization publicly thanked Prince Sultan on December 22, 2000, for his support and aid.

691. Shortly after the September 11, 2001 attacks, Prince Sultan publicly accused the "Zionist and Jewish lobby" of orchestrating a "media blitz" against the Saudi Kingdom. A Saudi embassy press release announced in April 2001 that "Prince Sultan affirms [the] Kingdom's Support" for the Palestinian Intifada, to the tune of $40 million already disbursed to "the families of those martyred" and other "worthies."

692. Prince Sultan argued against the United States use of Saudi bases to stage military strikes on Afghanistan after the September 11, 2001 attacks, stating that his government "will not accept in [Saudi Arabia] even a single soldier who will attack Muslims or Arabs." Saudi Minister of Defense Prince Sultan stated his country would not permit allied aircraft to launch preventive or major retaliatory strikes against Iraq from bases in Saudi Arabia. Prince Sultan expressed the hope that the Arab Nationals who have fought alongside the Taliban and al Qaeda will be allowed to return safely to their respective countries.

693. In 1994, the Saudi Kingdom issued a royal decree banning the collection of money in Saudi Arabia for charitable causes without official permission. King Fahd set up a

Supreme Council of Islamic Affairs, headed by his brother Prince Sultan to centralize, supervise and review aid requests from Islamic groups. This council was established to control the charity financing and look into ways of distributing donations to eligible Muslim groups.

694. Consequently, as Chairman of the Supreme Council, Prince Sultan could not have ignored the ultimate destinations of charitable funding, and could not have overlooked the role of the Saudi charitable entities identified herein in financing the al Qaeda terrorist organization.

695. Despite that responsibility and knowledge, Prince Sultan personally funded several Islamic charities over the years that sponsor, aid, abet or materially support Osama bin Laden and al Qaeda: the International Islamic Relief Organization (and its financial fund Sanabel el-Khair), al-Haramain, Muslim World League, and the World Assembly of Muslim Youth. All of these charities are and/or were involved in the financing of international terrorism. The total of Prince Sultan's donations to these entities since 1994 amounts to at least $6,000,000, according to official and public reports.

696. Prince Sultan's role in the IIRO's financing is of significance. Since the IIRO's creation in 1978, Prince Sultan participated by donations and various gifts to the charity. In 1994 alone, he donated $266,652 to the Islamic International Relief Organization. Since 1994, the amount funneled by Prince Sultan into IIRO is reported to be $2,399,868. Prince Sultan's role in directly contributing to and in the oversight of IIRO evidences his material sponsorship, aiding and abetting of international terrorism. Prince Sultan maintains close relations with the IIRO organization headquarters and knew or should have known these assets were being diverted to al Qaeda.

697. Prince Sultan is also a large financial contributor of the Muslim World League. Prince Sultan donated during a television fundraising campaign for MWL :

> The total collection made as a result of the television campaign was SR 45,000,000, with the Emir of Riyadh, Prince Sultan, donating a million Saudi Riyals ($533,304).

698. Prince Sultan is also a regular donator to the World Assembly of Muslim Youth (or "WAMY"). WAMY was founded in 1972 in a Saudi effort to prevent the "corrupting" ideas of the western world influencing young Muslims. With official backing it grew to embrace 450 youth and student organizations with 34 offices worldwide. WAMY has been officially identified as a "suspected terrorist organization" by the FBI since 1996 and has been the subject of numerous governmental investigations for terrorist activities.

699. At best, Prince Sultan was grossly negligent in the oversight and administration of charitable funds, knowing they would be used to sponsor international terrorism, but turning a blind eye. At worst, Prince Sultan directly aided and abetted and materially sponsored al Qaeda and international terrorism.

700. Prince Mohammed is engaged in the sponsorship of international terrorism through Dar al Maal al Islami, the Faisal Islamic Bank and Al Shamal Islamic Bank. As detailed *supra*, until 1983, DMI was under M. Ibrahim Kamel's chairmanship. On October 17, 1983, Prince Mohammed became CEO of DMI. Under Prince Mohammed's chairmanship, DMI developed banking, investment and insurance activities in approximately twenty offices across the world. DMI was founded twenty years ago to foster the spread of Islamic banking across the Muslim world and its Board of Directors included Haydar Mohamed bin Laden, a half-brother of Osama bin Laden. Faisal Islamic Bank Sudan was one of the five main founders of Al Shamal Islamic Bank.

701. Prominent Saudi businessman and terrorism financier Adel Abdul Jalil Batterjee is the Chairman and one of the largest shareholders of Al Shamal Islamic Bank in Khartoum,

Sudan. Al Shamal Bank is an instrumental bank in Osama bin Laden's financial support network. Osama bin Laden used Al Shamal Bank for the funding of his al Qaeda network leading up to the 1998 United States Embassy bombings in Africa. During the planning of these bombings, Jamal Ahmed al-Fadl, an al Qaeda operative, received $250,000 from the Al Shamal Bank in Sudan to purchase a plane for al Qaeda. The plane was used to coordinate al Qaeda's efforts in preparation for the 1998 Embassy bombings, which killed over 250 people and injured 1,000 more. Defendant Faisal Islamic Bank was implicated during al-Fadl's 2001 United States trial regarding the bombings as holding and managing bank accounts for al Qaeda operatives.

702. As the head of DMI, Prince Mohammed knew or should have known of these and other activities and acted as an aider and abettor and material sponsor of al Qaeda, Osama bin Laden, and international terrorism.

703. Prince Abdullah al Faisal was born in 1923 and is the son of former King Faisal. His brothers include Defendant Turki al Faisal al Saud and Defendant Mohammed al Faisal al Saud.

704. Prince Abdullah al Faisal, a former official of the Saudi Ministry of Interior, was Minister of Health between 1949 and 1950. He is Chairman of the Arabian Establishment for Trade and Shipping Ltd, Qassim Cement Company and owner of Alfaisaliah Group. He is also Chairman of the board of trustees of the King Faisal Foundation.

705. Alfaisaliah Group (a/k/a Al Faisal Group Holding Co.) (or "AFG") is based in Riyadh, Saudi Arabia. Its main shareholder is Prince Abdullah al Faisal. Its Chairman is Mohammed Abdullah al Faisal, Prince Abdullah al Faisal's son.

706. Alfaisaliah Group was reorganized in 2001 with Prince Abdullah al Faisal holding 97.5% of the shares, and businessman Mohammed bin Abdulrahman al Ariefy, President,

owning 2.5 percent of the shares. The company at that time changed its name to al Faisal Group Holding Co., a successor in interest to Alfaisaliah Group.

707. Founded in 1970, the Alfaisaliah Group is a large commercial conglomerates with 3,000 employees and thirteen subsidiaries involved in five business sectors (Food & Beverages, Petrochemicals & Plastics, Entertainment & Multimedia, Consumer Electronics, and High Tech & Information Technology). Alfaisaliah Group is the representative agent in Saudi Arabia of several international companies, including Sony, Hewlett Packard, MegaStar, Columbia Tristar, 20th Century Fox, Motorola, Toshiba and Danone. Its main subsidiaries include Modern Electronic Establishment, Modern Petrochemicals Establishment, Al Safi Diary Establishment, Al Faisalia Agricultural Establishment, Al Faisalia Real Estate Establishment and Al Faisalia Computer & Communication Services Establishment. Alfaisaliah Group maintains branches in Jeddah, Al Khobar, Khamis Mushait, Madinah, Qassim, Arar and Tabuk.

708. According to FBI records, September 11, 2001, hijacker Hani Saleh H. Hanjour (a/k/a Hani Saleh Hanjour, Hani Saleh, Hani Hanjour) is a Saudi national from the city of Taif, Saudi Arabia. Hanour was one of the hijackers on American Airlines flight 77 that crashed into the Pentagon on September 11, 2001. His brother Abdulrahman Saleh Hanjour harboured him in Tucson, Arizona, in the months preceding the September 11, 2001 attacks.

709. The two Hanjour brothers and another al Qaeda suspect in the attacks, Abdal Monem Zelitny, had a registered address in Taif, Saudi Arabia, under the name of Alfaisaliah, P.O. Box 1717, Taif, Saudi Arabia. The name and address are the branch office of Alfaisaliah Group in Taif, a subsidiary of the Riyadh based holding company. As detailed above, Alfaisaliah is owned and controlled by Prince Abdullah al Faisal, son of King Faisal, and for whom, terrorist financier Zouaydi was worked as an accountant in Jeddah, Saudi Arabia.

710. One of Prince Abdullah al Faisal's accountants in Jeddah, Saudi Arabia was Defendant Muhammed Galeb Kalaje Zouaydi, (a/k/a Abu Talha) (or "Zouaydi") convicted in Spain for financing al Qaeda operations in Europe. Zouaydi set up Spanish companies established during the time he was staying in Saudi Arabia and working for Prince Abdullah al Faisal, between 1996 and 2000. Zouaydi laundered Saudi money through Spain to an al Qaeda cell in Germany.

711. Evidence from eye witnesses indicates that Zouaydi was present in offices of Prince Abdullah al Faisal in Jeddah. Zouaydi was also recognized in the offices of Dr. Bakhsh Hospital with its Chairman, Abdul Rahman Taha Bakhsh, brother of businessman Abdullah Taha Bakhsh, former director of Zakat and Income Tax at the Saudi Ministry of Finance. Both brothers are members of the board of Trading Engineering & Contracting Corp. (Traco), based in Jeddah, Saudi Arabia.

712. Evidence recovered by the Spanish authorities shows that Muhammed Galeb Kalaje Zouaydi, a Syrian born businessman, along with several associates in Spain and Europe, funneled money from the Saudi-based company, Mushayt for Trading Establishment (or "Mushayt"), through Spanish corporations to entities and individuals known to be associated with the al Qaeda terrorist organization in Europe. Prince Abdullah al Faisal is implicated in these financial transactions of material support to al Qaeda, as is Prince Turki. When this and other evidence has been fully analyzed, additional parties or persons may be implicated.

713. According to Spanish authorities, Mushayt received funds and donations from other companies and individuals in Saudi Arabia that were funneled to al Qaeda through Spain. This fraudulent scheme provided material, financial support to the Global Relief Foundation in Spain, to Abdul Fattah Zammar and Mamoun Darkazanli in Germany, who maintained the bank

accounts of hijacker Mohamed Atta and other members of the Hamburg al Qaeda cell. These co-conspirators (Zammar and Darkazanli) are awaiting trial in Germany on charges of providing financial and logistical support to the organization of the September 11, 2001 attacks.

714. Ghasoub Al Abrash Ghalyoun (a/k/a Abu Musab), an associate of Zouaydi's in Spain, was observed filming future targets of al Qaeda in the United States. In his videotapes, Spanish authorities found pictures of the World Trade Center taken on August 9, 1997.

715. Prince Naif is the Chairman of the Saudi Arabian Committee for Support of the Intifada al Quds. According to documents captured by the Government of Israel in the Palestinian territories during operation Defensive Shield, this committee knowingly transferred large sums of money to the families of Hamas terrorists who had executed murderous attacks against Israelis. Prince Naif, along with others in Saudi Arabia, supports suicide martyrs.

716. Abu Mazen, the Palestinian Authority representative in Saudi Arabia, wrote a letter dated January 9, 2001, to Salman Bo Abed Al Aziz, the Governor of Riyadh Province and Chairman of the Popular Committees for Support of the Palestinian Jihadis. The letter, written on behalf of Palestinian President Yasser Arafat, states that the Saudi Arabian Committee for Support of the Intifada al Quds directly funds terrorism:

> The Saudi committee responsible for transferring the contributions to beneficiaries is sending large sums to radical committees and associations including the Islamic Association which belongs to Hamas, the Al-Atzlach Association [most likely the Al-Salah Association, a known agency of the Hamas in Gaza], and brothers belonging to the Jihad in all areas. (emphasis added.)

717. The letter is a request by Yasser Arafat to the Government of Saudi Arabia to curtail its funding of the Hamas movement in favor of the military faction of the Palestinian Authority, Fatah. Prince Naif has engaged in a pattern of conduct that aids, abets, and materially sponsors international terrorism and al Qaeda. As with Prince Sultan and Prince Turki, Prince

Naif has engaged in material support, including but not limited to monetary payoffs, to Osama bin Laden's al Qaeda.

718. Prince Naif is Saudi Minister of Interior and heads the Saudi Committee for relief to Afghans, which supervises the activities of Defendant al-Haramain Foundation whose sponsorship of terrorism is detailed *supra*. The Minister of Interior, by function, controls the activities of Islamic Charities and is empowered to verify their legality and conduct. At a minimum, Prince Naif has breached his duties of care with respect to this responsibility.

719. Abdullah bin Abdul Muhsen al Turki (or "al Turki") is a Saudi and the former rector of the University of Riyadh (1994), former minister of Waqf and Islamic Affairs until 2000, and advisor to King Fahd. Al Turki is also Secretary General of the Muslim World League.

720. Abdullah bin Abdul Muhsen al Turki is a counselor to the government of Saudi Arabia and was clearly in contact with al Qaeda financier Zouaydi. Abdullah bin Abdul Muhsen al Turki acted as Saudi Minister of Islamic Affairs for many years and clearly was in a position where he should have known about the reach of international terrorism and al Qaeda. Al Turki later became a shareholder in the front organization known as Promociones which bought real estate but did no actual construction work, although listing itself as a construction company. Instead, that company made direct payments to al Qaeda cells.

721. Al Turki organized in January 2002 a conference of scholars who stated that terrorism is not equal to Jihad, and defined a right to struggle "against occupiers … and those who renege on their commitments or prevent Muslims from peacefully preaching."

722. On October 10, 1999, Zouaydi, a senior al Qaeda financier for Europe, and Abdullah bin Abdul Muhsen al Turki, then advisor to King Fahd, agreed to participate as

business partners to a construction project in Madrid, Spain. A contract was written by Zouaydi Company in Spain stating that both parties will finance 50% of the project. The incomes would be split 70/30 between al Turki and Zouaydi.

723. Zouaydi was part of an international terrorist movement for global jihad which encompassed the al Qaeda network. This network channeled money directly to the perpetrators of September 11, 2001, and to similar global jihad movements planning terrorist actions in San Francisco, Bali, and elsewhere.

724. Several faxes in support of this enterprise, scheme and conspiracy were sent by Zouaydi to al Turki. In one fax sent on October 15, 1999, Zouaydi asks al Turki to send the money through al Rajhi Bank (which hold his accounts in Saudi Arabia).

725. As a guaranty for the operation, Zouaydi sent a check of 191 million Pesetas on September 15, 1999, to al Turki as beneficiary from Banco Sabadell in Madrid. On October 22, 1999, a fax was sent to al Turki by Prol & Asociados law firm in Madrid referring to a telephone conversation with someone acting on behalf of al Turki, Waleed O Houssainy, about a project of al Turki to buy 100% of Zouaydi's Spanish company.

726. On February 4, 2000, Zouaydi sent a fax to al Turki, referring to him as "advisor to King Fahd." In his declarations to the Spanish judge on April 26, 2002, Zouaydi refers to al Turki as "advisor to King Fahd." Al Turki's representative, Waleed al Husseini, is the manager of a major Saudi company owned by the prominent shareholders.

727. Prince Turki served in the same cabinet as Chief of Intelligence, which shared information with al Turki. It was widely known that al Qaeda members' and supporters' interpretation of the Koran provides that suicide bombing is a permissible act, and that al Qaeda's political goal is to establish global extremist Muslim rule. For al Qaeda and some

extremist Saudi supporters, support of the Taliban may have had less to do with Afghanistan's autonomy and much more to do with funding a staging platform and material sponsorship for worldwide global jihad.

728. The Saudi High Commission, (a/k/a the Saudi High Relief Commission) (or "SHC") was founded in 1993 by Prince Salman bin Abdul Aziz al Saud (or "Prince Salman"), the Mayor of Riyadh and a son of King Fahd, a prime supporter of the charity. Hailed as the largest fundraising effort in the Arab and Muslim world, the Saudi High Commission claims to have spent more than $600 million in aid to Bosnian Muslims impoverished by the country's recent civil war.

729. Despite the Saudi commission's generous efforts in Bosnia, it has been widely criticized by aid agencies and Bosnian intellectuals for importing the extreme form of Saudi Islam, Wahhabism, which is alien to the more moderate, secular form found in Bosnia. Bosnian officials claim that the Wahhabis' intolerant and anti-Western form of Islam contradicts and offends Bosnian tradition and undermines the country's rich and diverse religious heritage.

730. On October 21, 2001, five Algerians were arrested in Bosnia Herzegovina on criminal charges of international terrorism following a threat to the United States embassy. The incident resulted in the five day closure of the United States and British embassies for what both embassies called "a credible security threat." The plot was discovered when United States intelligence intercepted a telephone conversation between two of the accomplices about the mission. During this telephone conversation, one of the terrorists said, "American interests would be jeopardized within 48 hours."

731. This group of Algerians is suspected to be a part of the al Qaeda network. The NATO Secretary-General, George Robertson, stated that at least one of the five had "direct links

with al Qaeda and Osama bin Laden." The leader of the group, Bensayah Belkacem, has been identified as a top al Qaeda lieutenant. In October, 2001, Belkacem was arrested at his apartment in Zenica, Bosnia, where authorities found phony passports and a mobile telephone listing for Abu Zubeida, al Qaeda's third-in-command. According to phone transcripts, Belkacem was also in phone contact with an al Qaeda military commander Abu al-Maid.

732. One of the six Algerian terror suspects, Sabir Lamar, worked for the Saudi High Commission as an Arabic language teacher. Sahir Lamar is said to have fought in Afghanistan with the Mujahideen. He is married to the daughter of a former local employee at the United States embassy in Sarajevo and is believed to have had keys to the building, in which photographs and other information were available.

733. In October, 2001, United States forces raided the Sarajevo branch of the Saudi High Commission of Bosnia and Herzegovina. United States forces found computer hard drives with photographs of the World Trade Center before and after its collapse as well as photos of United States embassies in Kenya and Tanzania and the USS Cole. Additionally, United States forces discovered files on pesticides and crop dusters, information about how to make fake State Department badges as well as photographs and maps of Washington, marking government buildings. About $100,000 worth of local currency was found in a safe, as well as anti-Semitic and anti-United States computer material geared toward children.

734. The Financial Police of the Federation of Bosnia Herzegovina Ministry of Finance analysis of the documents seized from the offices of the Saudi High Commission describe the organization as a front for radical and terrorism-related activities:

> Members of the SFOR have on premises of the Saudi High Commission Relief for Bosnia and Herzegovina confiscated some documentation for which it can be claimed with certainty that it does not belong in the scope of work of a humanitarian organization (various photographs of the World

> Trade Center, sketches of military bases, certain photographs of military ships, civil airplanes, certain specially protected facilities, and other).

735. In October 2001, a Bosnian spokesman announced that between 100,000 DM and 200,000 DM in cash were also seized in the offices of the Saudi High Commission. The Saudi High Commission used 24 vehicles with diplomatic plates to transport members and material inside Bosnia Herzegovina.

736. Prince Salman has a history of funding Islamic extremism. Prince Salman was named Chairman of the General Donation Committee for Afghanistan (a/k/a Afghan Jihad Support Committee) in 1980. In 1981, the General Donation Committee for Afghanistan gave $39 million dollars to aid the Afghan mujahideen. Prince Salman stated the donation was made to "our Afghan brothers."

737. In 1999, Prince Salman made a donation of $400,000 during a fund-raising event organized for Bosnia Herzegovina and Chechnya by Defendants International Islamic Relief Organization, World Assembly of Muslim Youths, and Al-Haramain Foundation.

738. A letter seized by the Israeli Defense Forces during Operation Defensive Shield, evidences the involvement of Prince Salman in financing terrorist organizations. The letter dated December 30, 2000, was issued by the Embassy of the State of Palestine in Riyadh to Prince Salman bin Abdul Aziz al Saud, Chairman of the Popular Committees for Support of the Palestinian Fighters. The Palestinian ambassador expresses the concern of Yasser Arafat regarding funding of radical organizations.

> I wish to inform you that [Yasser Arafat] called me and asked to convey his request to mediate and intervene and express his opinion about what is happening in our homeland. The Saudi committee responsible for transferring contributions to beneficiaries is sending large sums to radical committees and associations, including the Islamic Association which belongs to Hamas, the Al-Salah Association, and brothers belonging to the

> Jihad in all areas. This has a bad affect on the domestic situation and also strengthens these brothers and thus has a bad impact on everybody.

739. Prince Salman is engaged in the aiding and abetting and material sponsorship of international terrorism, including al Qaeda and Osama bin Laden.

740. Given its level of financing, the SHC does not provide adequate financial aid to the needy. The Saudi High Commission was functioning at least until February 2001, when the announcement was made that the organization provided in a nine-year period a total of $560,900,000 in donations, while it was obvious, since at least year 2000, that funds sent to help Bosnia Herzegovina were diverted for other purposes. For instance, in September 2000, Prince Salman was alerted by a letter from the Bosnian association "Mothers of Srebrenica and Podrinje" in which it was clearly claimed that the Saudi High Commission in Bosnia Herzegovina didn't meet its goal in terms of financial help, accusing the director of the Sarajevo office.

741. This association stated that while Prince Salman announced that 200 million DM were collected in only one day after Srebrenica's fall in July 1995, for Srebrenica inhabitants, the Saudi assistance did not reach Srebrenica people. The association stated that:

> The director of the High Committee (Sheikh Naser bin Abdurahman al Said) is negating your statements, which we do not doubt, but we doubt the work of the director of the Committee who openly stands to the defense of the corrupted authorities in Sarajevo.

742. Prince Salman knowingly failed to take appropriate actions regarding the management and use of funds of the Saudi High Commission in Bosnia Herzegovina, as proven in the raids conducted in the Sarajevo office of the organization less than one year later.

743. Saudi High Commission financial records fail to account for $41 million dollars. United States investigative forces are currently reviewing suspicious financial records of the

Saudi High Commission. Matthew Levitt, a former FBI analyst and now a senior fellow at the Washington Institute for Near East Policy, says investigators have been unable to trace about $41 million dollars donated to the charity.

744. The organization Saudi High Relief Commission to Bosnia and Herzegovina has been required by the High Court in Sarajevo to submit banking and account records, an inventory of assets and liabilities and an accounting of all other business transactions.

745. Abdul Aziz Al Ibrahim (or "Al Ibrahim") is a Saudi citizen and the brother-in-law of King Fahd of Saudi Arabia. His sister, Jawhara, is the second wife of King Fahd.

746. Abdul Aziz Al Ibrahim acquired in 1989 a portion of the Marina Del Rey real estate venture in Los Angeles, through various offshore companies. American authorities discovered a loan of $132 million that was granted to Al Ibrahim at the end of 1989 by BCCI. Al Ibrahim was one of BCCI's leading loan beneficiaries.

747. Apart from being a lead investor in Marina del Rey, Al Ibrahim real estate assets have included Ritz-Carlton hotels in New York, Washington and Houston and Aspen, a hotel and office complex near Chicago's O'Hare International Airport, undeveloped property in the hills high above Bel-Air and largely vacant land near Disney World in Florida. Ritz-Carlton hotels have decided in 1997 to pull back their name from the facilities by terminating management agreements after they became controlled by Al Anwa USA company owned by Abdul Aziz Al Ibrahim.

748. The registered President of Al Anwa USA is Tarek Ayoubi, who also manages Anwa Hotel & Resort International, Luxury Holdings Inc, MDR Hotel and NY Overnight Inc, all based at the same address in Marina Del Rey.

749. Al Anwa holding is Al Anwa for Contracting Establishment (a/k/a Al Anwae Trading and Contracting Establishment, a/k/a Anwae Contracting Est) a construction company owned by Abdul Aziz Al Ibrahim. Al Anwa for Contracting is shareholder, along with Defendant Dallah al Baraka (Chaired by Defendant Saleh Abdullah Kamel), of the National Environmental Preservation Co Ltd in Jubail, Saudi Arabia.

750. With another brother, Walid, along with Defendant Saleh Abdullah Kamel, Abdul Aziz Al Ibrahim created in 1991 the leading Arab television satellite service, Middle East Broadcasting Corp (or "MBC"), which purchased the press agency United Press International (or "UPI") in 1992.

751. In 1990, he created the Ibrahim bin Abdul Aziz Al Ibrahim Foundation whose official stated aim is humanitarian assistance. The organization is present in Kenya, Bosnia, Chechnya, South America and Southern Asia.

752. The Ibrahim bin Abdul Aziz Al Ibrahim Foundation has built, among others, mosques in Dusseldorf, Gibraltar, Milan and Moscow.

753. The organization's branch in Nairobi in Kenya was associated with Osama bin Laden's network in the FBI's investigation into the attacks against the American embassies on August 7, 1998.

754. In September 1998, the Kenyan government canceled the registration of five Islamic relief agencies for allegedly supporting terrorism including Defendant Al-Haramain Foundation, Help African People, the Islamic Relief Organization, the Ibrahim bin Abdul Aziz Al Ibrahim Foundation, and Mercy Relief International. The authorities claimed that materials for the bomb were smuggled in as relief aid with the help of Islamic relief agencies.

755. The decision was announced by the Kenyan government's NGO coordinator who declared that:

> Our investigations reveal that the operations of these organizations are inconsistent with the reasons for which they were registered . . . These organizations are supposed to work for the welfare of Kenyans, but are instead endangering Kenyan's lives . . . They had been found to be working against the interests of Kenyans in terms of security.

756. After several organizations appealed this decision, Kenya's High Court has blocked the deregistration of four of the five non-governmental organizations. The International Islamic Relief Organization, Moslem World League, Al-Haramain Foundation, and Mercy International Relief Agency can still operate pending an appeal. Only the Ibrahim bin Abdul Aziz Al Ibrahim Foundation did not ask the court for an appeal.

757. In a study paper dated October 1999, called “The New Azerbaijan Hub: How Islamist operations are targeting Russia, Armenia and Nagorno-Karabagh”, Yossef Bodansky, Senior Editor of Defense and Foreign Affairs' Strategic Policy refers to the Ibrahim bin Abdul Aziz Al Ibrahim Foundation as one of those which provided help to Osama bin Laden.

> The key Islamist facilities are concealed as charity and educational organizations affiliated with the web used by bin Laden's networks. Moreover, the headquarters of these organizations are stuffed with Arab "teachers" and "managers" from the ranks of such organizations as the International Muslim Brotherhood, the Islamic Salvation Front, several branches of Islamic Jihad, and the National Islamic Front of Sudan. The key organizations are . . . Al Ibrahim Foundation. Very little is known about this Baku-based charity except that its Arab principals have huge amounts of cash in hard currency. They are involved in acquisition of real estate among other "educational" projects.

758. Other reports suggest that Ibrahim bin Abdul Aziz Al Ibrahim Foundation was funding the Islamic Movement of Uzbekistan (or “IMU”), an affiliate of al Qaeda, whose leaders met Osama bin Laden in 1999 in Kandahar, Afghanistan. Reports stated that the IMU received $270,000 dollars from the Ibrahim bin Abdul Aziz Al Ibrahim Foundation.

759. In 1999, the Russian special services and reconnaissance disseminated a report stating that Chechen militants were allegedly being trained in three paramilitary bases in Azerbaijan and that three Islamic organizations - the Ibrahim bin Abdul Aziz Al Ibrahim Foundation, World Youth Islamic Assembly and Islamic Rescue Organization - had taken part in setting up these bases.

760. During an investigative television program by the Russian NTV, on November 1, 2002, it was disclosed that in July 2002, more than a hundred young men from various regions of Russia attended a seminar organized by the clerical board of Muslims of the Asian part of Russia at Pervouralsk. The official goal of the event was to instruct to religious matters. One of the courses was based upon a study in sharia disciplines, published by Ibrahim bin Abdul Aziz Al Ibrahim, which emphasized (quote):

> Armed struggle in the name of Allah, for his word to be above all else…Sacrifice your life in witness of Allah's religion.

761. According to a document summarizing the seminar "the main task of the seminar was to select candidates for further instruction at Saudi universities, and to raise the level of Islamic awareness." After the NTV findings, an investigation was conducted and a criminal procedure is pending in Russia.

762. The event took place at the Middle Urals Kaziat Muslim community, where Defendant Abdullah bin Abdul Muhsen al Turki settled in 1995 a Joint committee for Islamic Action and Studies with representatives from Defendants Muslim World League, Islamic International Relief Organization, World Assembly for Islamic Youth, along with the Ibrahim bin Abdul Aziz Al Ibrahim Foundation.

763. The role of certain Saudis in the sponsorship of al Qaeda cannot be ignored. This is evidenced in the al Qaeda organization's own words. Captured al Qaeda documents state that

among all the Muslim governments in the world, the government of Saudia Arabia is the only representative model Islamic government, the greatest center of Islam as al Qaeda moves to expel the Jews and Christians from Arab lands through mass murder.

764. Osama bin Laden is referred to in al Qaeda documents as the billionaire merchant prince and the beloved member of Saudia Arabia's billionaire family who has been led by the bin Laden family to aim the Kalishnikow at super power America.

765. Information found in the possession of al Qaeda terrorists indicates that financial support of international terrorism by wealthy Saudis is designed to undermine moderate Arab regimes and movements while providing support for Saudi legitimacy as the strict guardians of Mecca and Medina.

766. These acts described herein constitute a pattern of conduct in sponsoring and promoting radicals and international terrorism generally, as well as al Qaeda and Osama bin Laden, specifically. The participation of certain Saudi nationals in the sponsoring and promotion of terrorism is widely known if politically unpalatable. As USA Today reported back in 1999:

> More than a year after the U.S. Embassy bombings in East Africa, prominent businessmen in Saudi Arabia continue to transfer tens of millions of dollars to bank accounts linked to indicted terrorist Osama bin Laden, senior U.S. intelligence officials told USA Today.
>
> The money transfers, which began more than five years ago, have been used to finance several terrorist acts by bin Laden, including the attempted assassination in 1995 of Egyptian President Hosni Mubarak in Ethiopia, the officials said.
>
> Secretary of State Madeleine Albright is expected to raise the issue with Prince Sultan, the Saudi defense minister, during his visit to Washington next week. Saudi Arabia, the main U.S. ally in the Persian Gulf, has pledged to fight terrorism.
>
> According to a Saudi government audit acquired by U.S. intelligence, five of Saudi Arabia's top businessmen ordered the National Commercial Bank (NCB), the kingdom's largest, to transfer personal funds, along with $3

> million diverted from a Saudi pension fund, to New York and London banks.
>
> The money was deposited into the accounts of Islamic charities that serve as fronts for bin Laden.
>
> The businessmen are paying bin Laden "protection money" to stave off attacks on their businesses in Saudi Arabia.

767. Certain members of the Saudi Royal family and related persons overtly and covertly aid, abet, and materially support the IIRO and other charities, despite their roles in terrorist financing. Certain members of the Saudi Royal family, along with other wealthy Saudi supporters, contributed to the IIRO and related charities as a way to support al Qaeda without suffering from the social (and legal) ramifications that such contributions bring. The IIRO received funds which were passed on to terrorists in part from the Zakat payments from individuals and companies in the kingdom of Saudi Arabia. The Saudi Royal family members own substantial assets in the United States of America, do substantial business in the United States of America, the profits of which in part are used to fund international terrorist acts, including those which led to the murderous attacks of September 11, 2001.

768. As the 2002 Report on terrorist financing by the independent task force of the Council on Foreign Relations pointed out: “it is worth stating unambiguously what official U.S. government spokespersons have not: [F]or years, individuals and charities based in Saudi Arabia have been the most important source of funds for al Qaeda; and for years, Saudi officials have turned a blind eye to this problem.” The report goes on to note that this is hardly surprising given that the Saudis possess the greatest concentration of wealth in the area.

769. Since at least August 1996, Osama Bin Laden has been named as a financier and promoter of Islamic extremist terrorist activities. A State Department fact sheet reported that Osama Bin Laden had various business interests in Afghanistan and that he was running several

military training camps there for the al Qaeda terrorist organization, with the support of the Taliban.

770. The 1996 Report on Patterns of Global Terrorism publicly described the affiliation between the Taliban regime and the al Qaeda terrorist network:

> The Taliban militia, which took over the capital city, Kabul, in September, has permitted Islamic extremists to continue to train in territories under its control even though they claimed to have closed the camps. (…) Saudi-born extremist Usama Bin Ladin relocated to Afghanistan from Sudan in mid-1996 in an area controlled by the Taliban and remained there through the end of the year, establishing a new base of operations. In August, and again in November, Bin Ladin announced his intention to stage terrorist and guerrilla attacks against US personnel in Saudi Arabia in order to force the United States to leave the region.

771. A 1998 memo signed by Abu Hafz (the military name for Mohammed Atef), the military chief of al Qaeda, reveals how the oil interests were recognized by the terrorist organization and used as a leverage by the Taliban to remain in power. This memo was seized in a computer during the FBI investigations on the al Qaeda United States Embassy bombings in Africa.

772. Abdulrahman Bin Khalid Bin Mahfouz, son of Khalid Bin Mahfouz, was trustee of the terrorist charity front Muwaffaq Foundation described *supra*. Abdulrahman Bin Khalid Bin Mahfouz was also member of the board and Vice Chairman of the Executive Management Committee of Defendant National Commercial Bank.

773. The Muwaffaq Foundation was founded by the Bin Mahfouz family. In 1991, Muwaffaq Foundation (or "Blessed Relief") settled in Sudan with Defendant Yasin Al-Qadi acting as chairperson, providing material and financial support for Osama bin Laden's operations in Sudan and elsewhere.

774. A Treasury Department statement reports that:

> Muwafaq is an Al-Qaida front that receives funding from wealthy Saudi businessmen. (…) Saudi businessmen have been transferring millions of dollars to bin Laden through Blessed Relief.

775. Defendant Khalid bin Salim bin Mahfouz was such a Saudi businessman. Khalid bin Mahfouz is the former Chief Executive Officer of the Bank of Credit and Commerce International (or "BCCI") and former Chief Executive Officer of the National Commercial Bank until 1999, and is a major financial sponsor and conduit for Osama bin Laden, al Qaeda operations, and international terrorism. Khalid bin Mahfouz materially sponsored al Qaeda and international terrorism.

776. Members of the Saudi Royal family aided and abetted the Taliban regime, despite the widespread knowledge they harboured al Qaeda terrorists, training camps, and Osama bin Laden.

777. Certain members of the Saudi royal family named herein (collectively the "Foreign Governmental Defendants") provided funding and material support and substantial assistance to al Qaeda and OBL, directly and indirectly, through their actions and failure to act, which were undertaken with knowledge of the foreseeable risks and consequences of how that same funding and material support and substantial assistance would be used in al Qaeda's war against America. Indeed, and as noted by Richard Gannon, former director of operations for the State Department's Office of Counterterrorism, "[w]e've got information about who's backing bin Laden and, in a lot of cases, it goes back to the royal family." The actions and inactions of the Defendants, both direct and indirect, were understaken with the knowledge and intent that the funding and material support and substantial assistance they provided would be used and relied upon by al Qaeda and OBL.

778. For instance, in 1998, OBL stated to ABC news that "Muslims and Muslim merchants should give their Zakat and their money in support of" the Taliban, which at that time, was harboring al Qaeda and OBL. In 1999, in a highly publicized and public trial for the U.S. Embassy bombings, the evidence revealed that Defendant MIRA employed al Qaeda operatives, provided al Qaeda members with identity documents, housed al Qaeda files (including the files of embassy bomber Wadiel-Hage), and assisted in the smuggling of weapons. Al Qaeda members served as MIRA's accountant and headed MIRA's Nairobi, Kenya branch. In January, 2001, OBL gave thanks to those "who give Zakat" to al Qaeda.

779. Moreover, these Defendants had also been told repeatedly by U.S. and other foreign officials that Saudi-based charities and relief organizations (among other entities and Defendants) were actively transferring and diverting Zakat to al Qaeda and OBL:

> In 1994, President Clinton complained about Saudi charities funding terrorists;
>
> In 1994, the French Interior Minister Pasqua complained to Prince Turki al Faisal al Saud ("Prince Turki") that Saudi based charities, including the Muslim World League, were financing Islamic extremists involved with terrorism;
>
> In 1996, U.S. officials flew to the Persian Gulf and met with Finance Ministry, intelligence, and law-enforcement officials in in Saudi Arabia to put individuals on notice that assistance was needed and that U.S. pressure to deal effectively with those who fund terrorism would grow;
>
> In 1999, the Canadian government stated that the IIRO clandestinely funds terrorism;
>
> In 1999, Indian police arrested Sayed Abu Nasir, a longtime IIRO employee, for plotting to bomb U.S. consulates. Nasir confessed that the IIRO was secretly supporting terrorist training camps;
>
> In 1999, U.S. Treasury and Intelligence officials again flew to the Persian Gulf to meet senior Saudi officials. According to reports of the meeting, U.S. officials "laid everything out—what we knew, what we thought.. .[w]e told them we'd just had two of our embassies blown up and that we needed to deal with them in a different way." In 1996, the CIA issued a classified

> report that identified charities tied to terrorism and indicated that high ranking members "of the collecting and monitoring agencies in Saudi Arabia" were "involved in illicit activities, including support for terrorists."

780. Yet, despite the fact the charities and relief organization Defendants were wholly controlled, directed, and/or supervised by and alter egos of the Foreign Governmental Defendants themselves, nothing was done to stop the flow of funds to al Qaeda. Indeed, rather than shutting these charity and relief organizations down, Prince Sultan, Prince Naif, Prince Turki, Prince Salman, and the other enterprise Defendants herein continued to fund, support, endorse and/or approve of the activities of these charities and relief organizations:

> Both before and after September 11, 2001, Prince Naif, in his own words, "participated in and headed a number of [Saudi] charitable societies". While Prince Naif has stated that he "know[s] personally that they are engaged only in charitable activities", he cannot deny that he heads and oversees the Saudi Committee for the Support of the Al Quds Intifadah, which has provided families of terrorists with millions of dollars through specially designated bank accounts. Indeed, according to Senator Charles Schumer (N.Y.), Prince Naif has "set up charities that funnel money to Wahhabi madrassah schools throughout the Middle East and Pakistan, making these areas hotbeds of anti-American sentiment and extremism.";
>
> Since 1994, Prince Sultan has donated over $2 million dollars to Defendant IIRO. He has also donated over a half-million dollars to Defendant MWL, and has made similar contributions to Defendant Al-Haramain; and
>
> In 2001, Prince Salman, who has been a central contributor to the Saudi High Commission, donated SR 1.5 million at a joint fundraiser involving IIRO and Al-Haramain. He had previously donated SR 1.5 million at a joint fundraiser involving these same charities in 1999.

781. Despite the known and foreseeable risks posed to United States citizens and property by al Qaeda, these Foreign Governmental Defendants acted with the knowledge and intent that the flow of funds to al Qaeda would continue unabated:

> After al Qaeda's attack on the Khobar Towers complex in 1996, U.S. government officials stated that the "Saudi Government would not cooperate with the United States on matters relating to" OBL and al Qaeda despite efforts to persuade the Kingdom to work with U.S. authorities to investigate the matter;

Throughout 1997 and 1998, U.S. officials were denied access to Madani al Tayyib, the former head of al Qaeda's finance committee, who had been detained by Saudi intelligence;

In 1998, the U.S. complained to the Saudi Royal family that Defendant National Commercial Bank ("NCB"), then run by Defendant Khalid bin Mahfouz, was funding OBL's and al Qaeda's activities in Afghanistan, Chechnya, and the Philippines. As noted, Defendant NCB was the first commercial bank founded in Saudi Arabia;

In 1999, former Secretary Madeline Albright met with Prince Sultan to discuss evidence that prominent Saudi businessmen were transferring tens of millions of dollars to bank accounts linked to OBL; and

U.S. government officials made additional trips to Saudi Arabia in 1999 and 2000 to request cooperation in tracking and restricting funds going to OBL and al Qaeda, but again the royal family members were recalcitrant.

782. The refusal of these Defendants to assist in stopping the flow of money to al Qaeda from Saudi Arabia is demonstrative of their knowledge and intent that it continue.

783. Prior to September 11, 2001, the banking Defendants should have initiated monitoring reforms, conducted audits, investigated suspicious bank accounts, required greater transparency cross-border wire transfers, and/or monitored those transfers. Instead, the banking and financial Defendants (both individual and corporate) facilitated and provided financial services with full knowledge and awareness that they were providing ongoing financial and material support to al Qaeda.

784. For example, according to U.S. intelligence sources, captured al Qaeda leader Abu Zubaydah was told by OBL that in 1991 OBL and Prince Turki met and agreed that OBL would be secretly funded if he would leave Saudi Arabia and wage jihad outside the Kingdom. This agreement was reached despite the fact that Prince Turki knew that al Qaeda: (A) was soliciting and raising funds in Saudi Arabia through Saudi-based businesses and financial entities; and (B) intended to use the material support and substantial assistance it acquired to kill Americans and attack American interests around the world.

785. Thereafter, Prince Turki met with OBL, al Qaeda and the Taliban, including at least two meetings in 1998. These meetings resulted in an agreement whereby al Qaeda would not attack Saudi Arabian targets, and in return, Saudi Arabia would make no demands for the closure of OBL's network of training camps. According to U.S. intelligence sources, Zubaydah attended one of these meetings in Kandahar where he witnessed Prince Turki agreeing to continue the flow of money and material support to al Qaeda from Saudi Arabia. After these meetings, 400 new pickup vehicles arrived in Kandahar, still bearing Dubai license plates.

786. Zubaydah's information that Prince Turki directly participated in providing financial and material support and substantial assistance to al Qaeda is corroborated by Mullah Kakshar. Mullah Kakshar was a former Taliban leader who has defected. In a sworn statement, Mullah Kakshar implicated Prince Turki in facilitating the transfer of funds from wealthy Saudi financiers directly to al Qaeda.

## Ary Gold LTD

787. Ary Gold LTD (a/k/a Ary Gold, a/k/a Ary International Exchange, a/k/a Ary Traders, a/k/a Ary Trade) (or "Ary Gold" or "Ary Group") was created in 1972 by Abdul Razzak Yakoob, a Pakistani native businessman. Abdul Razzak Yakoob came from a Pakistani family of gold merchants, and chaired the Ary Group since 1974 with his brother Mohammad Iqbal. The head office of Ary Group is located in Dubai. The Ary Group is a conglomerate active in several industrial sectors (textiles, food, television broadcasting, and precious metals). Faced with a financial crisis in 1986, the group increased its trading operations on gold and silver bullion, through its two branches, Ary Gold and Ary Jewellers:

> Ary Group started trading gold and silver in 1979. In 1994, it opened Ary Jewellers for the wholesale trade of manufactured jewelry, including Ary branded gold bars.

788. Abdul Razzak Yakoob confirmed the beginning of gold trading activity to Gulf News in 2001:

> I realize that […] we were working so hard to establish imported brands, in the end, we were hardly benefiting from the whole exercise. That's when I made up my mind to launch our own products and promote it. Those days, whatever gold that was there in the market was labeled either London Gold or Swiss Gold, so I thought of branding our gold.

789. In addition, Abdul Razzak Yakoob diversified his activities. In October 2000, he created Ary Digital by taking over Sky Digital Asian Network (formerly known as the Pakistani Channel) in the United Kingdom. The channel is currently chaired by Abdul Razzak Yakoob's nephew, Salman Iqbal. The Pakistani Channel Limited, located in London, and is currently owned by Salman Iqbal (former dealer of Ary International Exchange), and his father, Mohammad Iqbal. This company is under the control of Abdul Razzak Yakoob, whose mission is thus:

> The important thing for me is that, through my channel, people in all parts of the world can hear the sound of Azaan (call for prayers).

790. Since its beginning, the Ary Group grew through the Gold market. In 2002, the company acquired membership in the London Dullion Market Association. An official position on the gold market had not previously been taken by a Middle East company.

791. The Ary Group has a pattern of conduct consistent with money laundering in the Middle East. Ary was a key player in a scandal involving Benazir Bhutto in 1994. The former Pakistani Prime Minister was convicted of corruption with Abdul Razzak and Ary Gold:

> In 1998, Pakistani investigators looking into government corruption found two checks, each for $5 million, allegedly paid by ARY Gold in 1994 to Asif Ali Zardari, the husband of then-prime minister Benazir Bhutto, to secure a two-year monopoly on gold imports to Pakistan. While acknowledging he held the monopoly and shipped $500 million in gold to Pakistan from 1994 to 1996.

792. Several executives of Ary Group were involved in the illicit scheme. It resulted from a close association between Ary Group Executives and the Bhutto government, and through the Muslim Commercial Bank. The Ary Group's responsibility in this corruption scheme was confirmed by a Pakistani court, yet the Pakistani sentence against Ary Group was rejected five times by Dubai legal authorities as baseless. Abdul Razzak was cleared of criminal charges in Dubai but still faces charges in Pakistan.

793. Abdul Razzak is President of the Memon Community in the United Arab Emirates and Chairman of the World Memon Organization (or "WMO"). Other Ary Group executives were founders and trustees of the organization, particularly Mohammad Iqbal Yakoob. The Islamic charity WMO is very close to the Pakistani government. The headquarters of the organization is based in Dubai, and is in contact with others Islamic charities, particularly Defendant World Assembly of Muslim Youth. Described as a Muslim sect, WMO set up a cultural and business community between the United Arab Emirates and Pakistan. Hussain Lawai, the President of the Muslim Commercial Bank, was convicted of corruption in Pakistan in the Ary Group case, was member of the same Memon community in Dubai.

794. Gold trading is the principal source of revenue of the Ary Group. As the United States and its allies swept toward Afghanistan's main cities in the fall of 2001, the Taliban and al Qaeda network sent waves of couriers with bars of gold and bundles of dollars across the porous border into Pakistan. Financial transactions involving transfer of gold were centred in Dubai, the commercial capital of the United Arab Emirates and directly involved Ary Gold.

795. Persons aiding and abetting al Qaeda and facilitating and sponsoring terrorist conduct recently shipped large quantities of gold out of Pakistan to Sudan with the direct assistance of Ary Gold LTD of Dubai. Ary Gold was and is a principal conduit for transfer of

wealth for years by some of the co-conspirators named herein. Ary Gold does substantial business in the United States of America.

796. Ary Gold, a branch of Ary Group, is involved in terrorist financing according to several investigations around the world, including by United States Customs Service. Ary Gold engaged in gold transactions on behalf of the Taliban and al Qaeda and in doing so offered material support, aiding and abetting.

797. Gold trading was done between Ary Gold and the Taliban. This "gold trail" was described by intelligence officers, law enforcement officials, gold brokers, and sources that have direct knowledge of some of al Qaeda's financial movements. In addition, close relationships between al Qaeda operatives and Dubai gold traders were established during the United States investigations on the 1998 United States Embassy bombings in Africa. Ary Gold has a pattern of conduct as it relates to aiding and abetting and materially sponsoring international terrorism, and assisting al Qaeda.

798. The bomb that exploded at the United States Embassy in Kenya was built outside Nairobi. Kenya bomber Fazul Abdullah Mohamed (or "Fazul") rented the house where the Kenya bomb was assembled. Prosecution witness Tamara Ratemo, a Kenyan, told the court she rented Fazul her 10-room house outside Nairobi starting May 1, 1998. She also testified that Fazul was in frequent contact with gold traders in Dubai:

> Q. And did Mr. Fazhul tell you anything about why he needed such a large house?
> A. Yes, he said he had a family and he had some business people who would be coming to visit frequently.
> Q. And what kind of business people?
> A. He said the kind of people that are dealing with, they are trading in gold and they would come from Dubai.

799. Defendant Ary Gold is an aider, abettor and/or material sponsor of the Taliban, al Qaeda, Osam bin Laden and international terrorism.

## The Republic of Sudan

800. Defendant, the Republic of Sudan ("Sudan"), is a foreign state within the meaning of 28 U.S.C. § 1391(f). Sudan maintains an Embassy within the United States at 2210 Massachusetts Avenue N.W., Washington, D.C. 20008-2831.

801. Since 1993, Sudan has been designated by the State Department as a foreign State that sponsors terrorism within the meaning of the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j); the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b); and 28 U.S.C. § 2333. Sudan, by and through its agents and instrumentalities, has supported, encouraged, sponsored, aided and abetted and conspired with a variety of groups that use terror to pursue their goals. Sudan has provided financing, training, safe-haven, and weapons for international terrorist groups, including al Qaeda and Osama bin Laden.

802. In or about 1991, Sudan through Hassan al-Turabi, leader of the Sudan's ruling National Islamic Front Party (or "NIF"), allowed the terrorist Osama bin Laden and his al Qaeda Party entrance into Sudan. During this time period, Sudan abandoned visa requirements for Arabs and actively encouraged Islamic militants to live within its borders. By the end of 1991, there were between 1,000 and 2,000 members of al Qaeda in Sudan. Following al Qaeda's move to the Sudan in or about 1991, Osama bin Laden established a headquarters in the Riyadh section of Khartoum, Sudan, an area heavily populated by Saudis.

803. Osama bin Laden was able to establish a powerful military and political presence in Sudan in the early 1990s, using a variety of business ventures to finance his activities, aided and abetted and materially sponsored by Defendants and co-conspirators named herein.

804. Osama bin Laden forged business alliances during the early 1990s with wealthy Sudanese, becoming intimately involved with the Sudanese government. Osama bin Laden invested with senior members of the NIF in the Defendant Al Shamal Islamic Bank in Khartoum. Osama bin Laden invested $50 million dollars of his own funds into the Al Shamal Islamic Bank. Along with other senior members of the NIF, he founded Defendant Wadi al Aqiq, a trading company that was allowed by the Sudanese government to engage in unrestricted shipping. Osama bin Laden also founded Taba Investments Ltd., an organization that secured a near monopoly over Sudan's major agricultural exports. Other enterprises begun by Osama bin Laden in Sudan include Ladin International Company and al-Hijra Construction. Gum Arabic Company Ltd. was owned jointly by Osama bin Laden and the Sudanese government. Osama bin Laden had an interest in al Themar, a Sudanese agricultural company, which employed 4,000 employees working its one-million-acre al-Damazine farms. Osama bin Laden also had an interest in the Blessed Fruits Company and al-Ikhlas, both involved in the production of honey, fruits and vegetables.

805. During the early 1990s, while Osama bin Laden was being harbored in Sudan, al Qaeda grew into a sophisticated international terrorist organization. Several key figures in the organization portrayed al Qaeda at the time as a multinational corporation complete with a finance committee, investments and well-organized, concealed accounts and operations worldwide.

806. Osama bin Laden organized al Qaeda into camps dedicated to exportation of terrorism throughout Sudan (and eventually the world); the main Sudanese training site being a 20-acre site near Soba, 10 kilometers south of Khartoum. Osama bin Laden and al Qaeda were sponsored, encouraged and allowed to operate freely in Sudan. Al Qaeda purchased

communications equipment, radios, and rifles for the Sudanese NIF, while the Sudanese government in exchange provided 200 passports to al Qaeda so that terrorists could travel internationally with new identities.

807. In or about the early 1990s, Jamal al-Fadl went to Hilat Koko, a suburb of Khartoum, where he met with representatives of al Qaeda and the Sudanese army to discuss the joint manufacture of chemical weapons. Al Qaeda and the Sudanese army cooperated in efforts to mount chemical agents on artillery shells. Al Qaeda at this time also began to experiment with biological warfare – injecting or gassing dogs with cyanide.

808. In Sudan, between the years 1990 and 1993, members of al Qaeda undertook the task of writing the *Encyclopedia of the Afghan Jihad*. Al Qaeda wrote another terrorist work entitled *Military Studies in the Jihad against the Tyrants*. It was during this period that Osama bin Laden and al Qaeda became fully operational, expanding their terrorist network.

809. At various times between in or about 1992 and 1996, Osama bin Laden and Mamdouh Mahamud Salim worked together with a ranking official in the NIF to obtain communications equipment on behalf of the Sudanese intelligence service.

810. On at least two occasions in the period from in or about 1992 until 1995, members of al Qaeda transported weapons and explosives from Khartoum to the coastal city of Port Sudan for trans-shipment to the Saudi Arabian peninsula, using vehicles associated with Osama bin Laden's businesses.

811. In 1993, al Qaeda paid $210,000.00 for an airplane in Tucson, Arizona, that was then flown to Khartoum, Sudan. This plane was intended to transport American Stinger Anti-Aircraft missiles from Pakistan to Sudan, although that missile transport did not take place.

812. Osama bin Laden stated publicly that one of his proudest achievements during the period of time al Qaeda was based in Sudan was al Qaeda's role in the 1993 killing of more than a dozen American soldiers stationed in Somalia. Al Qaeda and its allies launched operations in Somalia to foment, foster and participate in, attacks on British and American forces taking part in Operation Restore Hope in Somalia. Al Qaeda grew to export hatred and terror internationally.

813. Because of Sudan's active and material support of Osama bin Laden and al Qaeda, the United States Department of State first put Sudan on the list of State sponsors of terrorism in 1993, largely because of Osama bin Laden's residency and activities.

814. In 1995, Hassan al-Turabi organized an Islamic Peoples Congress where Osama bin Laden was able to meet with militant groups from Pakistan, Algeria and Tunisia, as well as Palestinian Islamic Jihad and Hamas. During the time that al Qaeda was based in Sudan, it also forged alliances with Egyptian Islamic Groups and other Global Jihad groups in becoming an international sponsor of terrorism.

815. Hassan al-Turabi, under pressure from the United States and others, finally expelled Osama bin Laden from Sudan in 1996, but allowed him to relocate and regroup in Afghanistan.

816. Sudan continues to be one of the governments that the United States has designated as a State sponsor of international terrorism. Sudan serves as a safe-haven for members of al Qaeda, the Lebanese Hezbollah, al-Gama'a al-Islamiyya, Egyptian Islamic Jihad, the Palestine Islamic Jihad, and Hamas. Sudan still has not complied fully with United Nations Security Council Resolutions 1044, 1054, and 1070, passed in 1996 – which require that Sudan end all material support to terrorists. Sudan has assets frozen by the United States government.

817. The Sudanese government and Sudanese officials close to Osama bin Laden co-founded the Al Shamal Islamic Bank and were associated with its operations until at least October, 2001. Among the three founders of the Al Shamal Islamic Bank was the Northern State Government of Sudan, ruled at that time by Mutasin Abdel-Rahim, the personal representative of Hassan al-Turabi, leader and principal Osama bin Laden supporter in the country.

818. In 1988, the provisional Board of Directors of Al Shamal Islamic Bank included Abdel Wahab Osman (Chairman of the Board and Sudanese Minister of Industry at that time, going on to be Sudanese Minister of Finance & National Economy from 1996 to 2000), the Sudanese Government of Northern State, and Izz El-Din El Sayed (Speaker of the Sudanese People's Assembly from 1983 to 1985). Until at least October 2001, Al Shamal Islamic Bank's shareholders included the National Fund for Social Insurance, a Sudanese National entity listed as representative of the Workers Unions at the National Assembly Committee.

819. Between 1984 and 1991, Osama bin Laden capitalized the Al Shamal Islamic Bank in Sudan. One of Osama bin Laden's former associates testified at the trial on the 1998 African embassy bombings that $250,000 was wired from Al Shamal Islamic Bank directly into the Osama bin Laden's cohort's Texas bank account – where he used it to buy a plane delivered to Osama bin Laden intended to transport Stinger missiles. The money was wired from the Wadi al Aqiq account at Al Shamal Bank via Bank of New York to a Bank of America account held in Dallas, Texas by Essam al Ridi. Al Ridi, an Egyptian flight instructor who met Osama bin Laden in Pakistan in 1985, flew the plane to Khartoum.

820. Under Sudanese banking regulations, Al Shamal Islamic Bank is considered as a joint ownership commercial bank, and therefore subject to the Central Bank of Sudan review, supervision and control, according to the provisions of the Banks' Practice Act of 1991.

821. Al Qaeda operative Jamal al-Fadl testified that his terrorist activities were greatly aided by Sudanese intelligence and by other Sudanese officials. Al-Fadl said that he helped Osama bin Laden pay the employees of his companies and al Qaeda, whose members received monthly checks of several hundred dollars from Al Shamal Islamic Bank accounts. He also testified that al Qaeda members were granted Sudanese passports and diplomatic privileges by the government. Such material support constitutes the sponsoring of international terrorism.

822. These facts fall under the scope of the 1999 International Convention for the Suppression of the Financing of Terrorism, signed by Sudan on February 29, 2000, and entered in force on April 10, 2002. The Republic of Sudan's course of conduct contradicts the General Assembly Resolution 51/210 of December 17, 1996 calling the States to "prevent and counteract (…) the financing of terrorists and terrorist organizations, whether such financing is direct or indirect," the United Nations Security Council Resolution 1373 of September 28, 2001 and the United Nations Security Council Resolution 1269 of October 19, 1999, calling upon all States to "prevent and suppress in their territories through all lawful means the preparation and financing of any acts of terrorism." These resolutions were adopted under Chapter VII of the United Nations Charter, and are therefore binding on all United Nations member States, including Sudan.

823. Jamal Ahmed Al-Fadl (or "Al-Fadl"), was the first person called in the trial of four men charged with participating in a terrorism conspiracy led by Osama bin Laden, over the 1998 bombings of the American Embassies in Kenya and Tanzania. In February of 2001, Al-Fadl's testimony described Osama bin Laden's global banking network, naming institutions in Sudan, Malaysia, The United Kingdom, Hong Kong and Dubai where Osama bin Laden and his international terrorist organization kept money.

824. Al-Fadl also gave a detailed account of Osama bin Laden's agricultural, construction, transportation and investment companies in Sudan, which are fronts for terrorist activities. Osama bin Laden, his co-conspirators, aiders and abettors, and material sponsors have engaged in a global conspiracy aimed at the United States and other Western targets. Al Qaeda has also acted as a kind of umbrella organization providing support for other terrorist groups.

825. Al-Fadl described al Qaeda and the group’s cooperation with other terrorist organizations like the Iranian-backed Hezbollah.

826. Al-Fadl testified that he helped Osama bin Laden pay the employees of his companies and al Qaeda, whose members received monthly checks of several hundred dollars, and that he was sent out to buy five farms in Sudan for the group to use as training camps. Al-Fadl testified one farm cost $250,000 and another $180,000.

827. After Osama bin Laden moved his group to Sudan in 1991, Al-Fadl testified, its activities were greatly aided by Sudanese intelligence and by other government officials. Al-Fadl described several arms shipments, including al Qaeda's smuggling of Kalishnikov rifles into Egypt from Sudan on two separate occasions that involved about 50 camels each. Al-Fadl also recalled a midnight shipment of four large crates of weapons and explosives to an Islamic group in Yemen, carried on a boat owned by al Qaeda and accomplished with the help of a Sudanese intelligence officer.

828. Al-Fadl testified Osama bin Laden was surrounded by a group of al Qaeda associates who participated on a ruling council and ran various committees on military, business and religious matters.

## The Agencies and Instrumentalities of the Republic of Sudan

829. As described above, Sudan acted through its officials, officers, agents, employees and instrumentalities in aiding, abetting, and providing material support and resources to Osama bin Laden, al Qaeda and international terrorism. The support provided by the Republic of Sudan to Osama bin Laden and al Qaeda assisted in, or contributed to, the preparation and execution of plans that culminated in the attacks on September 11, 2001 and to the damages to the Plaintiffs herein.

830. Lieutenant General Omar Hassan Ahmad al-Bashir is the President of Sudan, and is an instrumentality of Sudan for the purposes of liability and damages under the Foreign Sovereign Immunities Act. As head of Sudan, Lieutenant General Omar Hassan Ahmad al-Bashir is responsible for formulating and executing Sudan's policy of supporting terrorism and Osama bin Laden and al Qaeda.

831. The Sudan Ministry of Defense, headed by General Rahman Abdul Siral-Khatim, is an agency of the Republic of Sudan. The Ministry of Defense, as a government agency, aided and abetted Osama bin Laden and al Qaeda as outlined above.

832. The Sudan Ministry of the Interior, headed by Major General Abdul- Rahim Mohammed Hussein, is an agency of Sudan. The Ministry of the Interior, as a government agency, aided and abetted Osama bin Laden and al Qaeda by providing instructors to the training camps run by Osama bin Laden and al Qaeda. In early 1994, Osama bin Laden was responsible for at least three major terrorist training camps in Northern Sudan and the Sudanese Intelligence Services, Al Amn al-Dakhili and Al Amn al-Khariji, provided the training. These services are answerable in part to the Ministry of the Interior.

## The Saudi – Spanish – German al Qaeda Scheme

833. Ramzi Binalshibh is an al Qaeda chief operative with ties to al Qaeda cells in Hamburg, Germany, and the Spanish branch of al Qaeda. He is currently in United States custody. The conduct described herein directly links Saudi Arabian entities and individuals to Mohammed Atta's Hamburg al Qaeda cell, and shows a proximate cause between Saudi Arabian individual's and entities' conduct and the funding of the terrorist attacks of September 11, 2001. The Defendants' actions led to the terrorist acts that occurred on September 11, 2001, which proximately caused the Plaintiffs' damages.

834. These entities and individuals include but are not limited to Proyectos y Promociones Iso, Afamia SL, Cobis, Abrash Company, Promociones y Construcciones Tetuan Pricote S.A., Contratas Gioma, Eurocovia Obras SA, Mushayt for Trading Establishment, Mohammed Ali Sayeed Mushayt, Proyectos y Promociones Paradise SL, Proyectos Edispan, Ghasoub al Abrash Ghalyoun, and Muhammed Galeb Kalaje Zouaydi.

835. On April 23, 2002, the Spanish Central Unit for Foreign Information ("Unidad Central de Informacion Exterior") provided information to the investigating magistrate Baltazar Garzon Real in order to prosecute the Spanish branch of al Qaeda. This Spanish al Qaeda branch turned out to be a key structure in the financing of the September 11, 2001 attacks.

836. Several members of al Qaeda were arrested in Spain in April 2002: Imad Eddin Barakat Yarkas, Muhammed Galeb Kalaje Zouaydi (a/k/a Abu Talha), Abdalrahman Alarnaot Abu Aljer (a/k/a Abu Obed), Mohammad Khair Al Saqqa (a/k/a Abu Al Darda), and Ghasoub Al Abrash Ghalyoun (a/k/a Abu Musab). Ghasoub Al Abrash Ghalyoun is considered a senior financier of al Qaeda in Europe, as is Zouaydi.

837. Abu Dahdah is a member of a Spanish cell and part of al Qaeda that is active through several economic entities. This organization's conspiracy and scheme is considered as a critical logistical component leading to September 11, 2001 attacks. Mohamed Atta had been in relation with several members of Abu Dhadah's terrorist cell in Spain, in order to arrange the details of the September 11, 2001 operations. In addition to these illegal activities in providing financial assistance to al Qaeda, additional businesses have supported terrorist operations.

838. Muhammed Galeb Kalaje Zouaydi (a/k/a Muhammad Ghalim Kalaji, a/k/a Abu Talha, a/k/a Abu Musab) (or "Zouaydi") was born in Syria on January 3, 1961. Zouaydi is the brother-in-law of Mohamed Bahaiah (a/k/a Abu Khaled), messenger and courier for al Qaeda in Europe.

839. In 1978, Zouaydi graduated in mechanical engineering from the Aleppo University and attended another academic year until 1980. In 1984, Zouaydi was of Spanish nationality, but resided in Saudi Arabia.

840. In 1985, Zouaydi formed Mushayt for Trading Establishment in Jeddah, Saudi Arabia, as a household gifts company, and owned it at least until the end of 1998. The company was controlled at all times relevant by members of the Muslim Brotherhood, including current General Manager, Walid Al Zaim.

841. In or about 1996, Zouaydi met Bassam Dalati Satut, Imad Eddin Barakat Yarkas and Ghasoub El Abrash Ghalyoun in Spain and Saudi Arabia. He also met Mamoun Darkazanli, an al Qaeda terrorist and co-conspirator, in Saudi Arabia. During his stay in Saudi Arabia, Zouaydi was in frequent contact with members of the Muslim Brotherhood, Saudi and Syrian businessmen, and several Saudi scholars and religious leaders. Zouaydi attended meetings and

had contacts with representatives of extremist organizations linked to Osama bin Laden, including those in the Philippines.

842. In December 1998, Zouaydi settled in Spain and created several businesses with individuals who are part of an al Qaeda cell in Spain. Between 1999 and 2001, Zouaydi frequently traveled to Saudi Arabia, Turkey, and in at least one instance to the United States.

843. From 1996 to 2001, the al Qaeda network in Europe received at least $1,093,197 dollars from Zouaydi's Saudi company "donations" and false contracts issued by Spanish companies owned by Zouaydi. These front companies, mainly involved in construction and real estate, were convicted in arms trafficking, credit card fraud and false documentation. They made false financial statements and laundered at least $2.5 million dollars over five years.

844. Since 1999, money was funneled to the Hamburg al Qaeda cell through businessmen Mahmoud Darkazanli and Mohammed Haydar Zammar who provided this cell of hijackers with financial, logistical and material support.

845. The financial and support network formed by Zouaydi in Spain engaged in relations with other al Qaeda cells in Belgium, Italy, Germany, the Philippines and Indonesia in furtherance of a common scheme, plan, course or pattern of conduct, criminal and civil conspiracy, and racketeering enterprise to aid, abet, or otherwise materially sponsor and promote acts of international terrorism.

846. Muhammed Galeb Kalaje Zouaydi is considered by Spanish government as the main benefactor of al Qaeda in Europe in preparation of the September 11, 2001 attacks. Between 1995 to 2000, Muhammed Galeb Kalaje Zouaydi received large amount of money from Saudi Arabia, in order to conduct investments, and provide logistical assistance and support to al Qaeda.

847. Muhammed Galeb Kalaje Zouaydi (or "Zouaydi") resided between Saudi Arabia and Spain, when he created with Ghasoub Al Abrash Ghalyoun, a money laundering scheme to assist al Qaeda operations. Zouaydi has close financial ties with Defendants Prince Turki al Faisal al Saud and Prince Mohammed al Faisal al Saud.

848. Zouaydi organized Spanish and Saudi Arabian businesses with Ghasoub Al Abrash Galyoun. These companies included the real estate company Promociones y Construcciones Tetuan Pricote S.A., located in Madrid. This company is related to Abrash Company, located at the same address, and to Contratas Gioma S.A., also chaired by Ghasoub Al Abrash Galyoun. Several other companies are located at the same address and purport to be involved in industrial building construction. Those entities are related to the operations of September 11, 2001 attacks and furnished logistical and material support to the al Qaeda Spanish branch.

849. All the companies located at the 33 Ana Maria Street in Madrid, and owned by Ghasoub Al Abrash Galyoun, received millions of dollars from Muhammed Galeb Kalaje Zouaydi. The financing used for the functioning of those companies was provided to Zouaydi from Saudi Arabia.

850. To attempt to legitimize as well as cover-up this sponsorship of al Qaeda and international terrorism, false contracts were signed with Zouaydi's Saudi Company, Mushayt for Trading Establishment. Mushayt for Trading Establishment is a company chaired by Mohamed Ali Mushayt was founded by Muhammed Galeb Kalaje Zouaydi in order to transfer funds for al Qaeda operations in Europe.

851. In addition, Mushayt for Trading Establishment in Jeddah, Saudi Arabia, sheltered and materially and economically supported Nabil Nanakli Kosaibati Nabil, who was

convicted for terrorist activities in Yemen. Each month, the Mushayt for Trading Establishment payed wages to Nabil Nanakli Kosaibati Nabil. Mushayt for Trading Establishment in Jeddah shares the same administrative infrastructure, phones, telexes, with a company named Mohammed Ali Sayeed Mushayt, chaired by Abdull Aziz Bin Abdullah, and also located in Jeddah. Those two companies operated money transfers to develop Spanish companies as fronts for the financing of international terrorism generally and al Qaeda specifically.

852. Mushayt for Trading Establishment materially and financially supported Mohamed Atta's al Qaeda cell and settlement in Hamburg, Germany. Abdul Fattah Zammar and Mamoun Darkanzali (a/k/a Abu Ilias) provided Atta with material and financial support to organize the September 11, 2001 attacks.

853. Muhammed Galeb Kalaje Zouaydi sent $227,000 dollars to Nabil Sayadi in Belgium through Mushayt for Trading Establishment. Nabil Sayadi is also a radical Muslim extremist in charge of the Fondation Secours Mondial and Defendant Global Relief Foundation in Belgium.

854. From 1996 to 2001, estimates of amounts personally donated by Muhammed Galeb Kalaje Zouaydi to al Qaeda logistics in the Europe are $656,022 dollars. Abdalrahman Alarnaot Abu Aljer, leader of the al Qaeda Spanish cell, invested $53,000 dollars in the Zouaydi's company Proyectos y Promociones Iso, registered in Madrid by Bassam Dalati Satut.

855. Proyectos y Promociones Iso was an umbrella organization for al Qaeda operations in Europe. The "contracts" signed with Mushayt for Trading Establishment and Muhammed Galeb Kalaje Zouaydi were part of a money laundering scheme to mutually support, aid and abet al Qaeda and international terrorism. The total revenue of the company Proyectos y Promociones Iso for the year 2000 equalled $2,549,175 dollars.

856. The company Proyectos y Promociones Iso, registered in Spain, was also used to launder invoices and bills of other members of al Qaeda in Europe.

857. Bassam Dalati Satut belongs to the Spanish al Qaeda cell headed by Abu Dahdah. Bassam Dalati Satut is also the manager of a company registered as Cobis, located in Madrid. This company materially supported, aided and abetted al Qaeda operations and propaganda.

858. Kamal Hadid Chaar participated in the material sponsorship and aiding and abetting of al Qaeda through his company Afamia S.L., also located in Madrid. Kamal Hadid Chaar is a Muslim activist, involved in extremist Islamic publications and in al Qaeda activities in Spain. Abdalrahman Alarnaot is also involved in Afamia S.L., as director. Kamal Hadid Chaar is the Chief Executive Officer of Afaimia S.L. Kamal Hadid Chaar facilitated and sponsored the passage of Chej Salah to Peshawar with a false passport registered as Kamal Hadid Chaar.

859. On July 16, 1996, Mohamed Neel Acaid, a member of the al Qaeda cell in Spain, sent through the Arab Bank the sum of $6,400 dollars to Khalid Ahman Hamdan Alriqib, an extremist associated with Chej Salah in Spain.

860. All of these companies, entities, and individuals participated in the sponsorship of terror and in the preparation of September 11, 2001 attacks. They did so with the cooperation of al Qaeda headquarters in Spain, particularly Chej Salah, founder of the Spanish cell and close to Osama bin Laden.

861. From at least 1995 to 2000, Ghasoub Al Abrash Ghalyoun was actively associated with Muhammed Galeb Kalaja Zouaydi in the financing and material support of al Qaeda and the September 11, 2001 attacks.

862. The September 11, 2001 attacks were financially and logistically assisted by this European money laundering scheme directed from Saudi Arabia with an epicentre based in Spain. The scheme resulted in the direct, material support of the Hamburg cell of al Qaeda hijackers, including Mohamed Atta and Ramzi Binalshibh.

863. Through several front companies that served as covers for al Qaeda operations established in Madrid, Spain, al Qaeda sponsors were able to funnel millions of dollars from companies and individuals based in Saudi Arabia to Spain, Germany and other European al Qaeda cells, between 1995 and 2001.

864. While the organizations and companies were supposedly involved in construction and real estate, they were indicted for arms trafficking, credit card fraud and false documentation. This terrorist funding scheme was directed by Defendants Mohammed Galeb Kalaje Zouaydi, Bassam Dalati Satut, Ghassoub Al Abrash Ghalyoun and Imad Eddin Barakat Yarkas. This scheme was carried out in Saudi Arabia, Spain, Germany, and elsewhere. It is anticipated that additional parties and persons will be implicated by the evidence being analysed regarding this scheme.

865. Funds for terrorism were funnelled to the Hamburg al Qaeda cell by and through businessmen Mahmoud Darkazanli and Mohammed Haydar Zammar, who both provided the al Qaeda cell of hijackers with financial and logistical support needed to carry out the gruesome attacks of September 11, 2001.

866. Mustaf Ahmed al-Hisawi (a/k/a Sheikh Saeed) is a Saudi Arabian businessman who facilitated the financial transactions to the terrorists and the al Qaeda cells that committed and planned the atrocities of September 11, 2001. This Defendant is known as one of Osama bin Laden’s financial chiefs.

867. Abdullah bin Abdul Muhsen al Turki (or "al Turki") is a former Saudi, advisor to King Fahd, and Secretary General of the Muslim World League. Additional specific allegations regarding al Turki's role in the Saudi-Spanish-German al Qaeda scheme are detailed *supra*.

868. On October 10, 1999, Zouaydi, a senior al Qaeda financier for Europe, and Abdullah bin Abdul Muhsen al Turki, then advisor to King Fahd, agreed to participate as business partners to a construction project in Madrid, Spain. A contract was written by Zouaydi Company in Spain stating that both parties will finance the project.

869. Zouaydi was part of an international terrorist movement for global jihad which encompassed the al Qaeda network. This network channeled money directly to the perpetrators of September 11, 2001, and to similar global jihad movements planning terrorist actions in San Francisco, Bali, and elsewhere.

870. Several faxes were sent by Zouaydi to al Turki. In one fax sent on October 15, 1999, Zouaydi asks al Turki to send the money through al Rajhi Bank (which hold his accounts in Saudi Arabia).

871. As a guaranty for the operation, Zouaydi sent a check of 191 million Pesetas on September 15, 1999, to al Turki as beneficiary from Banco Sabadell in Madrid. On October 22, 1999, a fax was sent to al Turki by Prol & Asociados law firm in Madrid referring to a telephone conversation with someone acting on behalf of al Turki, Waleed O Houssainy, about a project of al Turki to buy 100% of Zouaydi's Spanish company.

872. On February 4, 2000, Zouaydi sent a fax in furtherance of this scheme to al Turki, referring to him as advisor to King Fahd.

873. The Spanish scheme provided material support directly to al Qaeda operatives and the September 11, 2001 attacks. As investigations continue, additional evidence of such schemes will be uncovered.

## Abu Qatada al-Filistini

874. Abu Qatada al-Filistini (a/k/a Abu Ismail, a/k/a Abu Umar, a/k/a Abu Omar Omar, a/k/a Abu Umr Takfiri, a/k/a Abu Umar Umar, a/k/a Ali-Samman Uthman, a/k/a Omar Mahmoud Uthman, a/k/a Umar Uthman) (or "Abu Qatada,") was born 1960 in the city of Nablus in the Palestinian Territories. Abu Qatada entered high school in Amman and eventually obtained a degree in religious studies. Abu Qatada was one of the first Jordanians to join in the war against the Soviet Union. In Peshawar, Pakistan, Abu Qatada became a disciple of Abdullah Azzam, Osama bin Laden's spiritual mentor and founder of the organization that preceded al Qaeda. Following Azzam's assassination in 1989, Abu Qatada joined the jihad against the Soviet Union in Jalalabad, Afghanistan. In 1993 he immigrated to the United Kingdom where he received political refugee status. From 1994 to 1997, Abu Qatada was considered one of the ideological leaders of the Algerian-based international terrorist group, the Armed Islamic Group (or "GIA"). In 1998, Abu Qatada supported a branch of the GIA, the Salafist Group for Preaching and Combat headed by Hassan Hattlab.

875. Abu Qatada is a senior agent for Osama bin Laden in Europe. On October 12, 2001, Abu Qatada was designated as financial supporter of terrorism by President George W. Bush. Along with the designation was a call for the freezing of Abu Qatada's assets. At the Department of Treasury news conference that announced the designation of Abu Qatada as a financier of terrorism, Treasury Secretary Paul O'Neill stated:

> The list includes businesses and charitable organizations that funnel money to the al Qaeda terrorist network.

876. On the day of Abu Qatada's designation, October 12, 2001, the Department of Treasury issued a press release that describes Abu Qatada's role in al Qaeda, using his a/k/a Oman Mahmoud Uthman, which stated in part "Uthman is a senior agent for bin Laden in Europe."

877. Following his designation as a financier of terrorism by the United States, the United Kingdom froze $260,000 of Abu Qatada's assets. Government officials from France, Germany, Italy, Spain and Jordan have stated that Abu Qatada was in close contact with al Qaeda agents that were planning international terrorist attacks.

878. During the 1998 United States Embassy bombings in Africa trial, Abu Qatada was identified as a member of al Qaeda's religious council, known as the Fatwa Committee, that issues religiously acceptable rulings, or fatwas. On February 6, 2001, the key government witness and al Qaeda member, Jamal Ahmed al-Fadl, testified that al Qaeda maintained a Fatwa Committee and that Abu Qatada was a member of the committee:

> Q. We will come back to the businesses. Besides the business committee what other businesses were there within al Qaeda?
> A. Fatwah committee and Islamic study.
> Q. The fatwah and Islamic study committee. Can you tell us who was on the fatwah committee.
> …
> Q. Did you ever attend meetings where member so the fatwah committee spoke about the fatwas issued by al Qaeda?
> A. Yes.
> Q. Were the members of the fatwah committee identified by the members of al Qaeda?
> A. Yes.
> Q. Can you tell to the jury who the member of the fatwah committee were?
> …
> Q. Tell us who else was on the fatwah committee.
> A. Abu Faraj and Abu Qutada and Abu Ibrahim al Iraqi Hajer, Dr. Fadhl el Masry, and Dr. Abdel Omez.

879. Abu Qatada is still fulfilling the role of al Qaeda's Fatwa Committee by justifying the September 11, 2001 attacks. Abu Qatada wrote a ten page document that glorified Osama bin Laden and detailed the "moral" justification for the attacks of September 11, 2001. Distributed widely on emails and posted on a number of extremist websites in October 2002, Abu Qatada's document is titled, "The Legal Vision for the September 11 Events."

880. Abu Qatada was convicted twice by Jordan for his involvement in terrorism. In April 1999, Abu Qatada was sentenced to life imprisonment by a Jordanian military court. In March 2000, Jordan once again tried and convicted Abu Qatada for his role in aiding terrorism. This time, however, he was involved with a group of individuals identified by Jordan as members of al Qaeda. Abu Qatada was sentenced to death in absentia, along with the twenty-eight other accomplices. The charges levied against him were for planning terrorist activities on behalf of al Qaeda. More specifically, he was indicted on account of a) plotting terrorist actions; and b) memberships in an unauthorized group. The terrorist operations were directed against tourist attractions and American interests in Jordan and were timed to coincide with the Millennium. Abu Qatada is an aider, abettor, co-conspirator, and/or material supporter of international terrorism, al Qaeda and Osama bin Laden. Abu Qatada was arrested on October 24, 2002, by British authorities during an armed raid on his residence.

## **Mohammed Hussein al-Amoudi**

881. Mohammed Hussein Al-Amoudi ("Al-Amoudi") is a partner of Defendant Khalid bin Mahfouz in a number of businesses. Al-Amoudi is partner of bin Mahfouz in the oil business through Nimir Petroleum and Delta Oil. Al-Amoudi is a Saudi-Ethiopian.

882. Al-Amoudi was a Director of the al-Haramain branch in Kenya. The al-Haramain Islamic Foundation is a Saudi Islamic charity that has exploited its non-profit status for the

benefit of Osama bin Laden and the terrorist network al Qaeda as described in detail *supra*. Two of these branches, Bosnia and Somalia, have already been designated by the United States government as terrorist entities and their assets have been frozen. The leaders of al-Haramain have direct links to al Qaeda and international terrorism.

883. The al-Haramain Islamic Foundation was banned in Kenya, along with five other NGOs, following the 1998 Embassy bombings. Osama bin Laden and al Qaeda were convicted by the United States in 2001 for plotting and executing these dual attacks in Kenya, and Tanzania, which killed 224 people, and injured more than 4,000.

884. Al-Amoudi is an aider, abettor, co-conspirator, and/or material sponsor of international terrorism, al Qaeda, and Osama bin Laden.

## Yassir al-Sirri

885. Yassir al-Sirri (a/k/a Abu Ammar) (or "al-Sirri") was born in Egypt in 1963 and joined the radical Islamic movements eminating from the region. As a teenager, he was frequently arrested by Egyptian authorities and was refused entry into the Egyptian army for security reasons. He went to Yemen in 1988.

886. After being tried in absentia for the attempted assassination of Prime Minister Atef Sedki in 1993, al-Sirri was sentenced to death in Egypt. Al-Sirri fled from the Sudan, where he was currently residing, to the United Kingdom and requested political asylum. There he established the radical Islamic Observation Center, which releases al Qaeda messages and reports about its members.

887. After September 11, 2001, Yassir al-Sirri was again arrested in the United Kingdom for his alleged participaction in the assassination of Ahmed Shah Masood, the Afghan warlord who led the North Alliance against the Taliban. He was later released, unconvicted.

The United States has requested extradition of Yassir al-Sirri for his role in providing material support to Gama'a al-Islamiyya, Omar Abdel Rahman's jihadist organization that is part of the al Qaeda network.

888. In April of 2002, al-Sirri was indicted and charged with providing material support to Gama'a al-Islamiyya (IG), a designated terrorist group with numerous ties to al Qaeda.

889. Yassir al-Sirri solicited, commanded, induced and otherwise endeavored to persuade other persons to engage in violent terrorist operations worldwide.

890. In December 2000, al-Sirri arranged for money to be sent to Omar Abdel Rahman's son, Ahmed Abdel Rahman. The younger Rahman was in Afghanistan with al Qaeda when he relayed the request for the money. The criminal indictment explains:

> In or about December 2000, SATTAR spoke with one of Sheikh Abdel Rahman's sons, Ahmed Abdel Rahman, a/k/a "Sayfallah," who is a co-conspirator not named as a Defendant herein, and was in Afghanistan with al Qaeda, regarding the need for SATTAR to transfer money to him.
> On or about May 6, 2001, SATTAR spoke by telephone with AL-SIRRI and agreed that, because SATTAR could not send the money to Ahmed Abdel Rahman directly in Afghanistan, AL-SIRRI would arrange for an individual to transport the money to Ahmed Abdel Rahman.
>
> On or about May 8, 2001 SATTAR spoke with AL-SIRRI to finalize the money transfer to Ahmed Abdel Rahman through the director of a boys' school in Afghanistan.
>
> On or about May 14, 2001, SATTAR spoke by telephone with Ahmed Abdel Rahman who told SATTAR that there had been some confusion and that Mohammed Abdel Rahman had received the money sent by SATTAR.

891. The United States extradition warrant alleges that al-Sirri "sent money to Afghanistan in May 2001, 'knowing or having reasonable cause to suspect that the money would

or may be used for the purpose of terrorism within the jurisdiction of the government of the U.S.A.'"

## Sulaiman Al-Ali

892. On July 22, 1991, Sulaiman bin Ali Al-Ali (or "Al-Ali"), wealthy businessman, member of the International Islamic Relief Organization's (IIRO) Executive Committee, and a member of the Shura (Consultative) council of the Kingdom of Saudi Arabia, established the U.S. branch of Defendant IIRO) at 360 S. Washington St. in Falls Church, Virginia. Sulaiman bin Al-Ali is alleged to have aided, abetted, materially supported and conspired with Defendants IIRO, Muslim World League, Sana-Bell, Inc., and Taibah International Aid Association in furtherance of the goals of international terrorism and al Qaeda.

893. According to the deposition of Dr. Al-Ali's former U.S. business partner, Soliman Beheiri, Al-Ali came to the United States in the Summer of 1991 to establish IIRO. Beheiri stated that Al-Ali came to the United States from Saudi Arabia with $10 million dollars to invest through IIRO and Defendant Sana-Bell, with the goal of generating a sufficient return on investment to support IIRO's mission in the United States. Beheiri further testified how, in November 1991, Sulaiman Al-Ali introduced Biheiri to Dr. Abdulrahim Saati, a university professor of economics in Jeddah. Al-Ali introduced Saati as a "welcoming from Saudi Arabia from the office of the International Islamic Relief Organization to visit his office here to find out how he's progressing in establishing the organization here, and also assisting them in buying the building they have bought in Falls Church."

894. Defendant Sana-Bell, Inc. (the U.S. branch of Sanabel Al-Kheer) was organized as a District of Columbia non-profit company on July 28, 1989. In a civil lawsuit filed with the USDC for the District of Maryland, Sana-Bell described itself as an American non-profit

corporation deserving of tax-exempt status and headquartered in Jeddah, Saudi Arabia. Defendant Dr. Abdullah al-Obaid and Defendant Hassan Bahafzallah, listed as officers of Sana-Bell on their Articles of Incorporation filed in Washington D.C., have both served for many years as senior IIRO/MWL Executives in Saudi Arabia.

895. Al-Ali was himself later named as a member of Sana-Bell's Investment Committee and claimed to be the sole corporate executive responsible for executing and managing Sana-Bell investments. In April of 1998, the President of the "SanaBel Committee," [sic] writing on the letterhead of the Office of the Secretary General of the Muslim World League wrote to Defendant Yaqub Mirza to confirm that Al-Ali "rejoin[ed]" the Sana-Bell Al Kheir Committee and that Al-Ali would be "responsible for Sanabel in U.S.A." In July 1998, Defendant Dr. Abdullah Al-Obaid, Secretary General of the Muslim World League and Chairman of IIRO, wrote to Committee" of Sanabell S.A. of IIRO, and that he assisted in the review of its investments. Al-Obaid noted that part of the proceeds of these investments were used to establish Sana-Bell, Inc in the U.S. According to the deposition of Soliman Biheiri, "money transferred from Sana-Bell account to [Sulaiman Al-Ali's] office here was big, and I have a record of that. That can come close to over $1 million."

896. IIRO's form 1023 discloses that Sulaiman Al-Ali had strong relationships with other Islamic relief organizations, specifically, the Kuwaiti based Lajnat al-Dawa. On January 9, 2003, the Office of Foreign Assets Control of the United States Department of Treasury listed the Kuwaiti Lajnat al-Dawa as a specially designated global terrorist (SDGT), and blocked all of its assets pursuant to the International Emergency Economic Powers Act. Lajant al-Dawa was a critical component of the al-Qaeda network, delivering both financial and operational support. Indeed, during a videotaped interview from the late 1980's, al-Qaeda founder Abdullah Azzam

mentioned two relief organizations that supported the Arab Mujahideen in Afghanistan. One of those organizations was the Kuwaiti Lajnat al-Dawa. Recently captured 9/11 mastermind Khalid Sheikh Mohammad and his brother Ziad headed the Lajnat al-Dawa offices in Peshawar, Pakistan.

897. A search of the Person Locator (P-SRCH) database on Lexis-Nexis indicates that Sulaiman A. Al-Ali's former name is Sulaiman Kabbara. He has two brothers residing in the Northern Virginia area: Bachir and Amal Kabbara. On September 30, 1993, on behalf of himself, Amal, and Sulaiman, Bachir Kabbara incorporated "3 Brothers Of Virginia Paging Inc." using the same business address as IIRO: 360 S. Washington St. in Falls Church, Virginia. On November 1, 1993, Bachir Kabbara also incorporated "NAMA, Inc." using the 360 S. Washington St. address. Al-Ali's brother Bachir Kabbara had formerly served as the Imam of the radical Islamic Center of Tucson**,** Arizona from 1990 to 1992. One of Bachir Kabbara's predecessors as leader of the Tucson center was none other than MWL official and senior Bin Laden advisor Wael Jalaidan. Between 1985 and 1993 (including times at which Kabbara was in charge), the Islamic Center of Tucson served as the de-facto headquarters of Al-Qaeda in the United States. The mosque was integral in disseminating ***Al-Jihad***, the Arabic-language publication of the Peshawar, Pakistan-based "Mujahideen Services Office." As a result, the Islamic Center spawned the Al-Kifah Refugee Center, the Arab-Afghan jihad fundraising outlet tied to the 1993 World Trade Center bombing. While he lived in Arizona, Wadih el-Hage, Osama Bin Laden's former personal secretary, was a regular attendee at the Tucson mosque at this time. Phoenix Memo author FBI Agent Kenneth Williams believes that "El-Hage established an Osama Bin Ladin support network in Arizona while he was living there and that this network is still in place." At meetings at Kabbara's mosque, El-Hage has admitted in sworn

federal grand jury testimony to overhearing conversations between other worshippers that particular dissident Muslim leaders "should be killed" as "infidels."

898. According to the IRS 990 forms between 1992 and 1998, using supposedly charitable funds in IIRO and Sana-Bell accounts, Sulaiman Al-Ali made the following disbursements to other Muslim organizations suspected of connections to terrorism:

- $4,212,318 destined for IIRO operations in Bosnia and Somalia – 1992 & 1996. Paradoxically, rather than being distributed directly to the relief zones, this money was apparently re-routed back through the IIRO central offices in Jeddah, Saudi Arabia.

- $36,322 to the Horn of Africa Relief Agency (HARA) – 1992. HARA was used as a front to provide support to various Al-Qaeda affiliates, including the Eritrean Islamic Jihad Movement (EIJM). At the time IIRO made their $36,322 donation, HARA donor forms distributed in the U.S., titled "Eritrean Islamic Jihad Movement," advertised: "This pledge will support an orphan or the training of a Mujahid ["holy warrior"] or his family while he is in Jihad." Three payment options were listed: a $3,000 suggested yearly donation to help train a "Mujahid," $700 to "take care of a Mujahid's family," and $420 to support an orphan.

- $23,780 to the Holy Land Foundation (HLF) – 1996 & 1997. On December 4, 2001, the Office of Foreign Asset Control (OFAC) of the United States Department of Treasury designated the Holy Land Foundation (HLF) as a specially designated terrorist (SDT), as a specially designated global terrorist (SDGT), and blocked all of its assets pursuant to the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq. (IEEPA), and Executive Orders 13224 and 12947. According to Judge Gladys Kessler, who upheld the OFAC ruling against HLF, "the administrative record contains ample evidence that (1) HLF has had financial connections to Hamas since its creation in 1989; (2) HLF leaders have been actively involved in various meetings with Hamas leaders; (3) HLF funds Hamas-controlled charitable organizations; (4) HLF provides financial support to the orphans and families of Hamas martyrs and prisoners; (5) HLF's Jerusalem office acted on behalf of Hamas; and (6) FBI informants reliably reported that HLF funds Hamas."

- $10,000 to the Islamic African Relief Agency (IARA) – 1992. IARA is a Sudanese based Islamic charity group, headquartered in Khartoum with U.S. branch offices in Columbia, Missouri; Baltimore, Maryland; Norman, Oklahoma; Orlando, Florida; and elsewhere. In December 1999, two federal grants totaling $4.2 million dollars from the U.S. Agency for International Development (USAID) to IARA were cut off when the U.S. State Department determined that they were not in America's "national security interests." Orlando, Florida resident Ziyad Khaleel was detained by Jordanian authorities on December 29, 1999, on charges of being a

"procurement agent" for Osama Bin Laden. Khaleel, who was one of only eight U.S. regional IARA fundraising directors and the former IARA website administrator, is also responsible for the maintenance of a variety of radical Islamic Internet sites, including the official Hamas homepage (http://www.palestine-info.net).

- <u>$17,500 to Taibah International Aid Association – 1995 & 1996</u>. Taibah, with offices located in IIRO's building at 360 S. Washington, claimed to the IRS that it was "a missionary in the United States to promote the Muslim faith" and to aid needy Muslims around the world. However, Taibah International has been under investigation in Bosnia since shortly after September 11, 2001, when the Interior Ministry claimed to have averted a terror attack involving a computer consultant and suspected Al-Qaeda member working for Taibah. The Bosnian report further found evidence of "fictitious declarations of affiliation and employment" and of visas for entry into Bosnia for suspected militants. It concluded that "large cash sums were withdrawn by [Taibah] management... which were never accounted for," indicating "a wide scope for possible illegal spending." On May 6, 2004 the U.S. Treasury Department designated Taibah under Executive Order 13224. The U.S. is asking the United Nations' 1267 Sanctions Committee to add this entity to its consolidated list of terrorists tied to al-Qaeda, Osama bin Laden and the Taliban. Information shows this entity has significant ties to Global Relief Foundation (GRF), which initially operated in Bosnia under the auspices of Taibah. A former employee of Taibah International was a member of Ayadi Chafiq Bin Muhammad's network, who was designated by the Treasury department on October 12, 2001.

899. Al-Ali's IRO has been linked with Mercy International who US prosecutors claimed provided support for the 1998 US African embassy bombers.

900. In addition to charitable donations, Sulaiman Al-Ali also made several major financial investments in the United States on behalf of IIRO and Sana-Bell, Inc. In December 1992, Dr. Al-Ali transferred over $2.1 million in Sana-Bell charitable assets to investment projects controlled by BMI, Inc. (a.k.a. Bait ul-Mal), a company founded in Secaucus, New Jersey by Soliman Beheiri. According to a sworn statement filed by FBI Special Agent Robert Wright, BMI "had receive financing from [Yassin Kadi] and United States designated HAMAS terrorist [Musa abu Marzook]." In October 2001, the U.S. Treasury Department froze the assets of Yassin Kadi and listed him as a Specially Designated Global Terrorist, citing his financial support for al-Qaeda through a "relief" organization called Muwafaq, or Blessed Relief. Agent

Wright had initially investigated BMI as part of an ongoing Hamas fundraising investigation in the United States. According to an Affidavit filed by Wright, Yassin Kadi put up $820,000 for a real estate deal structured to funnel proceeds to Hamas operative Mohammed Salah. Moreover, "a note specifying that $820,000 was due and payable on December 31, 1993, [provided] that, 'All payments are to be made to Kadi International Corp., c/o BMI, Inc., One Harmon Plaza, Secaucus, New Jersey.'"

901. The $2.1 million invested by Sana-Bell in BMI ultimately became the subject of a civil lawsuit after the money disappeared entirely (it remains unaccounted for to this day). During the suit, Soliman Beheiri purportedly confessed that he had mishandled Sana-Bell's investments and was willing to "go to jail" to put this all behind him. Beheiri eventually defaulted in the suit and fled the country when faced with producing a financial accounting. According to Agent Robert Wright's sworn statement, an accountant at BMI later called another FBI agent to discuss his concerns that "funds the accountant was transferring overseas on behalf of [BMI] may have been used to finance the embassy bombings in Africa."

902. Through IIRO and Sana-Bell, Dr. Sulaiman Al-Ali also invested vast sums into other parallel fraudulent investment schemes tied to suspected terrorist financing. One of these was known as the Global Chemical Corporation (a.k.a. Amana Industrial and Trading), a defunct Illinois for-profit entity in Chicago, Illinois. According to FBI Special Agent Valerie Donahue, since November 1993, IIRO disbursed approximately $1,225,975 to Global Chemical and Amana. IIRO 990 records from 1995 quoted Al-Ali's total investment in Amana/Global Chemical at closer to $2,189,434. According to one Global Chemical administrator, Al-Ali was able to marshal these funds because "he's originally from Saudi Arabia, and he knew a lot of businessmen overseas in the Gulf area, and he… was the potential person to generate that money

from different businessmen. And we looked… up to him to really generate that funding for this big project… and he stepped up to the plate and he said, yeah, I know a lot of people that I can generate that money."

903. In a ten-count federal grand jury indictment returned in October 1996, Global Chemical President Mohammed Mabrook was charged with fraudulently obtaining at least $1,000,000 from various investors. As part of this scheme, Mabrook allegedly "created fictitious documents purporting to reflect customer orders for hundreds of thousands of dollars' worth of Global Chemical products… then solicited investors to provide funds to pay for the manufacture of products needed to fill these non-existent purchase orders." FBI Special Agent Valerie Donahue agreed that "the pattern of Global's receipt and disbursement of funds is consistent with the operation of an investment fraud scheme,..." Mabrook drew up fraudulent purchase orders with non-existent clients as documentation for supposed investments.

904. On January 9, 1997, Global Chemical's Chicago headquarters was raided by FBI Agents as part of a money laundering and fraud investigation. The organizations named in the Search Warrant included NAMA Inc. and the corporate entity founded by Al-Ali's brother and business partner Bachir Kabbara at 360 S. Washington St. in Falls Church. Days later, IIRO's Northern Virginia offices run by Sulaiman Al-Ali were raided by FBI Agents as part of the same terrorism, money laundering and fraud investigation. The individuals and organizations named in the Search Warrant included Global Chemical Corp, Nama Inc., Defendant Taibah International Aid Association, Defendant Sulaiman Al-Ali, and Bachir Kabarra. In an Online Chat session posted on March 22, 2002, Defendant Mohammed Omeish wrote:

> "I used to work with International Islamic Relief Organization [in the U.S.]. This organization ended its work about three years ago. The reason was …a decision of the administrative council at that time…The investigation to which IIRO was subject was for its being an investor in a commercial organization in Chicago which was raided by the authorities

> for a background of supporting terrorism, and IIRO was a chief investor. What touched the company touched the organization."

905. Soon thereafter, in August 1998, according the deposition of BMI President Soliman Beheiri, Al-Ali suddenly decided to abandon his properties in Northern Virginia and San Diego and promptly returned to Saudi Arabia after almost seven years of residence in the U.S. At this time, Beheiri received instructions from MWL and IIRO superiors in Saudi Arabia which, abruptly and for the first time, told him to "cancel the validity of [Al-Ali's] signature in regard to all of our accounts with your firm." Soon afterwards, MWL officials discounted all responsibility for the highly questionable investment decisions made by Sulaiman Al-Ali, apparently at their behest. Meanwhile, millions of dollars worth of MWL/IIRO/Sanabel donations designated for humanitarian causes disappeared with no apparent explanation.

906. During a U.S. Treasury interrogation of Soliman S. Biheiri, the agents wrote:

> "he found it very strange that Al-Ali opened up the office of the International Islamic Relief Organization (IIRO) in the United States as "International Relief Organization". Biheiri told the agents that Al-Ali's IRO was one and the same organization as the IIRO in Saudi Arabia. He related that he suspected that the IIRO's U.S. office had been deliberately named the IRO, so that one could not make the connection between the two organizations."

907. On IIRO – North America letterhead, Dr. Sulaiman A. Al-Ali requests all Muslims to "support IRO to provide the [Bosnian] refugees with immediate help," and to "donate generously". The appeal was sent out in English and in Arabic text.

908. Plaintiffs specifically incorporate all allegations from the Third Amended Complaint relating to Defendant International Islamic Relief Organization and the Muslim World League as they relate to Defendant Sulaiman Al-Ali. Sulaiman Al-Ali has engaged in the material support of al Qaeda and international terrorism, has aided and abetted and conspired to

advance their goals. The Defendants' actions led to the terrorist acts that occurred on September 11, 2001, which proximately caused the Plaintiffs' damages.

## Yousef Jameel

909. Defendant Yousef Abdul Latif Jameel (or "Yousef Jameel" or "Defendant Jameel") is an international financier and businessman.

910. At all relevant times, Defendant Yousef Abdul Latif Jameel for many years was a managing officer in an international business, a Jeddah, Saudi Arabia-based global financial conglomerate known as the Abdul Latif Jameel Group (or "Jameel Group"). The Jameel Group is an international enterprise owned by Yousef Jameel and the Jameel family. The Jameel Group was founded in 1955. Among other extensive global business and real estate dealings, the Jameel Group owns the world's largest independent Toyota franchise.

911. The Jameel Group is also engaged in international shipping, consumer finance, investments and trade.

912. In the United States, the Jameel Group's real estate interests are managed through its United States division, Jaymont (USA) Incorporated and Jaymont Properties, Inc. (or "Jaymont"), (formerly known as Jameel Inc.).

913. The Jameel Group and Jaymont own property and engage in business in the United States, including but not limited to real estate development and management of office buildings in New York, Boston, Miami, Orlando and San Francisco.

914. Defendant Yousef Jameel is a former board member and the largest single shareholder of Global Natural Resources, Inc. based in Houston, Texas.

915. The Jameel Group has provided funding for scholarship programs in the United States.

916. In addition to Jameel's extensive contacts with the United States that give rise to minimum contacts, Defendant Jameel is subject to the jurisdiction of this court under a specific jurisdiction analysis.

917. Defendant Jameel has directed his activities at the United States generally and specifically to persons and entities long associated with al Qaeda. Yousef Jameel has direct association with al Qaeda, including donations to several al Qaeda front charities, as well as direct links to individuals affiliated with al Qaeda.

918. Defendant Jameel provided material support to al Qaeda and its sponsors with knowledge that the funds would be used to support al Qaeda and its international terrorist agenda in attacking the United States. Yousef Jameel knew or should have known that Osama bin Laden and al Qaeda were targeting acts of violence against the United States and its citizens.

919. Defendant Jameel knowingly and intentionally aided, abetted or otherwise conspired to provide material support to al Qaeda in furtherance of its stated goals of attacks on the United States and its citizens.

920. Yousef Jameel’s name appears on the Golden Chain list, the list of wealthy financial sponsors and supporters of al Qaeda. The Golden Chain was seized by the Bosnian police during searches in the offices of the charity front Benevolence International Foundation in Sarajevo, Bosnia and Herzegovina on March 2002 and presented as evidence by the United States government in the criminal prosecution of al Qaeda. The Golden Chain document identifies Defendant Jameel’s name as one of the sources of funding to al Qaeda.

921. The Golden Chain list was presented by the United States government as an exhibit in the Department of Justice's Government's Evidentiary Proffer Supporting the Admissibility of Co-conspirator Statements in the case of *USA v. Arnaout* (U.S.D.C., Northern

District of Illinois, Eastern Division) filed on January 29, 2003. The list was also included in the Indictment of Enaam Arnaout on October 9, 2002. According to the United States government, the Golden Chain document is a list of people referred to within al Qaeda as the "Golden Chain," all wealthy donors to their extremist cause.

922. Originally, the Golden Chain document was seized by the Bosnian police during searches in the offices of Benevolence International Foundation in Sarajevo on March 2002. The Golden Chain was part of a computer file labeled "Tareekh Osama," or "Osama History," containing scanned images of several documents, including the formation minutes of al Qaeda. The computer files seized in Bosnia were delivered to the United States Embassy soon after the raids. The al Qaeda Golden Chain list of top Saudi financial sponsors includes bankers and businessmen, as well as former ministers of Saudi Arabia. The Golden Chain listing of Saudi donors and al Qaeda recipients includes other individuals named as Defendants herein. Major recipients of the Golden Chain are Osama bin Laden and Adel Abdul Jalil Batterjee. These two receive donations from 13 donors listed on the Golden Chain, including Defendant Jameel.

923. Yousef Jameel knowingly and/or intentionally provided material support to al Qaeda by giving funds to a key al Qaeda fundraiser, Defendant Adel Abdul Batterjee, a/k/a Adel Abdul Jalil Batterjee, Adel Abdul Baterji, (or “Batterjee”). Batterjee is identified on the Golden Chain as being the recipient of funds from Defendant Jameel. Batterjee's positions include: Chairman, Al Shamal Islamic Bank (Khartoum, Sudan); Founder, Al-Birr Society, or Benevolence International Foundation; and Former Secretary General of Defendant World Assembly of Muslim Youth. Batterjee is an al Qaeda member who received financial donations and material support from Yousef Jameel.

924. Following the September 11, 2001, attacks on the United States, the United States government requested that the Saudi Arabia Monetary Authority, the Kingdom's central banking authority, monitor the bank accounts associated with some prominent businessmen in Saudi Arabia, including Yousef Abdul Latif Jameel's company, the Jameel Group, in an effort to prevent the company and its executives, including Yousef Jameel, from funneling money to al Qaeda or other terrorist groups.

925. Defendant Jameel provided material support to charity front groups that directly supported al Qaeda and terrorist activities worldwide, including, but not limited to, Benevolence International Foundation (or "BIF"), Saudi Red Crescent Society, the Saudi Joint Relief Committee, Saudi High Commission (or Committee) for Donations and Collections for Bosnia Herzegovina, Al Haramain Islamic Foundation, Inc., the International Islamic Relief Organization, and the World Assembly of Muslim Youth.

926. Defendant Jameel provided material support to al Qaeda through Defendant Batterjee and through Benevolence International Foundation, an al Qaeda charity front founded by Batterjee. BIF has been designated by the United States as a Specially Designated Global Terrorist Entity. BIF was a key financer and supporter of al Qaeda beginning as early as the 1990s. As described in evidence presented in the United States Government's criminal case against BIF director Enaam Arnaout for material support to al Qaeda:

> In or about 1993, Bin Laden advised al Qaeda member Jamal Ahmed al Fadl that al Qaeda was using several charities to fund its operations overseas, specifically naming al Birr, which translates in English to "Benevolence." Al Fadl understood from conversations with Bin Laden and others in al Qaeda that the charities would receive funds that could be withdrawn in cash and a portion of the money used for legitimate purposes and another portion diverted for al Qaeda operations. The charities also provided assistance for mujahideen who traveled.

*U.S. v. Enaam Arnaout*, No. 02-CR-892 (N.D.I.L. 2003).

927. Jamal Ahmed Al-Fadl is an al Qaeda member who served as a witness in the Arnaout prosecution. Al-Fadl identified Defendant Jameel as having purchased a satellite phone for Osama bin Laden. Al-Fadl had a specific conversation with Madani Al Tayyib, a treasurer for al Qaeda during which he was told that Defendant Jameel donated funding via the Golden Chain to al Qaeda.

928. Al-Fadl specifically recalled Osama bin Laden mentioning BIF as one of the charities that al Qaeda was using for support. Al-Fadl also informed prosecutors that he had been instructed by al Qaeda's financial chief, and that a BIF employee who traveled from Sudan to Saudi Arabia to meet with Defendant Batterjee was questioned and detained by Saudi authorities because they had found documents linking BIF to Osama bin Laden. Defendant Jameel knowingly provided material support to Batterjee and BIF, and in doing so, thereby aided, abetted and/or conspired with to materially supported al Qaeda. Defendant Jameel knew or should have known that providing funds and equipment to Osama bin Laden and al Qaeda would further acts of international terrorism.

929. Beginning in the 1980's, Defendant Jameel and his family's Jameel Group contributed money and equipment to a number of extremist groups and organizations known to be supporters of al Qaeda and international terrorism in the Balkans, Chechnya, and the Middle East including the Saudi Red Crescent Society and the Saudi High Commission for Donations to Bosnia Herzegovina (or "Saudi High Commission"). The financial contributions of Jameel include millions given in April, 1999, in support of the Saudi Red Crescent Society. The donation included vehicles, in addition to a pledged contribution for each car sold by the Jameel Group, plus one percent of the Jameel Group's total sales.

930. The Saudi Red Crescent Society provided material support to al Qaeda and to terrorist activities through the Saudi Joint Relief Committee, which provides funds to al Qaeda terrorist activities.

931. In December 1999 alone, Defendant Jameel donated 8 million SR to the Saudi Red Crescent Society. The Saudi Red Crescent Society president was then Dr. Abdul Rahman Al-Swailem, Saudi Deputy Minister of Health for Executive Affairs, who also acted as Chairman of the Saudi Joint Relief Committee for Kosovo and Chechnya. In June 1998, the CIA and Albanian authorities raided several houses and offices of members of the Islamic Revival Foundation in Tirana which was supported by the Saudi Joint Relief Committee. In July 1998, Saudi Joint Relief Committee Director Muhamed Hasan Mahmud was also arrested on charges of arms possession and producing false documents. Mr. Mahmud was connected to a 1992 terrorist attack against the Egyptian Parliament. Several Saudi Joint Relief Committee members and directors were later arrested in connection with the August 1998 al Qaeda bombings of the United States Embassies in Kenya and Tanzania.

932. Defendant Jameel and the Jameel Group provided funding to the Saudi Red Crescent Society for so-called “charitable” activities even though it has been widely reported that the Saudi Red Crescent Society is a member of the Saudi Joint Relief Committee and that the Saudi Joint Relief Committee has provided material support to al Qaeda and international terrorist activities for years.

933. Defendant Jameel also gave 1.5 million SR at a joint fund-raiser held in December 1999 by three known al Qaeda sponsors, Defendant Al-Haramain Islamic Foundation, Inc. (or "al-Haramain"), Defendant International Islamic Relief Organization (or "IIRO") and

Defendant World Assembly of Muslim Youth (or "WAMY"). This financial support by Defendant Jameel was material and provided intentionally and/or knowingly.

934. Defendant al-Haramain Islamic Foundation, Inc. is an international charity front that has exploited its non-profit status for the benefit of Osama bin Laden and the terrorist network al Qaeda, in the furtherance of acts of international terrorism. In doing so, al-Haramain has developed an extensive worldwide network. Al-Haramain has been exposed for providing direct and material support to al Qaeda. The United States State Department has designated al-Haramain's branches including those located in Bosnia and Somalia, as global terrorist entities and frozen the assets of the organization. The leaders of al-Haramain have direct links to al Qaeda.

935. Intelligence and government officials throughout the world have acknowledged that al-Haramain exploited its non-profit status in providing material support and financial aid to international terrorist groups. Defendant Jameel knew or should have known of the terrorist-related agendas of al-Haramain, IIRO and WAMY, and that his contributions were being diverted to sponsor al Qaeda.

936. The International Islamic Relief Organization (or "IIRO") has materially supported terror around the globe, including Osama bin Laden and al Qaeda. IIRO's office in the Philippines is headed by Osama bin Laden's brother-in-law, Defendant Mohammed Jamal Khalifa and has acted as a center of terrorist financing and training activity – across the globe. IIRO then evolved into a vast independent terrorist machine – funding, recruiting and aiding and abetting al Qaeda members around the globe. IIRO was involved with the 1993 World Trade Center bombing, the plot to destroy the Lincoln Tunnel and the Brooklyn Bridge, the plot to

assassinate former President William Jefferson Clinton and Pope John Paul II, the plot to blow up twelve American airplanes simultaneously, and the 1998 Embassy bombings in East Africa.

937. WAMY was founded in 1972 in a Saudi effort to prevent the "corrupting" ideas of the western world influencing young Muslims. With official backing it grew to embrace 450 youth and student organizations with 34 offices worldwide. WAMY has been officially identified as a "suspected terrorist organization" by the FBI since 1996 and has been the subject of numerous governmental investigations for terrorist activities. WAMY conducts camps for youth all over the world including in North America. In one of the songs in the WAMY camp songbook are the words: "Hail! Hail! O sacrificing soldiers! To us! To us! So we may defend the flag. On this Day of Jihad, are you miserly with your blood?!"

938. As stated above, Defendant Jameel has provided material support to WAMY, IIRO, and al-Haramain, as well as the Saudi High Commission and other members and supporters of al Qaeda and international terrorism, with the knowledge that this support would sponsor acts of terrorism against the United States.

939. Al Qaeda, and other international terrorist organizations, raise money from a variety of sources and move money in a variety of manners. Al Qaeda and other terrorist groups, in partnership with banks, financial entities and charities, have successfully implemented a global financing system to collect and distribute money to terrorist individuals, cells and networks in every corner of the world. The al Qaeda charities that Jameel has sponsored include, but are not limited to, Al Haramain, Benevolence International Foundation, International Islamic Relief Organization, Muslim World League, Saudi High Commission, Saudi Red Crescent Society, and World Assembly of Muslim Youth.

940. Since at least 1998, Osama bin Laden made open and public calls for Muslims to donate to his terrorist organizations. On August 21, 1998, the President of the United States signed an Executive Order blocking the assets of Osama bin Laden and his terrorist cells, including al Qaeda, as international terrorists. Osama bin Laden, his sponsors and followers, were known to openly promoting hatred and violence against innocents long before this time. At all relevant times, Yousef Jameel provided material support to terrorists, terrorist activities and terrorist organizations, actively aided, abetted, conspired with and/or materially supported international terrorism and al Qaeda.

941. The Saudi High Commission was established on June 3, 1992 and is chaired by Defendant Salman bin Abdulaziz al Saud. In documents obtained from the Financial Police of the Federation of Bosnia Herzegovina Ministry of Finance, the offices of the Saudi High Commission in Bosnia Herzegovina serve as a front for radical and terrorism-related activities.

942. The Bosnian government and SFOR, the NATO-led Stabilisation Force in Bosnia and Herzegovina, are investigating authorities that described the incriminating findings following the seizures at the Saudi High Commission:

> [in 2001] Members of the SFOR have on premises of the Saudi High Commission Relief for Bosnia and Herzegovina confiscated some documentation for which it can be claimed with certainty that it does not belong in the scope of work of a humanitarian organization (various photographs of the World Trade Center, sketches of military bases, certain photographs of military ships, civil airplanes, certain specially protected facilities, and other).
>
> Among the items found at the Saudi charity were before-and-after photographs of the World Trade Center, U.S. embassies in Kenya and Tanzania, and the USS Cole; maps of government buildings in Washington; materials for forging U.S. State Department badges; files on the use of crop duster aircraft; and anti-Semitic and anti-American material geared toward children.

943. An Algerian employee of the Saudi High Commission for Aid to Bosnia and another unnamed cell member, who was in telephone contact with al-Qaeda operational commander Abu Zubayda, are in custody at Guantanamo Bay's Camp X-Ray for plotting an attack on the United States Embassy in Sarajevo. In October 2001, a SFOR spokesman announced that between 100,000 Deutschmarks ("DM") and 200,000 DM in cash were seized in the offices of the Saudi High Committee. Furthermore, Bosnian authorities are tracking down $41 million dollars of the commission's missing operating funds.

944. In August of 1995, the Jameel Group donated vehicles to the Saudi High Commission (or Committee) for Donations and Collections Bosnia Herzegovina (or "Saudi High Commission").

945. Defendant Jameel has provided material support to the Saudi High Commission.

946. In addition to Defendant Jameel's participation in funding al Qaeda directly and/or through Defendant Batterjee, Defendant Jameel's material and financial support of "charities" that were known to act as sponsors of Osama bin Laden and al Qaeda, Defendant Jameel also has engaged in a pattern of conduct in supporting individuals who are involved in religious extremism and international terrorism.

947. These activities and conduct include communications with Sami Al-Arian, a prominent United States "activist" who was indicted by the United States government on February 20, 2003 on charges of operating a racketeering enterprise that supported numerous violent terrorist activities associated with the Palestinian Islamic Jihad, another United States designated terrorist organization.

948. Yousef Jameel's communications with Al-Arian pertained to a plan to obtain palletized urea fertilizer in fifty kilogram bags suitable for ocean transportation and having it

shipped to a particular destination. Urea is a chemical compound that can be used in an improvised explosive device. According to Interpol, the main explosive charge used for the first World Trade Center bombing in 1993 consisted primarily of a home-made fertilizer-based explosive, urea nitrate. Upon information and belief, the palletized urea that was the subject of communication between Al-Arian and Defendant Jameel was intended to be used for terrorist activities.

949. Defendant Jameel also is a financial supporter of the Islamic Salvation Front of Algeria. On November 30, 1990, Jameel made a $1 million dollar donation to “Abad Islamque,” a French foundation whose beneficiary account was held by the Islamic Salvation Front (or "FIS") of Algeria. The FIS was created on March 10, 1989, from a coalition of Islamic groups including veteran Mujahideen from Afghanistan. The Islamic Salvation Front included an armed wing, the Islamic Liberation Army (AIS). The FIS was banned as a terrorist organization in March 1992. Defendant Jameel provided material support to this terrorist organization, in furtherance of the goals of religious extremism and acts of international terrorism.

950. Defendant Jameel provided material and financial support to the Raza Academy, a radical group which condemned the United States for the war in Afghanistan in October of 2001, voices support for suicide bombers in Palestine, sent human shields to Iraq, and supported fighters in Bosnia and Chechnya.

951. Defendant Jameel has engaged in a pattern of conduct in knowingly providing material support to radical Islamic groups.

952. The material support, aiding and abetting, acts of conspiracy, commission and/or omission of Defendant Jameel in supporting al Qaeda were a proximate cause of the attacks of September 11, 2001.

**Sami Omar Al-Hussayen**

953. Sami Al-Hussayen is a citizen of Saudi Arabia. Between roughly August 7, 1994 and September 23, 1998 Mr. Al-Hussayen studied at Ball State University in Muncie, Indiana and Southern Methodist University in Dallas, Texas where he obtained a Master's Degree.

954. In January of 1999, Sami Al-Hussayen was admitted to the Computer Science PhD. program at the University of Idaho. The Defendant began his studies at the University of Idaho in the Spring Semester, 1999. On or about August 11, 1999, Sami Al-Hussayen was readmitted into the United States on an F-1 student visa for the purpose of pursuing his PhD. degree. Sami Al-Hussayen never disclosed in any of his visa applications that he was providing World Wide Web-based services and funding for numerous charities and associations.

955. From at least October 2, 1998 until February 13, 2003 Sami Al-Hussayen provided expert computer services, advice, assistance and support to organizations and individuals, in the form of web-site registration, management, administration and maintenance. Sami Al-Hussayen actively participated in the creation and design of these websites which entailed determining the inclusion and placement of various articles and images. Sami Al-Hussayen assisted the Islamic Assembly of North America (IANA) and numerous other groups in the maintenance of their sites.

956. The IANA was incorporated in Colorado in 1993 as a non-profit charitable organization designed to spread the word of Islam. The IANA spreads the message of Islam through its website, internet magazines, radio services, toll-free telephone lines and website bulletin boards where patrons may post messages on the World Wide Web. The IANA also organizes Islamic conferences in the United States. IANA maintains an office in Ann Arbor, Michigan.

957. Sami Al-Hussayen was the formal registered agent for the IANA in Idaho. In addition, Sami Al-Hussayen was the registrant or administrative contact for a number of internet websites which either belonged to or were associated with the IANA. Al-Hussayen was the sole registrant of the following websites:

www.alasr.ws
www.alasr.net
www.almawred.com
www.heejrah.com
www.cybermsa.org
www.liveislam.net

958. Sami Al-Hussayen was also listed as the administrative contact for the website {www.almanar.net}. Al-Hussayen was the head of the Supervisory Committee and the Technical Committee for IANA and {www.ianaradionet.com}. The website {www.islamway.com} was registered to IANA, with direct links to Al-Hussayen's websites {www.alasr.ws} and {www.cybersma.org}. In fact, the President of IANA, Muhammad Al-Ahmari, e-mailed Sami Al Hussayen stating that "what matters to me is what we agreed upon, which is your total supervision of all of the Assembly's sites. Sami Al Hussayen was also registered as the administrative contact for {www.alhawali.com} and {www.alhawali.org}. Islam al-Maurabit, the administrator for {www.iana.org} sent an e-mail to Sami Al-Hussayen stating that:

> With Allah’s support, I suggest that no one is to have the authority to add or delete any banners, except for one person from the office, which shall be you…
>
> Anyway, Abu Al-Muhanned (a/k/a Sami Al-Hussayen), you have been the site manager for a very long time now and I know how busy you are but I want to stress the importance of defined authorities and responsibilities.

959. The internet, websites and chat rooms are an important medium through which Islamic fundamentalism is spread, donations are collected and Muslims are recruited to join

violent jihad. "Today, almost all active terrorist organizations maintain websites, and many maintain more than one website and use several different languages."

960. "The Internet is in many ways an ideal arena for activity by terrorist organizations. Most notably it offers: easy access; little or no regulation, censorship, or other forms of governmental control; potentially huge audiences spread throughout the world; anonymity of communication; fast flow of information; inexpensive development and maintenance of web presence; a multimedia environment (the ability to combine text, graphics, audio, video and to allow users to download films, songs, books, posters, and so forth); and the ability to shape coverage in the traditional mass media, which increasingly use the internet as a source for stories."

961. In their use of the internet, “terrorists commonly employ three rhetorical structures, all used to justify their reliance on violence. The first one is the claim that the terrorists have no other choice other than to turn to violence." "While the sites avoid mentioning how terrorists victimize others, the forceful actions of the governments and regimes that combat terrorists are heavily emphasized and characterized with terms such as 'slaughter,' 'murder' and 'genocide.'" The second method employed by terrorists is to demonize or delegitimize the enemy. "The members of the movement or organization are presented as freedom fighters, forced against their will to use violence because a ruthless enemy is crushing the rights and dignity of their people or group." "Terrorist rhetoric tries to shift the responsibility for violence from the terrorist to the adversary, which is accused of displaying brutality, inhumanity, and immorality." The third rhetorical device is to use language of nonviolence in an attempt to counter the terrorists' violent image. An example of this demonization is given in an interview by an individual working for the website {www.aljihad.com}:

> We have tried and we have succeeded to show to the world that the democracy and liberty in America is only for the good of the white man. We have won this war against America, now, all the World knows that all the concepts and principles, the Americans talk about, are just lies, with our website which costs us about 70 dollars, we were capable of destroying all those lies. The Americans have destroyed our Website five times, where is the freedom they are talking about? Why they should do that? Why they are fighting a small Website like ours? This explains that the American civilization reaches its end, they can not lie more, in addition, the blessed September 11, put the American administration in a series of troubles, it's their end now.

962. "The Internet is emerging as a cheap and powerful delivery system, capable of great disruptive power over long distances. It offers minimal risk to any individual or group wishing to illustrate the strength of its argument with direct confrontation against companies or governments." Jimmy Gurulé, Under Secretary of the Treasury for Enforcement, U.S. Department of the Treasury, testified before the U.S. Senate Judiciary Committee that terrorist groups exploit the Internet to recruit supporters and to raise terrorist funds.

963. "Al Qaeda has always depended heavily on donations, and its global fundraising network is built upon a foundation of charities, nongovernmental organizations, and other financial institutions that use websites and Internet-based chat rooms and forums." Frequently, the websites offer specific bank account numbers of the site to which donations may be wired. "The U.S. government has also frozen the assets of three seemingly legitimate charities that use the internet to raise money--the Benevolence International Foundation (BIF), the Global Relief Foundation, and the Al Haramain Foundation--because of evidence that those charities have funneled money to Al Qaeda." Each of these charities are associated with and have direct relationships with Sami Al-Hussayen or the websites he maintains for IANA.

964. In addition to soliciting donations, websites are also used "to recruit and mobilize supporters to play a more active role in support of terrorist activities or causes." Terrorist

organizations capture information about users who browse their websites. Those who appear to be most interested are sent e-mails with religious decrees and Anti-American propaganda.

965. Mohamad bin Ahmad Assalim, a member of al Qaeda wrote an article entitled "39 Ways to participate in Jihad and Serve the Mujahideen." He called for the publication of news about the mujahideen fighting jihad. "The publication and circulation of Mujahideen news should not be underestimated. So, as a Muslim, one should participate in these actions because it is a duty that has to be carried out." "You have to publish any information or materials to promote Jihad and to praise the Mujahideen." "You may also put this document in the Internet so that your brothers can have access to it."

966. He specifically mentions websites in item 34:

> Websites: This is a vital area for support and exchange of information on Jihad and the Mujahideen. Some of the topics could be discussed through the internet among a limited group of Muslims:
>
> Promoting Jihad
> Ways to Defend the Mujahideen
> Guidance
> Jihad Literature

967. Similarly, Jandal Al-Azdi declared in <u>Destroying America</u>, a media war.

> The Islamic jihadist websites should be a spider network that participates more in this conflict. These websites have to be developed and have to become more advanced, in fact, more websites are needed, their number should multiply like ants. Our war starts by the media, we have to win this war in order to be able to continue the conflict and fight."

968. "Terrorists use the Internet not only to learn how to build bombs but also to plan and coordinate specific attacks. Al Qaeda operatives relied heavily on the Internet in planning and coordinating the September 11, 2001 attacks."

969. Defendant Sami Al-Hussayen is committed to the principles of violent jihad. He actively supports and promotes this ideology by registering and maintaining websites. Sami Al-

Hussayen established, developed and maintained websites for individuals and groups which promote violent jihad and directly support al Qaeda. He performed this service and disseminated fatwas, articles, images and other materials with the intention of recruiting supporters, sympathizers and members and to raise money for terrorist groups like al Qaeda.

970. Sheiks Safar Al-Hawali and Salman Al-Ouda are the spiritual leaders of the al Qaeda movement. In September 1990, during the initial U.S.-Iraq conflict, Sheikh Al-Hawali released a tape which established a vision for Osama bin Laden's war against the United States and the West:

> We have asked the help of our real enemies in defending us. The point is that we need an internal change. The first war should be against the infidels inside and then we will be strong enough to face our external enemy. Brothers, you have a duty to perform. The war will be long. The confrontation is coming.

971. After the 1995 bombing of the U.S. National Guard Khobar Towers facility in Saudi Arabia, a fax was sent to CNN in Atlanta claiming responsibility for the attack. The terrorists stated that the attack was in retaliation for the imprisonment of Sheik Al-Hawali and Sheik Al-Ouda.

972. In 1996, when Osama bin Laden issued his fatwa or declaration entitled, Declaration of War against the Americans Occupying the Land of the Two Holy Places" Osama bin Laden specifically called for the release of these two Saudi sheiks from imprisonment in Saudi Arabia.

> By orders from the USA they also arrested a large number of scholars, Da'ees and young people - in the land of the two Holy Places- among them the prominent Sheikh Salman Al-Oud'a and Sheikh Safar Al-Hawali and their brothers; (We bemoan this and can only say: "No power and power acquiring except through Allah")...The imprisoned Sheikh Safar Al-Hawali, may Allah hasten his release...

973. Immediately after the 1998 attacks against the United States embassies in Africa, Osama bin Laden issued statements supporting the bombings and stating that attacks against the United States will continue until certain demands are met. One of these demands called for "Releasing Islamic preachers and youths detained inside prisons in the United States, Israel, and Saudi Arabia, foremost of whom are Sheik Omar Abdel Rahman, Sheik Alman Al-Ouda, Sheik Safar Al-Hawaly and their brothers."

974. These Saudi sheiks were outspoken in their proclamations of jihad, terrorism and violence against the West. In fact, they have promoted suicide operations as a legitimate means of jihad. Copies of Sheik Al-Ouda's sermons promoting violent jihad were found in one of Osama bin Laden's residences in Afghanistan.

975. In an October 19, 2001 open letter to President George W. Bush, Sheikh Al Hawali wrote: "In the midst of this continuous confusion and frustration, the events of the 11th of September occurred. I will not conceal from you that a tremendous wave of joy…was felt by the Muslim in the street."

976. The sheiks used websites to spread their violent message of jihad against the United States and non-Muslims. Sami Al-Hussayan assisted in their promotional efforts by creating a medium for them to express their ideology. Sami Al-Hussayen provided material support to the al Qaeda network by creating websites by which violent jihad against the United States could be espoused. In furtherance of al Qaeda's goals, he purposefully and knowingly posted militant articles and messages written by these Saudi sheiks--the spiritual leaders of al Qaeda.

977. A member of Mohammed Atta's September 11 hijacker cell in Hamburg, Germany made several calls to Sheik Al Hawali and Sheik Ouda. The sheiks provided

ideological justifications and support for suicide attacks. It has also been recently revealed that the United States National Security Agency intercepted phone conversations between the September 11, 2001 hijackers and sheiks from Saudi Arabia. Although the identity of the sheiks that the hijackers contacted has not been revealed at this time, it seems likely that they may have tried to contact these same Saudi Sheiks.

978. Sheik Al Hawali's websites {www.alhawali.org} and (www.alhawali.com} were registered by Sami Al-Hussayan. Sheik Ouda publishes his articles and fatwas on the website {www.islamtoday.net}. IslamToday was registered by the Specially Designated Global Terrorist Al Haramain Islamic charity on behalf of these two Saudi sheiks. Sami al-Hussayen administered the site {www.islamtoday.net}.

979. On May 15, 2001, three and one-half months before the September 11, 2001 attacks, an article written by Sheik Ouda called "Suicide Operations" was posted on the website {www.alasr.ws}. Sami Al-Hussayen was the sole registrant for this website. Sheik Ouda wrote:

> The second part of the rule is that the Mujahid (warrior) must kill himself if he knows that this will lead to killing a great number of the enemies, and that he will not be able to kill them without killing himself first, or demolishing a center vital to the enemy or its military force, and so on. This is not possible except by involving the human element in the operation. In this new era, this can be accomplished with the modern means of bombing or bringing down an airplane on an important location that will cause the enemy great losses.

980. Sami Al-Hussayen paid invoices for the website domain name {www.alasr.net}. The Defendant's computer also contained images of the materials posted on the "alasr" site. FTP logs show that Al-Hussayen uploaded these files from his computer to the website {www.alasr.ws}. In fact, Sami Al-Hussayen conducted this upload to the "alasr" site on the same date the fatwa was written.

981. Sami Al-Hussayen promoted these suicide operations and the ideology espoused by Sheik Ouda. Mr. Al-Hussayen e-mailed a poem to his brother entitled "A Martyr Under Twenty." The introduction to this poem was written by Sheik Ouda. The poem praises violent jihad through suicide operations.

982. As a telling precursor to the defense currently asserted by Sami Al-Hussayen in his criminal trial in Idaho, he stated that in the email that “if ever questioned about posting the messages of suicide attacks by Sheik Al-Hawali, ‘I will simply deny knowledge of the content of the message and claim that I merely host the servers.’”

983. Al-Hussayen also maintained and posted information on the website {www.al-multaqa}. The website presented an online version of the Arabic magazine *Al-Mutaqa.* The magazine contained Sami Al-Hussayen's contact phone numbers. The magazine also displayed news about the Chechen mujahideen and advised visitors to join the Yahoo!QoqazGroup for news about jihad in Chechnya. In one such article, among many found on the website and also on Sami Al Hussayen's personal computer is an article entitled "The True Meaning of Shaheed." The article states that to die as a shaheed [martyr] is the ultimate honor.

984. The magazine is hyper linked to the "alasr" websites and {www.ianaradio.net} maintained by Al-Hussayen. The site is also linked to the website {www.qoqaz.com} which has been used frequently by al Qaeda to promote jihad in Chechnya. The “alasr” site is also linked to {www.palestine-info.org}, a site considered by numerous experts to be the official website of Hamas. Hamas and al Qaeda are designated as global terrorist groups.

985. Al-Multaqa also included links for subscribing to the internet bulletin board that later became Yahoo!QoqazGroup, which was maintained by Sami Al-Hussayen. In a telephone

call with Verizon, Al-Hussayen requested the activation of the telephone number of Al Multaqa – 208 892 9197. He gave his own home phone number and address as a point of contact.

986. Sami Al-Hussayen received an e-mail thanking him for posting messages while the {www.qoqaz.com} website was not functioning. The Qoqaz website is the premier website promoting jihad in Chechnya. The website includes images of Ibn-ul-Khattab, the al Qaeda leader of jihad in Chechnya. These images were found saved on Sami Al-Hussayen's computer.

987. As described above, Al-Hussayen also monitored and participated in the Yahoo!QoqazGroup chat room. Participants in this chat room promoted violence and jihad. The invitation to join the chat room was posted on the Al-Multaqa website and announced the "Establishment of a network to support and disseminate news of the Caucasus [Qoqaz]." The purpose of the chat room was described the following way:

> So that those who cannot physically engage in holy war may support the Chechen issue and holy war by the pen and tongue, an electronic network [listserve] has been established. Please use this [listserve] for all news, discussions, dialogues, and consultations relating to the issue of our Chechen holy warrior brothers.... We ask everyone to help the Chechen holy warriors with your support, your money, and your selves. This is a duty upon us, and we must not be negligent.

988. The first posting that Sami Al-Hussayen issued on the Qoqaz group chat room called for "A Cry and Call" to fight "idolators with your money, your selves, your tongues and your prayers." His postings also included a statement that the problem with contemporary Islam is that Muslims have given up jihad and are not practicing it enough. In addition, he posted "Virtues of Jihad" which glorified those who die in battle while performing jihad. He said that these martyrs have a special place in heaven close to Allah.

989. Al Hussayen received jihadist messages on the Yahoo!QoqazGroup chat room which included an audiotape from Osama bin Laden. Sami downloaded and transferred these audio messages by e-mail to fellow terrorist operatives with instructions to its recipients to send

the messages out to as many people as possible. Thus, Sami Al-Hussayen directly promoted and distributed messages from Osama bin Laden.

990. Sami Al-Hussayen controlled IANA's websites. Al-Hussayen described himself in an e-mail as the Webmaster for IANA. IANA's sites include {www.islamway.com}, {www.iana.org} and {www.ianaradio.net}. Al-Hussayen maintained a complete back-up of these websites on his computer. Al-Hussayen knowingly and intentionally selected materials for the websites.

991. On June 19, 2001, IANA's website {www.islamway.com} published an article by al-Hawali that was republished on his website, {www.islamtoday.net}. On November 4, 2001, an article was posted on the site which:

> justified and advocated suicide bombings if certain conditions were met, namely: (1) that the purpose is to assist Allah's religion; (2) that 'the attacker is almost certain that his act will have some benefit, either by inflicting the enemy with casualties or injuries, by encouraging the Muslims to fight the enemy, or by weakening the enemy's resolve by showing them what a single man is capable of…[;] (3) that the act is against 'unbelievers who have declared war against the Muslims…[;] (4) that 'the act is in their countries or in countries under their rule, where Muslims need to resists them and expel them…[;] and (5) 'to be approved by the parents of the attacker…'

992. On August 16, 2001, IANA's website {www.islamway.com} published a propaganda statement that encouraged individuals to join arms in jihad against the West. Appropriately entitled "An Invitation to Jihad," the publication stated that "[t]he mujahid brothers will accept you with open arms and within a period of two weeks you will be given commando training and will be sent to the frontline."

993. Just two days before the attacks, on September 9, 2001, an individual posted a statement on IANA's website {www.islamway.com} that he was leaving Afghanistan "on duty" and that "Jihad is the only means to eradicate all evil on a personal and general level[;]" that

"[t]he only answer is to ignite and trigger an all out war, a worldwide Jihad; and that "[w]e will do our best to ignite this war, may Allah protect us."

994. In addition, an officer of IANA's Canada branch ran a mosque that harbored an al-Qaeda operative. Bahaa Elbatal is a director of the Islamic Assembly of North America in Canada. Elbatal is also the Secretary of the mosque in Montreal where Ould Slahi found refuge and led prayers. Slahi is a senior al-Qaeda operative that provided assistance to both the 1998 Embassy Bombing attacks and the failed Millennium bomb plot on the United States.

995. From November 1999 through February 13, 2003 Al-Hussayen was functioning as an IANA officer and employee. Al-Hussayen was actively involved in IANA's business transactions and fundraising activities. He also assisted in the coordination of an IANA conference.

996. A number of IANA conferences were sponsored by the Global Relief Foundation (GRF) which is a Specially Designated Global Terrorist and co-Defendant in this action. GRF also participated in the IANA conferences and sent money to IANA to offset the conferences' costs.

997. These conferences were also sponsored and/or financed, in part, by the Benevolence International Foundation which is also a Specially Designated Global Terrorist and co-Defendant in this action.

998. In addition to the messages and articles previously described, Sami Al Hussayen also maintained several disturbing images on his computer for use on these websites. Such images included:

> Several pictures of the World Trade Center Towers including a computer generated image of where the airplanes struck the towers, and images of the towers before and after they collapsed;

An aerial photograph of the Pentagon;

A picture of a United Airlines airplane;

A photograph of a U.S. Navy Aircraft Carrier;

Photographs of other Al Qaeda terrorist targets including the Golden Gate Bridge and the Capitol Building in Washington, DC;

Numerous photographs of Osama bin Laden including an image of Osama bin Laden facing off with President George Bush. There is a target superimposed on President Bush's head with the center of his head in the cross hairs of the target. A copy of this photograph is included below;

Numerous photographs of Sheik Salman Ouda;

Photograph of Sudaman Abu Ghaith who is an Al Qaeda spokesman;

A poster of Chechnya with a symbol for the website Qoqaz.com and images of armed mujahideen soldiers;

Photographs of Zacarias Moussaoui, the suspected 20th hijacker who has been indicted in Virginia and Richard Reid, the Al Qaeda operative convicted of attempting to explode a trans-Atlantic flight from Paris to Miami with explosives inserted in his shoes;

Photograph of a Taliban soldier firing a rocket propelled grenade.

These are merely a sample of the thousands of images contained on his computer.

999. Sami Al-Hussayen also provided material support to Al Qaeda and other terrorist groups through the collection of donations. From August of 1994 until at least February of 2003, Sami Al-Hussayen maintained at least six different bank accounts in the United States. From at least 1997, Sami used some of these accounts to receive donations and large sums of money. He transferred these sums to the IANA and other organizations and individuals. Sami Al Hussayen also made disbursements to individuals in Cairo, Egypt; Montreal, Canada; Riyadh, Saudi Arabia; Amman, Jordon; and Islamabad, Pakistan.

1000. Monies transferred from Al-Hussayen were used to fund salaries of IANA officers, and to permit patrons to travel to IANA conventions. Mr. Al-Hussayen played an active role in determining where the IANA would send its contributions and how the business should operate. The IANA received and distributed over three million dollars ($3,000,000.00). These funds were also used to support jihad and the al Qaeda network.

1001. Sami Al-Hussayen used the Yahoo!QoqazGroup to directly request financial contributions to support those engaged in jihad. In a response to statements that the Russians won the Chechen conflict, Al-Hussayen posted a message to the jihadist email group on February 9, 2000, “We request the Muslims to increase their *Duas* to Allah and to increase their moral and financial support to the mujahideen."

1002. In September, 1998, Sami Al-Hussayen received two checks totaling one hundred thousand dollars ($100,000.00) from his uncle, Saleh Al-Hussayen. Sami Al-Hussayen forwarded this money directly to the IANA. This same uncle’s travel was sponsored by the IANA. He traveled to the United States on an IANA fundraising mission to the United States in the weeks leading up to the September 11, 2001 terrorist attacks. Saleh al-Hussayen is a senior Saudi cleric and the director of the Two Holy Mosques. In August 2001, he arrived in New York City and was given a tour of the city, including the vicinity of the World Trade Center Towers. He then traveled to Chicago, Detroit and Canada meeting with IANA officials and with officials from other charities.

1003. There is an indication that Sami Al-Hussayen met with his uncle in Michigan, because he received a cash disbursement in Ann Arbor around the same time that his uncle Saleh was in Ann Arbor. On September 6, 2001, Sami's uncle Saleh arrived in Herndon, Virginia. Two or three days before the September 11, 2001 attacks, Saleh Al-Hussayen switched from his

original hotel to a hotel a few miles away, the Marriott Residence Inn in Herndon. The Marriott Residence Inn in Herndon was the same hotel where at least three of the American Airlines Flight 77 hijackers stayed the night before September 11, 2001. The following morning these men hijacked Flight 77 and crashed the airliner into the Pentagon.

1004. When interviewed by the FBI, Saleh Al-Hussayen feigned a heart attack to avoid interrogation. The doctor attending to Saleh Al-Hussayen claimed that he could not find anything wrong with him.

1005. Sami Al Hussayen was indicted on January 9, 2004 for providing material support and resources to terrorists. The indictment states that:

> Sami Omar Al-Hussayen did knowingly conspire, combine, confederate, and agree with persons known and unknown to the Grand Jury, to provide material support and resources, and to conceal and disguise the nature, location, source and ownership of material support and resources, intending that they were to be used in preparation for and in carrying out a violation of Title 18, United States Code, Section 956 (conspiracy to kill, kidnap, maim, or injure persons or damage property in a foreign country), in violation of Title 18, United States Code, Section 2339A and Section 371.

1006. The grand jury found that "the purpose of the conspiracy was to create and maintain websites and other internet media, which were intended in part to recruit personnel and raise funds for violent jihad…." The Grand Jury also determined that Sami Al Hussayen, on the {www.al-multaqa.com} website, invited "those who cannot physically engage in holy war" to join an internet e-mail group "for all news, discussions, dialogues, and consultations relating to the issue of our Chechen holy warrior brothers," and urged all readers "to help the Chechen holy warriors with [their] support, [their] money, and [their] selves." As described above, members of this internet e-mail group posted inquiries and information relating to violent jihad.

1007. Through these websites, Sami Al-Hussayen published and broadcast a wide variety of speeches, lectures and articles justifying and glorifying violent jihad. He also called

upon Muslims to personally participate in violent jihad, or alternatively to provide financial assistance to such groups.

1008. The Defendant also "published graphic videos depicting mujahideen and other subjects relating to violent jihad with the intent to inspire viewers to engage in violent jihad or to provide financial assistance to those who did so. Individuals in the United states who viewed these videos were inspired, at least in part, by the videos to travel overseas to train for and engage in violent jihad and related terrorist offenses."

1009. Sami Al-Hussayen ideologically supports global jihad believing that, irrespective of location, Muslims should support fellow Muslims who are engaging in violent jihad against non-Muslim regimes including the United States of America. Sami Al-Hussayen has directly provided material support to groups that sponsor and carry out international terrorist activities, including suicide operations.

1010. Sami Al-Hussayen has materially supported the al Qaeda network which carried out the September 11, 2001 attacks upon the United States by promoting and distributing articles and fatwas issued by the spiritual leaders of al Qaeda Sheiks Ouda and Al-Hawali. Sami Al-Hussayen has also downloaded and distributed a speech given by Osama bin Laden with instructions that the speech be widely distributed. Consistent with this ideological support of al Qaeda, Sami Al Hussayen has created, registered and maintained numerous websites and Internet chat rooms which promote radical and violent jihad for the purpose of recruitment and raising funds to perpetuate the al Qaeda jihad.

## The Advice and Reformation Committee (ARC) and The Committee for the Defense of Legitimate Rights (CDLR)

1011. The Advice and Reformation Committee (or “ARC”) and the Committee for the Defense of Legitimate Rights (or “CDLR”) are both Saudi-dissident groups with ties to Osama

bin Laden. Both organizations seek to overthrow the Saudi government to replace the regime with an even more strict brand of Islam. The ARC in London was headed by Khalid al-Fawwaz (or "al-Fawwaz"), and the CDLR in London is headed by Mohammed al-Massari. The ARC branch in the United States was set up by al-Massari's wife, Lujain al-Iman, providing a link between ARC and CDLR.

1012. These two organizations have disseminated al Qaeda and Osama bin Laden's propaganda throughout their existence and served to further the violent goals of radicals and terrorists against the United States. Al-Fawwaz has been indicted in the U.S., and the United States has requested his extradition for his prominent role in setting up the al Qaeda infrastructure that allowed the embassy bombings in East Africa to occur in 1998. Two al Qaeda operatives, Ziyad Khaleel and Tarik Hamdi, have been involved with both the CDLR and the ARC.

1013. Al-Massari, along with his wife al-Iman, also headed the now-dissolved Action Committee for the Rights of Middle East Minorities, located in Denver, Colorado.

1014. The ARC was established in 1994 at the behest of Osama bin Laden. The then Arab student named Khalid al-Fawwaz was chosen to run the center, ostensibly for the peaceful reform of Saudi Arabia, according to its constitution. In reality, though, ARC served as al Qaeda's base in The United Kingdom, plotting and promoting international terrorism. The indictment of al-Fawwaz and Osama bin Laden and the others involved in the Embassy bombings plot describes:

> In or about 1994, the Defendant USAMA BIN LADEN, working together with KHALID AL FAWWAZ, a/k/a "Khaled Abdul Rahman Hamad al Fawwaz," a/k/a "Abu Omar," a/k/a "Hamad," set up a media information office in London, England (hereafter the "London office"), which was designed both to publicize the statements of USAMA BIN LADEN and to provide a cover for activity in support of al Qaeda's "military" activities,

> including the recruitment of military trainees, the disbursement of funds and the procurement of necessary equipment (including satellite telephones) and necessary services. In addition, the London office served as a conduit for messages, including reports on military and security matters from various al Qaeda cells, including the Kenyan cell, to al Qaeda's headquarters.

1015. Al-Fawwaz employed Ziyad Khaleel, a student in Columbia, Missouri, whom the FBI described as a "procurement agent" for bin Laden, and whose job was to "procure computers, satellite telephones and covert surveillance equipment," according to an FBI memo, for al Qaeda.

1016. In 1996, al-Fawwaz tasked Ziyad Khaleel with purchasing a satellite phone needed for al Qaeda's communication network. That phone became instrumental in the Wmbassy bombings and was used by Osama bin Laden himself to dictate orders and relay information.

1017. As Assistant United States Attorney stated during the Embassy bombings trial:

> It is the phone that is used by the headquarters people in Afghanistan . . . And who they call on that phone and who has that number tells you a great, great deal about the activities of the people in this case.

1018. The prosecutors of the case maintained that Khaleel sent the phone to al-Fawwaz, who then sent it to Afghanistan. By 1998, the phone had been used for hundreds of calls, and the number for the phone appeared in the personal phone directories of terrorists in Egypt and Kenya.

1019. Also by 1998, Khaleel had ordered more than 2,000 minutes of phone time for the phone, and then would in turn be reimbursed by al-Fawwaz directly.

1020. The indictment additionally explains the role of the satellite phone:

> From at least as early as 1995 until September 1998, the Defendant KHALID AL FAWWAZ provided the Defendant USAMA BIN LADEN, as well as other al Qaeda members, with various means of

> communications, including a satellite telephone ("Bin Laden Satellite Telephone"), for the purpose of facilitating communications between al Qaeda members and associates.

1021. Phone records show that the highest ranking al Qaeda members in Kenya in 1998 placed calls to Saudi Arabia and other gulf states in furtherance of their terrorist enterprise.

1022. Wadih el-Hage made phone calls on behalf of Osama bin Laden and al Qaeda in furtherance of their international terrorist enterprise and scheme. Similarly, the use of wire transfers by al Qaeda operatives and supporters was and is done in violation of RICO.

1023. Khalid al-Fawwaz is a top al Qaeda member, also indicted for his role in the 1998 Embassies bombings in the same indictment as Osama bin Laden. Khalid al-Fawwaz helped establish the infrastructure and support system that aided al Qaeda to carry out the attacks. Numerous phone calls from Africa to Saudi Arabia and other gulf states were made on his mobile phone in furtherance of this scheme.

1024. The United States subsequently indicted al-Fawwaz for his role in the bombing and currently awaits extradition to the United States, while remaining imprisoned in The United Kingdom. Ziyad Khaleel left the country and probably resides currently in Saudi Arabia, although his whereabouts are unknown.

1025. Al-Fawwaz aided in the creation of Bin Laden’s famous 1996 Declaration of War Against the West. He then vouched for its authenticity and released it to the media, through the Committee for the Defense of Legitimate Rights. The indictment explains:

> On or about July 31, 1996, the Defendant KHALID AL FAWWAZ created, using a computer in his residence in London, England, a file entitled “the Message”
>
> On or about August 23, 1996, a Declaration of Jihad indicating that it was from the Hindu Kush mountains in Afghanistan entitled “Message from Usamah Bin-Muhammad Bin-Laden to His Muslim Brothers in the Whole World and Especially in the Arabian Peninsula: Declaration of Jihad

Against the Americans Occupying the Land of the Two Holy Mosques; Expel the Heretics from the Arabian Peninsula" (hereafter the "Declaration of Jihad") was disseminated;

In or about August and September 1996, the Defendant KHALID AL FAWWAZ maintained in a computer in his residence computer file copies of the "Message from Usamah Bin-Muhammad Bin-Laden to His Muslim Brothers in the Whole World and Especially in the Arabian Peninsula: Declaration of Jihad Against the Americans Occupying the Land of the Two Holy Mosques; Expel the Heretics from the Arabian Peninsula";

In or about August or September 1996, the Defendant KHALID AL FAWWAZ forwarded a copy of USAMA BIN LADEN's Declaration of Jihad to another person in England for further dissemination to the media for publication and thereafter KHALID AL FAWWAZ vouched for the Declaration's authenticity.

1026. Wadih el-Hage visited al-Fawwaz and admitted that al-Fawwaz also worked for Osama bin Laden. Wadih el-Hage, while testifying in front of a grand jury, noted that Fawwaz worked for bin Laden:

Q. Do you know Khalid Al Fawwaz?
A. Yes.
Q. Is he in London?
A. Yes.
Q. Does he work for Usama Bin Laden?
A. Yes.
Q. How long do you know Khalid Al Fawwaz?
A. Since '95 when I visited London.

1027. The ARC Branch in the United States facilitated communication with Osama bin Laden and al Qaeda. The ARC branch in the United States had its address in Denver, Colorado. The post office box was registered by Lujain al-Iman, the wife of CDLR's Mohammed al-Massari. In 1994, al-Massari asked al-Iman to set up an MCI 800 number in Denver for the ARC to allow the organization to communicate between Saudi Arabia and The United Kingdom without getting caught by Saudi authorities, according to al-Massari.

1028. After the phone system was set up, Osama bin Laden called al-Massari personally to thank him, according to al-Massari. Al-Iman said that she knew that al-Fawwaz, the head of ARC, worked for Osama bin Laden, when she set up the phone line, but thought that al-Fawwaz was just "a human rights activist."

1029. This address was also shared by the International African Relief Agency (or "IARA") and Ziyad Khaleel, who as explained *supra*, was a student in Columbia, Missouri, whom the FBI described as a "procurement agent" for Osama bin Laden, and whose job was to "procure computers, satellite telephones and covert surveillance equipment" for al Qaeda.

1030. CDLR's United States Branch is registered to a known al Qaeda operative. In the radical Arabic publication, *Al-Zaytuna*, an advertisement for CDLR listed in its contact information a telephone number that is registered in Tarik Hamdi's name. Tarik Hamdi has specific ties to Osama bin Laden and al Qaeda.

1031. Well after Osama bin Laden had openly declared war against Americans in 1996, Tarik Hamdi purchased and arranged for the delivery of a battery for the satellite phone that Ziyad Khaleel purchased and that Osama bin Laden used to coordinate international terrorism attacks. Hamdi also arranged for an interview that ABC News had with Osama bin Laden in 1998, the apparent cover for his involvement in procuring the battery for the satellite phone. Tarik Hamdi wrote a note to Khalid al-Fawwaz, calling him "Brother Khalid," indicating a more than professional relationship. Assistant United States Attorney Kenneth Karas, in the government's closing statements in the embassy bombings trial, described the whole process of obtaining the satellite phone for the use of al Qaeda and both Ziyad Khaleel and Tarik Hamdi's involvement:

> How else do you know that this is the phone that is used by Bin Laden and others in Afghanistan? Well, at some point in 1998 Ziyad Khalil puts a purchase order in for a battery pack to Ogara.
>
> This is an invoice from Ogara, and you see on the top left there, "Customer: Ziyad Khalil," and you see that what he is purchasing is the ultra light power supply and the 12VDC mini battery charger. Only Ziyad Khalil does not have it sent to him, he asked, ship to, Tariq Hamdi in Herndon, Virginia.
>
> The battery pack goes from Ziyad Khalil requesting it to shipping it to Tariq Hamdi, to Tariq Hamdi going to Pakistan, and then Afghanistan, where he delivers the battery pack for the phone.
>
> And the intermediary in all of this is Khalid al Fawwaz, because he's the guy whose paying Ziyad Khalil for the minutes and he's the guy who arranges for the interview with ABC News and he is the guy getting the message from Tariq Hamdi, the person who delivers the packet.

1032. Tarik Hamdi knew both Ziyad Khaleel and al-Fawwaz, and knew them intimately enough that they trusted him to both obtain materials for them as well as arrange an interview with Osama bin Laden.

1033. Tarik Hamdi also worked at International Institute of Islamic Thought (or "IIIT"), located at 555 Grove Street, Herdon, Virginia, the central address surrounding the SAAR Foundation raids, evidence and investigation.

1034. The CDLR posted Osama bin Laden's Declaration of War on October 12, 1996. CDLR used the email address 100043.1420@CompuServe.com to post Osama bin Laden's Declaration of War against the West on the Muslim Students' Association's listserve, the "MSA News."

1035. The preamble to this posting by CDLR indicates an intense hatred for the West and full support for Osama bin Laden as follows:

> Find below the first part of a very accurate translation of the "DECLARATION OF WAR" issued by the Mujahid Brother Sheikh Usama Bin Muhammad Bin Ladin concerning the illegitimate presence of

> the American occupation forces in the Arab Peninsula (The Land of the two holy sanctuaries).
>
> I believe it is a significant historic document and that you have the right to read, analyse and think about it. I stil believe that the Kufr regime of the British and later American agents and puppets, Aal Saud, is the source of the current evil of the occupation. On the other hand Aal Saud and the American occupation have become so intertwined and interconnected as to make it impossible to seperate them. They have become one ORGANICALLY connected evil!!
>
> Read and get ready for JIHAAD!!

The CDLR, the ARC, their officers, agents, employees, and co-conspirators are aiders and abettors engaged in the material sponsorship of al Qaeda, Osama bin Laden and international terrorism.

## Islamic Cultural Center of Milan/Islamic Cultural Center of Geneva

1036. According to the Italian investigation of several al Qaeda terrorists arrested in Milan in relation with al Qaeda operations in Europe, the Islamic Cultural Center of Milan (a/k/a Centro Cultural Islamico de Milano, a/k/a Islamic Cultural Institute of Milan, a/k/a Istituto Culturale Islamico de Milano) (or "ICCM") was extensively used as a cover for terrorist planning, recruiting sponsorship and operations.

1037. The principal suspect arrested in Italy, Essi Sami Ben Khemais, regularly met other suspects at the Islamic Cultural Center of Milan, and used its address to communicate with other members of al Qaeda European cells.

1038. The Islamic Cultural Center of Milan, Milan, Italy, is presided by Abdel Hamid Shaari. The Center is considered by the United States Treasury Department as "the main al Qaeda station house in Europe," utilized to "facilitate the movement of weapons, men and money around the world."

1039. The Islamic Cultural Center of Milan creation in 1988 was financed by Ahmed Idris Nasreddin, founder and member of the board of Bank al-Taqwa. According to the Italian investigation, Bank al-Taqwa was until recently paying the annual rent of the Islamic Cultural Center in Milan of Twenty-Five Thousand ($25,000.00) Dollars.

1040. Relations between the Islamic Cultural Center in Milan and Bank al-Taqwa also include Sante Abdulawahab Ciccarello, a board member of ICCM that co-founded the branch of Bank al-Taqwa in Bahamas.

1041. According to Swiss prosecutors, Bank al-Taqwa in Switzerland (change in name to Nada Management Organization SA, Lugano, Switzerland), "comprises the most important financial structure of the Muslim Brotherhood and Islamic terrorist organizations." Its founder, Youssef Nada, is a known international terrorist.

1042. Another director of Bank al-Taqwa, Ahmed Huber, was associated with the Islamic Center of Geneva, Switzerland, just across the border were he was converted to Islam. Ahmed Huber acknowledged publicly that he met with members of Osama bin Laden terrorist network in Lebanon.

1043. The principal financial support of the Islamic Center of Geneva is provided by Defendant Dar Al Maal Al Islami (or "DMI"), controlled by Prince Mohammed al Faisal al Saud.

1044. The Islamic Center of Geneva was established in 1961 by Said Ramadan, son-in-law of Hassan al-Banna. Hassan al-Banna was a founder of the Egyptian Muslim Brotherhood, and co-founder of Defendant Muslim World League in Saudi Arabia in 1962 while he was serving as advisor to King Saud. Hassan al-Banna was also a co-founder of the Bank al-Taqwa

branch in Bahamas. After his death in 1995, his son Hani Ramadan became President of the Islamic Center of Geneva.

1045. Hani Ramadan wrote an article defending stoning of women and various corporal sanctions under the guise Islamic law along with even more outrageous statements of violence and hatred. His license as scholar in Switzerland was suspended soon after. Founders of the Islamic Center of Geneva also included Abu al-Hassan Ali al-Nadawi (also a co-founder of Defendant Muslim World League with Said Ramadan).

1046. Another founder of the Islamic Center of Geneva, Muhammad Hamidullah, wrote:

> A struggle cannot be anything except a holy act. All war is forbidden in Islam, if it is not waged for a just cause, ordained by Divine law. The life of the Prophet (Muhammad) provides reference to only three kinds of wars: defensive, punitive, and preventive.…. To establish liberty of conscience in the world was the aim and object of the struggle of the Prophet Muhammad and who may have a greater authority in Islam than he? This is the 'holy war' of the Muslims, the one which is undertaken not for the purpose of exploitation, but in a spirit of sacrifice, its sole objective being to make the Word of God prevail. All else is illegal. There is absolutely no question of waging war for compelling people to embrace Islam; that would be unholy war.

1047. Youssef Nada was previously designated by the United States on November 7, 2001, and by the United Nations on November 9, 2001. Ahmed Idris Nasreddin was designated by the G7 on April 19, 2002, and by the United Nations on April 24, 2002. On August 29, 2002, the United States designated several additional entities controlled by Youssef Nada and Ahmed Idris Nasreddin stating that "through commercial holdings, [they] operate an extensive financial network providing support for terrorist related activities."

1048. Bank al-Taqwa was designated as a terrorist entity by the United States on November 7, 2001, and the United Nations on November 9, 2001. The United States Treasury

Department stated that "Bank al-Taqwa, for which Nasreddin is a director, was established in 1988 with significant backing from the Muslim Brotherhood. They have been involved in financing radical groups such as the Palestinian Hamas, Algeria's Islamic Salvation Front and Armed Islamic Group, Tunisia's An-Nahda, and Usama bin Laden and his Al Qaida organization."

1049. The Treasury Department reported that Bank al-Taqwa appeared to be providing a clandestine line of credit to a close associate of Osama bin Laden as of late September, 2001. See, Bank al-Taqwa section *supra*.

1050. Founded in 1991, the Qatar Charitable Society (or "QCS") is a Qatari-based charity that now has offices throughout the world. Outside of its headquarters in Qatar, QCS currently has offices in Albania, Baku, Bangladesh, Bosnia, Dahgestan, Palestine, Pakistan, and Sudan. According to its website, QCS maintains the following mission:

> QCS aims to offer relief and help to orphans, victims of war and disasters by supporting them financially, socially and culturally up to the age of 18. QCS aids widows to meet living expenses particularly those who lost all relatives and friends.

1051. QCS' website is managed by Hashem Hussain. Hashem Hussain is a member of the Qatari Government's Ministry of Municipal Affairs and Agriculture and is both the administrative and billing contact for QCS' website. In August 2001, Qatari Ambassador Ali bin Muhammad al-Usayri conveyed Qatar's commitment to the rehabilitation of Sudan. Al-Usayri announced that the Qatari Government will contribute to Sudan through the efforts of the QCS.

1052. In 1999, the Russian Interior Minister stated that QCS funneled money from Qatar to radical Chechen al Qaeda groups. In response to this accusation, the Qatari Foreign Minister Hamad bin Jasim bin Jar al-Thani did not deny that Qatar is funding al Qaeda terrorists in Chechnia during a November 20, 1999, *al-Jazeera* television interview:

> Q. How do you answer these accusations?
> A. … The second issue, that of aid, I cannot says there is no aid –
> Q. Why this aid?
> A. First of all, we as a government cannot control the aid going abroad, some of which may go for humanitarian goals, and some may start as humanitarian but end up in another way. However, there is no monitoring because people are sympathizing with the Chechen people…

1053. In this interview with *al-Jazeera*, the Qatari foreign minister also betrayed his underlying sympathy in favor of Chechen terrorists:

> A. …We as a government may be able to control our sympathy although in the end we are only human beings and Muslims. What we see in Chechnya is painful for us as Qatari, Arab, or Muslim citizens. Therefore we cannot restrain the people's feelings in this regard…

1054. The Qatar Charitable Society's relationship with al Qaeda is very intimate. From the sharing of senior officers to the funding of al Qaeda attacks, QCS' role has clearly been to serve Osama bin Laden and further his international terrorist aims.

1055. Qatar Charitable Society financially supports al Qaeda. The QCS' financial support for al Qaeda was demonstrated during the trial of al Qaeda operatives involved in the 1998 United States Embassy bombings in Kenya and Tanzania. In February 2001, the United States Government's lead witness and former al Qaeda member, Jamal Ahmed Mohamed al-Fadl, testified on QCS' relationship with al Qaeda. al-Fadl stated that in 1993 he was both a QCS employee and an al Qaeda member. He also stated that QCS' leader at that time, Dr. Abdullah Mohamed Yusef, was a member of al Qaeda as well, and a member of the Sudanese political group the National Islamic Front (or "NIF") that harbored Osama bin Laden in the early 1990s. When al-Fadl testified on his role with the QCS, he described Dr. Yusef's support of al Qaeda through the QCS:

> A. The guy, he runs a group, he is one of our membership, one of the al Qaeda group membership, and also he is Islamic National Front

membership, and he was in Afghanistan. So he helped our people for the travel, documents, and also if some money come from the Gulf area to the organization, he gives the group some money from that money.

Q. So the person that you knew in Afghanistan who was part of your group and part of the Islamic National Front, what was his name?

A. Dr. Abdullah Mohamed Yusef.

1056. That two individuals, Al-Fadl and Dr. Yusef, were both members of al Qaeda and QCS indicates a high-level of coordination between the charity and the terrorist group. The complicity of QCS with al Qaeda's terrorist acts is noted in Dr. Yusef's funding of an al Qaeda attack through the QCS. As al-Fadl's testimony states:

Q. What did you do with him regard to the Qatar charitable organization?

A. He helped the jihad Eritrea group, and also he give $20,000 for one of the attack (sic) outside of Sudan.

1057. Al-Fadl has also stated that QCS aided, abetted and materially supported al Qaeda through non-financial means. In his second day of testimony, Al-Fadl discussed a meeting of al Qaeda members in 1994 that took place in QCS offices:

Q. When was the second meeting?

A. It's during '94.

Q. Where was it?

A. In Jam Qatar Heira. It's Qatar organization.

Q. Is that the same organization you described yesterday or a different one?

A. Yes, same one.

Q. Is that the Qatar Charitable Organization?

A. Yes.

1058. QCS' history and pattern of conduct is that of furthering the spread of Islamic international terrorism wherever possible. This underlying goal of the QCS is revealed through its financing of Wahhabi terrorists in the Caucasus region.

1059. In April, 2002, the Azerbaijan Government annulled the registration of the QCS. This action was taken because, as stated by the Azerbaijani Justice Ministry, QCS engaged in

activities that "contradict Azerbaijan's national interests." The Justice Ministry went on to say that QCS was targeted because it performed, "damaging activities that violate our national interests, as well as cooperated with terrorist structures and conducted propaganda inciting radical sectarianism, religious hatred and fanaticism."

1060. In 1999, a group of Wahhabi militiamen invaded and took control of three districts of Dagestan, a country neighboring Chechnya. Dagestani police have identified that, the day before the attack, $200,000 were transferred into QCS' account with the Dagestan Commercial Bank. Following the invasion, these funds were distributed to the terrorists. After this event, Dagestani police have been able to identify at least an additional $1,000,000 that QCS transferred to aid the attack against Russia. During this investigation, Dagestani police have determined that there were no records of the funds flowing into and out of the QCS for a number of years.

1061. The Government of Russia's International sponsors of Chechen terrorist list, from 1991-2000, is a comprehensive list of organizations that provided aid or support for terrorist organizations in Chechnya. The Qatar Charitable Society was included on this list.

1062. Ahmed Ali al-Bugainain and Dr. Abdullah Mohamed Yusef are aiders, abettors, agents, co-conspirators, material supporters, and participants in the illicit scheme and enterprise of Qatar Charitable Society, al Qaeda, and international terrorism.

## **Mercy International Relief Agency**

1063. The Saudi-backed Mercy International Relief Agency (a/k/a Mercy International, a/k/a Mercy) (or "MIRA") was incorporated in Dublin, Ireland in 1992 with the ostensible purpose of embarking on charitable activities around the world. All the incorporators of the

charity are all of Saudi nationality and listed their address at Makkah, Saudi Arabia. MIRA also has branches in Somalia and Kenya. Its Dublin branch dissolved on January 16, 1998.

1064. MIRA is funded by Saudi businessmen. During the trial of Osama bin Laden's personally secretary Wadih el-Hage, convicted for his role in the 1998 United States Embassy bombings in East Africa, Wadih el-Hage's testimony before a grand jury establishes that MIRA was funded by "Saudi merchants":

> "Q. The grand jury had a couple of quick questions one of which is who funds the Mercy International relief agent in Kenya?
> "A. Some Saudi merchants in Saudi Arabia.
> "Q. Merchants in Saudi Arabia?
> "A. Yes.

1065. An al Qaeda member maintained that MIRA was an al Qaeda charity. L'Houssaine Kherchtou, a 36-year old Moroccan, joined al Qaeda in 1991. He affirmed this in his testimony as a government witness in the United States Embassy bombings trial. He worked for al Qaeda in Kenya, and noted specifically that MIRA served and sponsored al Qaeda's purposes. In his testimony, Kherchtou asserted that several al Qaeda members were workers at MIRA, received identity cards from MIRA, and that the organization was dealing directly with Osama bin Laden himself:

> Q. And during the time that you were in Nairobi were you familiar with a charity or relief organization known as Mercy International Relief Organization?
> A. Yes.
> Q. And were there any al Qaeda people affiliated with the Mercy International Relief Organization?
> A. Let me just.
> (Witness consults with interpreter)
> A. Yes, the people of al Qaeda they were dealing with the Mercy International.
> Q. Who were those people? Which al Qaeda people were dealing with Mercy International?
> A. Bin Laden, Mohammad Masry.
> Q. Are you talking about the military commander?

A. Yes.
Q. Abu Mohammad, are you talking about Saleh lay again?
A. Yes.
Q. Were there any people inside Mercy International who were part of al Qaeda in the past or the present?
A. Well, in the past Abu Jamal he was the manager of that relief agency but he was in the past of al Qaeda.
Q. You said Abu Jamal?
A. Yes.
Q. Anyone else in Mercy International who was a member of al Qaeda in the past or while in Kenya?
A. The accountant of Mercy International, too, he was of al Qaeda but in the past his name Abu al Kheryemeni.
Q. Did you ever see any al Qaeda members in Kenya who had identification cards in the Mercy International Relief agency?
A. No.
Q. Did you ever hear whether or not al Qaeda members in Nairobi obtained identification cards from Mercy International Relief agency?
A. Yes.
Q. Who did you hear obtained those cards?
A. I heard that Abu Mohammed Amriki and Bin Laden they had identity card.

1066. MIRA's Kenya Office served as a front for al Qaeda. Like many Osama bin Laden fronts, MIRA was an operating charity. The organization may have embarked upon actual charitable work, but only as a cover for their insidious goals. Following the Embassy bombings, federal authorities raided the offices of MIRA in Kenya on August 21, 1998, after finding MIRA documents in Wadih el-Hage's residence. At MIRA's office, agents discovered documentary evidence linking it to Osama bin Laden. Assistant United States Attorney Pat Fitzgerald, who prosecuted the Defendants in the Embassy bombings trial, noted this much when he stated:

> These documents show that Mercy International, while it does have legitimate charitable purpose, has other purposes that are contrary to that.

1067. Some of the documents seized belonged to Wadih el-Hage and concerned Abu Ubaidah, a top al Qaeda leader who died in 1996. Fitzgerald stated:

> When they searched Mercy International, they found a number of documents, included among which Wadih El Hage's files and files concerning Abu Ubaidah.

1068. Documents found on site indicated that MIRA was smuggling weapons into Kenya from Somalia. Fitzgerald noted that authorities found a receipt dated July 24, 1998, on the back of which it was stated as related to getting weapons from Somalia.

1069. FBI Agent John Michael Anticev interviewed Mohammed Odeh, who was convicted for his role in the 1998 Embassy bombings. Mr. Anticev testified that Mohammed Odeh explained to him that MIRA was working for al Qaeda.

> Q. Did Odeh talk to you at all about an entity known as the Mercy International Relief Agency?
> A. Yes.
> Q. What did he tell you about the Mercy International Relief Agency?
> A. That was also -- it was run by a guy in Nairobi named Tawhili, and that organization had ties to Al Qaeda, and Harun and Abu Ubaidah al Banshiri were close to that organization.

1070. The individual referred to above as Tawhili is also known as Sheikh Ahmad Salem Suweidan, one of the FBI's most wanted terrorists. Therefore, a fugitive al Qaeda member ran MIRA at all relevant points up to the Embassy bombings. Agent Anticev further related that Harun, Wadih el-Hage's former roommate who also worked for al Qaeda, frequented MIRA, typing information for top al Qaeda leadership:

> Q. Did Odeh describe to you any particular tasks that Harun performed for Al Qaeda?
> A. Yes. Harun, he said that Harun was a good typist, and, you know, he spent a lot of time at MIRA, the organization we just talked about, and he would type reports for the hierarchy in Al Qaeda.
> Q. And when you said MIRA, MIRA, are you referring to the Mercy International Relief?
> A. Yes, Mercy International Relief.
> Q. Did Odeh indicate to you what was contained in those reports that he typed for the hierarchy?
> A. In those reports they were using certain code words to conceal what their true intentions were.

1071. An al Qaeda fugitive was deeply involved in MIRA's Branch in Dublin. Hamid Aich (or "Aich"), an Algerian who lived in Ireland and volunteered at the MIRA branch in Dublin, was heavily involved in the 2000 bomb plot to destroy Los Angeles International Airport (LAX). Shortly before moving to Ireland, Aich was a roommate of Ahmed Ressam, the man currently in jail for his role in the LAX bomb plot. On December 21, 1999, Aich was arrested by Irish authorities, seizing several personal papers and computer documents, though he was released shortly afterwards, while FBI agents were traveling to interrogate him. Aich fled and went into hiding, and his current whereabouts are unknown.

1072. Documents found in MIRA's branch in Dublin link the charity to Zacarias Moussaoui. Travel documents found in a raid at a flat which served as one of MIRA's offices in Dublin are linked to forged documents used by alleged 20th hijacker, Zacarias Moussaoui, criminally charged in the September 11, 2001 attacks. The documents relate to air travel financed by Mustafa Ahmed al Hisawi, an alleged paymaster of the September 11, 2001 attacks. The documents show that Moussaoui's travel was financed by Hisawi. FBI agents maintain that the evidence found at MIRA's office "proves 'without a shadow of a doubt' that Moussaoui is linked to Osama bin Laden."

1073. Dr. Safar Alhawali, Dr. Soliman Alsaloomi, Dr. Mohamed Said Alghtani (a/k/a Alghatani, Al-Qohtany), Dr. Abdallah Aldomaiji (a/k/a Aldonaji), Abdalaziz Farsi, Faisal Alahmadi, and Waheed Almasry were co-conspirators, aiders, abettors, agents, and participants in the illicit scheme and enterprise of MIRA and material sponsors of international terrorism.

## Laundering of al Qaeda Funds Through Diamond Businesses

1074. Yassmine Diamonds in Vereffening BVBA is a diamond company registered in Antwerp, Belgium. Ossailly's relatives are members of the board: Mike Ossailly, or Najla Ossailly, but the company is managed by Samih Ossailly.

1075. Aziz Nassour and Samih Ossailly are both involved in diamonds business in Sierra Leone and Congo on behalf of al Qaeda leaders in order to continue its terrorists operations despite the international agreements to freeze bank accounts linked to al Qaeda. According to various investigations conducted on this issue, Samih Ossailly set up a safe house in Monrovia to funnel money from the diamonds fields to international terrorists throughout the world, including al Qaeda.

1076. Echogem NV, was used as a courier to exchange $300,000 for diamonds every week between December 2000 and September 2001.

1077. Since 1998, Ibrahim Bah, through several Lebanese businessmen based in Belgium, has expanded his operations. Official sources identified the key brokers working with Bah as Aziz Nassour and Samih Ossailly.

1078. A large part of these financial operations on behalf of al Qaeda were operated by Aziz Nassour through two companies in Belgium: African International Contact Office BVBA based in Brussels, and Echogem NV based in Antwerp.

1079. Echogem, is based in Antwerp, Belgium. Until recently, the company was headed by Aziz Nassour as Managing director and Francis Gerres as CEO.

1080. African International Contact Office BVBA is based in Brussels, Belgium. The company is chaired by Aziz Nassour as CEO and Ngalula Tseuhi is Managing Director of the company. Aziz Nassour ran his diamond trading activities with his cousin, Samih Ossailly, CEO

of a company based in Brussels called Yassmine Diamonds in Vereffening BVBA. Ossailly is currently detained in Belgium, pending trial.

## The al Qaeda Enterprise

1081. Al Qaeda was designated a Foreign Terrorist Organization by the United States in 1999. The Secretary of State designates Foreign Terrorist Organizations ("FTOs") in consultation with the Attorney General and the Secretary of the Treasury. These designations are undertaken pursuant to the Immigration and Nationality Act, as amended by the Antiterrorism and Effective Death Penalty Act of 1996.

1082. Al Qaeda is highly organized and exhibits a definitive structure, separate and apart from its terrorist operations. Its internal organizational structure allows it to build relationships with other terrorist organizations while maintaining and promoting its own goals and terrorist operations around the world.

1083. Al Qaeda is run by a council that "discusses] and approves] major undertakings, including terrorist operations." It also uses a treasurer and operation and planning chiefs to design and plan terrorist attacks.

1084. Al Qaeda operations are conducted around the world through the efforts of individual members and affiliated groups. Al Qaeda members swear an oath of loyalty to al Qaeda's aims and mission. These members carry out the terrorist directives received from their superiors.

1085. Al Qaeda is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons).

These transactions are accomplished through, inter alia, the use of interstate and international faxes, telephones, wire transfers and transmissions, and mailings.

1086. Al Qaeda relies upon a global network of charities and relief organizations, banks and financial institutions, businesses, individual financiers, and illegal activity (including narcotics trafficking) to generate material support to continue its terrorist operations.

1087. One of the pillars of Islam is the moral obligation of each Muslim to contribute towards Muslims in need. The Islamic rule of Zakat, or almsgiving, is supposed to be used to help the poor and dispossessed.

1088. In Saudi Arabia, Zakat is levied on Saudi nationals (corporate and individual), pursuant to Saudi Royal Decree and is administered by the Department of Zakat. The Kingdom of Saudi Arabia (alternatively "KSA") manages, directs, and/or oversees the activities of Saudi-based charities through the Supreme Council for Islamic Affairs ("Supreme Council"), the Saudi Minister of Interior, and the Saudi High Commission for Relief.

1089. The Supreme Council was created in 1994 by a royal decree, which banned the collection of money in the Kingdom for charitable purposes without official government permission. Once independent efforts to raise money for charities were made illegal, KSA Prince Sultan Bin Abdulaziz al Saud ("Prince Sultan") was installed as chairman of the Supreme Council and was charged with centralizing, supervising, and reviewing aid requests from Islamic groups.

1090. KSA Prince Naif bin Abdulaziz al Saud ("Prince Naif") is the Saudi Minister of Interior. As such, he is responsible for controlling the activities of charities and relief organizations in Saudi Arabia and is authorized and empowered to verify their legality and their conduct.

1091. KSA Prince Salman bin Abdul Aziz al Saud ("Prince Salman") founded Defendant Saudi High Commission for Relief in or about 1993. According to the CIA, the Saudi High Commission is the official Saudi governmental organization charged with collecting and disbursing humanitarian aid. The Saudi High Commission also has, on occasion, held itself out as a charity and relief organization in its own right though branch offices located in various countries.

1092. The charity and relief organization Defendants described herein knowingly and intentionally collected, diverted and transferred Zakat funds to al Qaeda and otherwise lent material support to al Qaeda. As noted by the recent report of the 9/11 Commission, al Qaeda "collected money from employees of corrupt charities" and relied upon relief organizations who, inter alia, "wittingly participated in funneling money" to al Qaeda. Among other material support, they also provided "access to bank accounts" and served as "cover" to al Qaeda members who were able to travel undetected "under the guise of working for" these humanitarian organizations.

1093. The charity and relief Defendants named herein were not independent of the Kingdom of Saudi Arabia. Rather, they were funded, authorized, supervised, directed, and/or controlled by the Kingdom of Saudi Arabia, Prince Sultan, Prince Naif, Prince Salman, and the Saudi High Commission for Relief. Each charity and relief organization Defendant: (A) raised funds only with the permission of the Kingdom; (B) was funded by the Kingdom directly and through donations made by Prince Sultan, Prince Salman, and other members of the royal family; (C) operated under the auspices of the Supreme Council, the Ministry of Interior, and the Saudi High Commission for Relief; and (D) otherwise functioned as a sponsor of al Qaeda openly, with

full knowledge, endorsement, and/or approval of the Foreign Governmental Defendants named herein.

1094. Defendant MWL holds itself out as a charity with humanitarian goals, and has raised, solicited and distributed funds under the pretense that the funds would be used for legal and humanitarian purposes. Yet, MWL has knowingly and intentionally lent material support to Al Qaeda through, inter alia, the use of interstate and international faxes, telephones, wire transfers and transmissions, and mailings.

1095. As to Rabita Trust, the Peshawar office of MWL was formerly led by al Qaeda member Wa'el Julaidan ("Julaidan"). Julaidan was appointed in February 2000 to the board of trustees of the Rabita Trust and served as its Director General. Julaidan helped to found al Qaeda and is also a Golden Chain donor. OBL himself acknowledged his close ties to Jalaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al Qaeda member Abdullah Azzam, OBL stated that "[w]e were all in one boat, as is known to you, including our brother, Wa'el Julaidan." According to the United States, Jalaidan is an associate of OBL who directly assisted OBL's efforts to "move money and men" in furtherance of al Qaeda's operations. Rabita Trust and Jalaidan have been designated by the United States government as terrorist entities and their assets have been blocked.

1096. The Saudi Arabia banking and financial sector is governed by Shari'a law. Saudi-based banks and financial institutions are overseen by the Saudi Arabian Monetary Authority ("SAMA"). Prior to September 11, 2001, SAMA had access to financial information from Saudi banks, and had the power to inspect accounts and transaction records, and to initiate formal audits.

1097. The United States government requested in September 2001 that the Saudi Arabian government freeze NCB bank accounts linked to al Qaeda. This request was followed in October 2001 by Congressional testimony by a former CIA counter-terrorism expert stating that there is "little doubt that a financial conduit to Bin Laden was handled through the National Commercial Bank." After September 11, 2001, the Saudi government closed down this channel of material support to al Qaeda, noting that "[i]t was evident that several wealthy Saudis were funneling contributions to Bin Laden through this mechanism."

1098. Defendant al-Rajhi Bank holds itself out as a legitimate banking and financial institution. Yet, al-Rajhi Bank has knowingly and intentionally lent repeated material support to al Qaeda through, inter alia, the use of interstate and international faxes, telephones, wire transfers and transmissions, and mailings.

1099. For instance, Defendant al-Rajhi Bank has knowing and intentionally provided financial and bank account services to several al Qaeda operatives, including September 11th hijacker Abdulaziz al-Omari, and has provided direct financial support to known front groups for the terrorist organization Hamas.

1100. Defendant al-Rajhi also is the main bank for Defendants Al-Haramain, IIRO, and MWL- all of whom maintained Zakat accounts of funds which were earmarked for and transferred to al Qaeda.

1101. Defendant Al Shamal Bank is based in Sudan. It was founded by Al Shamal for Investment and Development, the Sudanese Government of Northern State, Defendant Saleh Abdullah Kamel (who as noted founded Defendant Dallah Albaraka), Defendant Faisal Islamic Bank (Sudan) and Defendant Tadamon Bank.

1102. One of Al Shamal's major shareholders is Defendant Dar al Maal al Islami. The registered name for Dar al Maal al Islami's successor-in-interest is Defendant DMI Administrative Services SA, which provides services and support to Defendant DMI Trust (collectively "DMI").

1103. DMI is involved in various aspects of the financial services industry including banking, investment, and insurance services. For almost twenty years, DMI was operated under the chairmanship of Saudi Prince Mohammed al Faisal al Saud (a named Defendant described separately below).

1104. Another major shareholder of Al Shamal Bank is Defendant Faisal Islamic Bank (Sudan). It is a subsidiary of Defendant Islamic Investment Company of the Gulf (Bahrain) EC, which in turn is a wholly-owned subsidiary of Defendant DMI. Defendant Prince Mohammed al Faisal al Saud has chaired Defendant Faisal Islamic Bank (Sudan), Defendant Islamic Investment Company of the Gulf (Bahrain) EC, and DMI.

1105. Defendant Tadamon Bank is also a major shareholder of Al Shamal Bank. Tadamon's current and former major shareholders are themselves banking and financial institution Defendants: Saleh Abdullah Kamel, Al Baraka (and/or subsidiaries of Dallah al Baraka), and Faisal Islamic Bank (Sudan).

1106. Defendants Al Shamal, DMI, Faisal Islamic Bank (Sudan), Islamic Investment Company of the Gulf (Bahrain) EC, and Tadamon Bank, hold themselves out as legitimate international banking and financial enterprises. In fact, they have knowingly and intentionally lent repeated material support to al Qaeda through, inter alia, the use of interstate and international faxes, telephones, wire transfers and transmissions, and mailings.

1107. In 1991, OBL helped establish Al Shamal Islamic Bank by providing it with initial capital of $50 million. Thereafter, Al Shamal provided financial and account services to Defendant OBL. OBL maintained accounts at Al Shamal in both his own name and in the name of al-Hijrah Construction Company and Development Ltd. The United States government has asserted that this company lent material support to terrorists training in Sudanese training camps set up by OBL.

1108. Al Shamal regularly provided financial and account services to al Qaeda operatives—six of which held bank accounts at Al Shamal. OBL paid al Qaeda members from Al Shamal accounts. Moreover, money from these accounts was deposited, housed, and transferred to other al Qaeda members to buy military equipment, including an airplane which was delivered to OBL to be used to transport missiles.

1109. Al Shamal's major shareholders and co-founders have also knowingly and intentionally lent material support to terrorism.

1110. Like Al Shamal's founding shareholder Defendant Saleh Abdullah Kamel, Al Shamal's chairman, Defendant Adel Batterjee ("Batterjee") is also a Golden Chain al Qaeda donor. Batterjee founded an al Qaeda charity front Al Birr, which later evolved into the Benevolence International Foundation ("BIF"). According to the United States government, "one of the purposes of Al Birr was to raise funds in Saudi Arabia to provide support to the mujahideen then fighting in Afghanistan" and to provide "cover for fighters to travel in and out of Pakistan and obtain immigration status." Batterjee founded BIF in 1992, and continually funded BIF thereafter. It is well documented that during the 1990s, al Qaeda used Al Birr to fund its operations overseas—meaning that Al Birr would receive "charitable" funds that would then be withdrawn in cash by al Qaeda.

1111. Al Shamal shareholder Defendant Faisal Islamic Bank (Sudan) provided financial and bank account services to several al Qaeda operatives.

1112. Al Shamal shareholder Defendant Tadamon Bank also provided financial and bank account services to several al Qaeda operatives.

1113. Al Shamal shareholder Defendant DMI's Zakat accounts have been used to support al Qaeda.

1114. Defendants Al Shamal Bank, Dar al Maal al Islami, DMI Administrative Services SA, DMI Trust, Faisal Islamic Bank (Sudan), Islamic Investment Company of the Gulf (Bahrain) EC, Tadamon Bank, Shaykh Adil Abdul Galil Betargy, and Saleh Abdullah Kamel, lent repeated material support to al Qaeda and OBL, aided and abetted others who lent material support to al Qaeda and OBL and otherwise engaged in racketeering activity in violation of the law.

1115. Defendant Dubai Islamic Bank

1116. Defendant Dubai Islamic Bank ("DIB") is headquartered in the U.A.E. It is a shareholder of Defendant Tadamon Islamic Bank, and was formerly a major shareholder of Bank of Credit and Commerce International ("BCCI"). BCCI was named in a 1992 United States Senate Report as a money laundering operation used to sponsor terrorism.

1117. Defendant DIB holds itself out as a legitimate banking and financial institution. Yet, DIB has knowingly and intentionally lent repeated material support to al Qaeda through, inter alia, the use of interstate and international faxes, telephones, wire transfers and transmissions, and mailings.

1118. DIB has knowingly and intentionally provided financial and bank account services to several al Qaeda operatives. The United States government concluded in 1999 that

DIB had allowed itself to be used by Defendant OBL to launder money through the bank. The United States told U.A.E to take steps to clean up the bank.

1119. Shortly after the September 11th attacks, Luxembourg's commission for supervising financial institutions issued a regulatory alert naming DIB as having links with OBL. Similarly, the Central Bank of U.A.E. froze the accounts and investments of various persons and organizations suspected of having links with al Qaeda—including Defendant DIB. Furthermore, a preliminary 2002 analysis of the Dubai banking and financial services industry conducted by NATO revealed that al Qaeda "had previously used the Dubai Islamic Bank" and other means "to fund the bombings of the American embassies in Kenya and Tanzania."

1120. Defendant Dubai Islamic Bank lent repeated material support to al Qaeda and OBL, aided and abetted others who lent material support to al Qaeda and OBL and otherwise engaged in racketeering activity in violation of the law.

## Additional Defendants

1121. As a result of numerous ongoing civil, criminal, and governmental investigations, upon information and belief, Additional Defendants in this action will be identified as time proceeds. Numerous investigations are ongoing internationally which will result in additional evidence and information on al Qaeda terrorists, their sponsors, co-conspirators, scheme, enterprise, and financial support network. Additional Defendants 1-5,000 are the as yet unidentified terrorists and sponsors of terrorism that will be identified as investigations proceed and formal discovery commences. Additional Defendants 1-5,000 will be added to this civil action as they are identified, pursuant to F.R.C.P. 15(d) and Case Management Order No. 1, dated October 7, 2002. The same set of allegations and general facts al alleged herein apply to the Additional Defendants in terms of their culpability and amenability to suit under the legal theories expressed.

1122. Like the Defendants herein, the Additional Defendants knew or reasonably should have known they were aiding and abetting or providing material support to terrorists and terrorist organizations who committed the September 11, 2001 savagery that murdered thousands of innocent persons.

1123. Like the Defendants herein, the Additional Defendants engaged in negligent, grossly negligent, and/or intentional acts and breaches of duty which proximately caused the damages of September 11, 2001. The Defendants' actions led to the terrorist acts that occurred on September 11, 2001, which proximately caused the Plaintiffs' damages. Like the Defendants herein, the Additional Defendants entered into a conspiracy, scheme, and RICO enterprise.

1124. Additional Defendants include terrorist individuals, charities, banks, businesses, associations, entitites, organizations front groups or any other parties as of yet unidentified who engaged in the material sponsorship, aiding and abetting of the September 11, 2001 attacks, Osama bin Laden, al Qaeda and/or international terrorism. As investigations and formal discovery identify these additional Defendants, they will be added to this action pursuant to Case Management Order No. 1 in this matter.

## COUNT ONE
## VIOLATION OF THE ANTI-TERRORISM ACT
## 18 U.S.C. §§ 2331, 2333, et seq.

1125. Plaintiffs incorporate by reference all prior allegations in this Complaint.

1126. On and before September 11, 2001, al Qaeda was designated a foreign terrorist organization by the United States government.

1127. The September 11, 2001 attacks on Plaintiffs' properties were violent acts that violated the criminal and common laws of the United States, the State of New York, and the law of Nations, transcended national boundaries, and were intended to intimidate or coerce the

civilian population of New York and the United States and influence the policies of the United States by intimidation or coercion.

1128. The September 11, 2001 attacks on Plaintiffs' properties were acts of international terrorism within the meaning of 18 U.S.C.§§ 2331 and 2333.

1129. The Defendants knowingly and intentionally provided financial and other material support and substantial assistance to the al Qaeda Defendants. This financial and other material support and substantial assistance enabled the al Qaeda Defendants to plan, orchestrate, and carry out the September 11, 2001 attacks.

1130. By providing financial and other material support and substantial assistance to the al Qaeda Defendants, the Defendants aided and abetted and/or conspired to promote acts of international terrorism in violation of the Anti-Terrorism Act.

1131. Therefore, the conduct of the Defendants proximately resulted in the September 11, 2001 attacks and the damage to Plaintiffs' property and business. The Defendants' actions led to the terrorist acts that occurred on September 11, 2001, which proximately caused the Plaintiffs' damages.

## COUNT TWO
## VIOLATION OF THE RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") 18 U.S.C. § 1962(a)

1132. Plaintiffs incorporate by reference all prior allegations in this Complaint.

1133. In furtherance of their conspiracy to commit acts of international terrorism against the United States, its nationals and allies, the Defendants invested money derived from a pattern of racketeering into an illicit and criminal enterprise and into a pattern of racketeering activity and conduct which included, without limitation: acts of murder, kidnapping, arson, robbery, extortion, mail fraud, and wire fraud; dealings in controlled substances and listed chemicals; the

falsification of identification documents; the unlawful procurement, reproduction, sale and use of naturalization and citizenship papers, passports and visas; the obstruction of federal and state criminal investigations; and financial institution and mail fraud.

1134. The damages suffered by Plaintiffs and Plaintiffs' assignors were the direct result of the aforesaid pattern of racketeering activity by the Defendants, acting individually and in concert with one another. The Defendants' actions led to the terrorist acts that occurred on September 11, 2001, which proximately caused the Plaintiffs' damages.

## COUNT THREE
## VIOLATION OF THE RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")
## 18 U.S.C. § 1962(c)

1135. Plaintiffs incorporate by reference all prior allegations in this Complaint.

1136. Each of the Defendants are separate persons within the meaning of RICO, as they are individuals or entities capable of holding legal or beneficial interests in property.

1137. Al Qaeda itself is an enterprise within the meaning of RICO. Al Qaeda is an association-in-fact of persons and an ongoing organization with a definitive structure. Its members share a commonly held purpose to kill the Americans and plunder their money wherever and whenever they find it in the United States and abroad.

1138. The al Qaeda Defendants directly engaged in interstate or foreign commerce, and the impact of al Qaeda terrorist operations, including the September 11, 2001 attacks, affected interstate and foreign commerce.

1139. The Defendants herein associated themselves with al Qaeda's enterprise by: providing financial and other material support and substantial assistance to al Qaeda as set forth in detail above; and/or employing al Qaeda members.

1140. The Defendants conducted or participated directly or indirectly in affairs of the al Qaeda's enterprise through numerous patterns of racketeering activity by, *inter alia*, materially supporting al Qaeda and their illegal acts including murder, torture and terrorism, knowingly and intentionally employing al Qaeda operatives, laundering money for al Qaeda, raising and distributing financial assistance to al Qaeda (often under false pretences), providing al Qaeda with safe houses and false documentation, and/or facilitating weapons and military equipment purchases and transfers for al Qaeda.

1141. The Defendants' conduct or participation, directly or indirectly, in affairs of the al Qaeda enterprise through patterns of racketeering activity renders them jointly and severally responsible for the damage caused to Plaintiffs' property and business. This ongoing financial and material support and substantial assistance enabled al Qaeda to plan, orchestrate, and carry out the September 11, 2001 attacks. Therefore, the conduct of the Defendants' illicit enterprise resulted in the September 11, 2001 attacks. The Defendants' actions led to the terrorist acts that occurred on September 11, 2001, which proximately caused the Plaintiffs' damages.

1142. Plaintiffs suffered injury to their property and business by reason of the above conduct for which these Defendants are jointly and severally responsible in an amount to be determined at trial.

## COUNT FOUR
## VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") 18 U.S.C. § 1962(d)

1143. Plaintiffs incorporate by reference all prior allegations in this Complaint.

1144. By virtue of the criminal and tortious acts as described herein, including without limitations, engaging in the predicate acts of terrorism, murder, kidnapping, forgery, false use and misuse of passports, mail and wire fraud, fraud and misuse of visas, laundering of monetary

instruments, engaging in monetary transaction improperly derived from unlawful and tortuous activity. The use of interstate commerce facilities in murder-for-hire, interstate transportation of terrorist property, bringing in and harboring illegal aliens, and aiding and/or assisting illegal aliens, material sponsorship of terrorists and terrorism sponsors in entering the United States.

1145. Osama bin Laden and al Qaeda, with the material support of Defendants herein, transferred, received, supplied, promoted, trained, financed, both directly and indirectly, a pattern of racketeering activity in which Defendants participated as principals, agents and co-conspirators in an enterprise, used and invested, both directly and indirectly, the income and the proceeds of such acts, in establishing and furthering the operation of terrorist enterprises, in violation of 18 U.S.C. § 1962(d); 18 U.S.C. § 1961(1); inclusion of acts of terrorism as racketeering activity, USA Patriots Act 2001, § 813.

1146. Defendants herein, including the agents, directors, officers, and employees of Defendants were associated in fact with a common purpose as an "enterprise" as that term is defined in Title 18, United States Code, Section 1961 *et seq.*, which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce. This enterprise is hereby referred to for purposes of this Complaint as the "al Qaeda Enterprise." The al Qaeda Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

1147. Defendants herein and others, being persons employed by and associated with an enterprise, namely the al Qaeda Enterprise, which engaged in and the activities of which affected interstate and foreign commerce, did conspire with other persons known and unknown, to violate Title 18, United States Code, Section 1962(d), that is, to conduct and participate, directly and

indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, that is, through multiple acts indictable under the laws of the United States, including:

(a) 18 U.S.C. § 1341 (mail fraud);
(b) 18 U.S.C. § 1343 (wire fraud);
(c) 18 U.S.C. § 1503 (obstruction of justice);
(d) 18 U.S.C. § 1956 (money laundering); and
(e) 18 U.S.C.§ 2339A (material support to organizations engaged in violent activities).

1148. It was a part of the conspiracy that Defendants agreed that conspirators would commit acts of racketeering in the conduct of the affairs of the enterprise. It was part of the conspiracy that Defendants and co-conspirators devised, intended to devise, and participated in a scheme to defraud and to obtain money and property by means of materially false and fraudulent pretences, representations, and promises, and material omissions.

1149. It was a further part of the conspiracy that Defendants and others would and did misrepresent, conceal and hide, and cause to be misrepresented, concealed and hidden the purposes of, and acts done, in furtherance of the conspiracy, and in violation of Title 18, United States Code, § 1962(d).

1150. As a direct result of Defendants' violation of 18 U.S.C. § 1962(d), Plaintiffs suffered the loss of valuable properties, financial services and support, and suffered other pecuniary and personal damages. The Defendants' actions led to the terrorist acts that occurred on September 11, 2001, which proximately caused the Plaintiffs' damages.

## COUNT FIVE
## TRESPASS

1151. Plaintiffs incorporate by reference all prior allegations in this Complaint.

1152. The Defendants committed, caused to be committed, and did commit or otherwise conspired to commit an intentional and unlawful trespass upon Plaintiffs' real and personal

properties to which Plaintiffs did not consent in the form of the September 11, 2001 attacks on Plaintiffs properties.

1153. The September 11, 2001 attacks on Plaintiffs' properties were a direct, intended, and foreseeable consequence of the financial and other material support, substantial assistance lent to and enterprise in furtherance of al Qaeda and its goals prior to and on September 11, 2001.

1154. The Defendants knowingly and intentionally lent financial and other material support and substantial assistance to the al Qaeda Defendants. This flow of financial and other material support and substantial assistance enabled the al Qaeda Defendants to plan, orchestrate, and carry out the September 11, 2001 attacks.

1155. By providing financial and other material support and substantial assistance to the al Qaeda Defendants, the Defendants aided and abetted and/or conspired to cause the commission of an intentional and unlawful trespass upon Plaintiffs' real and personal properties.

1156. Therefore, the conduct of the Defendants, directly resulted in the September 11, 2001 attacks and the damage to Plaintiffs' property. The Defendants' actions led to the terrorist acts that occurred on September 11, 2001, which proximately caused the Plaintiffs' damages.

1157. Plaintiffs suffered injury to their property by reason of the above conduct for which these Defendants are jointly and severally responsible.

## COUNT SIX
## INTENTIONAL AND/OR WILLFUL DESTRUCTION OF PROPERTY

1158. Plaintiffs incorporate by reference all prior allegations in this Complaint.

1159. The Defendants herein did intentionally and willfully destroy, or cause to be destroyed, the properties of the Plaintiffs.

1160. The destruction of Plaintiffs properties was unlawful, willful and wanton.

1161. The willful destruction of Plaintiffs properties was proximately caused by the conduct of the Defendants as described herein. The Defendants' actions led to the terrorist acts that occurred on September 11, 2001, which proximately caused the Plaintiffs' damages.

1162. As a result of the willful destruction of the Plaintiffs properties, Plaintiffs have suffered, and continue to suffer, economic losses.

## COUNT SEVEN
## CONSPIRACY

1163. Plaintiffs incorporate by reference all prior allegations in this Complaint.

1164. As set forth in greater detail above, the Defendants conspired and continue to conspire to commit acts of international terrorism against the United States, its nationals and allies, which conspiracy included and includes the provision of material support and resources to Defendant al Qaeda and affiliated foreign states, persons, organizations, commercial entities and other parties.

1165. The September 11, 2001 attacks were a direct, foreseeable and intended product of the conspiracy among the Defendants to commit acts of international terrorism against the United States, its nationals and allies.

1166. The Defendants' actions and the September 11, 2001 attacks constitute overt acts in furtherance of the conspiracy.

1167. The damages suffered by Plaintiffs assignors were the direct result of the aforesaid conspiracy among the Defendants to commit acts of international terrorism against the United States, its nationals and allies. The Defendants' actions led to the terrorist acts that occurred on September 11, 2001, which proximately caused the Plaintiffs' damages.

## COUNT EIGHT
## AIDING AND ABETTING

1168. Plaintiffs incorporate the previous allegations by reference.

1169. Plaintiffs incorporate by reference all prior allegations in this Complaint.

1170. Through the material support and resources provided to al Qaeda, the co-Defendants aided and abetted al Qaeda in its campaign to commit acts of international terrorism against the United States, its nationals, and allies.

1171. The Defendants knowingly and intentionally lent substantial assistance to the al Qaeda Defendants. At the time of such aiding and abetting, the Defendants knew or should have known that such substantial assistance furthered the planning and execution of unlawful, criminal and/or tortious activity, including the attacks of September 11, 2001.

1172. The September 11th Attacks were a direct, intended and foreseeable product of the aiding and abetting of al Qaeda by the co-Defendants.

1173. The damages suffered by Plaintiffs and Plaintiffs' assignors were the direct result of the aforesaid aiding and abetting of al Qaeda by the co-Defendants, acting individually and in concert with one another. The Defendants' actions led to the terrorist acts that occurred on September 11, 2001, which proximately caused the Plaintiffs' damages.

## COUNT NINE
## VIOLATION OF INTERNATIONAL LAW

1174. Plaintiffs incorporate by reference all prior allegations in this Complaint.

1175. The Defendants are jointly and severally liable for the property damage caused to Plaintiffs under the principles of international law.

1176. It is long settled that the law of Nations is part of federal common law, and that federal courts are empowered to address claims against those that commit, aid, or abet violations of international law.

1177. The terrorist attacks of September 11, 2001 began with the hijacking of four airplanes. Aircraft hijacking is widely recognized as a violation of international law of the type

that gives rise to liability against the hijackers and those who aided or abetted the aircraft hijacking. The Defendants' conduct constituted aiding and abetting a violation of international law, to wit, aircraft hijacking, because their conduct substantially assisted al Qaeda's commission of the September 11, 2001 attacks.

1178. In addition, and in the alternative, the Defendants' conduct aided and abetted the violation of the following additional conventions, agreements, U.N. declarations, resolutions, and principles of international law, all of which fall outside the immunity protections afforded by the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1603-1611, as a matter of law and/or policy:

> The Charter of the International Military Tribunal, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 279;
>
> Allied Control Council Law No. 10 (Dec. 20,1945)
>
> Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9,1948, 78 U.N.T.S. 277;
>
> Hague Convention for the Suppression of Unlawful Seizures of Aircraft (Hijacking), Dec. 16,1970, 22 U.S.T. 1641, 860 U.N.T.S. 105;
>
> The Universal Declaration of Human Rights, Dec. 10,1958, G.A. Res. 217A, U.N. Doc. A/810, at 71 (1948);
>
> The International Covenant of Political and Civil Rights, Dec. 16,1966, U.N. Doc. A/6316, 999 U.N.T.S. 171;
>
> The Convention to Prevent and punish the Acts of Terrorism Taking the form of Crimes Against Persons and Related Extortion that are of International Significance, Oct. 20,1976, 27 UST 3949;
>
> The General Assembly Resolutions on Measures to Prevent International Terrorism, G.A. Res. 40/61 (1985) and G.A. Res. 42/159 (1987);
>
> Montreal Convention on Offenses and Certain Other Acts Committed on Board Aircraft, Sept. 23,1971, 24 U.S.T. 564, 974 U.N.T.S. 177;
>
> International Convention for the Suppression of Terrorist Bombings, Jan. 12,1998, art. 2, S. Treat Doc. No. 106-6, at 4, 371.L.M. 249, 253; and

International Convention For the Suppression Of The Financing Of Terrorism, G.A. Res. 54/109, U.N. Gaor, 4th Sess., U.N. Doc. A/Res/54/109 (1999).

International Convention For the Suppression Of The Financing Of Terrorism, G.A. Res. 54/109, U.N. Gaor, 4th Sess., U.N. Doc. A/Res/54/109 (1999).

1179. Plaintiffs suffered injury to their property by reason of the above conduct for which these Defendants are jointly and severally responsible.

## PUNITIVE DAMAGES

1180. Plaintiffs incorporate by reference all prior allegations in this Complaint.

1181. The Defendants' actions, in lending financial and other material support and substantial assistance, and/or aiding, abetting, and/or conspiring to lend financial and material support to al Qaeda, violated United States statutory law, federal and state common law, customary international laws, and the law of Nations. The Defendants' violations of United States statutory law, federal and state common law, customary international laws, and the law of Nations entitles the Plaintiffs to compensatory damages.

1182. The Defendants' conduct was intentional, knowing, willful, and/or performed with reckless and unconscionable disregard of the known and foreseeable consequences. The Defendants' conduct was directed at the general public and involved a high degree of moral culpability.

1183. By virtue of their intentional, knowing, willful, reckless and unconscionable acts and omissions, the Defendants are jointly and severally liable to Plaintiffs for punitive damages.

## DEMANDS

1184. WHEREFORE, as to COUNT ONE, Plaintiffs demand judgment against the Defendants, jointly and severally; demand an amount not presently susceptible to precise determination but estimated to be in excess of $75,000.00 for property damage, business

interruption, lost rental, workers' compensation benefit payments, and other damages to be specified and determined at trial; and demand treble damages pursuant to 18 U.S.C. § 2333, punitive damages, pre and post-judgment interest, costs of this action, attorney's fees, and any such other and further legal and equitable relief as the Court may deem appropriate under the circumstances.

1185. WHEREFORE, as to COUNT TWO, Plaintiffs demand judgment against the Defendants, jointly and severally; demand an amount not presently susceptible to precise determination but estimated to be in excess of $75,000.00 for property damage, business interruption, lost rental, workers' compensation benefit payments, and other damages to be specified and determined at trial; and demand treble damages pursuant to 18 U.S.C. § 1964, pre and post-judgment interest, costs of this action, attorney's fees, and any such other and further legal and equitable relief as the Court may deem appropriate under the circumstances.

1186. WHEREFORE, as to COUNT THREE, Plaintiffs demand judgment against the Defendants, jointly and severally; demand an amount not presently susceptible to precise determination but estimated to be in excess of $75,000.00 for property damage, business interruption, lost rental, workers' compensation benefit payments, and other damages to be specified and determined at trial; and demand treble damages pursuant to 18 U.S.C. § 1964, pre and post-judgment interest, costs of this action, attorney's fees, and any such other and further legal and equitable relief as the Court may deem appropriate under the circumstances.

1187. WHEREFORE, as to COUNT FOUR, Plaintiffs demand judgment against the Defendants, jointly and severally; demand an amount not presently susceptible to precise determination but estimated to be in excess of $75,000.00 for property damage, business interruption, lost rental, workers' compensation benefit payments, and other damages to be

specified and determined at trial; and demand treble damages pursuant to 18 U.S.C. § 1964, pre and post-judgment interest, costs of this action, attorney's fees, and any such other and further legal and equitable relief as the Court may deem appropriate under the circumstances.

1188. WHEREFORE, as to COUNT FIVE, Plaintiffs demand judgment against the Defendants, jointly and severally; demand an amount not presently susceptible to precise determination but estimated to be in excess of $75,000.00 for property damage, business interruption, lost rental, workers' compensation benefit payments, and other damages to be specified and determined at trial; and demand punitive damages, pre and post-judgment interest, costs of this action, attorney's fees, and any such other and further legal and equitable relief as the Court may deem appropriate under the circumstances.

1189. WHEREFORE, as to COUNT SIX, Plaintiffs demand judgment against the Defendants, jointly and severally; demand an amount not presently susceptible to precise determination but estimated to be in excess of $75,000.00 for property damage, business interruption, lost rental, workers' compensation benefit payments, and other damages to be specified and determined at trial; and demand punitive damages, pre and post-judgment interest, costs of this action, attorney's fees, and any such other and further legal and equitable relief as the Court may deem appropriate under the circumstances.

1190. WHEREFORE, as to COUNT SEVEN, Plaintiffs demand judgment against the Defendants, jointly and severally; demand an amount not presently susceptible to precise determination but estimated to be in excess of $75,000.00 for property damage, business interruption, lost rental, workers' compensation benefit payments, and other damages to be specified and determined at trial; and demand punitive damages, pre and post-judgment interest,

costs of this action, attorney's fees, and any such other and further legal and equitable relief as the Court may deem appropriate under the circumstances.

1191. WHEREFORE, as to COUNT EIGHT, Plaintiffs demand judgment against the Defendants, jointly and severally; demand an amount not presently susceptible to precise determination but estimated to be in excess of $75,000.00 for property damage, business interruption, lost rental, workers' compensation benefit payments, and other damages to be specified and determined at trial; and demand punitive damages, pre and post-judgment interest, costs of this action, attorney's fees, and any such other and further legal and equitable relief as the Court may deem appropriate under the circumstances.

1192. WHEREFORE, as to COUNT NINE, Plaintiffs demand judgment against the Defendants, jointly and severally; demand an amount not presently susceptible to precise determination but estimated to be in excess of $75,000.00 for property damage, business interruption, lost rental, workers' compensation benefit payments, and other damages to be specified and determined at trial; and demand punitive damages, pre and post-judgment interest, costs of this action, attorney's fees, and any such other and further legal and equitable relief as the Court may deem appropriate under the circumstances.

## JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.

Respectfully Submitted,

MOTLEY RICE LLC
Ronald L. Motley, Esq.
Joseph F. Rice, Esq.
Jodi Westbrook Flowers, Esq.
Donald Migliori, Esq.
Michael Elsner, Esq. (ME-8337)

Robert T. Haefele, Esq.
Justin Kaplan, Esq.
Elizabeth Smith, Esq.
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, South Carolina 29465
Telephone: (843) 216-900

- and –

HANLY CONROY BIERSTEIN &
SHERIDAN LLP

By: ______________________
Jayne Conroy, Esq. (JC-8611)
Paul J. Hanly, Jr., Esq. (PH-5486)
Andrea Bierstein, Esq. (AB-4618)
415 Madison Avenue
New York, NY 10017-1111
Telephone: (212) 401-7600

Attorneys for Plaintiffs

Dated: September 10, 2004